UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| JANE FIELY, ) | Case No. 3:13-cv-02005 |
| ) | |
| Plaintiff, ) | Judge Carr |
| ) | Mag. Judge Armstrong |
| v. ) | |
| ) | |
| ESSEX HEALTHCARE ) | |
| CORPORATION and ATRIUM ) | |
| LIVING CENTERS, INC., ) | |
| ) | |
| Defendants. ) | |

### DECLARATION OF ROBERT HUENEFELD

I, Robert Huenefeld, declare and state as follows:

1. I am over 18 years of age and make this Declaration voluntarily and of my own free will.

2. I have personal knowledge of and am competent to testify as to the matters in this declaration.

3. I am employed with Atrium Centers, Inc. ("Atrium") as a Regional Director of Human Resources. I have held this position since 2007.

4. As Regional Director of Human Resources, I advise and consult with the facilities located in my assigned region on various employee and labor issues, including, but not limited to issues relating to hiring, performance, conduct, policy and procedure violations, discipline, discharge, and labor relations.

1

5. As Regional Director of Human Resources, I also audit the facilities to make sure they are in compliance with all applicable policies, procedures, laws, and regulations.

6. As Regional Director of Human Resources, from time to time I investigate incidents or reports of employee misconduct.

7. St. Mary's Living Center ("St. Mary's") is one of the facilities for which I am responsible in my region.

8. In April 2013, I was asked to conduct an investigation into an incident at St. Mary's in which a State Tested Nursing Aide ("STNA") reported that the Director of Nursing ("DON"), Jane Fiely, grabbed and pushed her against a wall at work on the evening of April 19, 2013.

9. During my investigation into Fiely's reported conduct, I reviewed statements written by St. Mary's employees Jill Roby, Ciara McConn, Darla Micheal, Elizabeth Miller, and Deanna Kirkpatrick, reviewed Quellhorst's personnel file, and visited St. Mary's to conduct interviews of Quellhorst, Fiely, and other employees in person.

10. I concluded my investigation on April 24, 2013, and memorialized the findings of my investigation in a memorandum, which I sent to Susan Kreuser, Barry DeRossett, and Lorraine Fischio. A true and accurate copy of the email I sent them with this memorandum is attached as Defendant's Exhibit KK.

11. I did not consider Fiely's age during my investigative process.

Pursuant to 28 U.S.C. § 1746, I, Robert Huenefeld, state under the penalty of perjury that the foregoing is true and correct.

Executed on October 14, 2014, at Salem, Ohio.

/s/ Robert Huenefeld
Robert Huenefeld

US.55021157.01

| | |
|---|---|
| From: | Bob Huenefeld [bhuenefeld@atriumlivingcenters.com] |
| Sent: | 4/24/2013 6:22:36 PM |
| To: | Susan M. Kreuser [skreuser@atriumlivingcenters.com]; Barry Derossett [bderossett@atriumlivingcenters.com]; St. Marys Admin [61-admin@atriumlivingcenters.com] |
| Subject: | St Marys Livingt Center Investigation |
| Attachments: | Memo Regarding Employee Complaint at St. Marys .doc |

Good Afternoon,

Attached is a memo regarding the results of my investigation of an employee complaint at St. Marys Living Center.

If you have any questions or concerns please feel free to contact me immediately.

Bob

ATRIUM/FIELY 335

## MEMORANDUM

Re: Investigation of an Employee Complaint at St. Marys Care Center

On Tuesday, April 23rd, I visited St. Marys to investigate allegations that the Director of Nursing had grabbed an STNA while disciplining this employee. The employee is Kelsey Quellhorst, a twenty-two year old white female hired September 1, 2013. Kelsey has been disciplined only once and that was for failure to complete her Silverchair.

I contacted Kelsey through her mother and asked if we could sit down together and discuss this incident. She said she had school and would not have time to do that, but she agreed to discuss it over the telephone. Kelsey was still very emotional on this subject. She was very responsive to all of my questions.

On the second shift of Friday, April 19th, Kelsey was questioned by a resident and her daughter as to where her dinner tray was. She advised them that she did not know, but would find out. She went to the kitchen where she was advised that they had been told this resident would be eating in the dining room. But they said they would send a tray up immediately.

When Kelsey returned to the resident's room, she advised them as to what she had learned and that a tray was on its way. The daughter was upset because this change had not been discussed with her or her mother. She said she wanted to speak with Jane. She also complained that she had called Jane several times, and Jane had not returned her calls.

At that point, the daughter said her mother's meat loaf was cold and asked Kelsey if she would warm it up. Kelsey took the meatloaf to warm it up. On the way, she encountered Jane and advised her that the resident's daughter was upset and wanted to see her. She said that Jane became angry, but she continued on to get the entrée warmed up.

