UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF OHIO
                     WESTERN DIVISION

JANE FIELY,                  )
                             )
            Plaintiff,       )
                             )
      vs.                    ) Case No. 3:13-CV-2005
                             ) Judge Carr
ESSEX HEALTHCARE CORPORATION, )
et al.,                      )
                             )
            Defendants.      )

                      - - -


            Deposition of BARRY K. DEROSSETT, a

      Witness herein, called by the Plaintiff as if

      upon Cross Examination, pursuant to the Federal

      Rules of Civil Procedure, taken before me, Teri

      Genovese Mauro, Registered Professional

      Reporter, a Notary Public in and for the State

      of Ohio, at the offices of Marshall & Morrow,

      250 S. Civic Centre Drive, Columbus, Ohio, on

      Thursday, September 11, 2014, commencing at

      10:11 a.m.

                      - - -


          GENOVESE & RENO REPORTING SERVICE
            414 N. Erie Street, Suite 100
                 Toledo, Ohio  43624
                   (419) 249-2705

I N D E X

DEPOSITION OF BARRY K. DEROSSETT

Cross Examination                    Page

        By Mr. Franklin               3

                    - - -

Plaintiff's Exhibits

        27                          115

        28                          175

        29                          183

        30                          208

        31                          211

        32                          212

        33                          213

        34                          215

        35                          216

        36                          227

        37                          230

                    - - -

Objections

        By Mr. Garrison              47

        By Mr. Garrison             146

        By Mr. Garrison             164

        By Mr. Garrison             204

                    - - -

Page 3

```
 1    APPEARANCES:

 2      On behalf of the Plaintiff:

 3          WIDMAN & FRANKLIN, LLC
            405 Madison Avenue, Suite 1550
 4          Toledo, Ohio  43604  (419) 243-9005
            By:  JOHN D. FRANKLIN
 5          By:  KERA PAOFF

 6      On behalf of the Defendants:

 7          FAEGRE BAKER DANIELS
            300 N. Meridian Street, Suite 2700
 8          Indianapolis, Indiana  46204-1750  (317) 237-8239
            By:  BRIAN R. GARRISON

 9
    ALSO PRESENT:  Jane Fiely
10                 Susan Kreuser

11                      - - -

12                  BARRY K. DEROSSETT,

13    a Witness herein, called by the Plaintiff as if

14    upon Cross Examination, was by me first duly sworn,

15    hereinafter certified, testified and said as follows:

16                      - - -

17                  CROSS-EXAMINATION

18    BY MR. FRANKLIN:

19        Q    Please state and spell your full name for

20    the record, please.

21        A    It's Barry Kent DeRossett, B-A-R-R-Y,

22    K-E-N-T, D-E-R-O-S-S-E-T-T.

23        Q    Mr. DeRossett, what's your current

24    residential address?

25        A    116 Canewood Boulevard, C-A-N-E-wood
```

1    Boulevard, Georgetown, Kentucky.

2        Q    What's the zip code there?

3        A    40324.

4        Q    How long has that been your place of

5    residence?

6        A    About 11 years.

7        Q    Do you reside at that location with anyone

8    over the age of 17?

9        A    Yes.

10       Q    Who is that?

11       A    My wife, Vivian.

12       Q    Anyone else?

13       A    My son is 18, but he's in college.

14   Technically he still resides there.

15       Q    Okay.  What's his name?

16       A    Charlie.

17       Q    Anyone else?

18       A    No.

19       Q    Where does Charlie go to school?

20       A    Bellarmine University.

21       Q    Where's that located?

22       A    Louisville, Kentucky.

23       Q    Does he work for the company at all?

24       A    No.

25       Q    Okay.  Is your wife employed outside the

1   home?

2        A    Yes.

3        Q    Where is she employed?

4        A    She works for Trilogy Health Care in

5   Lexington, Kentucky.

6        Q    How long has she worked there?

7        A    Six to eight months.

8        Q    Where did she work before that?

9        A    She worked for -- it's called CCH.  It's a

10  hospital group in Lexington, Kentucky.

11       Q    What did she do there?

12       A    She's an RN.

13       Q    Is that what she did?

14       A    She still works there PRN.

15       Q    That's as needed?

16       A    Uh-huh.

17       Q    Yes?

18       A    Yes.

19       Q    Okay.  What does she currently do at the

20  Trinity [sic] Health Care?

21       A    She's a nurse.

22       Q    Okay.  And she practices as a nurse?

23       A    Yes.

24       Q    Have the two of you ever worked together

25  at the same place at the same time?

1       A     Yes.

2       Q     Okay.  When was that?

3       A     2003 or '4, I think.

4       Q     What company were the two of you working

5    for?

6       A     American Health Care I believe is the name

7    of it.  I'm not clear on the name.  I think it was

8    American Health Care, something like that.

9       Q     What position did you hold?

10      A     I was a director of nursing.

11      Q     What position did she hold?

12      A     She worked as a part-time activities

13   assistant.  Not sure if she was part time or that

14   was completely volunteer at the time, but --

15      Q     Was that company eventually bought by

16   Atrium?

17      A     I don't know.

18      Q     How long did you work there?

19      A     Not sure.

20      Q     Well, more than five years?

21      A     No.

22      Q     Less than five years?

23      A     Yes.

24      Q     More than two years?

25      A     Somewhere around there.  I'm not sure if

1   it was more or less.

2        Q    How long did she work there?

3        A    Probably less than six months.

4        Q    Were you her supervisor?

5        A    No.

6        Q    Did she have ultimate reporting

7   responsibility to you?

8        A    No.

9        Q    How long have the two of you been married?

10       A    Twenty-one years.

11       Q    Have the two of you ever worked together

12  at the same time for any other company?

13       A    No.

14       Q    Has she ever worked for Atrium?

15       A    No.

16       Q    Has she ever worked for any company that

17  Atrium bought?

18       A    No, not to my knowledge.

19       Q    What's the current address of your place

20  of employment?

21       A    2780 Airport Drive, Suite 400, Columbus,

22  Ohio.

23       Q    What's the zip code?

24       A    37 -- let's see, no.  I have to think

25  about it.  43219, I believe.

1      Q    How long has that been your business

2  address?

3      A    Since May of 2014.

4      Q    What was your business address before May

5  of 2014?

6      A    Two Easton Oval.  I can't recall the suite

7  number.  I believe it was 400, and same -- Columbus,

8  Ohio, same zip.

9      Q    Was it for the same company?

10     A    Yes.

11     Q    How long was that your business address?

12     A    Not sure.

13     Q    More than five years?

14     A    Yes.

15     Q    Do you report to the Columbus office each

16  day?

17     A    No.

18     Q    What's your current birth date -- I mean,

19  what's your birth date?  I'm sorry.

20     A    3/13/69.

21     Q    Well, I know that you've sat through at

22  least one deposition, so you may recall how it

23  works, and I'm sure you've been told how it works,

24  but just quickly, we have a court reporter present

25  so you'll need to keep your answers audible.  I may

1    see that you're nodding your head or shrugging your

2    shoulders, but the court reporter can't take that

3    down.

4            In general conversation, people anticipate

5    questions and start to answer the question before

6    it's completed.  Even though you may correctly

7    anticipate my question, I ask that you allow me to

8    finish my question and I'll allow you to finish your

9    answer.  That way when we read the transcript,

10   there's not the beginning of my question, beginning

11   of your answer, the end of my question, the end of

12   your answer.

13           If I ask you a question that you don't

14   understand, I want you to tell me that you don't

15   understand my question and what part of my question

16   you don't understand.  I'll then try to rephrase my

17   question and put it in a form that you will

18   understand.

19           There may be times that you give an answer

20   that I don't understand.  That doesn't mean that I

21   don't believe your answer.  You just may be using

22   some phraseology in the workplace I'm unfamiliar

23   with and I may have to ask some follow-up questions

24   so that I completely understand your answer.

25           As long as there's not a question pending,

Page 10

1    if you'd like to take a break, just indicate out

2    loud on the record you'd like to take a break and

3    we'll take one.  Okay?

4         A    Okay.

5         Q    Did you review any documents in

6    preparation for your deposition today?

7         A    Yes.

8         Q    What documents did you review?

9         A    I reviewed my statement from April.

10        Q    April of what year?

11        A    The 23rd of 2013.

12        Q    Okay.  Anything else?

13        A    Reviewed the FMLA policy and procedure for

14   the company.

15        Q    Anything else?

16        A    I reviewed the investigation of the

17   incident that took place on the 19th of April, 2013.

18        Q    When you say you reviewed the

19   investigation, what documents did you review?

20        A    Bob Huenefeld's summary.

21        Q    Did you review any other documents related

22   to the investigation?

23        A    I looked through my black notebook.

24        Q    When you looked through your black

25   notebook, what were you looking for?

1     A     Anything related to St. Marys and Jane.

2     Q     Anything related to St. Marys and what?

3     A     And Jane and the incident that occurred in

4  April.

5     Q     Well, I mean are you telling me you looked

6  for documents that had all three of those criteria

7  on the document?  That it had St. Marys, that it had

8  Jane, and it had the incident in April?

9     A     No.

10     Q     Okay.  So if a document was related to

11  St. Marys, you looked at that; if a document was

12  related to Jane, you looked at that; if a document

13  was related to the incident in April of 2013, you

14  looked at that?

15     A     Yes.

16     Q     Is that correct?  How many pages did you

17  look at then where the criteria was St. Marys, Jane,

18  or the incident in April?

19     A     It's in general order of time.  I looked

20  back at when I started using that notebook.

21     Q     Okay.

22     A     And kind of thumbed to -- through until I

23  got to April, that time frame, and looked at a few

24  pages before and after the time frame.

25     Q     Okay.  Well, before that April time

Page 12

1    period, there weren't any documents related to

2    St. Marys?

3         A    No, there was.

4         Q    There was?

5         A    (Witness nodded.)

6         Q    Did you turn those over to counsel?

7         A    Those didn't have anything to do with --

8         Q    Did you turn those over to counsel?

9         A    No.

10        Q    That's my question.

11        A    No.

12        Q    How many documents would you say included

13   some reference to St. Marys that you didn't turn

14   over to counsel from the black notebook?

15        A    I couldn't give you a number exactly.

16        Q    More than 10?

17        A    Yes.

18        Q    Okay.  More than 20?

19        A    Yes.

20        Q    More than 30?

21        A    Yes.

22        Q    More than 40?

23        A    I don't know.

24        Q    Okay.  But you know it's more than 30?

25        A    Possibly, yes.

1       Q    Correct?  Okay.  Did you look at documents

2  that reference Jane but not in the April time

3  period?

4       A    I looked for her name anywhere around that

5  time frame.  After that, I didn't look.

6       Q    Well, did you look for her name at all in

7  the black book?

8       A    Yes.

9       Q    Okay.  So did you find her name anywhere

10  other than in the April 2013 time period?

11       A    I'm not sure.

12       Q    Okay.  Well, did you produce to counsel

13  all documents that had her name on it?

14       A    I'm not sure.

15       Q    Okay.  What do you mean you're not sure?

16  What does that mean?  I don't get it.

17       A    Her name may be in on an earlier page

18  about something.  If it was, I didn't think it was

19  relevant to this.

20       Q    Okay.  Do you think that you're the

21  individual that's to determine whether a document's

22  relevant or not?

23       A    Yes.

24       Q    Oh, you are?

25       A    (Witness nodded.)

Page 14

1       Q     Did you go to law school?

2       A     No.

3       Q     Okay.  Where is the black notebook now?

4       A     It's in my briefcase.

5       Q     Okay.  What time period does the black

6   notebook cover?

7       A     I couldn't tell you the exact dates.

8       Q     Okay.  Well, I'm not asking for the exact

9   date.  Give me the year or years that it covers.

10      A     Late or fall of 2012 through summer of

11   2014.

12      Q     Are you currently still using that black

13   notebook?

14      A     I still use it as reference.  It's full,

15   so I'm using a different one.

16      Q     Well, do you keep the full notebooks for

17   reference?

18      A     I do that one, yes.

19      Q     Well, are there other black notebooks that

20   you've kept over time?

21      A     No.  That was the first one I started

22   using.  I have others that are empty at this point.

23      Q     Okay.  Well, I mean let's throw away the

24   color.  Have you used notebooks in the past?

25      A     Note pads like that you have in front of

Page 15

1   you, yes.

2        Q    Okay.  Did you keep the information that

3   was on the note pads you're describing?  You're

4   pointing to the legal pad?

5        A    Yes.

6        Q    Okay.  Did you go through those legal pads

7   to see if there was any information related to Jane?

8        A    Yes.

9        Q    Okay.  Was there?

10       A    I don't remember.

11       Q    Okay.  Well, I'm not -- you understand I'm

12  not asking if you believe the information was

13  relevant.  I'm just asking if there was anything in

14  the notebooks related to Jane?

15       A    No.

16       Q    You're saying no?  Is that your answer or

17  you don't remember?

18       A    Yeah, I don't remember if there was

19  anything specific to Jane.

20       Q    Okay.  When you're saying that you don't

21  remember, you're saying that there could have been,

22  you just don't have present day recollection?

23       A    Yeah.

24       Q    Is that fair?  How many of the notebooks

25  did you go through that weren't black notebooks that

1   were more like a legal pad?

2        A     Two or three.

3        Q     How far did those notebooks go back?

4        A     Maybe 2012.

5        Q     Did you keep any type of notebook before

6   2012 related to your employment with Atrium?

7        A     No.

8        Q     The notebooks that you just described that

9   look like a legal pad, were they yellow?  Were they

10  white?  Were they some different color?

11       A     Different.

12       Q     Okay.  What color were they?

13       A     Yellow, white.

14       Q     Yellow?

15       A     Uh-huh.

16       Q     Were they the longer version of a legal

17  pad --

18       A     Some were.

19       Q     -- or were they the same size as the one

20  I'm holding up?

21       A     Some were longer, some were that size.

22       Q     Well, you said there were only two.  So

23  when you say some are longer, some are shorter, are

24  you saying one was the size I'm holding up and one

25  was a larger size?

1      A     Of the -- you're talking about the two to

2  three that --

3      Q     Okay.  Two to three.

4      A     Is that what you're talking about?

5      Q     Sure.

6      A     I'm not sure.  I'll have to look at them

7  again.  I've got a bunch of different sizes so --

8      Q     Well, did you pass those notebooks on to

9  legal counsel?

10     A     No.

11     Q     If I want to write a letter and ask for

12 those documents, do you call them anything in

13 particular or could I just say the legal pads that

14 you -- that Barry maintained from 2012 forward?

15     A     Yeah, I don't know what I would -- my

16 notes is what I would refer to them as.

17     Q     Where do you keep those?

18     A     At home.

19     Q     Do you have a home office?

20     A     Yeah.

21     Q     Are they in a file cabinet?

22     A     They're in a box.

23     Q     A box.  And the black notebook you have

24 with you?

25     A     Yes.

Page 18

1      Q     Okay.  Why do you have that one with you?

2      A     For historical data from this year and the

3  previous year that I may need to refer to.

4      Q     So you just carry that one all the time?

5      A     Well, until I get past a certain point in

6  time that I don't feel it's necessary.

7      Q     How many pages of notes did you give to

8  legal counsel?

9      A     I think one, one or two.

10     Q     Did you give those to Susan and she gave

11  those, to your knowledge, to legal counsel or did

12  you physically hand them over?

13     A     I scanned them to Susan.

14     Q     So you sent them to Susan?

15     A     Yeah.

16     Q     Then was it Susan that asked you to look

17  for the documents?

18     A     We were discussing it, if there's

19  anything -- any other documentation, and I just so

20  happened to have the book in front of me and I

21  opened it up and it went back to the time frame, so

22  I looked.

23     Q     Was this you and Susan in a conversation

24  or was legal counsel, also --

25     A     It was legal counsel.

1      Q    Okay.  Did Susan send you an e-mail asking

2   you to look through the documents?

3      A    I don't remember.

4      Q    You don't intend on destroying any

5   documents like within the next four or five months,

6   do you?  Meaning, the notebooks that you have at

7   home?

8      A    No.

9      Q    By chance, are you moving from your home

10  to another home?

11     A    Not that I'm aware of.

12     Q    Okay.  At the Columbus address, do you

13  actually have an office?

14     A    No.

15     Q    So when you gave me the address and the

16  suite number, you don't actually have an office at

17  that location?

18     A    No.

19     Q    What other documents did you review in

20  preparation for your deposition?

21     A    I believe that's it.

22     Q    Did you read in whole or part Jane's

23  deposition?

24     A    No.

25     Q    No.  As far as getting the documents that

Page 20

1    you just told me about that you reviewed in

2    preparation for your deposition, were these

3    documents that you chose to look at or were these

4    documents someone told you to look at?

5         A    I looked -- I had looked at -- are you

6    saying in preparation for the deposition?

7         Q    Yes.

8         A    Yeah, I reviewed them with counsel.

9         Q    Okay.  So you didn't pick the documents to

10   look at?

11        A    No.

12        Q    Okay.  Were there any documents that you

13   asked to look at to prepare your recollection for

14   today's deposition that you were told you could not

15   look at?

16        A    No.

17        Q    Are there any documents that you're aware

18   now that you sit here that could help you refresh

19   your recollection of the events, let's say, in 2012,

20   2013, related to Jane's employment?

21        A    You say are there other?

22        Q    Yeah.  Is there something you can think of

23   now, if I'd only seen that I'd feel much more

24   comfortable testifying?

25        A    No.

```
1        Q    Okay.  You recall coming to Toledo, Ohio,

2   and sitting through Jane's deposition?

3        A    Yes.

4        Q    Was there anything that Jane said in her

5   deposition that sticks out in your mind that you

6   don't agree with?

7        A    Not that I remember.

8        Q    Okay.  Well, you took notes during Jane's

9   deposition, if I recall?

10       A    (Witness nodded.)

11       Q    Would you agree with that?

12       A    Yes.

13       Q    What happened to those notes?

14       A    They're in my briefcase.

15       Q    Did you look at those notes in preparation

16  for your deposition today?

17       A    No.

18       Q    Just so I understand, there's nothing that

19  sticks out in your mind that you disagree with that

20  Jane said in her deposition in Toledo, Ohio?

21       A    Not that I recall right now.

22       Q    If you recall anything that Jane said in

23  her deposition that you don't agree with, will you

24  tell me during this deposition?

25       A    Yes.
```

1        Q     Did you -- have you read anyone's

2   deposition in whole or part?

3        A     No.

4        Q     Have you been told what anyone said in

5   their deposition?

6        A     No.

7        Q     No?  When was the last time you talked to

8   Susan about this case?

9        A     Monday or Tuesday.

10       Q     Okay.  Did you talk to Susan with or

11  without counsel present?

12       A     Without.

13       Q     Okay.  Well, what did you and Susan talk

14  about Monday or Tuesday related to this case?

15       A     The time and location of the deposition

16  today.

17       Q     Anything else?

18       A     Not that I recall.

19       Q     Well, are you telling me that there may

20  have been things that you talked about that you

21  don't remember talking about last Monday or Tuesday

22  with Susan?

23       A     No.  We talked about the deposition, the

24  time, location.  I believe that was it.

25       Q     How long did the conversation last?

 1      A    Specifically about this case?

 2      Q    No.  How long did your conversation with

 3  Susan last on Monday or Tuesday?

 4      A    We had two different conversations.

 5  Probably five, ten minutes.

 6      Q    Each?

 7      A    Yes.

 8      Q    Okay.  In the first conversation, did you

 9  talk about this case?

10      A    Yes.

11      Q    Okay.  What did the two of you talk about?

12      A    The time and the location of the

13  deposition.

14      Q    In the second conversation, did you talk

15  about this case?

16      A    No.

17      Q    Have you talked to Bob about the case?

18      A    No.

19      Q    Have you talked to Lorraine about the

20  case?

21      A    No.

22      Q    Have you talked to Bob since Jane's

23  termination about the case?

24      A    Other than seeing him here for his

25  deposition?

1      Q    Sure.

2      A    No.

3      Q    Guys haven't talked --

4      A    No.

5      Q    -- about the case at all?

6      A    Not that I recall.

7      Q    Talk about Jane at all?

8      A    Not that I recall.

9      Q    When you were here for his deposition, did

10 you talk to him about the case outside the presence

11 of counsel?

12     A    No.

13     Q    Did you talk to Susan about the case other

14 than what you've already told me about, this

15 five-minute conversation you allegedly had?

16     A    No.

17     Q    Are there any e-mails that you sent about

18 Jane after she leaves Atrium?

19     A    I recall one, yes.

20     Q    Okay.  Was it only one?

21     A    I don't know.

22     Q    Was it the e-mail that you testified about

23 already or was this something different?  Did you

24 review the e-mail in preparation for your deposition

25 today?

1      A    Yes.

2      Q    Okay.  What did that e-mail entail?

3      A    Susan had sent out -- every week she sends

4  out an open positions report or HR sends that out,

5  and when it came out, I noticed that I had -- didn't

6  have St. Marys' DON position on there, so I sent her

7  an e-mail saying sorry I didn't get this to you

8  before the report, but Jane had resigned effective

9  the 25th.

10     Q    Do you have a copy of Jane's resignation?

11     A    No.

12     Q    Did she resign in writing?

13     A    No.

14     Q    Did she say words to you to the effect of

15  I resign?

16     A    Yes.

17     Q    Did you tape that conversation?

18     A    No.

19     Q    Did you take notes during the

20  conversation?

21     A    Not that I remember.

22     Q    Well, if you had taken notes during the

23  conversation, would you have produced those notes to

24  counsel?

25     A    Yes.

1       Q    You wouldn't have destroyed those notes,

2  correct?

3       A    Not intentionally.

4       Q    Well, do you accidently destroy documents?

5       A    I have documents from time to time that I

6  purge my files.  If it was included in that, I may

7  have inadvertently done it.

8       Q    What do you mean you have documents that

9  you -- when you purge your file?  I don't get that.

10      A    Well, when I get a big volume, I go back

11  to the oldest ones and try to get rid of those so --

12      Q    Well, I mean, are you telling me that

13  during the conversation with Jane, you may have been

14  typing notes?

15      A    No.

16      Q    Okay.  I'm talking about the handwritten

17  notes.  Okay?

18      A    Okay.

19      Q    So those wouldn't be notes that you

20  accidently purged from your file, would they?

21      A    Possibly, yes.

22      Q    Okay.  So they could be -- you purge hard

23  copies?

24      A    Well, like the note pad you have in front

25  of you.

1     Q    Right.

2     A    I may take that, pull it apart and throw

3  it in the shredder.

4     Q    Okay.  Did you do that in this case?

5     A    I don't know.

6     Q    Well, does the company have a document

7  retention policy that you're aware of?

8     A    Yes.

9     Q    Okay.  What does that retention policy

10  say?

11     A    It's related to medical records.

12     Q    Only medical records?

13     A    As far as I know, yes.

14     Q    Anyone ever talk to you about litigation

15  hold in this case?

16     A    When the -- I think when the suit was

17  filed, I was asked to review and find anything

18  pertinent.

19     Q    Well, did anyone talk to you about the

20  word litigation file?

21     A    I don't recall.

22     Q    Okay.  Well, if someone asked you or told

23  you that there was a litigation hold in this case,

24  would it come typically verbally or would there be

25  an e-mail that was sent out?

1        A    Could be either.

2        Q    Well, the thing that you told me, and I

3   don't think it was responsive to my question, but

4   you had said that you were told to look for

5   documents related.  Who told you that?

6        A    Susan.

7        Q    Okay.  Was that in an e-mail or was that

8   verbally or over the phone or --

9        A    Verbally.

10       Q    Okay.  Was it over the phone or

11   personally?

12       A    Over the phone.

13       Q    Was anyone else on the phone call to your

14   knowledge?

15       A    No.

16       Q    Okay.  When did that phone call take

17   place?

18       A    I don't remember.

19       Q    Was it to your home phone or to your cell

20   phone?

21       A    To my cell phone.

22       Q    Okay.  Is your cell phone provided by the

23   company?

24       A    No.

25       Q    Do you get reimbursed for the cell phone?

1       A    Yes.

2       Q    By the company?

3       A    Yes.

4       Q    Okay.  Did you have the same cell phone

5  provider in April of 2013 that you have today?

6       A    Yes.

7       Q    Who is that?

8       A    AT&T.

9       Q    Do you have the same phone number?

10      A    Yes.

11              MR. FRANKLIN:  Okay.  I want to go

12           off the record.

13              (Whereupon, a discussion was held off

14           the record.)

15              MR. FRANKLIN:  Let's go back on the

16           record.

17  BY MR. FRANKLIN:

18      Q    Is that the same cell phone number that

19  you had in April of 2013?

20      A    Yes.

21      Q    How do you get reimbursed for your phone?

22      A    It's based on a percentage of business

23  calls.

24      Q    Okay.  Well, who decides the percentage?

25  Do you send it in to someone at corporate, your

Page 30

1   bill, and then they decide or do you decide?

2       A    I usually send it in.  It's reimbursed at

3   a hundred bucks.

4       Q    But you send in your entire bill?

5       A    Yes.

6       Q    Okay.  Do you redact?  Do you know what

7   redact means?

8       A    No.

9       Q    Do you blacken out anything on your bill

10  before you send it in or do you just send in the

11  entire bill?

12      A    I used to do that.  I stopped doing that

13  at some point.  I just copy the bill and send it.

14      Q    Okay.  When did you stop blackening out

15  phone bills?

16      A    I don't remember.

17      Q    Was it before April of 2003 [sic] or after

18  April of 2003 [sic]?

19      A    I don't remember.

20      Q    Does your cell phone allow someone to send

21  you an instant message?

22      A    Yes.

23      Q    Using what application?

24      A    Text messages.

25      Q    Yes.  What application are you using?

Page 31

1    It's not just called text message.  Is it through

2    AOL?  Is it through some other provider?  How are

3    you sending text messages back and forth?  What --

4         A    Through AT&T is all I know.  It's a text

5    message.  I don't know how else to answer.