Kelsey said as she was returning to the resident's room with the food, Jane stopped her literally two steps short of the door and began yelling at her about what she had said about the food tray. She said Jane grabbed her shoulder and pushed her back into the wall behind her. Jayne criticized Kelsey for the way she had handled the situation. She said Jane continued telling her in a loud tone of voice that she did not understand what she was saying to her. She said that at the time Jane was shaking her other hand inches from her face. Kelsey said she wanted to get out of there before she started crying. She said as she turned to leave, Jane grabbed her shoulder again and continued making the points she

ATRIUM/FIELY 336

had already made. Kelsey said she took the reheated entrée into the resident's room.

The resident's daughter said to Kelsey "I can't believe she spoke to you like that" and offered to write a statement. Kelsey was very upset about being grabbed and the fact that Jane had invaded her personal space. Kelsey said she was nervous about returning to work at the facility. I assured her that this matter would be handled and she had no reason to be concerned about this issue going forward.

Jane had contacted Lorraine, and advised her that she was not feeling well and that she would be off ill through Wednesday. I called Jane and explained the reason for my visit and told her I would really like to meet with her face to face and that I was willing to do that anywhere that might be convenient for her. She said she was not up to doing that. I asked if she was able to discuss the situation over the phone. She said she was able to do that.

I asked her to explain what happened Friday evening. She said she was upset with Kelsey because she had told the resident and her daughter the reason that Dietary had not provided a tray initially was because it had been decided that she would be eating in the dining room. Jane said a resident has the right to eat wherever they want and that Kelsey should know that. Jane said she confronted Kelsey outside the resident's room about the issue. I asked about how loudly she was talking. She said she was speaking softly because she was in a public area. I asked if she thought the resident and her daughter overheard this discussion. She said she was sure they had not. I asked why she had not asked Kelsey to come to her office to deal with the issue. She said she thought it would only take a minute. I asked how long it took. She said only a few minutes. I asked her why, when the discussion started getting heated, she did not move it to her office. She said she did not know. I asked her if during the discussion she put her hands on Kelsey causing her to back into the wall. She said she doesn't think she ever touched Kelsey. I asked if at any point Kelsey started to walk away and she grabbed her shoulder. Again Jane said she did not remember touching Kelsey.

I asked her if we change a resident's dining routine would that not be at the direction of the Clinical Department as opposed to Dietary doing it. She said that that was true, but then insisted that a resident can eat wherever they want. Jane said that she then went to the kitchen to explain that to dietary personnel. I asked her if when she did that if she was speaking normally or very loudly. She said she was speaking quietly. I asked if someone in the Dining Room would have been able to hear her. She was sure they could not. We have a statement from an RN stating that she could hear the confrontation between Jane and the Dietary employees, and that while Jane was speaking loudly the Dietary employees never raised their voices in this situation.

Next I interviewed Jill Roby, an LPN who witnessed the confrontation between Kelsey and Jane. Jill said she came down the hall to secure approval on a pharmacy issue so she got there after the discussion had begun. She said that she also left to answer a call light and returned before the confrontation ended. Clearly this was an extended confrontation.

Jill said she never saw Jane grab Kelsey, but admitted that she was not there all of the time and that it may have happened before she got there or while she had to step away.

I asked Jill how loudly Jane was speaking to Kelsey, and she said she was speaking very loudly. I asked if the daughter could have heard this conversation. Jill said "Absolutely, she could not have missed it." Jill said this was very unprofessional and never should have occurred in the hallway. Jill was very upset and really did not want to get involved, but answered my questions completely.

Next I interviewed Ciara McConn, an STNA who witnessed Jane's confrontation with Kelsey. Her version of what happened was consistent with Kelsey's. She was emphatic that Jane put her hand on Kelsey's shoulder with enough force to push her into the wall. She emphasized that she was not saying Jane threw her into the wall; but she wanted me to understand that she was not just resting her hand on her shoulder while speaking to Kelsey. She definitely shoved her. I asked if she saw Kelsey attempt to leave and Jane grab her again. She said she had been called away to assist with a resident before the confrontation ended and did not see that. In answer to my question she said that Jane was speaking loudly. However, she seemed to place more emphasis on how Jane was talking to Kelsey. She said Jane was talking to her like she was "stupid". Ciara said she was embarrassed for Kelsey. This conversation was handled on a speaker phone with Barry Derossett present.

Based on my investigation, I believe that Jane grabbed Kelsey twice during this confrontation. I felt it was significant that Jane did not deny touching Kelsey, but rather said she did not remember doing so. She also handled this situation in an unprofessional manner, and could not explain why she had not handled this in her office. The yelling at employees has been an on-going problem and seems to have escalated. I believe discipline up to and including discharge is in order.

Robert W. Huenefeld
Regional Director Human Resources
April 24, 2013