6         Q    Just a little icon on the phone that says

7    text message or an abbreviation for text message?

8         A    Yeah.

9         Q    Can you receive e-mails on your phone?

10        A    Yes.

11        Q    Do you have a company e-mail account?

12        A    Yes.

13        Q    Okay.  Is it the same company e-mail

14   account you had in March and April of 2013?

15        A    Yes.

16             MR. FRANKLIN:  Okay.  Let's go off

17        the record again.

18             (Whereupon, a discussion was held off

19        the record.)

20             MR. FRANKLIN:  Let's go back on the

21        record.

22   BY MR. FRANKLIN:

23        Q    And you've indicated you've had that

24   e-mail address since March or April 2013, correct?

25        A    Yes.

1      Q    Do you have any other e-mail account that

2   you use for work?

3      A    No.

4      Q    Okay.  How is your e-mail disseminated at

5   work, if you know?  Is there like a directory or

6   only certain people know or does everybody have

7   their name and then Atrium Living Centers?

8      A    Other employees have the same set up for

9   their employee address or e-mail address, their

10  first initial, last name, at Atrium Living Centers

11  dot com.

12     Q    Does somebody set that up for you?  In

13  other words, does the IT department?

14     A    Yes.

15     Q    Who in the IT department do you typically

16  interact with?

17     A    Derrick Williams.

18     Q    Anyone else?

19     A    Brian Woolard.

20     Q    Okay.  Anyone else?

21     A    That's the two main guys I deal with.

22     Q    Okay.  Does the company provide you a

23  desktop computer?

24     A    Yes.

25     Q    Do they provide you a laptop computer?

1       A     Oh, I'm sorry.  They provide me a laptop,

2   not a desktop.

3       Q     Okay.  Then let's start over.  Does the

4   company provide you a desktop computer?

5       A     No, no desktop.

6       Q     Does the company provide you a laptop

7   computer?

8       A     Yes.

9       Q     Do you have the same laptop today as you

10  had in March and April of 2013?

11      A     I believe so, yes.

12      Q     What do you mean I believe so?

13      A     I've had two or three over the course of

14  my employment with Atrium Centers, and when they

15  were changed out for different reasons, but

16  I believe that the one that I have right now I had

17  in April of 2013.

18      Q     Well, see that, again, leads me to believe

19  that you may not have had the same one.  You said

20  you think.  The last time you had your computer,

21  let's say, swapped out, what was it for?  Why did

22  you have to have it swapped out?

23      A     I believe that was a new operating system,

24  updates, software updates.

25      Q     Okay.  So instead of just putting the new

1    software on your computer, they just gave you a new

2    computer with the software?

3         A    Yes.

4         Q    Did they put the information from your old

5    laptop into your new laptop, if you know?

6         A    Yes.

7         Q    Okay.  What type of laptop do you have

8    currently?

9         A    HP.

10        Q    Okay.  But can you be more specific?

11        A    I believe that stands for Hewlett Packard.

12   That's all.

13        Q    Okay.  Thank you.  But if you want to buy

14   an identical laptop, you would just go into the

15   store and say I want an HP or would you -- is it a

16   particular series or model number?

17        A    I would have to look at the computer to

18   tell you that.

19        Q    Okay.  Have you ever done that?

20        A    No.

21        Q    Okay.  So you don't know beyond it being

22   an HP?

23        A    Yes.

24        Q    Do you know how much memory capacity it

25   has?

Page 35

1         A     No.

2         Q     Do you know what type of processor it

3    uses?

4         A     I believe it's an Intel processer.

5         Q     Do you typically delete things off of your

6    laptop?  And I'm going to be maybe more specific.

7    E-mails?

8         A     Yes.

9         Q     What causes you to delete an e-mail?

10        A     The volume of e-mails.

11        Q     How do you know that?  Does the computer

12   say you're running out of memory capacity or what?

13        A     No.  It -- one of the first -- one of the

14   first laptops I had --

15        Q     Let's just talk about this last laptop.

16        A     Okay.

17        Q     The one you currently have.

18        A     I try to keep -- old e-mails, I just try

19   to get rid of them because in the past it has slowed

20   down the processing, so I needed to remove some of

21   that so I could work on what I needed to currently.

22        Q     But the computer is not sending you any

23   type of message?  You're just saying it's time to

24   purge my e-mails?

25        A     Other than the number it shows with the

1    e-mails, yes.

2         Q    Okay.  I understand that, but the computer

3    isn't telling you to do this?

4         A    No.

5         Q    Okay.  So what number do you look at that

6    causes you to purge your e-mails?  Is it when it

7    gets to 1,000, 500, 10,000?  What is it?

8         A    There's no specific number.

9         Q    Okay.  Well, what's the highest it's ever

10   been with your current laptop that you've noticed?

11        A    1700.

12        Q    Okay.

13        A    Unread e-mails.

14        Q    Those are unread?

15        A    Yes.

16        Q    Okay.  Well, do you also purge read

17   e-mails?  In other words --

18        A    Yes.

19        Q    -- you read them, do you purge them right

20   then?

21        A    No.

22        Q    Okay.  Is there a particular number that

23   your read e-mails hit before you decide to delete?

24        A    No.

25        Q    Okay.  What's the highest you've ever seen

1    your unread e-mails being?

2         A    I don't know what that number would be.

3         Q    Have you ever deleted read e-mails?

4         A    Yes.

5         Q    Okay.  How many times since you've had

6    your current computer?

7         A    I would estimate a half dozen.

8         Q    Okay.  How many times have you deleted

9    read e-mails since April of 2013?

10        A    I'd have to estimate four or five.

11        Q    How many times have you deleted unread

12   e-mails since 2013?

13        A    Half a dozen times.

14        Q    Okay.  Do you do anything to delete your

15   e-mails other than push a delete button and it puts

16   it in a trash bin?

17        A    Not sure what you're asking me.

18        Q    Well, just take me through the process.

19   You see the number 1700.  Time to purge.  What do

20   you do?  Just take me through it.

21        A    I go through the e-mails by sender and we

22   get daily e-mails that have statistics that change

23   daily.  If I have the most current e-mail in that,

24   then I may go back and delete weeks' or months'

25   worth.

1      Q     Okay.  But what buttons do you press to

2  delete?

3      A     I'll find the address.

4      Q     Okay.

5      A     I'll start with the first one and

6  determine how far down on the list I'm going to go.

7  I hit -- I believe it's shift and go down to the

8  bottom and click on that and it groups those

9  together and then I hit delete.

10     Q     Okay.  That's all you do?

11     A     Yes.

12     Q     You don't have any software on your

13  laptop, like shredder that actually shreds the

14  document?  You just hit the delete button?

15     A     That's my understanding.

16     Q     Okay.  Do you have an understanding that

17  that actually permanently deletes that e-mail?

18     A     I don't know.

19     Q     And it's no longer on your computer

20  anywhere?

21     A     My understanding it is not on my computer,

22  but I believe it's on our hard drive or server.

23     Q     Okay.  On your server?

24     A     Server, yes.

25     Q     I mean, would you describe yourself as

Page 39

1    being computer literate, middle of the road, or I

2    don't know anything, I rely on IT?

3        A    Probably middle of the road.

4        Q    Okay.  Now, when you create a document,

5    let's say that you're going to type a memo to Susan,

6    do you use a particular program?  Like do you use

7    Word?

8        A    We use a word processer.

9        Q    No.  Do you use the software Word?  In

10   other words, you put it in Word?  Have you ever

11   heard that?

12       A    I believe that's the one we use, but I'm

13   not a hundred percent sure.

14       Q    Okay.  Well, take us through what you

15   would do then if you're going to send an e-mail to

16   Susan.  Not an e-mail, send a document to Susan.

17   You're going to create a document and send it, a

18   letter.

19       A    If I'm sending a letter?

20       Q    Uh-huh.

21       A    I would use a template that was generated

22   from the corporate office.

23       Q    Okay.

24       A    I just use that because it has the

25   letterhead on it.

Page 40

1        Q     Okay.

2        A     And I'll get on that and type it in and

3   save it.

4        Q     Okay.  What if you're not sending it to

5   corporate.  You don't have a template, but you're

6   just going to create a document to send.  What do

7   you do?

8        A     I usually find an old Word document that

9   I've used before.

10       Q     Okay.

11       A     And delete what's on there and type on

12   that.

13       Q     Just type over an old document?

14       A     Uh-huh.

15       Q     Yes?

16       A     Yes.

17       Q     I mean, do you know how to pull up the --

18   a Word program?  Do you know kind of what the icon

19   looks like?

20       A     Yes.

21       Q     Okay.  Describe what it looks like.

22       A     I think it has a white background with a

23   blue W in it.

24       Q     Okay.  Now, do you know how to click on

25   there and bring up the Word program?

Page 41

1        A     Yes.

2        Q     Okay.  Do you ever do that, just bring up

3   the Word program and not type over a document, but

4   create an original document?

5        A     Yes.

6        Q     Okay.  Do you then save that document?

7   You hit save?

8        A     Yes.

9        Q     Correct?  Then what happens to the

10  document?  Do you drag it into a folder or do you do

11  something else with the document?

12       A     It depends on what the document is.  If

13  it's pertaining to a certain building, I may do

14  that.

15       Q     May do what?

16       A     May put it in a file.

17       Q     Okay.

18       A     If it's a general form, I may just keep it

19  on my desktop.

20       Q     Okay.  So something could go in your

21  desktop, something could go in your file?

22       A     Yes.

23       Q     Okay.  If you were creating a document

24  about a situation that occurred, let's say, at

25  St. Marys and you're going to send that document to,

1   let's say, Bob, have you sent enough documents to

2   Bob that you just pull up an old Bob document and it

3   has his address on it already or you start from

4   scratch?

5       A    I would start with the template with the

6   Atrium logo most of the time.

7       Q    Okay.  And then do you send things to --

8   let's say you're sending something to Bob, do you

9   send it to his corporate e-mail address?

10      A    Yes.

11      Q    Okay.  Do you have an e-mail address for

12  Bob other than the corporate e-mail address?

13      A    No.

14      Q    Okay.  Do you have an e-mail address for

15  Susan other than the corporate e-mail address?

16      A    No.

17      Q    Do you receive any e-mails work related to

18  an address that's not the address you testified

19  about that was your work address?

20      A    No.

21      Q    Okay.  So if someone from a company wants

22  to send you an e-mail and have the e-mail not go

23  through the company server, they don't have any type

24  of private e-mail that you -- e-mail address that

25  you maintain that they could send it to?

Page 43

1        A     For business purposes?

2        Q     For any purpose.

3        A     I have a personal e-mail account that I

4   use for my travel.

5        Q     Okay.

6        A     Through Delta, Hertz, hotels, that kind of

7   thing.

8        Q     What do you mean you use for your travels?

9        A     Well, that -- that e-mail address is on

10  file as well as my business address with that

11  company.

12       Q     But who has that e-mail address?  Let's

13  say that Susan wants to contact you, can she contact

14  you through that other e-mail address?

15       A     No.

16       Q     Okay.  So I'm asking like if you have a

17  G-mail account or an AOL account or any other type

18  of account that some employee could send you a

19  document to -- that some employee could use to send

20  you a document?

21       A     That they could use or that they have

22  used?

23       Q     That they could use.  Let's start with

24  could.

25       A     Yeah, I have a personal e-mail account.

1       Q    Okay.  Does everyone at work have that

2   personal e-mail?

3       A    No.

4       Q    Okay.  Who at work has your personal

5   e-mail account?

6       A    Nobody that I'm aware of.

7       Q    Okay.  Not Susan?  Not Bob?

8       A    No.

9       Q    Okay.  Has any employee ever contacted you

10   through that personal e-mail account?

11       A    No.

12       Q    Okay.  Has any -- and I should have

13   included, has any ex-employee ever contacted you

14   through the personal e-mail account?

15       A    Not that I'm aware of.

16       Q    Okay.  Do you check that account weekly,

17   daily?

18       A    Daily.

19       Q    Okay.  Other than today, have you given

20   testimony under oath?

21       A    Not that I remember.

22       Q    Okay.  You've never testified, let's say,

23   in an unemployment hearing or an OCRC hearing or any

24   type of administrative hearing, unemployment?

25       A    No.

1        Q     Okay.  Have you ever been a plaintiff in a

2   lawsuit?  You've sued somebody?

3        A     No, not personally.

4        Q     What do you mean not personally?  What

5   does that mean?

6        A     Well, I don't know if this is relevant,

7   but like if -- if there's a major issue with

8   somebody like iTunes or big company like that, there

9   was litigation or there was some reimbursement, I

10   think -- I think it was iTunes or Netflix or

11   somebody recently had to settle and if you had

12   purchased anything through them, you were included

13   in that.

14        Q     Okay.

15        A     That stuff, I've, you know, gotten e-mails

16   on that or letters on that before, but I have never

17   personally --

18        Q     Sued someone --

19        A     Right.

20        Q     -- or something, some entity?

21        A     Correct.

22        Q     What about a defendant, have you ever been

23   sued by someone?

24        A     No.

25        Q     Have you ever been named in a lawsuit

Page 46

1    related to your employment?

2        A    This one.

3        Q    You think that you were personally named

4    in this one?

5        A    I think so.

6        Q    So you think you're a defendant in this

7    lawsuit?

8        A    Yes.

9        Q    So have you seen a copy of the complaint?

10       A    I have.

11       Q    Okay.  And on your copy, it showed that

12   you were being sued personally?

13       A    I think so.

14       Q    Okay.  Has anyone ever told you that

15   you're a defendant in the lawsuit?

16       A    I don't remember.

17       Q    Just answer yes or no in case it's an

18   attorney.  I don't want to know.  But has anyone

19   ever told you that you were a defendant in a

20   lawsuit?

21       A    No.

22       Q    How long have you been under the

23   assumption that you're a defendant in this lawsuit?

24       A    I believe since the -- since this started.

25   I don't know the time frame.  Fall of last year.

1      Q    And if no one's told you that you were a

2   defendant in a lawsuit, what did you look at or who

3   did you talk to to come to an understanding that you

4   are a defendant in the lawsuit?

5      A    Just through this process, I assume that

6   I'm part of the lawsuit.

7      Q    Okay.  But when you say part of the

8   lawsuit, do you think you're being sued in the

9   lawsuit?  You're a defendant?

10      A    I'm not being sued.

11      Q    Okay.  So then you're not a defendant?

12           MR. GARRISON:  I'm going to object.

13           He testified he didn't go to law school.

14           He may not know the understanding of being

15           a defendant, being named, being a party.

16           MR. FRANKLIN:  Well, he'd have an

17           understanding, and I don't want to talk on

18           the record.

19           (Whereupon, Susan Kreuser came into

20           the room.)

21      Q    It's your understanding, 'cause I think

22   you've now switched, it's not your understanding

23   that you're a defendant or it is your understanding

24   that you're a defendant in this case?

25      A    I understand that I'm named in the

1    lawsuit.

2         Q    Okay.  But being named, do you understand

3    being named in a lawsuit, seeing your name somewhere

4    in the paragraph may not necessarily mean that you

5    are actually a defendant in the lawsuit?

6         A    No.

7         Q    Okay.  You never asked anyone?  You've

8    just gone under the assumption that you're a

9    defendant?

10        A    Well, I know I was named.  I don't know if

11   I would term it as a defendant or I've been named in

12   the lawsuit.

13        Q    Have you sought counsel other than your

14   current counsel?

15        A    No.

16        Q    You think at the end of this case if

17   Jane's successful, you're going to have to pay

18   damages --

19        A    No.

20        Q    -- out of your pocket?

21        A    No.

22        Q    Other than today, have you ever been a

23   witness in a lawsuit?

24        A    No.

25        Q    Since you've been 18, tell me all the

Page 49

1   counties and states you've lived in.

2       A    I was born in Pike County, Kentucky.

3       Q    Okay.  Well, let's -- did you live there

4   when you were 18?

5       A    I lived in Floyd County, Kentucky.

6       Q    Okay.  So when did you start living in

7   Floyd County, Kentucky?

8       A    From birth.

9       Q    I thought you said you lived in Pike

10  County.

11      A    No.  I said I was born in Pike County.

12      Q    Okay.  Well, that would be at birth,

13  right?

14      A    Uh-huh.

15      Q    So since you've been 18, you've lived in

16  Floyd County, Kentucky?

17      A    Since I was 18?

18      Q    Yeah.

19      A    I lived there when I was 18.

20      Q    Okay.

21      A    But --

22      Q    Where else have you lived after Floyd?

23      A    Fayette County, Kentucky.

24      Q    Okay.

25      A    Madison County, Kentucky.

Page 50

1       Q     Okay.

2       A     Cochise County, Arizona.  I'm not sure of

3  the county, but Washington D.C.  San Antonio, Texas.

4       Q     What county is San Antonio in?

5       A     I believe Bexar.  It's spelled B-H-E-A-R,

6  something like that.  Korea.  That's all I can tell

7  you about.  County, I don't know the county or the

8  southern peninsula of Korea.

9       Q     You lived there?

10      A     Yes.

11      Q     What time period?

12      A     199 -- I think it was 1994 through 1995 or

13  '6.

14      Q     What were you doing there?

15      A     I was in the army.

16      Q     Anywhere else?

17      A     Fort Campbell, Kentucky.  Actually lived

18  in Montgomery County, Tennessee.

19      Q     Anywhere else?

20      A     I think that brings us to present,

21  Georgetown, Kentucky.

22      Q     What county is that in?

23      A     Scott.

24      Q     Have you ever been arrested for a

25  misdemeanor or felony?

Page 51

```
 1        A     Yes.

 2        Q     Okay.  Which?  Misdemeanor or felony or

 3   both?

 4        A     Misdemeanor.

 5        Q     When were you arrested for a misdemeanor?

 6        A     '90 or '91, somewhere in that

 7   neighborhood.

 8        Q     What was the nature of the misdemeanor?

 9        A     Public intoxication.

10        Q     Is that what you were arrested for or is

11   that what you eventually pled to?

12        A     That's what I was arrested for.

13        Q     Okay.  Where at?

14        A     Fayette County, Kentucky.

15        Q     Did you plead in that case?

16        A     Yes.

17        Q     What was your -- what did you plead to?

18        A     Guilty.

19        Q     Okay.  You didn't plead no contest?

20        A     I don't remember.  I paid the fine.

21        Q     Did you have legal counsel?

22        A     No.

23        Q     You had to pay a fine?

24        A     I believe so.

25        Q     Anything else that you had to do because
```

Page 52

1   you were arrested for a public intoxication?

2       A    Not that I recall.

3       Q    No probation?

4       A    No.

5       Q    Any other times you've been arrested for a

6   misdemeanor or felony?

7       A    No.

8       Q    When you were in the military, did you

9   receive any type of discipline?

10      A    Yes.

11      Q    Okay.  Tell me about that.  What

12  discipline did you receive?

13      A    I couldn't tell you specifics.

14      Q    What does that mean?  You don't remember?

15      A    Well, in the military, you have -- you

16  know, you're disciplined.  You could be disciplined

17  regularly.  The formality of it, I guess, would be

18  the difference.

19      Q    Well, did you receive any formal

20  discipline?

21      A    Not that I remember.

22      Q    You would say you received informal

23  discipline?

24      A    Sure.

25      Q    When did you go into military service?

1       A    August of 1992.

2       Q    What branch?

3       A    Army.

4       Q    What rank were you when you went in?

5       A    PFC.

6       Q    So you didn't go in as an officer?

7       A    No.

8       Q    How long were you in the military?

9       A    Until August of 1999.

10      Q    Was that -- is any part of this from '92

11   to '99 in the reserves?

12      A    No.

13      Q    Okay.  It was all military service?

14      A    Yes.

15      Q    Okay.  What was the highest rank you

16   obtained?

17      A    Sergeant.

18      Q    Any other title to the sergeant, like

19   gunnery sergeant or anything like that?

20      A    No.

21      Q    Had you ever been lowered in rank?

22      A    No.

23      Q    Did you come out with some type of skill?

24      A    Yes.

25      Q    What was that?

```
 1        A     When I left the army, I was a licensed
 2   particular nurse.
 3        Q     Anything else?
 4        A     No.
 5        Q     Okay.  Did you have to attend any type of
 6   schooling to be in -- you were an LPN?
 7        A     Yes.
 8        Q     Did you have to go through any type of
 9   schooling?
10        A     Yes.  I attended St. Phillips College in
11   San Antonio, Texas, for the certification of
12   licensed practical nurse.
13        Q     How long were you at St. Phillips College?
14        A     Approximately a year.
15        Q     During the time that you went to
16   St. Phillips College, did you work anywhere other
17   than trying to obtain your degree?
18        A     Well, I was still under the army.
19        Q     Can you not work somewhere else if you're
20   in the army?
21        A     Yes, you can, but during that time, I had
22   no other employment besides the army.
23        Q     Okay.  Did you go to school full time?
24        A     Yes.
25        Q     What time period did you attend
```

1   St. Phillips?  '92 to '94?  '94 to '96?  '94 to '95?

2   What was it?

3        A    '96 to '97.

4        Q    What caused you to want to be a licensed

5   practical nurse?

6        A    I was a medic initially in the army and

7   the opportunity came for me to go to -- because I

8   had been to college, opportunity came for me to gain

9   that skill as an LPN.

10       Q    Okay.  Well, do you have a high school

11  degree?

12       A    Yes.

13       Q    What year?

14       A    '87.

15       Q    Take me through your formal post high

16  school education.

17       A    I attended Prestonsburg Community College.

18       Q    What is that, Prestonsburg?

19       A    Prestonsburg.

20       Q    Where is that located?

21       A    Floyd County, Kentucky.

22       Q    Is that a college or a university?

23       A    It's a college.

24       Q    Okay.  Did you obtain any type of degree?

25       A    No.

1        Q     What time period did you attend that

2   college?

3        A     '87 through '88.

4        Q     What was your course of study?

5        A     Biology.

6        Q     Did you leave school after '88?

7        A     Yes.

8        Q     Were you going full time or part time?

9        A     Full time.

10        Q     Were you working anywhere?

11        A     No.  I left that school and went to the

12   University of Kentucky in Lexington, Kentucky.

13        Q     Why did you do that?

14        A     That school I was attending was a two-year

15   college and I had gained most of the credits I could

16   from there, so I moved on to where I could continue

17   full-time hours at the University of Kentucky.

18        Q     So is it your testimony that from '87 to

19   '88 you got all of the credit hours that you could

20   at that school before transferring out?

21        A     Not all, no.

22        Q     But that was the reason that you're giving

23   us for going to the University of Kentucky?

24        A     That was one of the reasons, yeah.

25        Q     What were the other reasons?

Page 57

```
 1        A    To go to a bigger school, bigger
 2   university.
 3        Q    Anything else?
 4        A    No.
 5        Q    When did you start at University of
 6   Kentucky?
 7        A    The fall of '88.
 8        Q    Full time or part time?
 9        A    Full time.
10        Q    What was your course of study?
11        A    Biology.
12        Q    Did you obtain a degree?
13        A    No.
14        Q    Okay.  How long did you go to University
15   of Kentucky that time?
16        A    I believe three semesters.
17        Q    How many credit hours did you get?
18        A    I don't know.
19        Q    Did you go full time each time?
20        A    Yes.
21        Q    Did you go fall semester, spring semester,
22   summer semester, or did you go back in the fall of
23   '89?
24        A    Back in the fall of '89.
25        Q    Okay.  Why did you leave school?
```

1       A     I moved to Madison County, Kentucky, to

2    attend Eastern Kentucky University.

3       Q     Eastern Kentucky?

4       A     Uh-huh.

5       Q     Why did you do that?  Why do you leave

6    University of Kentucky?

7       A     For a girl.

8       Q     Your grades allowed you to stay at the

9    University of Kentucky?

10      A     Yes.

11      Q     What -- when do you enroll in Eastern

12   Kentucky?

13      A     To my recollection, it was the following

14   semester.

15      Q     Okay.  So that would have been the winter

16   of '90?

17      A     Yes.  It may have been the fall of '90.  I

18   may have sat out that semester.  I don't recall

19   specifically.

20      Q     Okay.  Did you go to Eastern Kentucky full

21   time or part time?

22      A     Full time.

23      Q     What time period did you go to Eastern?

24      A     Something between '90, either spring or

25   fall of '90 until spring of '92.  There may have

1  been a semester there that I didn't go during that

2  period of time.

3      Q    Okay.  But when you did go, you went full

4  time?

5      A    Yes.

6      Q    Did you obtain a degree?

7      A    No.

8      Q    What was your course of study?

9      A    Biology.

10      Q    So you start your biology degree in '88

11  and by '92 you still hadn't received your degree?

12      A    No.

13      Q    Okay.  Did you go to school anywhere after

14  that, after Eastern Kentucky?

15      A    Immediate -- well, I joined the army that

16  year, '92.  That was after the first --

17      Q    Why did you join the army?

18      A    It was after Desert Storm.

19      Q    Okay.  But why did you join the army?

20      A    I felt a duty to serve my country.

21      Q    So you enlisted in the army?

22      A    Yes.

23      Q    Where did you enlist at?

24      A    Madison County, Kentucky, Richmond.

25      Q    Did you go through basic training?

Page 60

1      A      Yes.

2      Q      Where at?

3      A      Fort Leonard Wood, Missouri.

4      Q      Anywhere else?

5      A      I went to Advanced Individual Training at

6  San Antonio, Texas.

7      Q      What was the advanced training?  What does

8  that mean?

9      A      To become a medic.

10     Q      Did you ever serve in the theater of

11  Desert Storm?

12     A      No.

13     Q      How long were you in San Antonio?

14     A      Approximately three months.

15     Q      Did you come out of San Antonio with some

16  type of certification or licensure?

17     A      I was -- in the military, they call it an

18  MOS, a military occupational specialty.  A 91 Bravo,

19  which is an indicator for medic.

20     Q      Was that the time that you attended

21  St. Phillips?

22     A      No.

23     Q      Okay.  So after San Antonio, where are you

24  stationed?

25     A      Cochise County, Arizona.

1       Q    For how long?

2       A    I believe I was there from 1993 until

3   1996.  '95 or '96, I'm not sure of the year.

4       Q    What were you doing in Arizona?

5       A    I was working as a medic in the hospital

6   at Fort Huachuca.

7       Q    Is that a military hospital?

8       A    Yes.

9       Q    What does a medic do in a hospital?

10      A    A medic can do several different things in

11  a hospital, but what I did, I was an orderly in the

12  emergency room for the first part of my duty at Fort

13  Huachuca.

14      Q    Okay.  So you go from an orderly to what?

15      A    I was promoted to corporal, went to

16  Washington D.C. for allergy and immunology training.

17  Went back to Fort Huachuca and ran the allergy and

18  immunization clinic in the hospital.

19      Q    How long were you in D.C.?

20      A    Two months.

21      Q    And when you say you were running the

22  allergy unit, what does that mean?

23      A    I was the NCO in charge of the clinic.

24      Q    What is in charge of the clinic?  I mean,

25  I don't know what you were doing.  You were an

1  orderly and then what were you doing?  What were

2  your duties?

3      A    Made sure all the ordering was taking

4  place, all the staffing was covered.  I was the

5  leader of the clinic.

6      Q    Well, did you provide any type of medical

7  service?  I mean, it sounds like you were holding an

8  administrative position?

9      A    Yes, I worked on the -- I provided

10  immunizations as well as vaccinations, allergy,

11  allergy shots, allergy tests, that type of thing.

12      Q    Were you working under a particular

13  physician?

14      A    Yes.

15      Q    Who was that?

16      A    Dr. Wagley.

17      Q    How long did you hold that position?

18      A    Little less than two years.

19      Q    Than what happens?

20      A    I went to Korea.

21      Q    Did you want to go?  I mean, did you

22  request to be transferred to Korea or were you just

23  told you were going?

24      A    I was told I was going.

25      Q    Okay.  To do what?

Page 63

1       A    Whatever they needed me to do when I got

2  there.

3       Q    Okay.  It wasn't related to your

4  allergy --

5       A    Not necessarily.

6       Q    Okay.

7       A    I was going to be a medic in Korea.

8       Q    I take it South Korea?

9       A    Yes.

10      Q    Where were you stationed in Korea?

11      A    Camp Casey.

12      Q    So what did you do when you were there?

13      A    I was a medic for an armor unit.

14      Q    For an armor unit?

15      A    Yes.

16      Q    What does a medic for an armor unit in

17 South Korea do?

18      A    Oversee the health and welfare of the

19 soldiers in my company.

20      Q    Do you work under the supervision of a

21 physician?

22      A    Physician's assistant.

23      Q    Was there a physician that was available?

24      A    Yeah.

25      Q    Okay.  Who was that?

1    A    I don't know.

2    Q    So you worked for a PA?

3    A    Yes.

4    Q    And the PA worked for the physician?

5    A    Yes.

6    Q    How long did you do that?

7    A    I was in Korea for 14 months.

8    Q    Is that what you did for 14 months?

9    A    Yes.

10    Q    During the time that you were there, was

11   that a theater of operation for any type of combat?

12    A    Yes.

13    Q    Okay.  Was there some combat that was

14   going on?

15    A    There were skirmishes.

16    Q    Were you close enough to the DMZ to

17   provide medical care during these skirmishes?

18    A    Yes.

19    Q    Tell us, like, the -- a time -- I want an

20   example of the time that you provided some type of

21   medical care during a skirmish.

22    A    I don't know that I provided any specific

23   medical care as a result of a skirmish.

24    Q    Why did you leave Korea?

25    A    Typically you serve 12 months there and

1    they send you back to the states.

2         Q    Okay.  Well, you served 14 months.

3         A    Yes.  Because I had a -- when I came down

4    on orders to change and come back to the states, I

5    was given an opportunity to go to Fort Sam Houston

6    and attend St. Phillips College.  I was selected to

7    go to the college to obtain a new military

8    occupational specialty of 91 Charlie, which is the

9    civilian equivalent of a licensed practical nurse.

10        Q    So when you come out of the military, are

11   you recognized as an LPN?

12        A    Yes.

13        Q    You don't have to go through any testing?

14        A    You do that while you're in and you get

15   your state license.

16        Q    Do you have to pick the state?

17        A    It's usually where you are, so yes.

18        Q    So what state were you in at that point?

19        A    Texas.  And I'm not --

20        Q    Are you licensed in Texas?

21        A    I was.

22        Q    Okay.  What year did you obtain your LPN

23   in Texas?

24        A    '97.

25        Q    Okay.  When did it expire?

Page 66

1      A    I don't recall.

2      Q    How long after you became the civilian

3  equivalent of an LPN did you leave the military?

4      A    Approximately two years.  '99 is when I

5  left the military.

6      Q    When do you leave Texas, St. Phillips?

7      A    July of 2000 -- or I'm sorry, July of

8  1997.

9      Q    Where do you go from there?

10     A    Forth Campbell, Kentucky.

11     Q    What were you -- what were your

12 responsibilities there?

13     A    I worked in labor and delivery at the

14 hospital on post at Fort Campbell.

15     Q    What did you do there?

16     A    I was responsible for performing Apgar

17 tests on newborn babies, overseeing the care of

18 mothers that had just delivered.

19     Q    What do you mean overseeing the care of

20 mothers that had just delivered?

21     A    Well, right after you have the baby,

22 there's a period of four to six hours that certain

23 care has to be given.  I was part of the staff that

24 provided that.

25     Q    Were you stationed anywhere else after

Page 67

1   leaving Texas other than Fort Campbell?

2       A    No.

3       Q    Okay.  Why did you leave the military?

4       A    I retired.

5       Q    Why did you want to retire?

6       A    It was a medical retirement.

7       Q    So did you go out on a medical disability?

8       A    Yes.

9       Q    So if I looked at your military records,

10  it would show that you were discharged for a medical

11  disability?

12      A    Yes.

13      Q    Is that considered an honorable discharge?

14      A    Yes.

15      Q    When you go out on the medical disability,

16  are you eligible to be in the reserves?

17      A    No.

18      Q    When you go off on a medical disability,

19  does the disability have to be related to your

20  military service?

21      A    I don't know.

22      Q    Was yours?

23      A    Yes.

24      Q    During the time that you're in the

25  military, do you oversee any employees?

Page 68

1       A    Yes.

2       Q    Is it just because of your rank that you

3  oversee them or are certain employees actually

4  reporting to you?

5       A    It's both.

6       Q    Okay.  Well, tell me about the employees

7  that actually report to you.  What position were you

8  holding and how many employees reported to you?

9       A    Well, I was -- I was promoted to corporal

10  based on, I guess, leadership qualities that I had

11  shown to my superiors.

12      Q    Well, I mean, why are you saying that?  I

13  mean, is there a document I can look at that says

14  you were promoted based on your leadership qualities

15  or is that just what's in your head as to why you

16  were promoted?

17      A    There was a document saying that.

18      Q    Okay.  Who signed that document?

19      A    Levy Freeman, staff sergeant.

20      Q    So a staff sergeant could promote you to

21  corporal?

22      A    It was his recommendation.

23      Q    Okay.  But who actually promoted you?

24      A    It would be the command sergeant, Major

25  Holcomb.

1      Q     Okay.  So when you become a corporal, is

2  that the first time that you have direct reports, so

3  to speak?

4      A     Formally, yes.

5      Q     Okay.  How many?

6      A     Two.

7      Q     What are their titles?

8      A     Licensed practical nurses.

9      Q     Same as you?

10     A     I wasn't a licensed practical nurse then.

11     Q     Okay.  So even though you weren't a

12 licensed practical nurse, you had supervisory

13 authority over the LPNs?

14     A     Yes.

15     Q     When it came to what they were doing

16 administratively or did you have responsibilities

17 even for what they were doing as part of a patient's

18 medical care?

19     A     Both.

20     Q     How long did you have the responsibility

21 for the two direct reports?

22     A     Less than two years.

23     Q     Any other times you had direct

24 responsibilities for supervising employees when

25 you're in the military?

1        A     While I was in Korea.

2        Q     What employees were you supervising?

3        A     I had one report to me.

4        Q     What was the report's title?

5        A     Driver.

6        Q     Okay.  Any other reports at any time while

7     you're in the military?

8        A     There's multiple times where we have

9     platoon and squad leaders, so as a squad leader, I

10    would be responsible for anywhere from five to eight

11    soldiers at any given time.

12       Q     Is that for a fixed period of time, like

13    four weeks?

14       A     No.

15       Q     For how long?

16       A     Until you change duty stations or change

17    positions or things need to be changed.  There's no

18    definite schedule on that.

19       Q     Okay.  Any other times you claim you had

20    direct reports in the military?

21       A     No.

22       Q     Did you obtain any accommodations or

23    awards of distinction?

24       A     Yes.

25       Q     What were those?

1          A     I don't recall.

2          Q     Do you still treat for this disability?

3          A     Yes.

4          Q     Do you have to attend the VA clinic?

5          A     Yes.

6          Q     How often?

7          A     Every two years.

8          Q     Is that how often you treat for this

9     disability, every two years?

10         A     No.

11         Q     How often do you treat for your

12    disability?

13         A     As necessary.

14         Q     How often is that typically?

15         A     Monthly.

16         Q     Does the treatment require you to see a

17    physician?

18         A     Sometimes.

19         Q     Which VA -- do you see a VA hospital every

20    two years?

21         A     No.

22         Q     Where do you -- what VA clinic or location

23    do you go to every two years?

24         A     The Newberg Clinic in Louisville,

25    Kentucky.

1      Q    When was the last time you went there?

2      A    I don't recall.

3      Q    After you get out of the military in --

4   I believe you said '99?

5      A    Yes.

6      Q    -- where were you next employed?

7      A    I worked as -- worked as an LPN through

8   nursing agencies out of Nashville, Tennessee.

9      Q    Is that where you were living?

10     A    No.

11     Q    Where were you living?

12     A    Clarksville, Tennessee.

13            MR. GARRISON:  John, before you go

14            down this road, I'd like to take a quick

15            break.

16            MR. FRANKLIN:  Okay.  Let's take one.

17            (Whereupon, a recess was taken at

18            11:39 a.m. and resumed at 11:48 a.m.)

19   BY MR. FRANKLIN:

20     Q    When you got out of the military, you

21   indicated that you were working through various

22   nursing agencies in Nashville, correct?

23     A    Yes.

24     Q    Why out of Nashville?  Is that the closest

25   big city?

1        A     Yes.   That's where the offices were.

2        Q     Were you -- did you attempt to get jobs at

3    hospitals?

4        A     No.

5        Q     Why not?

6        A     I was enrolled in school to complete my

7    bachelor's in -- bachelor's of nursing.

8        Q     What school were you enrolled in?

9        A     Austin Peay State University in

10   Clarksville, Tennessee.

11       Q     When did you enroll in Austin Peay?

12       A     In the year 2000.

13       Q     Did you take some time off between the

14   time you leave the military and the time you start

15   working through agencies?

16       A     No.

17       Q     Why is it that you couldn't work at a

18   hospital and also attend school?

19       A     I did.

20       Q     Okay.  Well, I asked you if you were

21   looking for jobs in a hospital and you said no, and

22   I asked why, and you said because you were going to

23   school?

24       A     I worked for a nursing agency.

25       Q     Okay.  But --

Page 74

1      A    So I worked in hospitals, I worked in

2  nursing homes, both.  So I wasn't looking for a job

3  at a hospital because I was working for the nursing

4  agencies.

5      Q    Do you remember which agencies?

6      A    I don't recall the name specifically, but

7  there was two or three.

8      Q    Did your license from the military

9  transfer?

10     A    I applied for a license in the state of

11  Tennessee.

12     Q    Did you receive that license?

13     A    Yes.

14     Q    When did you apply for the license in

15  Tennessee?

16     A    I'm not sure on the date.

17     Q    Was it before or after you retired from

18  the military?

19     A    Before.

20     Q    Going back to the nursing agency, do you

21  remember who you worked for primarily during that

22  time period?

23     A    I think I recall her name as being Beth,

24  but I couldn't tell you her last name.

25     Q    Okay.  But do you remember the name of the

1  agency?

2      A    No.

3      Q    Were you working full time or part time?

4      A    I was working a mixture.  Some weeks would

5  be part-time hours; some weeks would be full-time

6  hours.

7      Q    Did you obtain your degree from Austin

8  Peay?

9      A    Yes.

10     Q    What was it a degree in?

11     A    Bachelor of science in nursing.

12     Q    Did you ever obtain your biology degree?

13     A    No.

14     Q    What's -- what was the difference, if

15  there was, when you obtained your BS in nursing as

16  compared to when you were an LPN?  What does it

17  allow you to do?

18     A    What's the difference between those two?

19     Q    Yeah.

20     A    Besides the education, it's more the

21  theory.  There's a lot more theory involved in being

22  a registered nurse versus an LPN.

23     Q    But what were you physically allowed to

24  do?  Was your scope of practice different than an

25  LPN?

1       A     Yes.

2       Q     How's it different?

3       A     At the time, you could do more invasive

4   procedures, like you could hang blood, hang

5   antibiotics, IVs, that type of thing.  That's one of

6   the major differences.

7       Q     That you could hang blood and start an IV?

8       A     Yes.  And provide IV therapy.

9       Q     So how long are you working through the

10  agencies?

11      A     I worked through the agencies as an LPN

12  while I went to school at Austin Peay and finished

13  my degree.

14      Q     Okay.  So when do you finish your degree?

15      A     2002.

16      Q     So then what happens after you obtain your

17  degree by way of employment?

18      A     I move to Scott County, Kentucky.

19      Q     Why?

20      A     I had family in the area and put us back

21  closer to our relatives.

22      Q     It was Scott County?

23      A     Uh-huh.

24      Q     Did you have a job lined up or did you

25  just move there?

```
 1        A     Yeah, I had -- started working at a place

 2   called Darby Square.

 3        Q     Darby Square?

 4        A     Uh-huh.

 5        Q     Doing what?

 6        A     I started as an evening supervisor.

 7        Q     What is Darby Square?  Was it a facility?

 8        A     Nursing Home.

 9        Q     Skilled?

10        A     Yes.

11        Q     What did the evening supervisor do at

12   Darby Square during that time?  What were your job

13   duties?

14        A     Oversaw patient care being provided by

15   nurses and nurse aides.

16        Q     Were you able to supervise RNs?

17        A     Yes.

18        Q     Were you able to supervise the DON?

19        A     No.

20        Q     Okay.  How many employees were you

21   supervising on the evening shift at Darby Square?

22        A     I don't remember any exact number.

23        Q     Well, give me a range.  Hundreds?

24        A     Six to ten.

25        Q     By title, what were they?  Who were you
```

1    supervising?  Two of --

2         A    RNs.

3         Q    Two RNs?

4         A    I don't know the number, but RNs --

5         Q    Okay.

6         A    -- LPNs and nurse aides, and then any

7    ancillary staff that may be in the building, so that

8    could make the number 10 to 15.

9         Q    When you say you're working evening shift,

10   what hours does evening shift start at Darby Square?

11        A    Typically 3:00 to 11:00.

12        Q    What was the census?  How many individuals

13   were you caring for patient wise?

14        A    Eighty to a hundred.

15        Q    The beds were always full, eighty to a

16   hundred?  What was the capacity?

17        A    I believe the capacity was 104 beds, and

18   we typically ran somewhere around 80.

19        Q    Who was your supervisor?

20        A    Janice Ward.

21        Q    What was her title?

22        A    Director of nursing.

23        Q    How long did you work there as the evening

24   supervisor?

25        A    I don't recall.

1     Q    Was there various audits when you worked

2  there?

3     A    Yes.

4     Q    How often were audits done when you worked

5  there, Darby Square?

6     A    Audits by whom?

7     Q    You told me the answer was yes.  Who were

8  you considering?

9     A    Annual surveys done by the state of

10 Kentucky on an annual basis.

11    Q    And how many of those --

12    A    I don't --

13    Q    During how many of those were you the

14 evening supervisor?

15    A    I don't recall.

16    Q    Okay.  How long did you work there?

17    A    Two to three years, I believe.

18    Q    Were you married at that point?

19    A    Yes.

20    Q    Where was your wife working?

21    A    I believe she was working at Merle Norman

22 Cosmetics.

23    Q    Where did you next work after Darby

24 Square?

25    A    I became the leader of a home health

Page 80

1    agency, an office in Georgetown, Kentucky.

2         Q    During the time that you work at Darby

3    Square, do you receive any discipline?

4         A    None that I recall.

5         Q    Were you evaluated?

6         A    Yes.

7         Q    Annually?

8         A    Yes.

9         Q    Okay.  Were those done by Janice Ward?

10        A    I don't recall.

11        Q    So after Darby Square, you become the

12   leader of a home what?

13        A    Home health agency.

14        Q    Why did you leave Darby?

15        A    While I was at Darby, I worked in multiple

16   positions.

17        Q    What does that mean?

18        A    I worked my way from supervisor up until

19   when I left, I was the director of nursing.

20        Q    Okay.

21        A    And the company changed ownership.

22        Q    Meaning Darby changed ownership?

23        A    Yeah.

24        Q    Okay.

25        A    And I got an opportunity to take a

1    position in Georgetown, Kentucky, which was five

2    minutes from where I was living.

3         Q    What is the -- I mean, why did you tell me

4    that there was an ownership change at Darby?  Did

5    that affect whether you wanted to work there or not?

6         A    I thought they were getting ready to take

7    the facility somewhere else, physically move that

8    building, and I met a gentleman who ran the home

9    health agency who made me an offer to come there and

10   work and be closer to home.

11        Q    Okay.  Well, did Darby Square move?  I

12   mean, did the new owners move the facility?

13        A    Yes.  They changed.  They closed the

14   facility.  I can't remember exactly when, but it

15   eventually happened.

16        Q    Was it years after you left?

17        A    No.

18        Q    Did you resign from Darby?

19        A    Yes.

20        Q    And you put it in writing?

21        A    Yes.

22        Q    What reason did you give?

23        A    To pursue an opportunity closer to home.

24        Q    How far away was Darby from your home?

25        A    About 40 minutes, 35.

1       Q    You thought that was a long way to drive?

2       A    No.

3       Q    Forty minutes?

4       A    No.

5       Q    I mean, you drive a lot longer than that

6 now, don't you?

7       A    Yeah.

8       Q    Okay.  So what position -- you said you

9 were the leader of a home health agency; is that

10 your title, leader?

11      A    I was the office manager.

12      Q    So if I looked at a business card, it

13 would say office manager, not leader, right?

14      A    I'm not sure.

15      Q    Okay.  So your title may have been leader?

16      A    No.  It wasn't leader.

17      Q    Okay.  Was it office manager?

18      A    I'm not sure.

19      Q    Was it anything?  I mean, did you have a

20 title.

21      A    Yes.

22      Q    Who did you answer to?  Who was your boss?

23      A    Brenda Dile.

24      Q    Brenda Dile?

25      A    Uh-huh.

1      Q    What was her title?

2      A    She was the director of clinical services

3   for the home health agency.

4      Q    Who did she answer to?

5      A    The board of directors, I imagine.

6      Q    Okay.  Who was the person that you met

7   that told you about this opportunity?

8      A    Ron Evans.

9      Q    Did he work for this home health agency?

10     A    I believe he was the president of the

11  company.

12     Q    Okay.  So the president of the company

13  tells you about the opening?

14     A    Yes.

15     Q    Okay.  Did you interview with him?

16     A    Yes.

17     Q    Okay.  What were your job duties as either

18  the office manager or the leader or whatever your

19  title was?

20     A    I oversaw the clinical documentation of

21  the visiting nurses and RNs.

22     Q    What was the name of the home health

23  agency?

24     A    Family Home Health.

25     Q    Family Home Health?

1      A      Yes.

2      Q      What state?

3      A      Kentucky.

4      Q      Okay.  What did -- what did you do?  You

5  oversaw the paperwork?

6      A      I was the office manager, so that was part

7  of my duties.

8      Q      Okay.  To oversee the paperwork of what?

9      A      I don't recall the name of the form

10  specifically used for home health, but there's

11  certain forms that are used for home health that the

12  visiting staff have to fill out and complete and

13  there's regulations similar to long-term care that

14  have to be met, so I was -- I would always review

15  their visits.

16      Q      I mean, were you -- are you telling us

17  it's a company where like some home health aide goes

18  to someone's home and provides some type of service?

19      A      Sure.

20      Q      Is it medical service or is it like

21  washing their dishes?

22      A      Both.

23      Q      Okay.  So I mean, did they have to have an

24  LPN license to do this?

25      A      To make skilled visits, yes.

1      Q     Okay.  So there's skilled visits and

2  unskilled visits?

3      A     Yes.

4      Q     Okay.  And sometimes there's skilled

5  visits doing unskilled work, correct?

6      A     Yes.

7      Q     I mean, I could be an LPN, I go in there

8  and perform some type of skilled service, and then I

9  wash the person's dishes?

10     A     Yes.

11     Q     Okay.  And they have to fill out paperwork

12  for each of those visits, correct?

13     A     Yes.

14     Q     And then that paperwork comes to you for

15  review?

16     A     Yes.

17     Q     Okay.  How many home health aides were you

18  responsible for reviewing their documentation?

19     A     It's a fluctuation between four and six.

20     Q     Four to six.  And did they do multiple

21  visits?  In other words, they'd go to home one,

22  spend a few hours, go to home two, spend a few

23  hours?  Is that how it worked or you spend all your

24  time at one place?

25     A     Multiple visits.

Page 86

1    Q    Okay.  And is this -- are you billing

2  Medicare and Medicaid?

3    A    Yes.

4    Q    So when you say that you're reviewing the

5  documentation, you're reviewing the coding for

6  Medicare and Medicaid?

7    A    I don't recall that I reviewed coding for

8  Medicare and Medicaid.

9    Q    Well, who did the coding?

10    A    We had a home office that took care of the

11  billing and coding.

12    Q    Where is home office located?

13    A    It was in Taylor County, Kentucky.

14    Q    What were you reviewing then if you

15  weren't reviewing coding?

16    A    I put together their schedule and I signed

17  off on their time sheets.  I supervised their work.

18  I would make -- periodically I would make visits and

19  accompany them to see what they're doing.  I looked

20  at their documentation.

21    Q    Yeah, that was my question.  If you're not

22  reviewing the coding on the documentation, what are

23  you reviewing?

24    A    There's more than just coding on the

25  documentation.  So there's --

1      Q    Well, do you get paid for things other

2  than what's coded and sent in to Medicare and

3  Medicaid billing?

4      A    I don't recall the specifics to that.

5      Q    I mean, were any of these people private

6  insured?

7      A    Yes.

8      Q    Okay.  I mean, were there different

9  regulations for private-insured individuals as

10  opposed to those that were being cared for and then

11  paid by Medicare and Medicaid?

12      A    I don't recall.

13      Q    Okay.  I'm just trying to figure out what

14  you were doing by way of reviewing documentation.

15  What were you looking at if you weren't the coder?

16      A    I reviewed what they did while they were

17  there, how long they were there, any notes that they

18  may have written as a narrative.

19      Q    Okay.  For what purpose?  Just to make

20  sure they were where they said they were going to

21  be?

22      A    Well, there's a quality assurance

23  application from that as well as making sure there's

24  an accountability.

25      Q    Okay.  I mean, were you responsible for

1  QC?

2      A    Sure.

3      Q    I mean, did you have anything to do with

4  marketing?  Are you going out and soliciting --

5      A    Yes.

6      Q    -- individuals?  How did you do that?

7      A    I got to play a lot of golf.

8      Q    Okay.  Who were you golfing with?  I mean,

9  who -- what was your target audience?

10     A    Referral sources.

11     Q    Give us an example of some referral

12  sources.  Not by name, but by category.

13     A    Discharge planners, physicians, office

14  managers of clinics.

15     Q    Were you paid some type of salary plus

16  commission?

17     A    No.

18     Q    Okay.  Was it a strictly salary position?

19     A    It was a salary position, but I did have a

20  bonus structure.

21     Q    Okay.  Did you actually supervise any

22  employees?

23     A    Yes.

24     Q    Were you supervising the home health aide

25  worker?

1       A       Yes.

2       Q       Anyone else?

3       A       RNs, LPNs, office staff.

4       Q       How many RNs were you supervising?

5       A       It fluctuated between four to six nurses.

6       Q       How many LPNs?

7       A       Two to three LPNs.

8       Q       And then workers, I think you told me four

9   to six?

10      A       There was about four or five other folks

11  that worked in the office.  One was a biller, one

12  was a supply clerk, receptionist, those type

13  positions.

14      Q       Did you supervise any employees that

15  provided unskilled duties at the homes?

16      A       Yes.  There would be -- if there needed to

17  be a supply delivery by maybe the clerk or the

18  receptionist or even myself, we would make those

19  deliveries.

20      Q       Okay.  Was this a seven-day-a-week

21  operation?

22      A       Yes.

23      Q       Was it 24 hours a day?

24      A       Yes.

25      Q       Okay.  Did you have to hold any licensures

Page 90

1    to hold your position other than your LPN?

2         A    I was a registered nurse at that point.

3         Q    Okay.  Did you hold any other license

4    other than your driver's license?

5         A    Registered nurse license.

6         Q    Okay.  Other than registered nurse license

7    and your driver's license, did you hold any other

8    license?

9         A    No.

10        Q    How often would your supervisor come in to

11   the office?  I mean, was this a person in Taylor or

12   person who's actually in the same office you were

13   in?

14        A    My supervisor was from Taylor County, so I

15   saw her maybe monthly --

16        Q    Okay.

17        A    -- in the office in Scott County.

18        Q    Did she provide any type of yearly

19   evaluation?

20        A    Yes.

21        Q    Did you receive any discipline when you

22   worked for Family Home Health?

23        A    None that I remember.

24        Q    Your disability that caused you to leave

25   the military, does it in any way affect your memory?

1          A     Not that I remember.

2          Q     Well, I mean has any physician told you

3     that whatever disability, and I've tried to not ask

4     you what the disability is, but has any physician

5     indicated to you that your disability could affect

6     your memory?

7          A     Not that I remember, no.

8          Q     Okay.  Are you on any medication currently

9     that affects your memory in any way?

10         A     No.

11         Q     And when I say currently, I mean within

12     the last few days?  I don't want to play games.

13         A     Not that I'm aware of.

14         Q     Not that any physician's told you --

15         A     Yes.

16         Q     -- may cause memory loss?

17         A     (Witness nodded.)

18         Q     Were you on any medication in March or

19     April of 2013 that may have caused any type of

20     memory loss?

21         A     Not that I remember.

22         Q     Were you on different medication in March

23     or April of 2013 than you're currently on?

24         A     Not that I remember, no.

25         Q     What does not that I remember mean?  You

Page 92

1    don't know if your medication is different today

2    than it was in 2013?

3         A    No, I don't know that.

4         Q    Okay.  Who -- do you have a primary care

5    physician?

6         A    Yes.

7         Q    Is that who prescribes your medications?

8         A    Uh-huh.

9         Q    Yes?

10        A    Yes.

11        Q    Does the VA prescribe any medication, the

12   VA hospital?

13        A    No.

14        Q    Okay.  How long do you work for Family

15   Home Health in Kentucky?

16        A    Approximately four years.

17        Q    So what four-year time period are we

18   talking?

19        A    Prior to 2006.

20        Q    So do we say 2005, 2004, 2003, 2002, so

21   2002 to 2005?  I'm saying what four-year time

22   period?

23        A    It may have been three years.

24        Q    Okay.

25        A    Up until about 2005 or '6.

Page 93

1      Q    Okay.  So starting in 2004, 2003?

2      A    I don't recall specifically.

3      Q    Okay.  Why did you leave there?

4      A    I got bored with the job.

5      Q    Was there ever any type of government

6    investigation regarding the billing practices at

7    Family Health Care -- I'm sorry, Family Home Health?

8      A    Not that I'm aware of.

9      Q    What do you mean you got bored?  What was

10   boring about the job?

11     A    I wasn't being challenged.  I got tired of

12   sitting in the office reviewing forms.

13     Q    It sounds like part of your job was to go

14   out and get new business.  Is that boring?

15     A    It can be, yes.

16     Q    Played too much golf?

17     A    Yes.

18     Q    Okay.  So did you ever apply for a

19   position at the company that you didn't get?  Was

20   there a next natural position for you to obtain?

21     A    Not that I'm aware of.

22     Q    So you never applied for any other

23   positions?

24     A    No.

25     Q    Did you put your resignation in writing?

1     A     Yes.

2     Q     Did you say that you're resigning because

3  you were bored?

4     A     No.

5     Q     Okay.  What reason did you give?

6     A     I don't remember specifically.

7     Q     Okay.  How much time did you give them?

8     A     Thirty days.

9     Q     Who did you turn in your resignation to?

10     A     As I recall, I gave it to Brenda Dile and

11  Ron Evans.

12     Q     Who was Ron Evans?

13     A     The president of the company.

14     Q     You give him the same resignation?

15     A     Yes.

16     Q     You send an e-mail and copy him or did you

17  send it US mail?

18     A     I don't recall.

19     Q     Prior to leaving the job because you were

20  bored, did you contact Ron or Brenda, say I'm bored,

21  like to do something else within the company?

22     A     I contacted them and -- and contacted them

23  and told them I was contemplating leaving the

24  company.

25     Q     Okay.  Did you say because you were bored?

1        A     No.

2        Q     Okay.  What did you tell them why you were

3   contemplating leaving?

4        A     I wanted to pursue something else.

5        Q     Okay.  You didn't tell them what?

6        A     I don't recall.

7        Q     Did you have an idea what you wanted to

8   pursue?

9        A     Yes.

10       Q     What did you want to pursue?

11       A     Working in long-term care.

12       Q     What caused you to want to work in

13  long-term care?

14       A     I had done it before at Darby Square and I

15  felt like I was -- that's where I was the most

16  useful to the residents and populations, population

17  of the elderly.

18       Q     You wanted to work in the administration

19  or did you want to use your clinical skills and

20  actually provide hands-on service?

21       A     Both.

22       Q     Could you, when you were working in the

23  home health aide position, have gone out yourself

24  and provided some type of skilled medical treatment

25  to the different individuals?

1       A     Well, I never worked as a home health

2    aide.

3       Q     Okay.  But when you worked at the company,

4    couldn't you have gone out and performed the same

5    task as a home health aide individual?

6       A     As a home health aide, yes.

7       Q     Okay.  I mean, you were an RN at that

8    point, right?

9       A     Yes.

10      Q     So you could have gone in and provided

11   skilled care to individuals, correct?

12      A     Yes.

13      Q     Did you ever do that?

14      A     Yes.

15      Q     Okay.  How often?

16      A     I don't recall specifically.

17      Q     Did you only do it if it was kind of an

18   emergency, somebody couldn't make it to their

19   assignment?

20      A     No.

21      Q     Okay.  You actually scheduled yourself?

22      A     Yes.

23      Q     And you did the scheduling, correct?

24      A     I don't recall that I did the scheduling.

25   I oversaw the scheduling.

1     Q    Okay.  Where did you next work?

2     A    I worked for LeaderStat.

3     Q    Leader Staff?

4     A    LeaderStat.

5     Q    Stat?

6     A    Uh-huh.

7     Q    All one word or two words?

8     A    One, I believe.

9     Q    Okay.  What was LeaderStat?

10    A    It's a consulting company.

11    Q    What were you providing consulting

12 services for?

13    A    As a registered nurse in long-term care.

14    Q    Was that the only consulting you were

15 providing was that, registered nurse in long-term

16 care?

17    A    Yes.

18    Q    I mean, it was that specific of a

19 consulting job that it was an RN consulting in

20 long-term care?

21    A    Well, an RN encompasses many different

22 roles, so yes.

23    Q    Okay.  But it was in long-term care?

24    A    Yes.

25    Q    Okay.  How did you hear about that job?

1        A     Through Janice Ward.

2        Q     What did she tell you?

3        A     She had done it and encouraged me to

4    pursue it.

5        Q     Was she working there at the time?

6        A     Yes.

7        Q     Okay.  What was she doing for LeaderStat?

8        A     Nurse consultant.

9        Q     Different type of nurse?

10       A     RN.

11       Q     Okay.  But was she consulting in long-term

12   care like you?

13       A     Yes.

14       Q     When you're consulting in long-term care,

15   what does that really mean you're doing?

16       A     It can mean different things depending on

17   the need of the client.

18       Q     Okay.  What were you doing?

19       A     I was supervising.

20       Q     Supervising what?

21       A     On the first assignment, I was supervising

22   second and third shift of a facility in Pittsburgh.

23       Q     Did you actually have to move there?

24       A     No.

25       Q     So how were you overseeing the second and

1    third shift?

2         A    I would live there for weeks at a time.

3         Q    Okay.  So you actually -- did you have an

4    apartment there?  You live in a hotel, motel?

5         A    Lived in a hotel.

6         Q    For weeks at a time?

7         A    Yes.

8         Q    How long did you do that for with respect

9    to the Pittsburgh facility?

10        A    I don't recall.

11        Q    Okay.  Well, more than a month?

12        A    Yes.

13        Q    Okay.  More than a year?

14        A    No.

15        Q    Somewhere between a month and a year?

16        A    Yes.

17        Q    Okay.

18        A    Somewhere --

19        Q    Did you drive there or fly there?

20        A    I drove there.

21        Q    Did you get reimbursed for your mileage?

22        A    Yes.

23        Q    Okay.  So there would be a record as to

24    how often you drove there?

25        A    Sure.

1      Q    Okay.  What was the name of the facility?

2      A    I believe the name of it was Shady Lawn or

3   Shady Side maybe.

4      Q    Okay.  And did you report to someone

5   there?

6      A    Yes.

7      Q    Who did you report to?

8      A    There was an administrator and a regional

9   nurse consultant.

10     Q    Okay.  What were their names?  Let's start

11  with the administrator.

12     A    I don't remember his name.

13     Q    How about the regional nurse?

14     A    I don't remember her name.

15     Q    Okay.  Did they ultimately fill your

16  position that you were working there with a

17  full-time employee?

18     A    I was working there as a consultant.

19     Q    Okay.

20     A    And I wanted to take a break.  So --

21     Q    What do you mean you wanted to take a

22  break?

23     A    I had been there for several -- you know,

24  several weeks, several months, whatever the time

25  frame was.

1      Q    Well, you tell me.  Was it several weeks

2  or several months?

3      A    I don't remember specifically.

4      Q    So you wanted to take a break.  What did

5  that mean?  Had you not been home in that several

6  weeks or several months?

7      A    I wanted to take some time off.

8      Q    Time off of work completely?

9      A    Yes.

10      Q    How much time did you take off work?

11      A    I don't remember exactly.

12      Q    Well, give me a guess.

13      A    Three weeks.

14      Q    I mean, was the time off of work related

15  to your military disability?

16      A    No.

17      Q    Did you have to seek any type of

18  medical -- medical treatment during the three weeks?

19      A    No.

20      Q    Did you seek any mental health treatment?

21      A    No.

22      Q    What did you do during that three weeks?

23      A    I think I did my honey-do list at home,

24  went on vacation.

25      Q    Okay.  Did you have three weeks coming or

1   did you have to leave the company?

2       A    I did not have any paid vacation time.

3       Q    Okay.  But when you tell company I want

4   some time off, do they say take as much time as you

5   want, you're fired, or words to that effect?

6       A    For that company as a nurse consultant,

7   you work when you want to work.

8       Q    Okay.  So you tell LeaderStat I want to

9   take three weeks off.  I want to take some time off,

10  when I'm ready, I'll come back?

11      A    Yes.

12      Q    Did you have to train someone to perform

13  the duties you were doing in Pittsburgh?

14      A    I don't recall.

15      Q    Okay.  Did you apply for unemployment?

16      A    No.

17      Q    Okay.  So at the end of the three weeks,

18  what do you do by way of seeking employment?

19      A    They called me for another assignment.

20      Q    They called you?

21      A    From LeaderStat.  I may have called them,

22  but we discussed another assignment.

23      Q    Okay.  You let them know you're ready to

24  come back?

25      A    Yes.

1      Q    Okay.  And then how long between the time

2  you say I'm ready to come back and the time they

3  give you a call and say we have a position?

4      A    I was on the beach when I was talking to

5  them, and when I left the beach, I went home and

6  then reported to the next assignment.

7      Q    Well, I don't know where the beach is.

8      A    Less than a week.  Less than a week.

9      Q    Where do you report?

10     A    Nashville, Tennessee.

11     Q    What were you doing there?

12     A    I was the director of nursing over a

13  long-term care facility.

14     Q    Skilled?

15     A    Yes.

16     Q    How many beds?

17     A    Approximately 120.

18     Q    What happened to the previous DON?

19     A    I don't know.

20     Q    Was the previous DON there to provide you

21  some type of training?

22     A    No.

23     Q    So you just walk in kind of cold?

24     A    There was staff there from the corporate

25  office.

1      Q    Okay.  So they were able to provide you

2   some type of training?

3      A    Yes.

4      Q    How long do you hold that position?

5      A    Approximately six months.

6      Q    Was it a position you could commute to?

7      A    Yes.

8      Q    Okay.  How far away was it from your home?

9      A    Three hours.

10     Q    Okay.  So you weren't commuting every day?

11     A    Not every day.

12     Q    Okay.  During that six-month assignment,

13  did you receive any type of discipline?

14     A    None that I remember.

15     Q    Okay.  Was there an administrator who

16  worked there?

17     A    Yes.

18     Q    Who was the administrator?

19     A    Lori Britton.

20     Q    Lori, I'm sorry?

21     A    Britton, B-R-I-T-T-O-N.

22     Q    In Tennessee, does the administrator have

23  to hold a license?

24     A    Yes.

25     Q    Was she your supervisor?

1      A    Yes.

2      Q    Okay.  During the six months that you work

3  there, was there any type of government audit of any

4  type?

5      A    Yes.

6      Q    Okay.  Is that why you were asked to work

7  the assignment, because an audit was coming up or a

8  survey?

9      A    Yes.

10      Q    I mean, during the time that you work

11  there, are they trying to hire a DON?

12      A    Yes.

13      Q    Was it your understanding if they found

14  the right person then that assignment was going to

15  end for you?

16      A    Yes.

17      Q    Did they ever ask you if you wanted the

18  job?

19      A    Yes.

20      Q    Okay.  You turn them down?

21      A    Yes.

22      Q    Flat or did you consider it?

23      A    I considered it.

24      Q    Okay.  Why didn't you want to work there?

25      A    I didn't want to move to Nashville.

1      Q    Okay.  So what happens?  Where's your next

2  assignment if you have a next assignment?

3      A    They offered me a job.

4      Q    Who did?  The company?

5      A    Atrium Centers.

6      Q    Is that who you were working for at that

7  point, Atrium?

8      A    Yes.  I was working for LeaderStat

9  Consulting.

10      Q    But you were assigned to Atrium?

11      A    Yes.

12      Q    Which facility of Atrium?

13      A    The one in Nashville is Cornelia House.

14      Q    Cornelia House?

15      A    Uh-huh.

16      Q    Is that still one of the Atrium locations?

17      A    No.

18      Q    To your knowledge, when did Atrium cease

19  owning Cornelia's House?

20      A    It was sold approximately two years after

21  I started in 2006.

22      Q    Okay.

23      A    So it was sold sometime in 2007 or 2008.

24      Q    Were you reporting to some type of

25  regional nurse when you were a DON?

1       A     Yes.

2       Q     Who were you reporting to?

3       A     Pam Reese.

4       Q     Is she related to Jason Reese?

5       A     Yes.

6       Q     How are they related?

7       A     They're married.

8       Q     Did Jason hold a position in the company?

9       A     Yes.

10      Q     What position did he hold?

11      A     CEO.

12      Q     So he was the CEO at the time that you

13   were working for LeaderStat but assigned to the

14   Atrium facility entitled Cornelia's?

15      A     Yes.

16      Q     Correct?  Why was it called Cornelia's, is

17   that the road it's on?  The city it's in?

18      A     I don't know.

19      Q     Okay.  Did Pam give you any type of

20   evaluation while you held the position with

21   LeaderStat?

22      A     Yes.

23      Q     Okay.

24      A     Oh, while I held the position with

25   LeaderStat?

1     Q    Right.

2     A    I don't know.

3     Q    Okay.  Who actually offers you the

4  Nashville location, the Cornelia's House?  You said

5  that was offered to you.  You could have been the

6  DON there.  Who said -- who made the offer?

7     A    Pam.

8     Q    Okay.  How long did you consider it before

9  you told Pam you didn't want it?

10    A    Over the weekend.

11    Q    Did you tell her, though, that you did

12  want to work at one of their facilities if possible?

13    A    I don't recall that.

14    Q    Okay.  Well, after the six months, how

15  does it end?  Do they hire a DON?  What's the end of

16  the story?

17    A    Yes.  We hired a DON.

18    Q    Who was that?

19    A    I don't remember the name.

20    Q    Okay.  And then is there a time between

21  the time you leave and the time that you start at

22  another Atrium facility?

23    A    I was offered the regional director of

24  clinical services job by Pam while I was at that

25  facility before I left and there was still some work

1    to be done after we hired a DON, so there was no gap

2    in that.

3         Q    Okay.  I mean, when you're working for

4    LeaderStat, do you have to sign some type of

5    non-compete agreement?

6         A    Yes.

7         Q    Okay.  Was going to work for Atrium in

8    violation of that non-compete agreement?

9         A    Yes.

10        Q    Okay.  Did they, meaning LeaderStat, try

11   to enforce the non-compete agreement?

12        A    Atrium Centers paid for that non-compete

13   to be broken.

14        Q    Okay.  Do you know how much they paid?

15        A    No.

16        Q    Did you ultimately pay for it?  In other

17   words, you said -- and I'm making my numbers up,

18   I'll take the job for 100,000 and they say no,

19   you'll take the job at 75,000 because we had to pay

20   25,000 to get you out of a non-compete?  Did that

21   ever happen?

22        A    No.

23        Q    Words to that effect?

24        A    Not that I recall.

25        Q    Okay.  So you -- as you sit here today,

1  you have no idea what they paid to get you out of

2  your non-compete?

3      A   If I gave you a number, I'd be guessing,

4  so I don't know exact number.

5      Q   Okay.  Well, would it be guessing from

6  something empirical, like now that I work for the

7  company, I know what the standard formula is or is

8  it just a pure guess?

9      A   It would be somewhere around 15 to

10  20 percent I would guess.

11      Q   15 to 20 percent of what?

12      A   Salary.

13      Q   I mean, do they take it out of your pay or

14  is it --

15      A   No.

16      Q   They actually just pay it?  It's not a

17  loan that they give you to get yourself --

18      A   No.

19      Q   -- out of the non-compete?

20      A   No.

21      Q   Okay.  So this regional director's job, it

22  also entailed initially duties related to your DON

23  position at Cornelia's?

24      A   Yes.

25      Q   What did it entail?  That you had to train

1    the DON?

2         A    Yes.

3         Q    How long did you train the DON?  Is it

4    weeks?  Days?  Hours?

5         A    It's several weeks in total.

6         Q    Was it several weeks, five hours here,

7    five hours there, or was it like 40 hours a week for

8    several weeks?

9         A    It was broken up.

10        Q    Okay.  Did you get to do that yourself?

11   Did you break up the schedule?

12        A    Yes.

13        Q    Okay.  And then did you make the

14   determination as to when the DON at Cornelia's was

15   ready to go on their own?

16        A    Yes.

17        Q    As the regional director initially, what

18   were you responsible for doing?

19        A    Overseeing the clinical operations of the

20   facilities that I was put in charge of.

21        Q    What does that mean, overseeing the

22   clinical operations?

23        A    Policies, procedures, systems that we have

24   to follow and adhere to to maintain a regulation

25   compliance.

1      Q    Okay.  But what were you doing?  Since you

2   couldn't physically be everywhere at every moment,

3   what were you doing to oversee the clinical side of

4   the Atrium facilities you were assigned?

5      A    When I would go into a building, I would

6   review their documentation, develop relationships

7   with the directors of nursing at the various

8   buildings.

9      Q    Okay.  How many facilities are you

10  initially assigned to?

11     A    Eight to ten facilities.

12     Q    Eight to ten.  Was it in a particular

13  geographic location or was it all over the United

14  States?

15     A    It was in three states.

16     Q    Okay.  Which were the three states?

17     A    Oh, I'm sorry, four states.

18     Q    Okay.

19     A    Tennessee, Kentucky, Ohio, and Wisconsin.

20     Q    Okay.  How many in Tennessee?  How many

21  facilities?

22     A    Two.

23     Q    How about Kentucky?

24     A    Two.

25     Q    Ohio?

1        A     Four or five.

2        Q     How about Wisconsin?

3        A     One.

4        Q     In Ohio, which facilities did you have?

5        A     Springfield, St. Marys, Evergreen, and I

6   don't think initially we had Lexington and Woodside,

7   but once we acquired those two, I was given those

8   two buildings later on.  So initially it would have

9   been three in Ohio.

10       Q     Okay.  You don't have Darlington

11  initially?

12       A     No.

13       Q     Okay.  How long then is it until that

14  changes, if it does?

15       A     Soon thereafter I started -- we acquired

16  Lexington and Woodside.

17       Q     Lexington, Kentucky?

18       A     No.  It's in -- just north of Columbus,

19  Mansfield area.  There is two facilities there.

20  One's called Lexington and one's called Woodside.

21       Q     Okay.  So did you then still have the

22  other three facilities in Ohio?

23       A     Yes.

24       Q     Okay.  Was anything removed or did you

25  just get the additional two facilities?

1       A    I don't remember specifically how that

2   happened, but we -- we sold the Memphis property --

3       Q    Okay.

4       A    -- somewhere along that time frame.

5       Q    Well, did that still leave one in

6   Tennessee?

7       A    Yes.

8       Q    Okay.  What year was it that you're

9   assigned Woodside and Lexington?

10      A    I don't recall specifically.

11      Q    When is it that you sell the Tennessee

12  facility -- the Memphis facility?  I'm sorry.

13      A    Memphis, I'm not sure.

14      Q    Okay.  Then does your oversight

15  responsibility change from what you just testified

16  to at any point or is that it today?

17      A    Oh, it changed as we arranged the region a

18  little bit.

19      Q    Okay.  In, let's say, 2013, okay, let's

20  focus on that year.

21      A    Okay.

22      Q    Which facilities did you have oversight

23  for?

24      A    2013, I'm the director of operations and I

25  oversee --

1      Q    At the beginning of '13?

2      A    Yes.

3      Q    Okay.  Which facilities do you have

4   responsibility for?

5      A    Two in Kentucky.

6      Q    Okay.

7      A    Two in the Upper Peninsula of Michigan.

8      Q    Okay.

9      A    Three in Wisconsin, and two in Ohio.

10     Q    Which two in Ohio?

11     A    Springfield and St. Marys.

12               (Whereupon, Plaintiff's Exhibit 27

13          was marked for identification.)

14     Q    Handing you what's been marked as

15   Plaintiff's Exhibit 27.  If you could take a moment

16   to look at that please.  Have you seen Plaintiff's

17   Exhibit 27 prior to today?

18     A    Yes.

19     Q    For the record, what does Plaintiff's

20   Exhibit 27 appear to be a copy of?

21     A    A job title, director of operations.

22     Q    At some point do you become the director

23   of operations?

24     A    Yes.

25     Q    When was that?

1      A     February of 2011.

2      Q     Was there a change in February of 2011 of

3  position or simply title of your job?  Before that,

4  what was your title?

5      A     I was the director of clinical services.

6      Q     Okay.  Once you become the director of

7  operations, do your responsibilities change?

8      A     Yes.

9      Q     Okay.  How do they change?

10     A     Become directly responsible for the

11  overall operations of the facilities assigned.

12     Q     Well, did someone hold that position

13  before you?

14     A     Yes.

15     Q     Who was that?

16     A     Don Babbitt.

17     Q     Spell his last name.

18     A     B-A-B-B-I-T-T, I believe.

19     Q     What happened to Don?

20     A     I don't know.

21     Q     Okay.  Did he provide you some training?

22     A     No.

23     Q     Did you report to Don?

24     A     No.

25     Q     Who did Don report to, to your knowledge?

1      A     Mr. Reese.

2      Q     The same person you reported to?

3      A     No.

4      Q     You didn't report to Reese?

5      A     I reported to Pam Reese.

6      Q     Pam Reese.  Okay.  Reported to the wife?

7      A     Yes.

8      Q     And then when you get a promotion, you

9   report to the husband?

10      A     Yes.

11      Q     Now, did there come a time when Jane left

12   the facility, in other words, quit before the

13   April 2013?

14      A     Yes.

15      Q     Okay.  When did she quit?

16      A     I don't recall the specific time frame.

17      Q     Okay.  Do you know why?  Did she give you

18   a reason?

19      A     I know she walked out on a Friday.  I

20   think it was late summer time frame.  I don't recall

21   the specific reason that she told me.

22      Q     Okay.  That's what I asked you.  Like why

23   would she leave?

24      A     Yeah, I don't recall the specific reason.

25      Q     Okay.  Well, did she talk to you before

1    she left?

2        A    No.

3        Q    This -- you didn't see this coming?

4        A    No.

5        Q    You didn't know that there was any type of

6    dissention between Jane and her administrator?

7        A    I don't recall that time.

8        Q    Do you know who the administrator was?

9        A    Yes.

10       Q    What's her name?

11       A    Brandy Slick.

12       Q    Okay.  Are you testifying that you were

13   not made aware of any problems between Jane and

14   Slick before Jane leaves?

15       A    No.

16       Q    Okay.  If you were aware of any problems,

17   would you have written them down?

18       A    Not necessarily.

19       Q    Okay.  Well, after Jane leaves, do you

20   become aware of issues between Jane and Slick?

21       A    Yes.

22       Q    Okay.  What do you become aware of?

23       A    That Jane was put on an action plan for

24   performance issues.

25       Q    Okay.  I mean, did Brandy have the

1    authority to do that?

2        A    Yes.

3        Q    Okay.  So you learn that she's put on an

4    action plan and Jane leaves.  You learn anything

5    else?  Any other problems between Jane and Slick --

6        A    No.

7        Q    -- other than Slick putting Jane on an

8    action plan?

9        A    Not that I'm aware of.

10       Q    Okay.  If you were aware of any of those

11   problems, would you have put it in writing

12   somewhere?

13       A    Maybe.

14       Q    Okay.  Would you have put it in writing in

15   one of the tablets you were telling us about?

16       A    I don't know.

17       Q    Okay.  Well, have you looked through those

18   tablets for this particular incident, the time the

19   DON, I think your words are, walked out?

20       A    I don't recall.

21       Q    Okay.  Well, again, you have the books,

22   the tablets at home, correct?

23       A    Yes.

24       Q    Okay.  How did you become aware that Jane

25   was placed on an action plan?

1       A     I don't remember.

2       Q     All right.  Well, what type of employee

3   did you consider Jane to be up until the time she,

4   in your words, walks out?

5       A     We had always had a good relationship.

6       Q     Okay.

7       A     And Jane would -- she needed the help from

8   the regional team to identify some problems and be

9   redirected regularly, but she was always able to

10  rise to that occasion.

11      Q     Uh-huh.  Who's the regional team?  Who

12  encompasses that, the team?

13      A     That would be the director of operations.

14      Q     Would be you, right?

15      A     And regional nurse.

16      Q     Who was the regional nurse?

17      A     At that time, 2011 was when I became the

18  director of operations.  There was a period of time

19  that I wasn't associated with the building in -- in

20  either role.

21      Q     When was that?

22      A     The specific dates, I would have to look

23  at some documentation to remind me of the specific

24  dates.

25      Q     Well, what documents would you have to

1   look at?

2       A    I don't know.

3       Q    Well, why were you not associated with the

4   building for a particular period of time?

5       A    There was a restructuring of the

6   assignment of the regions.

7       Q    Okay.

8       A    So St. Marys was no longer under my

9   supervision.

10      Q    Who was it under?

11      A    The director of operations for a while was

12  Paul Gustafson.

13      Q    What was he?  The director of operations?

14      A    Yes.

15      Q    Okay.  Let's go back to my original

16  question.  Who was the regional nurse during the

17  time period that we're talking about where you claim

18  Jane walked out?

19      A    I don't recall.

20      Q    Okay.  And you don't know why Jane walked

21  out other than you found out she was on an action

22  plan?

23      A    Not that I remember.

24      Q    So you don't remember what was on the

25  action plan?

1        A    In detail, no, but in general, it was to

2    perform director of nursing responsibilities and

3    duties.

4        Q    Did you think Slick was a good

5    administrator?

6        A    No.

7        Q    Okay.  Why not?

8        A    I don't think she commun- -- communicated

9    very well and she would make unprofessional

10   comments --

11       Q    Like what?

12       A    -- outside of work.

13       Q    Like what?

14       A    Talking about -- bragging about her

15   position as the administrator to community folks.

16   This is things that I've -- I had been told in the

17   facility.  I don't have any firsthand knowledge it

18   happened.

19       Q    Well, what's there to brag about?  I'm an

20   administrator of a facility.  How is that -- who

21   cares?

22       A    You'd have to ask her that.

23       Q    No, but I mean, what, is she going to

24   groups saying I'm the administrator of the facility

25   and using her title to get something?

1     A    I don't know.

2     Q    Okay.  Well, what were you hearing that

3  she was bragging about?

4     A    That she was bragging about being the

5  nurse -- or nursing home administrator.

6     Q    In your opinion, is that something in and

7  of itself to brag about?

8     A    Yeah, could be.

9     Q    Okay.  Give me an example of when it's --

10  would be a topic to brag about?

11     A    I guess it would depend on the individual.

12     Q    Okay.  Well, did you do anything to test

13  the veracity of the information you were being given

14  with respect to her bragging about being the

15  administrator?

16     A    No.

17     Q    Okay.  Who told you that?

18     A    I don't recall specifically, but I believe

19  it was Jane that told me that.

20     Q    Okay.  Well, I'm interested when you claim

21  Jane walks out, do you do anything in response?  I

22  mean, do you post an ad for a new DON or what do you

23  do?

24     A    I don't recall that I was associated with

25  the building at that time, so I don't -- I don't

1  know that I was a part of the operations.

2      Q    Okay.  Did you ever contact Jane while she

3  was off and ask her to come back to work?

4      A    Yes.

5      Q    When was that?

6      A    I don't recall the specific date.

7      Q    Why did you ask her to come back?

8      A    Because I had came back to the facility

9  as -- I'm not sure if I came back as the DO or if I

10 was still the regional nurse, but I came back to the

11 facility.  But we needed a director of nursing and I

12 had worked with Jane before and so I called her to

13 see if she wanted to come back.

14     Q    What did she say?

15     A    Eventually she said yes.  I don't know if

16 it was over the weekend or the next day or that day.

17     Q    Well, did you broker a meeting between

18 Jane and Slick --

19     A    I don't recall.

20     Q    -- that you were supposed to attend?

21     A    I don't recall.

22     Q    Do you recall that there was a meeting to

23 be held in a restaurant near the facility and you

24 were unable to make it so you attended by speaker

25 phone?

1       A    Yes.

2       Q    Okay.  Tell me why you weren't able to

3  attend that meeting?

4       A    I don't know.

5       Q    I mean, you knew Jane and Slick didn't get

6  along and so you were going to be at the meeting, I

7  presume, to kind of act as referee or broker to see

8  if Jane would come back to work, correct?

9       A    I don't remember.

10      Q    Okay.  But you do remember attending by

11  cell phone, correct?

12      A    Yes.

13      Q    And did you have an understanding that the

14  two individuals, Jane and Slick, were at a

15  restaurant?

16      A    Yes.

17      Q    Okay.  Was it after that conversation that

18  Jane decided to come back to work?

19      A    I don't remember.

20      Q    At that point, what was Paul -- is it

21  Gustafson?

22      A    Gustafson.

23      Q    What was his position?

24      A    He was director of operations, but I'm not

25  sure if he was -- still had the St. Marys' building

1   or not.  I don't remember.

2        Q    Well, do you know if after you tried to --

3   after you had the conversation with the speaker

4   phone if he then called and talked to Jane?

5        A    I don't know.

6        Q    You were never made aware of that either

7   by Jane or by Paul?

8        A    I don't recall.

9        Q    Okay.  Did you -- did you ever come to an

10  understanding that Paul asked her to come back to

11  work, too?

12       A    I don't know.

13       Q    How long is it between the time Jane comes

14  back and the time Slick is no longer the

15  administrator?

16       A    I don't remember the dates.

17       Q    Okay.  I mean, was it -- do you recall it

18  being a month?

19       A    I don't remember.

20       Q    What would you have to look at to refresh

21  your memory as to how long it is between the time

22  Jane agrees to come back and the time Slick is no

23  longer employed?

24       A    I don't know.  If I saw the date that

25  Lorraine started maybe.

Page 127

1        Q     Okay.

2        A     I don't know.

3        Q     Well, do you know as -- whether or not

4   there was an interim administrator between the time

5   Slick leaves and the time Lorraine starts?

6        A     I don't remember if there was one.

7        Q     Okay.  'Cause if there was, how would that

8   help you to know Lorraine's start date?

9        A     I don't know.

10       Q     I mean, do you have responsibilities to

11  make sure that each facility has -- that it comes

12  under your scope of leadership that each has a DON?

13       A     Sure.

14       Q     Okay.  Do you have any responsibility for

15  filling the administrator's position?

16       A     Yes.

17       Q     Okay.  If there was an interim between the

18  time that Slick leaves and the time that Lorraine

19  starts, would that interim come from a particular

20  agency that you used in the St. Marys area?

21       A     No.

22       Q     Did you ever transfer individuals from one

23  facility to another to cover during a time period

24  that you were hiring?

25       A     I don't recall that situation.

1       Q     Uh-huh.  Why were you asking Jane to come

2    back?  Why not just go hire someone off the street

3    or transfer someone from another facility?

4       A     Because we had a good-working relationship

5    before and I thought she would be able to do the job

6    she used to be able to do.

7       Q     Well, I mean, I thought I heard you tell

8    me that she walked off the job?

9       A     (Witness nodded.)

10      Q     Why would you want to rehire her?

11      A     After I talked to her, I felt like she

12    wanted to come back.

13      Q     Well, did you contact her or did she

14    contact you about coming back?

15      A     I believe I contacted her first.

16      Q     When you become the director of

17    operations, are you paid salary with some type of

18    bonus structure?

19      A     Yes.

20      Q     Was that something different than you had

21    been paid in the past?  In other words, were you

22    paid in the past a salary plus bonus?

23      A     Yes.

24      Q     Were you made aware of any problems

25    between Jane and Lorraine prior to the April 2013

1    incident?

2        A    Yes.

3        Q    What problems were you hearing?

4        A    Periodically every four to six weeks or

5    so, Lorraine would call me and say that there was a

6    problem with Jane's performance.  She was yelling at

7    staff in the hallway, discipline them in

8    inappropriate places, not following up on her

9    responsibilities on a daily basis, and not

10   communicating with her regularly.

11                   MR. FRANKLIN:  Okay.  Teri, can you

12               like slowly read back that list?

13               (Whereupon, the court reporter read

14               back the previous answer.)

15       Q    When did she -- when did Lorraine start to

16   call you every four to six weeks?  What time period

17   are we starting in?

18       A    Sometime in 2012.

19       Q    Well, do you know when?

20       A    It happened every four to six weeks

21   probably about five or six times, so early 2012

22   going forward.

23       Q    Okay.  Now, I mean, did other

24   administrators call you and complain about their

25   employees or was it just Lorraine calling about

1   Jane?

2        A    From time to time I get a phone call from

3   the administrator discussing employee performance.

4        Q    Okay.  Well, was this -- these calls every

5   four to six weeks about Jane's alleged performance

6   deficiencies something out of the ordinary or is it

7   something that happened between DONs and

8   administrators all the time?

9        A    Initially, like I said before, Jane was

10  able to perform her job but she always required a

11  lot of assistance from her regional nurse position,

12  which would mean coming in, doing a review, make

13  recommendations.  She would go back and get those

14  things corrected and move forward.

15            This started to be not normal for Jane.

16  It escalated from that's what it sounded like at

17  first, and then it got a little worse, and then with

18  the yelling at staff, so it started to escalate into

19  a more than negative performance.

20        Q    So at first is she -- during the first few

21  times she calls, is she complaining about Jane

22  yelling at staff or does that come later, the like

23  third or fourth call?

24        A    It's probably on the second or third call.

25        Q    Okay.  Now, employee -- strike that.  Now,

1    Jane's given a performance review annually, correct?

2         A    Yes.

3         Q    Is that performance review given by you or

4    given by Lorraine?

5         A    Lorraine.

6         Q    Okay.  Do you review the performance

7    review before it's given out to a DON?

8         A    I try to, yes.

9         Q    Okay.  And then can you, if you don't

10   agree with it, make recommendations?

11        A    Yes.

12        Q    Okay.  Are those recommendations typically

13   followed?

14        A    Yes.

15        Q    Okay.  Now, I want to go back to the

16   four-to-six-week phone calls that start in '12.

17   Let's start with Number 1.  We'll just call it

18   Number 1.  Where can I find a document that shows

19   that Lorraine called and complained about Jane and

20   what the complaint was about?

21        A    I don't know.

22        Q    Well, surely you took notes?

23        A    I don't know.

24        Q    You don't know what?

25        A    I don't know if I took notes for that

1  call.

2      Q    Well, if you did, where are they?

3      A    I don't know.

4      Q    Would they be in one of your notebooks,

5  your tablet?

6      A    If it existed, possibly.

7      Q    Okay.  It would be on a legal tablet?

8      A    I don't know.

9      Q    Is that what you call these?  I'm holding

10 up what I refer to as a legal pad, but you call it

11 something different?

12     A    It's possible.

13     Q    It's possible you call it something

14 different than a legal pad?

15     A    No, it's possible that it's -- it's on the

16 notebook or some piece of paper that I was putting

17 notes on at the time.

18     Q    Okay.  Didn't anyone ask you to look

19 through your notes and give notes to someone,

20 whoever did the asking, if those notes related to

21 Jane?

22     A    Yes.

23     Q    Okay.  And if they related to Jane's work

24 performance?

25     A    Yes.

1       Q     And did you do that?

2       A     Yes.

3       Q     Okay.  And I think your testimony was you

4    only gave one or two pages, correct?

5       A     Yes.

6       Q     Okay.  So given what you just testified

7    to, are we to believe there are no other notes about

8    Jane in your notebook?

9       A     Yes.

10      Q     Okay.  So if you did take notes, they're

11   destroyed?

12      A     I don't know.

13      Q     Well, what happened to them?  Give me all

14   the other places I could find your notes.

15      A     I don't know that they ever existed from

16   that phone call.

17      Q     Phone Call Number 1?

18      A     Yeah.  You asked me if possibly I took

19   notes.  Possibly I take notes when I talk to folks,

20   but not always.

21      Q     Okay.  Well, if you're talking to an

22   administrator about a DON, you wouldn't have taken

23   notes or it's just possible you would have taken

24   notes or you don't take notes?

25      A     Maybe.

1        Q    Maybe what?

2        A    Maybe I would have; maybe I wouldn't have.

3        Q    Okay.  Well, did you take notes in this

4    situation?

5        A    I don't remember.

6        Q    Okay.  But you do know that you've looked

7    for notes --

8        A    Yes.

9        Q    -- like that, correct?

10       A    Yes.

11       Q    And you didn't find any?

12       A    Yes.

13       Q    Correct?  Did you look through your

14   computer?

15       A    Yes.

16       Q    Okay.  Did you memorialize notes that you

17   may have taken regarding Lorraine's complaints about

18   Jane?

19       A    I don't know what you mean by memorialize

20   notes.

21       Q    Typed.  In other words, you hand wrote

22   them when you're talking to her on the phone and

23   then you memorialized it.  You typed it on the

24   computer.

25       A    No.

 1      Q    Do you scan in your notes to the computer?

 2  I mean, you know how to do that?

 3      A    No, I didn't do that.

 4      Q    Okay.  So if I want to find notes from

 5  your first conversation where you're claiming

 6  Lorraine complained about Jane's work performance in

 7  this every four to six weeks, what do I ask for?

 8      A    I think you've already asked for that.

 9      Q    No, what do -- I want to write your

10  counsel a letter.  What do I ask for?

11      A    Any notes pertaining to that incident or

12  that phone call.

13      Q    Okay.  And then you -- he's going to -- he

14  may ask you to look at the tablets, the black book,

15  are there other notes somewhere?

16      A    Not that I'm aware of.

17      Q    How about in Outlook?  Did you keep a

18  calendar on your computer?

19      A    No.

20      Q    Okay.  You keep a paper calendar?

21      A    No.

22      Q    What notes do you keep to tell yourself

23  four weeks from now I'm supposed to be at a

24  particular location at a particular time?

25      A    I print a monthly 30-day calendar and put

1    my schedule on it at the beginning.

2         Q    Okay.  So you print a monthly calendar

3    from where?  Just off-line?

4         A    Yeah.  Just a blank 30-day calendar that I

5    write in where I'm going.

6         Q    Okay.  Where can I find that 30-day

7    calendar?

8         A    You could find September's in my

9    briefcase.

10        Q    Okay.  What if I want to look at your

11   calendar from March or April or May of 2012 -- 2013?

12   Excuse me.

13        A    I don't have a copy of those.

14        Q    Do you shred the prior month?

15        A    Yes.

16        Q    Is there anywhere else that I could direct

17   counsel to look for documents that you may have had

18   that would show these phone calls that you received

19   every four to six weeks from Lorraine complaining

20   about Jane?

21        A    None that I'm aware of.

22        Q    Okay.  So with respect to Phone Call

23   Number 1, I think we've gone over that.  What about

24   Phone Call Number 2, is that -- did you take notes

25   during that conversation with Lorraine?

1        A     No.

2        Q     Did you take notes with respect to Call

3  Number 3?

4        A     Not that I'm aware of.

5        Q     How about Call Number 4?

6        A     Not that I'm aware of.

7        Q     Call Number 5?

8        A     No.

9        Q     Okay.  Is it fair to say that you never

10  took notes related to Lorraine calling and

11  complaining about Jane?

12       A     I don't know.

13       Q     What does I don't know -- you don't know

14  if you took notes?  You don't know if you have the

15  notes?  What are you telling me?

16       A     I don't know if I have the notes or if I

17  took notes.

18       Q     I mean, am I far off if I asked for notes

19  that you might keep in the trunk of your car?  I'm

20  just trying to think of all the places I could find

21  notes.  How about the trunk of your car, are there

22  notes in there?

23       A     No.

24       Q     Notes in your briefcase?

25       A     Yes.

1      Q    Okay.  Do you have like banker's boxes for

2  each year that you might put notes from '11 in, '12

3  in, '13 in?

4      A    No.

5      Q    Do you have any type of administrative

6  assistant or secretary?

7      A    No.

8      Q    Okay.  When Lorraine would make these

9  complaints about Jane every four to six weeks, what

10  did you do in response?

11      A    I told her that she needed to sit down

12  with Jane and discuss the issues and communicate

13  what the expectation was and I encouraged her to go

14  ahead and start documenting that.

15      Q    Okay.  Did you insist that she do that?

16      A    No.

17      Q    Like that was a requirement, start taking

18  notes?

19      A    No.

20      Q    I mean, why would you want her to take

21  notes?

22      A    For follow-up.

23      Q    Well, you weren't taking notes, right?

24      A    I don't know.

25      Q    Well, why is it important to take notes?

1      A    For follow-up.

2      Q    Okay.  Well, when Jane -- when Lorraine

3  would call you and make these complaints every four

4  to six weeks, did you then call and talk about the

5  issues with Jane?

6      A    I don't recall doing that.

7      Q    Did you talk about the issues to your

8  boss?

9      A    I would mention them, yes.

10     Q    Okay.  Who was your boss at the time?

11     A    Jason Reese.

12     Q    You would mention them to Jason, what does

13  that mean?

14     A    I would let him know that I had a call

15  from Lorraine saying that Jane was not performing

16  her duties and responsibilities and I encouraged her

17  to go ahead and have a conversation with her and

18  document the issue.

19     Q    Did Jason ever say you should put that in

20  writing, memorialize that conversation, any words to

21  that effect?

22     A    Not that I remember.

23     Q    If he would have told you to do it, would

24  you have done it?

25     A    Yes.

1     Q    If your testimony is that Lorraine called

2  you every four to six weeks, and it sounds like she

3  made the same complaints, did you ever intervene; in

4  other words, either call Jane or go down and talk to

5  Jane at the facility?

6     A    Yes.

7     Q    Okay.  When was that?  After a particular

8  call?

9     A    The one I remember right now is the

10  Thursday before the incident on -- I believe it was

11  April 18th, 2013.

12     Q    Okay.  Had you talked to her before coming

13  down on the Thursday before the incident?

14     A    Well, I always have a regional call with

15  administrators and DONs on Tuesday, Monday or

16  Tuesday.

17     Q    Okay.

18     A    And I usually will say after the end of

19  the call, I will be at such-and-such and

20  such-and-such place, and that week I would have

21  probably said on Thursday, I'll be at St. Marys.

22     Q    Okay.  Well, was that a regularly

23  scheduled visit?

24     A    What do you mean by regularly scheduled?

25     Q    Well, did you visit all of your sites, you

1    know, five times a year, once a year?  You sound

2    like you have a meeting every week or is it every

3    month?

4          A    I have a phone call every week.

5          Q    Okay.  And at the end of that phone call,

6    you say I'm going to be at a particular facility?

7          A    (Witness nodded.)

8          Q    Yes?

9          A    Most of the time.

10         Q    Okay.  So I would take it that you have

11   some sort of schedule going on like I want to visit

12   two sites a week or --

13         A    Okay.  Yeah.  I had scheduled a visit on

14   Thursday.

15         Q    Okay.

16         A    Because of the last call that I had with

17   Lorraine concerning Jane.

18         Q    Okay.  So then the last call would have

19   been sometime in '13?

20         A    Sometime before April the 18th, 2013.

21         Q    Okay.

22         A    We just had an annual survey and a few

23   weeks prior to that time frame.

24         Q    How'd the survey go?

25         A    The state surveyors complained that Jane

1    wasn't doing her job as she normally had done over

2    the years.

3         Q    Really?

4         A    Because she always had a good relationship

5    with them.  I had regional staff reporting to me

6    that Jane wasn't herself during the survey.  She --

7    the perception was she didn't know what she was

8    doing.

9         Q    Really?  Well, tell me about this -- are

10   you claiming the state surveyor made some type of

11   complaint about Jane?

12        A    To Lorraine, yes.

13        Q    Okay.  Well, to Lorraine.  Well, what does

14   Lorraine say the state surveyor said?  Let's start

15   with the surveyor's name.

16        A    I don't remember their name.

17        Q    Okay.  Did the state surveyor write down

18   anywhere that Jane was deficient in anything?

19        A    I don't know.

20        Q    Well, did you write down when Lorraine

21   told you this alleged allegation that a state

22   surveyor said something about Jane's either work

23   ethic or work habit or ability, whatever it is?

24        A    I don't remember if I wrote anything

25   pertaining to the state on that.

1              MR. FRANKLIN:  Can we take like five

2        minutes?

3              MR. GARRISON:  Sure.

4              (Whereupon, a recess was taken at

5        1:26 p.m. and resumed at 1:38 p.m.)

6   BY MR. FRANKLIN:

7        Q    Isn't it true that the survey in 2013 only

8   resulted for the St. Marys' location with four desk

9   reviews?

10       A    I don't recall.

11       Q    Okay.  What is a desk review, do you know?

12       A    They don't come back for a re-visit.

13       Q    I mean, were all of your facilities -- did

14  all facilities that you had responsibilities for

15  have that type of survey?

16       A    No, not all.

17       Q    Okay.  So in spite of these alleged

18  complaints about Jane, it doesn't seem to have

19  affected the site survey, correct?

20       A    No, that's not correct.

21       Q    Okay.  Well, tell me how that's not

22  correct.

23       A    Early on during the survey, Jane called

24  the corporate office.

25       Q    Talked to you?

1      A    No.  She talked to one of our nurses at

2  the corporate office.

3      Q    Okay.  So you're telling us a story that

4  somebody told you?

5      A    Yes.

6      Q    Okay.  Well, who told you this story?

7  Who's the nurse?

8      A    I'm not sure.  I believe it was Lorraine

9  that told me that Jane had called.

10     Q    Okay.  Now, hold on.  So now you're saying

11 that Lorraine told you that Jane called the

12 corporate office and may have spoken to a nurse?

13 Was Lorraine on the phone?

14     A    I don't know.

15     Q    Okay.  Well, early on, what does that

16 mean, like when?

17     A    Survey usually lasts three -- two, three,

18 four days.

19     Q    Okay.  So we can narrow it down?

20     A    One or two days into the survey.

21     Q    What did Lorraine tell you that Jane did

22 by way of calling a nurse at region?

23     A    Was upset, didn't know, you know, what was

24 going on.  There was another regional staff member

25 there and then we ended up sending two or three

1    nurses down there to help manage the survey because

2    it was going south.

3         Q    Why didn't you do that to your other

4    facilities that didn't come close to passing the

5    survey?  Why didn't you send that team to those

6    facilities?

7         A    'Cause the DON was doing her job and was

8    managing surveys.

9         Q    Well, I've seen the surveys from the other

10   facilities that you had responsibilities for, and

11   they didn't end up with desk surveys, desk reviews,

12   right?

13        A    I would have to look at the ones you're

14   referring to.

15        Q    Some of them didn't even meet the standard

16   for the survey, correct?

17        A    Neither did St. Marys.

18        Q    Really?  Where can I find in writing that

19   you are claiming Lorraine told you this story?

20   Where can I find that?

21        A    I don't know.

22        Q    I mean, did you document it somewhere?

23        A    Not that I remember.

24        Q    Okay.  But I just want to make sure that I

25   understand it.  Lorraine told you that Jane called

1  corporate and talked to a corporate nurse; is that

2  what you told me?

3        A    Somebody, I'm not sure who.

4        Q    Okay.  And one other person?

5        A    There was another person already there at

6  the survey.

7        Q    Another person was there at the survey.

8  What month was the survey done?

9        A    It was either late March or early April.

10       Q    Okay.

11       A    2013.

12       Q    Do you remember who headed the team from

13  the state who performed the survey at the St. Marys'

14  location --

15       A    No.

16       Q    -- in '13?  Well, can I find somewhere in

17  a note that you drafted or a document you may have

18  filled out any of the information you just told us

19  about that Lorraine reported to you that Jane called

20  corporate and talked to a corporate nurse?

21            MR. GARRISON:  Objection.  Asked and

22            answered.  Go ahead.

23       A    Not that I remember.

24       Q    Well, do you recall taking notes?

25       A    For that specific time frame, I don't

1   recall.

2        Q    Does it -- am I confusing you by talking

3   about specific time frames when it comes to your

4   documentation related to Jane?

5        A    No.

6        Q    Okay.  Because I'm willing to -- you can

7   tell me about any documentation that you've ever

8   drafted related to Jane.  Tell me that.  Give me any

9   documents you've drafted related to Jane.

10       A    I think you have the letter from April

11  23rd.

12       Q    Okay.  April 23rd letter.  What else?

13       A    There was a note from my black book.

14       Q    Note from the black book.  Okay.  Anything

15  else?

16       A    That's all I recall right now.

17       Q    Okay.  Well, if you recall anything other

18  than those two documents, which we'll spend a

19  considerable amount of time on, you tell me.  Okay?

20       A    Okay.

21       Q    If the survey was going south, as you say,

22  did you go down there during the survey and pitch

23  in?

24       A    No.  No.

25       Q    Why not?

```
 1      A     I don't remember.

 2      Q     Were you busy at one of the other

 3  facilities?

 4      A     I probably was doing something else and

 5  there was a team of regional staff already there to

 6  help.

 7      Q     Well, I mean what is the regional staff's

 8  responsibilities?  Do they just sit at the region

 9  and play cards and wait until somebody calls with a

10  problem?

11      A     No.

12      Q     Okay.  What do they do?

13      A     Depending on who we're talking about

14  specifically.

15      Q     Okay.  Well, who are we talking about

16  specifically when it comes to the 2013 survey at

17  St. Marys?

18      A     Regional -- the nurse that's responsible

19  for quality assurance.

20      Q     Okay.  Who's that?

21      A     Gerty Dickey.

22      Q     Gerty Dickey?

23      A     Uh-huh.

24      Q     Can you spell the name for us?

25      A     Last name, D-I-C-K-E-Y.
```

1       Q     What about Gerty?

2       A     G-E-R-T-Y.

3       Q     T-Y.  Okay.  So she was at St. Marys?

4       A     I think so, yes.

5       Q     Okay.  And who else?

6       A     Adeline Baker was there.  I'm not sure

7  exactly what date she was there but --

8       Q     Well, was she there during the survey?

9       A     I believe so.

10       Q     Okay.  What's her title?

11       A     She's a -- I don't remember her specific

12  title, but she's a regional nurse as well.

13       Q     Okay.  Now, having said that, why wouldn't

14  regional nurses be involved in surveys?  I mean,

15  what are they doing if they're not involved?  Do

16  they just sit in a corporate office and play cards?

17       A     No.

18       Q     Okay.  What do they do?

19       A     They have different responsibilities.

20  What they were doing at any given moment, I can't

21  tell you.

22       Q     Well, did they have responsibilities to

23  pitch in during the survey if need be?

24       A     They can, yes.

25       Q     Okay.  So I mean you seem to be indicating

1   that the regional nurses were the ones that were

2   responsible for St. Marys' survey and bringing it

3   from the -- it was on the downslope, and then did

4   they bring it up?

5       A    Yes.

6       Q    Okay.  That's who you think brought it up,

7   not Jane or Lorraine?

8       A    There's other people involved in that

9   process.

10      Q    Okay.  But are those people only involved

11  if it's going south or are they involved in the

12  process year round?

13      A    Both.  There's other people involved that

14  we haven't mentioned there.

15      Q    Okay.  Well, I mean, are you saying if the

16  survey was going south, it's Jane's fault and

17  responsibility, and if the survey turned around and

18  was going north, it was everybody else's efforts

19  including people we haven't talked about?

20      A    Is that a question?

21      Q    Yeah.  I'm asking you is that how you look

22  at it.  If it's going south, it's Jane's fault; if

23  it turns around and goes north, it's everybody

24  else's responsibility?

25      A    No, not definitively.

1      Q      Where can we look at to see where you were

2   during the survey?  Can we look at your calendar?

3      A      No.

4      Q      Okay.  Anything that you can think of that

5   we could look at to know what you were doing during

6   the survey?

7      A      Not that I can recall right now.  I don't

8   know what that would be.

9      Q      Well, I mean, if you're going somewhere

10  for the company, you would ask for reimbursement, I

11  would take it, for mileage?

12     A      Yes.

13     Q      So if we look at your expense reports

14  during the time period of the survey, we should know

15  where you were at, right?

16     A      Yeah.

17     Q      Okay.  Prior to the survey that occurred

18  in 2013 at the St. Marys' facility, did you have any

19  one-on-one interaction with Jane?

20     A      I don't remember.

21     Q      Did you come down and issue any type of

22  discipline to Jane?

23     A      No.

24     Q      Did you come down and give her some

25  counseling?

```
 1        A     I don't recall.

 2        Q     Okay.  If you did, would it be in writing?

 3        A     Not that I remember.

 4        Q     Okay.  Handing you what was previously

 5   marked as Defendants' Exhibit P.

 6              MR. GARRISON:  Do you have a copy of

 7         that by chance?

 8              MR. FRANKLIN:  No.  I don't think we

 9         have that.

10              MS. PAOFF:  No.

11              MR. GARRISON:  Let me take a look at

12         it first.

13        Q     Have you seen what's been previously

14   marked as Defendants' Exhibit P prior to today?

15        A     I don't recall.

16        Q     Didn't you tell me earlier in this

17   deposition that you review the evaluations that's

18   given by the administrator to the DON before it's

19   given out?

20        A     I told you I try to.  I don't always get

21   to.

22        Q     Okay.  Well, do you keep track of which

23   ones you look at and which ones you don't?

24        A     I don't know.

25        Q     What do you mean you don't know?  Don't
```

1   you have some procedure in place if you review a

2   document, you write down I reviewed the document,

3   you sign the document?  Do you have some sort of

4   policy in place for yourself?

5        A    I try to do that, yeah.

6        Q    Well, which one?  I just gave you -- you

7   do all of those things?

8        A    I don't know.

9        Q    Okay.  Well, do you -- let's start with

10  the first one I suggested.  Do you keep a note

11  somewhere where you say I reviewed the evaluation

12  for 2013 that was given from -- given by Lorraine to

13  Jane?

14       A    I try to do that, yes.

15       Q    Okay.  Because you're telling me in 2012

16  and going into 2013 that Lorraine is calling you

17  every four to six weeks complaining about Jane,

18  correct?

19       A    Yes.

20       Q    Okay.  And then I look at this evaluation

21  and, you know, it doesn't seem to correlate to what

22  you've told me.  I mean, Number 1, the handwriting

23  is good knowledge of basic systems.  Number 3 is,

24  you know, good documentation.  Number 5 is Jane has

25  shown marked improvement in resident staff

1  relations.  It doesn't seem to correlate with your

2  testimony, would you agree?

3       A    No.

4       Q    You don't agree?

5       A    No.

6       Q    Okay.  Well, tell me how you don't agree.

7       A    I don't agree that it contradicts what

8  we've said before.

9       Q    Okay.

10      A    Because Number 3, it's marked as needs to

11 improve under management effectiveness.

12      Q    Okay.

13      A    And then I think you talked about the one

14 that said that she has improved, so I think it shows

15 that Lorraine had conversations with Jane after she

16 talked with me on the phone and made her aware of

17 some of the issues that were improved.

18      Q    Anything else that would demonstrate that

19 Lorraine was calling you four to six times -- four

20 to six times during -- four to six weeks -- I think

21 you said every four to six weeks she would call,

22 correct?

23      A    Yeah, approximately that.

24      Q    Uh-huh.

25      A    Around that time frame.

1      Q    I mean this evaluation indicates that Jane

2  is between meeting expectations and exceeding

3  expectations, correct?

4      A    Based on the score 3.2, she would be in

5  the meets expectations category.

6      Q    Okay.  So it would seem the supervisor

7  rates her, during the time period that you claim

8  she's calling you and complaining about Jane, she

9  says Jane's meeting expectations, correct?

10     A    She is improved in some of those

11 categories.

12     Q    Okay.  Well, you get evaluated, correct?

13     A    Yes.

14     Q    You're not always evaluated as a stellar

15 employee in every category, are you?

16     A    No.

17     Q    Okay.  So tell me about, if you can, an

18 alleged incident that happened with Jane in April of

19 2013.  What did you hear?

20     A    Are you talking about the incident where

21 she put her hands on an employee on the 19th?

22     Q    Okay.  Where she allegedly did that.  You

23 weren't there, right?

24     A    No.

25     Q    You didn't see anything?

1      A     No.  Is that what you're referring to?

2      Q     Yeah.  Sure.  Is there some other incident

3  you want to talk about?

4      A     No.

5      Q     I mean, are you aware of another incident?

6      A     Not that I'm aware of.

7      Q     Okay.  Well, go ahead and tell me what

8  this particular incident is about.

9      A     Well, I had gone down on the 18th, the day

10  prior to the 19th, to talk to Jane.

11      Q     Did you do that?

12      A     Did I go down there?

13      Q     Yeah.

14      A     Yeah, I just said I went down there.

15      Q     Did you talk to her?

16      A     Yes.

17      Q     Take notes?

18      A     Yes.

19      Q     Okay.  Took notes.

20      A     Well, I don't know if I took notes.

21  Mental notes.  I didn't write anything down on pen

22  and paper while I was talking to her.

23      Q     Okay.  So you want the jury to believe

24  that you took mental notes; is that fair?

25      A     Yeah.

1      Q    That's what you called them.  Okay.  Put

2  me in the conversation on the 18th.  What did you

3  talk to Jane about?  What do your mental notes tell

4  you?

5      A    What I remember of the conversation, I

6  went into her office and we spent some time talking

7  about her family, her sons, her husband, what they

8  were doing.  She had pictures up in her office and

9  that was not uncommon that we would do that.  So we

10  talked about those things and then started getting

11  into some of the performance issues, the yelling at

12  staff in the hallways, unprofessional behavior in

13  the hallway.

14      Q    When did this happen?  Because I'm looking

15  at a review dated February 7th, 2013, and I don't

16  see anything about yelling in the hallways and

17  things that you're talking about.  Did it happen

18  after that date?

19      A    Yes.

20      Q    Okay.  So sometime after February 7th, you

21  heard complaints about Jane.  Should we just like

22  forget about the testimony where you said every four

23  to six weeks Lorraine would call?

24      A    No.

25      Q    Okay.  So after her evaluation in

1    February, you're claiming that you received other

2    calls about her yelling at staff?

3         A    Yes.

4         Q    Who gave you -- who called you and told

5    you that?

6         A    Lorraine.

7         Q    Okay.  Did you take notes of any of those

8    conversations?

9         A    I don't recall.

10        Q    If you did, would it be in your notebooks?

11        A    Possibly.

12        Q    Okay.  Would it be in her personnel file?

13        A    No.

14        Q    Would it be on your computer?

15        A    No.

16        Q    Okay.  So you told her that you received

17   complaints?

18        A    On the 18th?

19        Q    Yeah.

20        A    Yes.

21        Q    Okay.  You said I received complaints that

22   you were yelling at employees in the hallway?

23        A    That was part of it, yes.

24        Q    Okay.  Did you tell her who you received

25   the complaints from?

1        A     Yes.

2        Q     Okay.  So you said Lorraine called and

3    complained?

4        A     Well, Lorraine told me about it, yes.

5        Q     Okay.  Anybody else -- had anybody else

6    called you and complained?

7        A     Yeah.  The state surveyors -- the state

8    surveyors didn't call me, but they made a comment

9    about some of that during the survey, and then our

10   regional staff had called me during the survey that

11   happened March or April when that happened to say

12   that there was some things like that going on.

13       Q     Okay.  Well, I thought that this

14   conversation that you had with Jane happened before

15   you would have had the regional people calling you?

16   Am I wrong in my timing?

17       A     Yeah.  State -- the survey happened before

18   April.

19       Q     Well, the state surveyor never called you

20   and complained about Jane, right?

21       A     I didn't say a surveyor called me.

22       Q     Okay.  Communicated in any way with you?

23       A     Directly to me, no.

24       Q     Okay.  So let's just get that out of the

25   way.  The state surveyor never sent you a text,

1    correct?

2         A    Right.

3         Q    Never called you, correct?

4         A    Right.

5         Q    Never communicated to you in person,

6    correct?

7         A    Yes.

8         Q    Okay.  Never communicated to you in

9    person, that's correct?

10        A    Yes.

11        Q    Okay.  So this alleged testimony that

12   you're giving about a state surveyor is something

13   someone told you, correct?

14        A    Yes.

15        Q    Okay.  Did you do anything to find out if

16   it was true, that the surveyor actually said that?

17        A    Yes.

18        Q    What did you do?  Did you call the

19   surveyor?

20        A    No.

21        Q    That wouldn't have been the best thing to

22   do if you're trying to find out if there's any truth

23   that a surveyor made this complaint?

24        A    I asked Jane about the comment.

25        Q    Okay.  But don't you think the smartest

1    thing would have been to call the surveyor?

2         A    I don't know.

3         Q    Okay.  Okay.  Tell me what else you said.

4         A    We talked about the performance issues and

5    then I suggested that we go to lunch across the

6    street where we could get out of the facility and

7    just have a conversation over lunch, and we did

8    that, continued our conversation.

9         Q    Okay.  What was the conversation about

10   over lunch?

11        A    About performance issues, what happened

12   during the state survey.  She mentioned to me that

13   she was -- she was looking for another job, was in

14   the process of either the second or third interview.

15   I don't know if it was that night or the next day

16   or -- it was coming up soon.  She thought she had a

17   good shot at getting the job with another company

18   and she felt like she needed to leave St. Marys and,

19   you know, she wanted to do that with no drama and

20   leave quietly.

21        Q    Do you have any notes to that effect?

22        A    Yeah, I think that's in my letter that I

23   wrote on the 23rd.

24        Q    Okay.  Did you take any notes during the

25   conversation with Jane?

Page 162

1      A     I did not write anything down.

2      Q     Okay.  Where was she going to get this

3  job?

4      A     I don't remember the name of the company.

5      Q     Did you ask her?

6      A     Yes.

7      Q     And she gave you the name?

8      A     Yes, I believe so.

9      Q     But you don't remember it?

10     A     No.

11     Q     Are you claiming she resigned that day?

12     A     On the 18th?

13     Q     Yeah.

14     A     No.

15     Q     Okay.  So then what happens?  Do you

16  escort her back to work?

17     A     Yeah.  We went back over to the facility.

18     Q     Okay.  Then what did you do?

19     A     I talked with Lorraine, told her that I

20  had encouraged Jane to -- while she's there to

21  communicate with her, perform her duties as she

22  knows that she's supposed to, and that she told me

23  that she was looking for another job and may be

24  leaving soon.

25     Q     Okay.  If that's true, did you start at

1   that point on the 18th to look for a new DON?

2        A    No, not that I remember.

3        Q    Well, if she told you she was leaving

4   soon, why didn't you start the process?

5        A    Well, because of our relationship, I took

6   that to mean that when I do decide to go, I'll give

7   a 30-day notice and we would have that time frame as

8   we normally would to look for her replacement.

9        Q    Did she ever say to you I'll give 30 days'

10  notice and we'll -- so you'll have time to find

11  someone else?

12       A    No.

13       Q    I mean, I thought you told me the last

14  time she left, I think your words were she just

15  walked out, correct?

16       A    That's right.

17       Q    So it would seem based on her history that

18  she wouldn't give 30 days' notice, correct?

19       A    I don't know.

20       Q    Well, you said based on your history with

21  her she would give 30 days' notice and it seems like

22  her history was to not give you any days' notice?

23       A    I wasn't there when she walked out as the

24  director of clinical services so --

25       Q    Okay.

1      A      -- she had never walked out on me.

2      Q      Because of your relationship with her,

3  what does that mean?

4      A      We had a good working relationship.  We

5  were always able to communicate and I think until

6  the deposition that we did recently was probably the

7  first time I've been in a room that she had not

8  walked up and hugged me.

9      Q      Well, do you think that she didn't walk up

10  and hug you because you fired her?

11      A      I don't know.

12      Q      Okay.

13      A      I don't know what she was thinking.

14      Q      Uh-huh.  Did you ask her?

15      A      No.

16      Q      So sometime it appears between Defendants'

17  Exhibit P, which is dated February 7th and signed by

18  Lorraine on February 8th, Jane, you want us to

19  believe, turned into a different type of employee?

20                  MR. GARRISON:  Objection to form.  Go

21              ahead and answer if you can.

22      A      Could you rephrase that question?

23      Q      Yeah.  I'm trying to figure out how I

24  match your testimony about 2012 when I look at

25  February 7, 2013.  And now I'm trying to figure out

1   between February 7, 2013, and the time she is

2   terminated, what happens?  In your opinion, is she

3   just a different type of person?

4        A    Well, when I asked her what happened with

5   the state survey, she told me that she had been put

6   on a new medication and had doubled the dose during

7   the first day of the survey and that was why she was

8   out of control so to speak.

9        Q    How was she out of control?

10       A    She was -- she was different from how she

11  had been with the surveyors the previous years.  I

12  think she was tearful.  Other staff had to come in

13  to help her.  There had been other times when

14  Lorraine had told me that she had yelled or been

15  inappropriate with staff at the nurses' station or

16  in the hallway, and then on Friday, the 19th, she

17  had an incident where she allegedly put her hands on

18  an employee.

19       Q    Okay.  You keep saying that regional came

20  in to help.  Isn't that their job?

21       A    Yes.

22       Q    Okay.  So what's the issue?  I mean why do

23  you keep throwing that in that regional came in to

24  help when that is their job?

25       A    Because she had never had to have that

1   kind of -- that mass assistance from three and four

2   nurses before.

3       Q    So now it's three or four nurses?

4       A    Well, they didn't -- they didn't go to

5   every building because annual survey started.

6       Q    So what do you -- what do you allege

7   happened on the 19th?

8       A    Well, like you'd asked me before what was

9   different from this evaluation until later.  The

10  incident on the 19th with allegedly putting her

11  hands on an employee was a significant event.

12      Q    Okay.  But how are you informed?  You're

13  not there?

14      A    Lorraine called me and told me.

15      Q    Lorraine called and told you what?

16      A    That Jane had done it again, she had

17  yelled at an employee in the hallway, but this time

18  she had pushed her up against the wall.

19      Q    So she says Jane done it again?  Is that

20  what --

21      A    Something to that effect.

22      Q    -- she says?  And this time she put her

23  hands on the person?

24      A    Yes.

25      Q    Okay.  Did you take notes during that

1  conversation?

2      A    I don't recall taking notes.

3      Q    Okay.  So what happens after she makes

4  this statement to you?

5      A    Well, we had to get HR involved for an

6  investigation into the issues that happened on the

7  19th.

8      Q    What do you mean we had to get HR

9  involved?

10     A    Well, typically in that building, Bob

11 Huenefeld would come in and start an investigation

12 by discussing the incident or getting statements

13 from --

14     Q    Who is Bob Huenefeld?

15     A    He's our regional HR person for that

16 building.

17     Q    Had you worked with him in the past?

18     A    Yes.

19     Q    Where at?

20     A    Well, with this company.

21     Q    Okay.

22     A    Atrium Centers.  Other buildings had

23 issues.

24     Q    Had you ever had another issue where an

25 employee was terminated and you and Bob were

1    involved?

2         A    Yes.

3         Q    Okay.  When was that?

4         A    I don't recall specific dates or times or

5    places.

6         Q    Okay.  Don't know the time, don't know the

7    place.  Do you know the facility?

8         A    I don't recall.

9         Q    Okay.  Do you know the people involved?

10        A    I don't recall their names.

11        Q    Do you know the incident?

12        A    I don't recall specific incident.

13        Q    Okay.  Well, I mean why was the person

14   terminated?  You just said you'd worked with Bob on

15   a time when an employee was terminated.  Just tell

16   me what you remember.

17        A    Well, Bob would do his investigation

18   through statements.

19        Q    Yeah.  Are you guessing or are you going

20   to tell me what happened the last time you and Bob

21   worked together?

22        A    You asked me to tell you and I was going

23   to tell you.

24        Q    Okay.  But are you saying "Bob would

25   have"?  That sounds like you're telling me what you

1   presume he did as opposed to "Bob did."  So are you

2   going to tell me what you think Bob should have done

3   or are you going to tell me what Bob did?

4        A    Well, Bob went into the facility, got

5   statements, put his investigation together, did a

6   summary, and then I would review that.

7        Q    Again, you say "I would review that."  Did

8   you review a summary?

9        A    Yes.

10       Q    So "I did review it"?

11       A    Yes.

12       Q    Okay.  When did any of that occur?  What

13   year?

14       A    I don't remember a specific date.

15       Q    Do you have a copy of the summary?

16       A    I would -- I probably do, yes.

17       Q    Okay.  Where at?

18       A    On my computer.

19       Q    Other than the summary, did you review

20   anything else?

21       A    I don't remember.

22       Q    Was the employee terminated?

23       A    In some cases, yes.

24       Q    No.  I'm talking about this particular

25   time that you -- I presume you're telling me about

1   where you and Bob did an investigation and an

2   employee was terminated?

3        A    I'm not speaking to a specific incident,

4   time, or date.

5        Q    Well, so the summary that you're reviewing

6   doesn't really exist?  It's just imaginary?

7        A    No.

8        Q    Okay.  So it exists?

9        A    Yes.

10       Q    Okay.  More than one?

11       A    I don't know.

12       Q    Okay.  What's it under?  Is it in its own

13   folder, like summary incidents?

14       A    No.

15       Q    What do I ask for since you don't remember

16   time, place, who it involved, anything like that?

17       A    I don't know.

18       Q    Well, if you wanted to find it, how would

19   you go about looking for it?

20       A    I would look for the specific incident or

21   name.

22       Q    Okay.  But how would you do that since you

23   don't remember anything?

24       A    I would have to be looking at a specific

25   incident or time or place.

1      Q    Okay.  I have your computer in front of

2   me; what do I look for?  Something called summary?

3      A    I don't know.  I don't know what it would

4   be titled.

5      Q    Okay.  But if you needed to look at it,

6   what would you look at?

7      A    I could review my e-mails.

8      Q    Okay.  It's in an e-mail?

9      A    More than likely, yes.

10     Q    Is it an e-mail from Bob?

11     A    Yes.

12     Q    Okay.  How many e-mails does Bob send you?

13     A    I don't know.

14     Q    Does he send you ten a year?

15     A    I don't know.

16     Q    Okay.  Did you do anything in the

17   investigation of Jane?

18     A    Yes.

19     Q    What did you do?

20     A    I went to the facility the following week.

21     Q    After Jane was terminated or --

22     A    After the 19th, that following week

23   I believe I was there.

24     Q    So you went to the facility?

25     A    On the 23rd.

1       Q    What did you do there?

2       A    I anticipated being able to talk to Jane,

3    but she wasn't there.

4       Q    Where was she?

5       A    I was told she was off sick.

6       Q    Who told you that?

7       A    Lorraine.

8       Q    Okay.  She's the same person that tells

9    you just about everything that goes on there, right?

10      A    She's the administrator, yes.

11      Q    Okay.  So she told you Jane was off sick?

12      A    Yes.

13      Q    Okay.  What did you do?  Do anything based

14   on that?

15      A    I was there at the facility and Bob was

16   doing his investigation.

17      Q    Okay.  What did you do?  I mean, so far

18   I've heard that you asked maybe Lorraine where Jane

19   was.  Do anything else?

20      A    Yes.

21      Q    Okay.  What did you do?

22      A    I don't remember everything that I did

23   that day.

24      Q    Well, give me anything that you did that

25   day other than ask Lorraine where Jane was.

```
 1        A    I did sit in on an interview with Bob

 2   by -- he had a nurse aide that was involved in the

 3   incident on the 19th that was a witness to the

 4   incident.

 5        Q    Okay.  What's the person's name?

 6        A    I believe her name was Ciara or Sienna.

 7        Q    Ciara or Sienna?

 8        A    Yeah.  I'm not --

 9        Q    Did you take notes?

10        A    No.

11        Q    What day?

12        A    It was the 23rd, I believe, when I was

13   there.

14        Q    Is that the day you sat in with Sienna or

15   Ciara?

16        A    No.  I was on the phone.  She was on the

17   phone, and I was with Bob.  He did it by a phone

18   conversation, and he put her on speaker phone and I

19   was in the room with Bob.

20        Q    Did you say anything?

21        A    I don't remember.

22        Q    Did you notice Bob taking notes?

23        A    Yes.

24        Q    Okay.  Did you look over his notes?

25        A    No.
```

1     Q    Okay.  Anything else?  Do you remember

2   anything Ciara said?

3     A    I'd have to look at the investigation to

4   refresh my memory, but she -- she -- I believe she's

5   one of the nurse aides that observed Jane putting

6   her hands on the other nurse aide.

7     Q    Did she observe Jane being loud?

8     A    Yes.

9     Q    Anything else you can remember?

10    A    Not that I remember of that day.

11    Q    Okay.  Did you do anything else that day?

12    A    Sometime that evening, I believe I wrote

13   the -- my memo from the 23rd.

14    Q    Where did you write the memo?  Where were

15   you?

16    A    I don't recall.

17    Q    Well, were you at the facility or were you

18   in your car?  Were you in a hotel room?

19    A    I was probably in a hotel room, but I

20   don't recall the specific location.

21    Q    Well, did you take notes at all?

22    A    Not that I recall.

23    Q    Uh-huh.

24              (Whereupon, Plaintiff's Exhibit 28

25              was marked for identification.)

1       Q     Handing you what's been marked as

2    Plaintiff's Exhibit 28.  Take a moment to look at

3    that document, please.  Have you seen this document

4    prior to today?

5       A     Yes.

6       Q     For the record, what does this document

7    appear to be a copy of?

8       A     It's a copy of two pages out of my black

9    notebook that I keep in my briefcase.

10      Q     Tell me how it's two pages.

11      A     The notebook is like a hard-back book so

12   when you open it up, there's two pages being shown.

13      Q     Okay.  Why does one page look so much

14   smaller than the other page?

15      A     Because the book's wider than what the

16   printer would print off.

17      Q     Well, when did you create this document?

18      A     Sometime in April after the 25th, that --

19   the particular entry from St. Marys.  I mean,

20   there's other entries on there from 4/15 and other

21   things.

22      Q     Did you make this -- did you put this in

23   your black -- is this from the black notebook?

24      A     Yes.

25      Q     Did you put this in there once you got

1  back to your home or did you have the black notebook

2  with you?

3       A    I don't know exactly when I made the

4  entry.  I could have put it in there that night.  I

5  could have put it in there when I got back home.

6       Q    Well, my first question is did you have

7  the black book with you?

8       A    Yes.

9       Q    Okay.  So did you make the entry before

10  you created the other document or after you created

11  your version of the incident?

12       A    I believe it was after the 23rd.

13       Q    Okay.  So you created this after the 23rd?

14       A    Yeah, after the 25th, I believe.

15       Q    After the 25th?

16       A    Yeah.

17       Q    So you were home by then, right?

18       A    I don't know.  I'd have to look at my

19  schedule.

20       Q    Okay.  What I'm trying to figure out is

21  when you copied it, how is the -- look at the

22  document that says 4/15 or whatever it says.  See

23  the date, what would be the second page?

24       A    4/15, Monday call.

25       Q    Okay.  How is the 4 and the 1 on one side

1   of the document and the 5 on the other side?  How is

2   that possible?

3        A    'Cause I still had room on this side to

4   put some notes in there, so I did.

5        Q    I don't understand your answer.  I'm

6   sorry.

7        A    I could have written the entry about Jane,

8   then the incident the following week even a week or

9   so later.  There's no chronological order to the

10  book.

11       Q    Yeah, I get that.  But how is the 4 and

12  the 1 on one page, and the rest of the document on

13  the other page?

14       A    It's not.

15            MR. GARRISON:  I'm just going to --

16            yeah.  There's a crease there.  That's a

17            margin notation, not an indication that

18            it's a different page.

19       Q    I thought you said this was two pages?

20       A    It is.

21            MR. GARRISON:  There's a crease going

22            down right here.

23       A    Yeah.  That double line is a margin here

24  and here.

25       Q    Yeah.  You have the book.  Just let me see

1    the book.

2         A    I don't have it with me.

3         Q    You just told me it was in the briefcase?

4         A    I don't have my briefcase with me.  It's

5    in my car downstairs.

6         Q    Can you get it during a break?

7         A    Sure.

8         Q    So you think you made the notation about

9    the incident at St. Marys on the 25th?  You're just

10   guessing?

11        A    When I made the -- when I made the entry

12   on the notebook --

13        Q    Yeah.  Are you guessing?

14        A    -- it was after the 25th.

15        Q    Okay.  What date?  Would you just be

16   guessing?

17        A    I don't know a date specifically.

18        Q    I think you write Jane pushed an aide

19   during altercation Friday evening, 4/19/13.  Visit

20   St. Marys 4/23.  Is that "with," the symbol for

21   "with"?

22        A    Yes.

23        Q    Bob Huenefeld.  Two aides confirm Jane

24   pushed the aide and was loud and unprofessional.

25   Family member daughter overheard everything.  Did I

1   read that correctly?

2        A    Yes.

3        Q    Okay.  Let's kind of start backwards.

4   Family member daughter heard everything.  Did you

5   talk to the family member's daughter?

6        A    No.

7        Q    Did you talk to the patient or the

8   resident?

9        A    No.

10       Q    Well, how do you know the family member

11  daughter heard everything?

12       A    I was told that by Lorraine.

13       Q    Well, was Lorraine -- to your knowledge,

14  did Lorraine witness the incident?

15       A    Not to my knowledge.

16       Q    Did Lorraine talk to the family member's

17  daughter?

18       A    I don't know.

19       Q    So Lorraine is telling you family member's

20  daughter overheard everything.  Did you ask what do

21  you base that on, what's the evidence, anything to

22  that effect?

23       A    Not that I remember.

24       Q    Just took it at face value?

25       A    No.

1      Q     Right?

2      A     (Witness shook head.)

3      Q     What did you do to confirm that the family

4  member's daughter heard everything?

5      A     It was a logical conclusion based on the

6  location of the incident and statements from the

7  nurse aides.

8      Q     So you claim what -- you drew an inference

9  that you believe was logical, correct?

10     A     Yes.

11     Q     Based on what Lorraine told you and where

12  the incident took place?

13     A     And the nurse aides' statements and the

14  investigation.

15     Q     Okay.  But you could have easily asked the

16  resident, correct?

17     A     No.

18     Q     Why not?

19     A     I wasn't there.

20     Q     Well, you were there on the 23rd.  Is this

21  information that you're given after the 23rd?

22     A     What I wrote there?

23     Q     Yeah.

24     A     Is after the 23rd.  After the -- after my

25  visit there that week.

1       Q    Okay.  So after your visit on the 23rd,

2   you got additional information?

3       A    I believe Bob's summary was done after

4   that, yes.

5       Q    But that's what you're relying on then to

6   write family member's daughter overheard everything?

7       A    That's part of it.

8       Q    Well, I thought you relied on what

9   Lorraine told you?

10      A    That was part of it.  She had input as

11  well.

12      Q    Okay.  So you relied in part on Lorraine

13  saying family member's daughter heard everything,

14  correct?

15      A    In part, yes.

16      Q    Okay.  When were you given this

17  information?

18      A    What information?

19      Q    Family member's daughter overheard

20  everything.  What date did someone tell you that?

21      A    I think Lorraine told me the initial --

22  when she initially called me after the 19th.

23      Q    Okay.

24      A    And then I believe it's in the summary

25  from Bob's investigation.

1      Q    Okay.  So you're told about it on the

2  19th.  You're there on the 23rd.  Why didn't you

3  just ask?

4      A    I don't think I was told about it on the

5  19th.  It was after the 19th, because it happened

6  late in the evening on Friday.

7      Q    Were you told about it before you got

8  there on the 23rd?

9      A    I believe so.

10      Q    Okay.  Then why didn't you investigate by

11  asking the resident?

12      A    I don't know.

13      Q    Did you go to try to find the daughter?

14      A    I don't remember.

15      Q    You say two aides confirmed Jane pushed

16  the aide and was loud and unprofessional.  Who did

17  you -- who are you referencing there?

18      A    The nurse aides in the investigation.

19      Q    No, give me their names.  You overheard --

20  I think you said earlier Ciara or Sienna said that

21  Jane pushed whoever the person is, right?

22      A    Yeah, I believe the other -- the other

23  aide Kelsey that was involved in the incident if I'm

24  not mistaken.

25      Q    Did you talk to everyone that was involved

1    in the incident?

2        A    I don't remember that I talked to

3    everyone.

4        Q    I mean, did you talk to some people that

5    said Jane never touched her?

6        A    No.

7        Q    Have you ever read the statements of all

8    of the witnesses?

9        A    I'm not sure.

10        Q    Wouldn't that be important to you?

11        A    Yes.

12        Q    The word altercation, Jane pushed an aide

13    during an altercation, whose word is that?

14        A    I was the one who wrote it, so it would be

15    my word.

16        Q    I mean, no one said there was an

17    altercation, that's just something that you

18    logically concluded?

19        A    Yes.

20                (Whereupon, Plaintiff's Exhibit 29

21                was marked for identification.)

22        Q    Handing you what's been marked as

23    Plaintiff's Exhibit 29.

24                MR. FRANKLIN:  Let's go off the

25                record for a minute.

1          (Whereupon, a discussion was held off

2          the record.)

3          MR. FRANKLIN:  Let's go back on the

4          record.  You're agreeing, I believe, that

5          what we've marked as Plaintiff's Exhibit

6          29 --

7          MS. PAOFF:  Yeah.

8          MR. FRANKLIN:  -- has two blank pages

9          that were Bates stamped inadvertently 848

10         and 849.  That's correct?

11         MR. GARRISON:  That's correct.  I can

12         confirm that there were no redactions made

13         from either one of these pages.

14         MR. FRANKLIN:  Okay.  And there was

15         nothing on it, just copier pulled through?

16         MR. GARRISON:  Right.

17         MR. FRANKLIN:  Got it.

18   BY MR. FRANKLIN:

19     Q    Have you seen the first page then of

20   Plaintiff's Exhibit 29 prior to today?

21     A    Yes.

22     Q    For the record, what does Plaintiff's

23   Exhibit 29 appear to be a copy of?

24     A    It's the memo that I typed up regarding

25   discussion with Jane.

1      Q    Okay.  Is this the document you reviewed

2  in preparation for your deposition today?

3      A    Yes.

4      Q    Okay.  Is this a document that's on your

5  computer currently?

6      A    Yes.

7      Q    Okay.  If I wanted to find this document

8  on your computer, what do I look at?

9      A    I believe it's under the St. Mary file.

10     Q    What is the St. Mary file?

11     A    It's a folder I created on my desktop --

12  on the laptop, on the desktop page.

13     Q    So it's on your desktop?

14     A    Well, it's on the laptop.  I don't have a

15  desktop computer.

16     Q    No.  It's on your screen --

17     A    Yes.

18     Q    -- the desktop?

19     A    Yeah.

20     Q    And it's called St. Marys?

21     A    I believe that's the name of it, yes.

22     Q    Okay.  And what do you keep in that file?

23     A    Various forms, letters, memos.

24     Q    Okay.  Have you produced that entire file

25  to the lawyers in this case?

1      A    No.

2      Q    Did you even tell them that the file

3  existed?

4      A    No.

5      Q    Why not?

6      A    This is all I had about the incident in

7  there.

8      Q    So you went through the file, yourself,

9  and made a determination as to what to produce?

10     A    Yes.

11     Q    Well, tell me how you decided what to

12  produce and what not to produce?

13     A    If it had Jane's name on it, I produced

14  it.

15     Q    Okay.  So this is the only document with

16  Jane's name on it in the folder?

17     A    Related to this incident.

18     Q    No.  See, that's what I'm asking.  Are

19  there other -- you said I searched for Jane's name.

20  Now are you telling me you searched for Jane's name,

21  but only as it relates to this incident?

22     A    Yes.

23     Q    Okay.  Well, I mean, did you search for

24  Jane's name as it relates to these alleged phone

25  calls you received in 2012 and 2013?

1      A    I looked under the file for anything

2  pertaining to this incident.

3      Q    Okay.  Well, why not just type the word

4  Jane, have it search and bring up all the documents

5  with Jane's name and give them to the attorneys?

6      A    I don't know how to do that.  Didn't know

7  you could do that.

8      Q    When did you give the lawyer this

9  document?

10      A    I don't remember.

11      Q    Well, was it recently?  Was it months ago?

12  When was it?

13      A    I don't remember how long ago it was.

14      Q    Well, who did you give it to?  Did you

15  give it to the lawyer directly or did you give it to

16  Susan?

17      A    I sent it to Susan.

18      Q    You sent it to Susan?

19      A    (Witness nodded.)

20      Q    So you sent it with some sort of e-mail

21  heading?

22      A    Probably, yes.

23      Q    So there would be a date on that document?

24      A    Yes.

25      Q    Okay.  Can you tell me what it might have

1   said in the subject line?  Like to Susan, here's

2   another document related to Jane?

3        A    I don't remember specifically what it

4   said.

5        Q    You still have it, right?

6        A    Yes.

7        Q    Where were you when you created this

8   document?  Where were you on the 24th?

9        A    I'm not sure.

10        Q    Well, let's start with did you actually

11   create the document on the 24th?

12        A    No.

13        Q    Then why is it dated the 24th?

14        A    It's dated the 23rd, isn't it?  Oh, I

15   guess it was the 24th.  My mistake.

16        Q    No.  It's not a mistake.  Just tell me

17   when you created the document.  23rd?  24th?  Two

18   weeks ago?

19        A    It was sometime after the 23rd, either

20   that night.  It may have been early in the morning,

21   because sometimes if I'm in a hotel room, I'll work

22   on things late at night.  So I could have produced

23   it at midnight.  I could have produced it the next

24   morning.  I don't recall.

25        Q    Okay.  Well, if you were at a hotel, what

1    hotel were you at?

2         A    I don't remember.  I'd have to go back and

3    look.

4         Q    What could we look at?  Your expense

5    report?

6         A    Probably, yes.

7         Q    Now, did you create this document by

8    looking at any other document or is this all from

9    your mental notes in your head?

10        A    Yeah, this is a template that we have with

11   the company logo on it.

12        Q    Yeah, I understand that.

13        A    And I started typing based on those things

14   that I remember from the week before with Jane and

15   our conversation and the incident that occurred on

16   the 19th.

17        Q    So you're not looking at any other notes,

18   you're just doing this from memory; is that correct?

19        A    I don't know.

20        Q    So you may have been looking at something

21   else when you created it?

22        A    I may have had a note or a piece of paper.

23   I don't know.

24        Q    I want to see the note or piece of paper.

25   Do you have it?

1        A       I don't know.  I don't think so.  I've

2     looked for it, but I don't have anything else so --

3        Q       You looked for it, what does that mean?

4        A       When asked for documentation pertaining to

5     Jane, I went through everything and that's what I

6     found.

7        Q       Well, it seems to me that you only

8     produced documents that you thought were relevant,

9     correct?

10       A       I produced documents -- I type documents

11    that I think are relevant, yes.

12       Q       You gave Susan documents that you thought

13    were relevant to this case, correct?

14       A       Yes.

15       Q       Did this document go through more than one

16    draft or is this it?  You sat down, you typed it,

17    and you sent it, let's say, or did you work on it

18    for a few days, make changes?

19       A       I don't recall.  I think it was a one --

20    one-time thing.  I don't think there was any --

21    anything over the course of several days.  I don't

22    recall that.

23       Q       But see, when you tell me I don't recall,

24    what I hear is I don't have present day recollection

25    but I might have created it over several days; is

1   that fair?

2         A     Yes.

3         Q     But you know you created it on the company

4   laptop, correct?

5         A     Yes.

6         Q     How do you back up your documents?  Do you

7   put them on the stick?

8         A     Not always.

9         Q     But sometimes?

10        A     Yeah, I deal with hundreds of documents.

11  They go different places, hundreds of different

12  places.  I can't tell you exactly.

13        Q     Yeah, but to back up your computer, do you

14  put it on some sort of stick or flash drive?

15        A     No, I don't back up my computer.

16        Q     So you don't have any type of zip drives?

17  The stick?

18        A     No, not as a backup.  If I had something

19  like that, it would be to make a copy of something,

20  a form that I may need or somebody else needs,

21  something like that --

22        Q     Okay.

23        A     -- for presentation, but not as a storage

24  device.

25        Q     I'm reading from -- I'm going to start at

1    the first paragraph.  I received a call from

2    Lorraine, administrator of St. V's [sic], on or

3    about April 12th regarding the behavior of her

4    director of nursing, Jane Fiely.  Is that correct?

5    You wrote that?

6         A    Yes.

7         Q    I don't see where you've indicated that

8    you received all of the other calls that you

9    testified to, the call every four to six weeks.  I

10   mean, is this the first call that you actually

11   received regarding Jane?

12        A    No.

13        Q    Lorraine reported to me that Jane was

14   yelling at staff in the hallway and having

15   difficulty staying focused on her DON

16   responsibilities.  Do you see that?

17        A    Yes.

18        Q    Did you ask her what -- did you ask

19   Lorraine what she meant by having difficulty staying

20   focused?

21        A    I don't recall asking her that.

22        Q    I mean, what did you take that to mean?

23        A    That she wasn't attentive to what she

24   should do each day.

25        Q    That's how you took it, that she wasn't

1  attentive to her daily duties?

2      A    Well, she wasn't doing her job and her

3  responsibilities as she had previously.

4      Q    I made a specific visit to speak to Jane

5  on Thursday, April 18th.  I talked with Jane about

6  90 minutes in her office and we continued our

7  discussion in a restaurant across the street from

8  the facility over lunch.  Do you see that?

9      A    Yes.

10     Q    So the meeting that you had with Jane took

11 over two hours?

12     A    Approximately.

13     Q    You talked to her in her office 90 minutes

14 and then you continued the discussion in a

15 restaurant across the street; do you see that?

16     A    Yes.

17     Q    Okay.  During that 90-minute time period

18 and the time period across the street, you're not

19 taking any notes, correct?

20     A    I'm not writing anything down, no.

21     Q    Okay.  When I asked Jane about the above

22 behaviors, she responded by denying ever yelling at

23 the staff in the hallway.  Do you see that?

24     A    Yes.

25     Q    She gave examples of how she felt she was

1    focused on getting tasks accomplished in the

2    facility each day and thought she was doing a good

3    job.  Do you see that?

4        A    Is that that second sentence there?

5        Q    Yeah.

6        A    Yeah.

7        Q    Was there any evidence that you had that

8    she wasn't focused in accomplishing her tasks each

9    day other than Lorraine saying something to the

10   effect of she's having difficulty staying focused?

11       A    Yes.

12       Q    What was it?

13       A    Well, in --

14       Q    I mean, did you review something she did

15   or didn't do?

16       A    In preparation for the survey, we had

17   folks from a sister facility that are not regional

18   staff --

19       Q    Okay.

20       A    -- go to her building to help her with her

21   systems to make sure she was ready for her survey.

22       Q    Okay.

23       A    And then during the survey, we had the

24   issue with her becoming emotional and not able to

25   focus on the survey and not able to do it by herself

1   like she had done many times before.  We had

2   regional staff go down to help rescue the survey, so

3   to speak, so the fact that that happened and she

4   still believed that she was doing a good job caused

5   me concern.

6        Q    I asked her about her bizarre behavior

7   during the recent annual survey that was pointed out

8   by several regional staff as well as the state

9   survey team.  Do you see that?

10       A    Yes.

11       Q    Did you have these regional staff

12  individuals write down what they observed?

13       A    I don't recall.

14       Q    In other words, a witness statement?

15       A    I don't recall doing that, no.

16       Q    Okay.  How about did you ask anyone from

17  the state survey team to write down what they

18  allegedly observed about her behavior?

19       A    No.

20       Q    And you weren't there to observe it

21  yourself?

22       A    Correct.

23       Q    Correct?  Give me the names of the

24  individuals in the state survey team who you're

25  claiming witnessed Jane's, I think you say, bizarre

1  behavior?

2      A    I can't give you their names, but we can

3  get their cards because they leave their business

4  card with each survey.

5      Q    So what do I ask for?  I write a letter to

6  Brian, and I say I need the names of the people on

7  the state survey team, apparently they leave their

8  cards in what?

9      A    If you ask for the names of the surveyors

10 that did the survey in 2013?

11     Q    Yeah.  I want the names of the people that

12 you claim reported this bizarre behavior.

13     A    From the state?

14     Q    No.

15     A    From our company?

16     Q    Yeah.

17     A    That would be Gerty Dickey, Adeline Baker,

18 Dawn Puka.  I believe Dawn Puka was there.

19     Q    Gerty, Dawn Puka?

20     A    Uh-huh, P-U-K-A.

21     Q    Who else?

22     A    I don't remember the regional nurse at

23 that time.  I'm not sure that that regional nurse

24 was there or not.

25     Q    Are you sure Adeline Baker was there?

1       A    I'm not sure if she was there during the

2    survey.

3       Q    Well, give me the names of the people

4    you're sure were there who reported the bizarre

5    behavior.

6       A    Gerty Dickey was one of them.

7       Q    Okay.

8       A    And I'm not sure if the regional nurse at

9    that time, who that was.  I think the regional nurse

10   reported it as well.

11      Q    Okay.  You say it was pointed out by

12   several regional staff.  So far I've heard for sure

13   Gerty who we'll be talking to, but who else for

14   sure?

15      A    The regional nurse.

16      Q    Regional nurse.  Who's that?

17      A    I don't remember her name at that time.

18      Q    Does she have a different name now?

19      A    I don't recall who was the regional nurse

20   during that period.

21      Q    It's not the same regional nurse?

22      A    No.  That's there now, no.

23      Q    Okay.  Did you get any of these statements

24   in writing?  That's what I'm asking first --

25      A    No.

1       Q      -- so I don't have to haul them into a

2    deposition.

3       A      No.

4       Q      Okay.  Does Gerty still work there?

5       A      Yes.

6       Q      Does Puka still work there?

7       A      Puka, yes.

8       Q      Does Adeline Baker still work there?

9       A      Yes.

10       Q      And you think it's a different regional

11    nurse?

12       A      Yes.

13       Q      Was there some reason that you didn't take

14    notes when they allegedly came to you and talked

15    about the bizarre behavior?

16       A      Was there a reason I didn't take notes?

17       Q      Yeah.

18       A      No.

19       Q      I mean, do you have any training in the

20    mental health field?

21       A      Aside from being trained as a registered

22    nurse during that training, that's it.

23       Q      Well, I mean tell me, you don't hold any

24    type of LPC?

25       A      No.

1      Q    Correct?  I mean, you don't hold any

2  licensure related to mental health, correct?

3      A    No.

4      Q    And you're not alleging that you do,

5  right?

6      A    No.

7      Q    'Cause that would be illegal, right?

8      A    I suppose.  I'm not a lawyer as you

9  pointed out earlier.

10     Q    No.  But you're also not an LPC?

11     A    What is an LPC?

12     Q    See, you don't know that.  You don't even

13  know what makes up the mental health field, correct?

14     A    I'm not an expert on the mental health

15  field.

16     Q    Well, that's -- you use the word bizarre.

17  What does bizarre mean?

18     A    Unusual, out of the ordinary.

19     Q    Is that how you were using it in this

20  document?

21     A    Yes.

22     Q    Unusual, out of the ordinary.  You claim

23  Jane went on to say she was currently interviewing

24  for another position and would more than likely be

25  leaving soon, but you can't tell us what the other

1    position was, correct?

2         A    I'm sorry, where did you --

3         Q    The next -- the next paragraph, one,

4    two -- third paragraph.  Jane went on to say that

5    she currently -- she was currently interviewing for

6    another position and would more than likely be

7    leaving soon; do you see that?

8         A    Yeah.  You skipped the part about --

9         Q    I can skip anything I want.

10        A    Okay.  I'm just asking that you didn't --

11        Q    Okay?

12        A    I'm making sure I followed you.

13        Q    Did I read it correctly or not?

14        A    Yes.  Yeah, you did.

15        Q    Okay.  Can you tell us where she was

16   interviewing?

17        A    No.

18        Q    You asked her?

19        A    Yes.

20        Q    Okay.  And she gave you the name

21   allegedly, right?

22        A    Yes.

23        Q    She felt her relationship with Lorraine

24   was not repairable at this point and felt Lorraine

25   did not want her in the DON role at St. Marys any

1  longer.  Do you see that?

2      A    Yes.

3      Q    Did you ask her why she felt that?

4      A    Yes.

5      Q    What did she say?

6      A    That they were having difficult time

7  communicating and she didn't feel like she wanted

8  her there any more.

9      Q    Did she tell you that Lorraine had asked

10  her when she was going to retire?

11      A    She mentioned that Lorraine had talked

12  about retirement.

13      Q    Okay.  Did she tell you that she believed

14  that you were down there to give her some type of

15  retirement package that Lorraine had referenced?

16      A    No.

17      Q    Where on the document does it say that she

18  told you that Lorraine had asked her about

19  retirement?

20      A    On this document?

21      Q    Yeah.

22      A    I don't think it's in there anywhere about

23  retirement.

24      Q    Why not?

25      A    It wasn't anything we talked about very

 1   long.

 2        Q     Well, you didn't talk about it very long,

 3   but you talked about it, right?

 4        A     She mentioned that Lorraine had talked

 5   about retirement, and Jane said, well, I can't

 6   retire, I still have to work, and that was the

 7   extent of it.

 8        Q     Okay.  Did you ask Lorraine about that

 9   comment?

10        A     I don't recall that.

11        Q     If you talked to Lorraine about the

12   comment, would you have documented it somewhere?

13        A     I don't know.

14        Q     Have you received any training since

15   you've worked at Atrium related to age

16   discrimination in the workplace?

17        A     Yes.

18        Q     When was the last time you received any

19   training?

20        A     I couldn't tell you exact date.

21        Q     Well, I'm not asking for an exact date.

22   Give me a year.

23        A     We usually do it on a regular basis.  I

24   can't tell you exactly when the last time I saw --

25        Q     But when you say on a regular basis,

1   yearly?  Every two years?  Every three years?

2   What's the regular basis?

3       A    I'm not sure of the regular time frame.

4       Q    You say we do it.  Do you provide the

5   training?

6       A    I am part of the training.

7       Q    Really?  What part do you serve in the

8   training of age discrimination?

9       A    Well, we review the EEO policy and

10  procedure for the company.

11      Q    Okay.  But do you provide training to the

12  employees?

13      A    I don't provide the training, no.

14      Q    Who does?

15      A    HR.

16      Q    Did your training indicate to you that you

17  should investigate when an employee tells you that

18  their supervisor's talking to them about retirement?

19      A    If that would indicate such, I would.

20      Q    Well, she told you, I mean Jane, that

21  Lorraine had talked to her about retirement and that

22  she told Lorraine that she couldn't retire, correct?

23      A    I don't know if she told Lorraine that.

24  She told me that.

25      Q    Okay.  That didn't raise any red flags

1    with you?

2         A    Not the way it was presented to me.

3         Q    Okay.  Well, it was presented to you just

4    like you testified, right?

5         A    I think so, yes.

6         Q    Okay.  What could she have said that would

7    have raised your antenna as to this is possibly age

8    discrimination, I need to put an end to it now?

9                   MR. GARRISON:  Objection.  Calls for

10                  speculation.

11        Q    Go ahead.

12        A    If she -- depending on what she was

13   thinking.  I don't know.

14        Q    Well, you're not a mind reader amongst

15   other things, correct?

16        A    Right.

17        Q    Okay.  So what do you mean it was

18   dependent on what she was thinking?

19        A    I don't know.  I wouldn't know the answer

20   to that.

21        Q    My question to you is what could she have

22   said to you that would raise your antenna that this

23   is possibly age discrimination?

24        A    If she would have said something like I

25   think she's trying to force me out of my job because

1    I'm the age I am.

2        Q    I think she says in here, at least you

3    write, that Lorraine did not want her in the DON

4    role at St. Marys any longer, correct?

5        A    Yes.

6        Q    So she's telling you that at the same time

7    she's telling you that Lorraine is talking to her

8    about retirement and she's telling Lorraine I can't

9    retire, right?

10       A    Not at the same time, no.

11       Q    It's not in the same conversation?

12       A    It's during the same time frame, the same

13   conversation, but not in the context of each

14   statement.

15       Q    Okay.  So she didn't do it the right way?

16   She didn't complain about discrimination the right

17   way in your opinion?

18       A    I don't know the answer to what the right

19   way would be, what you're referring to.

20       Q    Well, the right way would be, I guess,

21   saying something that would cause you to investigate

22   whether or not there was age discrimination?

23       A    Did she say it to me in a way that would

24   make me think that she was complaining about age

25   discrimination?  No.

1      Q    Okay.  When was the last time that you had

2  received any kind of training in the area of age

3  discrimination before April of 2013?

4      A    I would have to look at my record.  I

5  don't know.

6      Q    I mean, do you get sent to a seminar or

7  are you given training related to age internally?

8      A    I attend American Health Care Association

9  conventions from time to time and it may be

10  something that's discussed there.  We also have an

11  internal -- internal process where we review those

12  policies and procedures.

13      Q    Okay.  Well, other than your guess about

14  the conference that you attend from time to time

15  that may be in there, tell me about the internal

16  process.  You don't know how often you're trained in

17  age discrimination, correct?

18      A    The exact time frame?

19      Q    Yeah, and when you say the exact, you

20  understand I'm just asking you for the year?  I

21  don't need to know the exact date.  I just want to

22  know when you received training prior to April of

23  2013.

24      A    I don't know.

25      Q    Do you save documents -- strike that.  Are

1    you given documents when you're trained on age

2    discrimination that you can review from time to

3    time?

4         A    Yes.

5         Q    Okay.  Do you have those documents now?

6         A    I don't know.

7         Q    Well, where would the documents be

8    located?

9         A    They could be passed out at a meeting and

10   reviewed.

11        Q    Yeah, but what do you do with your copy?

12        A    I may take it home.  I may put it in my

13   briefcase.

14        Q    May throw it in the trash?

15        A    I don't typically do that but --

16        Q    Okay.  Well, if I wanted to see it, where

17   would I ask that people look?

18        A    Policy and procedure.

19        Q    No.  Where do you keep it?  I want to see

20   yours, your copy.

21        A    It may be at my house in my desk.

22        Q    House, desk, okay.  Where else?

23        A    That's it.

24        Q    I'm looking at the last paragraph where

25   you write she denies having any conversations with

1    Lorraine regarding her behavior or job performance.

2    Do you see that?

3         A    Yes.

4         Q    Okay.  Did you tell Lorraine that Jane had

5    denied ever having a conversation about her behavior

6    or job performance at work?

7         A    Yes.

8         Q    Okay.  And I take it Lorraine said it did

9    happen, correct?

10        A    Yes.

11        Q    And did you say prove it?  In other words,

12   show me the document, show me the disciplinary

13   action, anything to that effect?

14        A    I asked her if she documented it.

15        Q    Okay.  Did you ask to see the

16   documentation?

17        A    I don't recall asking her on that date

18   when I was talking to her about it.

19        Q    Well, when you asked her did she document

20   it, what did she say?

21        A    She said she had some, but not always.

22             (Whereupon, Plaintiff's Exhibit 30

23             was marked for identification.)

24        Q    Have you seen this document prior to

25   today?

1      A     Yes.

2      Q     For the record, what does this document

3  appear to be a copy of?

4      A     Appears to be a copy of the e-mails

5  between Susan and myself.

6      Q     Okay.  If you look at the second page at

7  the top, it's to Susan regarding leadership vacancy

8  report.  I'm sorry, Jane Fiely at St. Marys resigned

9  today.  Effective today.  Do you see that?

10     A     Yes.

11     Q     What is the leadership vacancy report?

12     A     It's a report that Susan puts out from HR

13  talking about what positions we have open from

14  leadership positions such as the DON or the

15  administrator.

16     Q     Okay.  At what point in that day does Jane

17  tell you that she's resigning?

18     A     On the 25th?  I believe it was that

19  morning.

20     Q     Okay.  Were you there?

21     A     No.

22     Q     Okay.  So how is it that Jane communicates

23  to you that she's resigning?

24     A     She told me over the phone.

25     Q     Okay.  Tell me what she says.  Put us in

1    the conversation.  Who is on the phone?

2         A    Lorraine called me.

3         Q    Okay.

4         A    Said she had me on speaker phone in her

5    office.  Jane was in there with her.  And I started

6    talking to Jane about the incident that had occurred

7    on the 19th.  I told Jane based on the investigation

8    that we -- you know, that I thought it was in her

9    best interest that she go ahead and resign and we

10   would give her the opportunity to resign.

11        Q    And what did she say in response?

12        A    She said, well, if I don't have a

13   choice -- or no, she said if -- if I don't resign,

14   am I going to lose my job, and I said, yes, we would

15   have to terminate you if you don't want to resign.

16   She said, well, then I guess I'll resign.

17        Q    Had you already communicated that

18   information to Susan?

19        A    I don't recall.

20        Q    What was Susan's role, if you know, in all

21   of this?  I mean, she's the head of HR, right?

22        A    Yes.

23        Q    Is she aware that this was going on?

24        A    Yes.

25        Q    How do you know that?

1      A    Well, Bob was down there and Bob and I --

2  with Bob there, I figured that she was aware.  I

3  don't remember a conversation specifically.  I may

4  have talked to her at one point, but --

5      Q    When you say "I may have talked to her at

6  one point," again, you don't know, you're just

7  guessing, right?

8      A    At some point, I don't know.

9      Q    "At some point, I don't know," what does

10 that mean?

11     A     If I talked to her at some point.  I may

12 have talked to her before this date.  It may have

13 been on that date.  I don't recall specifically,

14 day, time.

15     Q    Have you told me everything now that you

16 recall that was said during the telephone

17 conversation?

18     A    Everything that I recall, yes.

19     Q    Did you take notes during the telephone

20 conversation?

21     A    No.

22              (Whereupon, Plaintiff's Exhibit 31

23              was marked for identification.)

24     Q    Handing you what's been marked as

25 Plaintiff's Exhibit 31.  Have you seen this document

1   prior to today?

2       A    Yes.

3       Q    For the record, what does this document

4   appear to be a copy of?

5       A    It's a letter of Lorraine's annual

6   evaluation, kind of a summary.

7       Q    Okay.  Created by you?

8       A    Yes.

9       Q    Are you at that point her supervisor?

10      A    Yes.

11      Q    When do you become her supervisor?

12      A    I'm not sure of the exact date.

13      Q    Okay.  Just give me the year.

14      A    2011, 2012, somewhere in there.

15      Q    Why were you creating a summary of her

16  evaluation?

17      A    Just for a conversation about her

18  evaluation and expectations moving forward,

19  something to look at and to keep as a quick

20  reference for her.

21              (Whereupon, Plaintiff's Exhibit 32

22              was marked for identification.)

23      Q    Handing you what's been marked as

24  Plaintiff's Exhibit 32.  Have you seen this document

25  prior to today?

1      A    Yes.

2      Q    And for the record, what does this

3  document appear to be a copy of?

4      A    It's a copy of my evaluation for 2013.

5      Q    Okay.  And it looks like you're overall

6  scores 2.1; is that correct?

7      A    Yes.

8      Q    And that falls in the needs improvement

9  category, correct?

10     A    Yes.

11     Q    Who gave you this evaluation?

12     A    Mr. Reese.

13     Q    And this is for the year that Jane was

14  terminated, correct?

15     A    2013, yes.

16              (Whereupon, Plaintiff's Exhibit 33

17          was marked for identification.)

18     Q    Handing you what's been marked as

19  Plaintiff's Exhibit 33.  Take a moment to look at

20  that, please.  Have you seen this document prior to

21  today?

22     A    I'm not sure.

23     Q    Well, it says it's to you, correct?

24     A    Yes.

25     Q    You just don't remember seeing it or

 1   sometimes you don't get documents?  What's your

 2   testimony?

 3        A    You asked me if I'd remembered seeing it.

 4   I don't remember seeing it.

 5        Q    Okay.  Do you remember there being some

 6   issue with the pharmacy keys?

 7        A    Yes.

 8        Q    Okay.  Are you -- you're not claiming that

 9   Jane took the pharmacy keys home with her when she

10   left, are you?

11        A    No.

12        Q    Okay.  In fact, it looks like -- says Deb

13   talked to her yesterday and she says the key is in

14   her desk.  I haven't had time to look yet.  Do you

15   see that?

16        A    Yes.

17        Q    Okay.  And that's from Lorraine?

18        A    Yes.

19        Q    Okay.  I mean, why is -- I mean, do you

20   have some idea why this document is generated?

21   What's the issue?  Does it have anything really to

22   do with Jane?

23        A    Apparently they were looking for the

24   controlled substance keys.

25        Q    Okay.  And apparently they were in Jane's

1   desk but Lorraine claims she didn't have time to

2   look, correct?

3        A    That's what the e-mail says, yes.

4        Q    Okay.  Where is Jane's office in relation

5   to Lorraine's?

6        A    At that time, I couldn't tell you exactly

7   because that office changed locations in the

8   building, so I don't know exactly where it was at

9   this time of this e-mail in May 2013.

10                  (Whereupon, Plaintiff's Exhibit 34

11                  was marked for identification.)

12        Q    Handing you what's been marked as

13   Plaintiff's Exhibit 34.  Have you seen this document

14   prior to today?

15        A    Yes.

16        Q    For the record, what does this document

17   appear to be a copy of?

18        A    It's a copy of the employee handbook for

19   Atrium.

20        Q    Is this the employee handbook that was in

21   effect at the time Jane left the company?

22        A    I don't know.

23        Q    Why don't you know?  I mean, what do you

24   need to look at?

25        A    I don't know if any revisions had been

1    made before that or after that.

2         Q    Okay.  So you don't know what time period

3    this employee handbook covers?

4         A    I don't see a date associated with it so I

5    don't know.

6         Q    Okay.

7                   MR. FRANKLIN:  We need about a

8              five-minute break, please.

9                   (Whereupon, a recess was taken at

10              3:19 p.m. and resumed at 3:36 p.m.)

11                  (Whereupon, Plaintiff's Exhibit 35

12              was marked for identification.)

13   BY MR. FRANKLIN:

14        Q    Handing you what's been marked as

15   Plaintiff's Exhibit 35.  If you could take a moment

16   to look at that, please.  Have you seen Plaintiff's

17   Exhibit 35 prior to today?

18        A    Yes.

19        Q    For the record, what does Plaintiff's

20   Exhibit 35 appear to be a copy of?

21        A    It's a summary of the year-end performance

22   evaluation for me of 2013.

23        Q    Looking at the third page, Bates Stamp

24   000814.  It says the superior region five star

25   ratings.  What's a five star rating?

1       A     That's the CMS's evaluation system for

2   nursing homes.

3       Q     CMS?

4       A     Center for Medicare/Medicaid Services.

5       Q     Okay.  So is five the highest that you can

6   get?

7       A     Yes.

8       Q     Okay.  Well, under -- are you the superior

9   region?

10      A     Yes.

11      Q     Okay.  Where it shows -- let's go to the

12  first one where it just says the region.  It has 3.2

13  for January and 3.4 for December and the average

14  3.3.  It says the target was 3.5.  What does that

15  mean, like 3 --

16      A     That's the average among those facilities.

17      Q     No.  But what are they actually judging

18  on?  What makes up the number?

19      A     The five star is made up of three areas.

20      Q     Okay.  What are they?

21      A     One is health surveys.

22      Q     Okay.

23      A     One is quality measures.

24      Q     Okay.

25      A     And one is staffing.

1        Q     Staffing?

2        A     Yes.

3        Q     Who sets the target?

4        A     The target that is on Page 3, that's set

5    by the company.

6        Q     Okay.  So that's not something set by the

7    government, correct?

8        A     No.  The scale is set by the government

9    one through five, and the company has chosen the

10   target.  We want to be four --

11       Q     Okay.

12       A     -- or hire.

13       Q     Then where it says CCCC, and the target

14   was a 4 and the average was a 1.5, do you see that?

15       A     Yes.

16       Q     Why is the five star number so low for

17   CCCC?

18       A     Because they had a negative outcome in the

19   fall of 2013 that contributed to that score.

20       Q     What's a negative outcome?

21       A     They received immediate jeopardy

22   deficiency.

23       Q     Oh, okay.  'Cause it looks like -- is it

24   Frederic, Springfield, St. Marys, and Westgate were

25   the facilities that met their target, correct?

1      A    Yes.

2      Q    Okay.  I want you to look at Plaintiff's

3  Exhibit 29 again.  It's the letter from you to Bob.

4  How did this -- how was this letter transmitted to

5  Bob?

6      A    I believe I sent it to him by e-mail.

7      Q    Okay.  Well, wouldn't there be a cover

8  letter?

9      A    By e-mail, no.

10     Q    So you just would have sent this to him;

11  would there be a subject?

12     A    As an attachment, I would imagine.

13     Q    Yeah.  Okay.  So there would be something

14  in the subject line, correct?  What's your typical

15  verbiage?

16     A    I may have written St. Marys.  I may have

17  written discussion with Jane.  I don't know unless I

18  looked at the actual e-mail.

19     Q    Okay.  Well, I mean, if we want to see the

20  actual e-mail that was attached to this, what do we

21  look for?

22     A    I would look for an e-mail from me to Bob

23  on that -- that date, around that date.

24     Q    So would you just put in Bob's first and

25  last name?  Would that get us there?

 1      A    I don't know.

 2      Q    Well, did you ever -- did you produce this

 3  document to the company?

 4      A    Yes.

 5      Q    Okay.  Did you give them the e-mail that

 6  was attached?  In other words, if you sent it as an

 7  attachment to Bob, there would have been some type

 8  of cover sheet, would have had his name, maybe your

 9  name, and then a subject line?

10      A    When I sent it to Bob?

11      Q    Yeah.

12      A    This would have been the sheet of paper I

13  scanned in and attached to an e-mail and sent it to

14  Bob.

15      Q    Right.  But where's the e-mail?  That's

16  what I'm saying.  Did you produce the e-mail to

17  anyone?

18      A    I don't know.  I don't think so.

19      Q    'Cause the e-mail would tell us, at least,

20  when you sent the document.

21      A    (Witness nodded.)

22      Q    We want to know when you created this

23  document, and if you created it recently.

24      A    I created it in April of 2013.

25      Q    Okay.  But you didn't give it to anyone

1    till recently?  Did you find the document and give

2    it to Susan or did somebody else find the document?

3         A    No.  I found the document.

4         Q    Okay.  By doing what?  That's all I'm

5    saying.  How did you find it?

6         A    Went back and opened my St. Marys' file --

7         Q    Okay.

8         A    -- and there it was.

9         Q    I mean, you opened up the file and it was

10   the first document that appeared?

11        A    I think it was the second at that time.

12        Q    Well, how many documents are in the

13   St. Marys' file?

14        A    I don't know.

15        Q    Hundreds?

16        A    No, not hundreds.

17        Q    When you're putting documents back into

18   the folder, I mean are you doing it in the order

19   that they're created?

20        A    I don't know how it puts it in there.  I

21   think it was probably there because it started with

22   either -- I may have titled it as discussion, so it

23   would have been one of the first ones

24   alphabetically, but I'm not an IT expert so I don't

25   know how to tell you how it puts them into the file.

1    I'll put it in the file and it shows up in the file.

2        Q    Have you been putting documents in that

3    file from the date of the incident to today?  I

4    mean --

5        A    Yeah, more than likely.

6        Q    -- it surprises me it's the second

7    document that pops up.

8        A    Okay.

9        Q    I mean, have you added documents since

10   this date?

11       A    Sure.

12       Q    Like hundreds?

13       A    No.  There's not hundreds in there.

14       Q    Okay.  What goes into that file?

15       A    Things that I feel like I need to keep in

16   that file.  There's not a specific criteria that

17   says this file goes and this one doesn't.

18       Q    It's just your feelings?

19       A    It's what I think needs to go in there at

20   the time.

21            MR. FRANKLIN:  Let's go off the

22            record for a minute.

23            (Whereupon, a discussion was held off

24            the record.)

25   BY MR. FRANKLIN:

1     Q    You indicated that when you talked to

2  Jane, you had basically told her that she could

3  resign or be fired; is that true?

4     A    Yes.

5     Q    Okay.  Had you talked to Lorraine earlier

6  in the day and told Lorraine that I'm going to fire

7  Jane?

8     A    We did discuss that.  I don't know if it

9  was earlier that day or the night before.

10     Q    Okay.  Put me in that conversation.  First

11  of all, do you have any notes from the conversation?

12     A    No.

13     Q    Okay.  Tell me who's in this meeting?

14     A    It's a phone call between Lorraine.

15     Q    And yourself?

16     A    Yes.

17     Q    Is anybody else involved?  Like is Susan

18  involved?

19     A    I don't recall anybody else was on the

20  phone call.

21     Q    Okay.  Tell me what was said.

22     A    Well, I told Lorraine based on the

23  investigation, statements, the fact that Lorraine --

24  or I'm sorry, the fact that Jane couldn't remember

25  whether she had placed her hands on the employee or

1  not and it was a serious situation that the nurse

2  aides had said that she put her hands on the nurse

3  aide that we would have to replace her as the

4  director of nursing, but I would like to give her an

5  opportunity to resign so that it would -- it

6  wouldn't reflect negatively on her, her leaving the

7  building.  And I thought it was in her best interest

8  to do that versus being terminated for placing her

9  hands on an employee.

10      Q    Well, did you talk to her in that meeting

11  about whether she had approached Jane with questions

12  related to her retirement?

13      A    No.

14      Q    Did you give her permission to tell Jane

15  basically that she was fired before she even talked

16  to you?

17      A    I told her we would do it on the phone

18  because I wasn't there and because the relationship

19  that I'd had with Jane in the past, I felt like I

20  needed to talk with her directly about it.

21      Q    Okay.  But did you tell Lorraine don't

22  tell her that she's terminated, that's something I'm

23  going to do when I'm on the phone?

24      A    I don't recall that.

25      Q    Have you been made aware in the course of

1   this lawsuit that Jane is alleging that Lorraine

2   said you're fired before you ever got on the phone?

3        A    I don't know.

4        Q    Nobody's ever told you that?

5        A    No.

6        Q    Do we know what time you had this

7   conversation with Jane, time of day?  Morning?

8        A    Morning, I believe.

9        Q    Like how early?

10       A    I don't recall.

11       Q    Did you call Lorraine or did Lorraine call

12  you?

13       A    She called me.

14       Q    Okay.  And she told you that Jane was in

15  her office?

16       A    Yes.  She said I have you on speaker

17  phone.  Jane's in here with me.

18       Q    Okay.  So is it -- are you indicating that

19  you're the person then that made the decision that

20  she was going to be fired if she didn't resign?

21       A    Yes.

22       Q    And you did that without input from anyone

23  above your reporting level?

24       A    I had the investigation.  That was input.

25  Talking with Lorraine, that's what led to the

1  decision.

2      Q    Did you talk to Susan or anyone in Susan's

3  office before having the phone call with Jane?

4      A    Yes.

5      Q    Who did you talk to?

6      A    I talked to Bob that week and I don't

7  recall if I talked to Susan specifically or not.

8  Usually we do have a conversation about it, but I

9  don't recall specifically if we did, Susan and I.

10      Q    I take it there's no notes of a

11  conversation between you and Susan?

12      A    No.

13      Q    Is there any notes of a conversation

14  between you and Bob?

15      A    Not that I'm aware of, no.

16      Q    Have you been taught in the -- since

17  you've been an employee of Atrium not to document

18  incidents so when you are called to testify, you can

19  simply say I don't recall?

20      A    Have I been taught to say that?

21      Q    Yeah.

22      A    No.

23      Q    Well, I mean is that something that's been

24  discussed with you and your colleagues that, you

25  know, if we don't write it down, then we can simply

Page 227

1    say in a deposition or otherwise that we don't

2    remember?

3         A    No.

4                   (Whereupon, Plaintiff's Exhibit 36

5              was marked for identification.)

6         Q    Handing you what's been marked as

7    Plaintiff's Exhibit 36.  Have you seen this document

8    prior to today?

9         A    Yes, I believe I have.

10        Q    For the record, what does this document

11   appear to be a copy of?

12        A    It's a memo from Susan to the

13   administrators and DONs discussing disciplines and

14   terminations.

15        Q    Okay.  Well, it says to all administrators

16   and directors of nursing, correct?

17        A    Yes.

18        Q    So you would fall in that category?

19        A    No.

20        Q    You're not an administrator?

21        A    No.

22        Q    And you're not the director of nursing?

23        A    No.

24        Q    So this doesn't apply to you?

25        A    The memo was not sent to me.

1       Q     Yeah.

2       A     It does include me in the description of

3   the process.

4       Q     Okay.  I read under the termination

5   section starting with the second sentence, if you

6   are planning to terminate someone, you need to make

7   sure you have all of the appropriate documentation

8   together.  The documentation should be forwarded to

9   your director of human resources.  Do you see that?

10      A     Yes.

11      Q     Then it says IE, previous disciplines,

12  statement investigation summary, et cetera; do you

13  see that?

14      A     Yes.

15      Q     Was there a packet that was put together

16  and sent to human resources before you decided to

17  terminate Jane?

18      A     I don't know.

19      Q     Well, you would be the person responsible

20  for putting it together?

21      A     No.

22      Q     Well, if you're the one who's deciding to

23  terminate her, aren't you the person who's

24  responsible for putting together documentation to

25  send to human resource to justify the termination?

1       A     No.

2       Q     Who's responsible for that?

3       A     Would be HR at the building level, the

4  administrator.  Depending on what position we're

5  talking about.

6       Q     Okay.  Well, there's no HR at the building

7  level at St. Marys, is there?

8       A     There's a person who handles the internal

9  paperwork.

10      Q     Okay.  Who is that?

11      A     Claudette.

12      Q     Okay.  Was she responsible for handling

13 the paperwork in April of 2013?

14      A     Yes.

15      Q     So you're claiming she should have been

16 the one to put together the packet to send to HR?

17      A     No.  I'm not claiming that she should have

18 been the person to put the packet together.

19      Q     Well, you're claiming you shouldn't be the

20 person.  So you're saying it wasn't me.  Who was it

21 then?  Who's responsible?

22      A     Normally it would be the administrator

23 with some help from HR if necessary.

24      Q     Okay.

25      A     If they needed that.

1      Q    So you're saying that it should have been

2    Lorraine?

3      A    It normally would have been.

4      Q    Okay.  Well, I mean is this some

5    exception?

6      A    I don't know.

7      Q    Well, this looks like it was put out in

8    February of 2011, correct?

9      A    Yes.

10     Q    Do you know if this policy was in place at

11   the time that you gave Jane the ultimatum?

12     A    I believe so, yes.

13              (Whereupon, Plaintiff's Exhibit 37

14              was marked for identification.)

15     Q    Handing you what's been marked as

16   Plaintiff's Exhibit 37.  If you could take a moment

17   to look at that, please.  Have you seen Plaintiff's

18   Exhibit 37 prior to today?

19     A    Yes.

20     Q    For the record, what does Plaintiff's

21   Exhibit 37 appear to be a copy of?

22     A    It's a policy and procedures, subject,

23   discharge.

24     Q    On the back, it says forms.  On the second

25   page, Bates stamped 891.  Do you see that?

1       A    Yes.

2       Q    Employee Memorandum Form PG-306, do you

3    see that?

4       A    Yes.

5       Q    What is that?

6       A    I'm not sure what you're asking me.  What

7    is what?

8       Q    What is that form?  Have you ever seen it?

9       A    Employee Memorandum Form PG-306?

10       Q    Yeah.

11       A    I'm not sure.

12       Q    Okay.  Did you ever tell anyone in HR that

13    Jane had told you that Lorraine was talking to her

14    about retirement?

15       A    No.

16       Q    Okay.  And that would be you didn't tell

17    Claudette, you didn't tell Bob, you didn't tell

18    Susan?

19       A    Right.

20       Q    Correct?  Apparently there's another Susan

21    maybe involved, long last name.

22            MS. PAOFF:  Suzanne.

23       Q    Suzanne?

24       A    Petrimoulx.

25       Q    Yeah, Petrimoulx.  Was she there at the

1    time?

2         A    I don't recall what her employment was.

3              MR. FRANKLIN:  It's

4         P-E-T-R-I-M-O-U-L-X.

5         Q    But you didn't tell anyone in HR?

6         A    Not that I recall, no.

7         Q    If you're going to report, let's say, a

8    complaint of discrimination, be it age, race, sex,

9    national origin, disability, or religion, is there a

10   form that you're to fill out?

11        A    I'm not sure.

12        Q    So you don't know if there's a form for

13   the employee to fill out; is that correct?

14        A    I would contact HR.

15        Q    And you don't know if there's a form that

16   you would need to fill out as the employee's

17   supervisor if they came to you with a complaint of

18   discrimination based on age, race, sex, national

19   origin, disability, or religion?

20        A    I'm not sure.

21        Q    Why is Lorraine not the administrator at

22   St. Marys?

23        A    She resigned.  It was this year or last

24   year.

25        Q    I mean, was she given an ultimatum like

1    you gave Jane, resign or you're terminated?

2         A    I don't recall.

3         Q    Well, you would have made that decision,

4    correct?

5         A    Yes.

6         Q    And you don't remember if you gave her an

7    ultimatum of resign or be terminated?

8         A    I don't recall doing that, no.

9         Q    Are you saying that it didn't happen or

10   you just don't remember as you sit here today?

11        A    I don't remember it that way.

12             MR. FRANKLIN:  Okay.  I have no

13             further questions.

14             MR. GARRISON:  We have nothing

15             either.

16             MR. FRANKLIN:  Want me to explain

17             signature or are you just going to

18             reserve?

19             MR. GARRISON:  No.  We'll reserve.

20             (Whereupon, the deposition was

21             concluded at 4:08 p.m.)

22                       -  -  -

23                       _____

                         BARRY K. DEROSSETT
24

25

1               C-E-R-T-I-F-I-C-A-T-E

2        I, Teri Genovese Mauro, a Notary Public in and

3    for the State of Ohio, duly commissioned and

4    qualified, do hereby certify that the within-named

5    Witness, BARRY K. DEROSSETT was by me first duly

6    sworn to tell the truth, the whole truth and nothing

7    but the truth in the cause aforesaid; that the

8    testimony then given by him was by me reduced to

9    stenotype in the presence of said Witness,

10   afterwards transcribed upon a computer; that the

11   foregoing is a true and correct transcription of the

12   testimony so given by him as aforesaid.

13        I do further certify that this deposition was

14   taken at the time and place in the foregoing caption

15   specified and was completed without adjournment.

16        I do further certify that I am not a relative,

17   employee or attorney of any of the parties hereto,

18   or otherwise interested in the event of this action.

19        IN WITNESS WHEREOF, I have hereunto set my hand

20   and affixed my seal of office at Toledo, Ohio, on

21   this 26th day of September, 2014.

22

23                          TERI GENOVESE MAURO
     My Commission expires        Notary Public
24   June 8, 2018.           in and for the State of Ohio

25