UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JANE FIELY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:13-CV-2005 |
| | ) | Judge Carr |
| ESSEX HEALTHCARE CORPORATION, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

- - -

Deposition of ROBERT W. HUENEFELD, a
Witness herein, called by the Plaintiff as if
upon Cross Examination, pursuant to the Federal
Rules of Civil Procedure, taken before me, Teri
Genovese Mauro, Registered Professional
Reporter, a Notary Public in and for the State
of Ohio, at the offices of Marshall & Morrow,
250 S. Civic Centre Drive, Columbus, Ohio, on
Thursday, August 14, 2014, commencing at 10:08
a.m.

- - -

GENOVESE & RENO REPORTING SERVICE
414 N. Erie Street, Suite 100
Toledo, Ohio  43624
(419) 249-2705

I N D E X

DEPOSITION OF ROBERT W. HUENEFELD

Cross Examination                    Page

       By Mr. Franklin                 4

Direct Examination

       By Mr. Garrison               215

Recross Examination

       By Mr. Franklin               216

                        - - -

Plaintiff's Exhibits

       1                             150

       2                             185

       3                             186

       4                             187

       5                             190

       6                             192

       7                             197

       8                             202

       9                             204

       10                            204

       11                            206

       12                            207

       13                            208

                        - - -

Objections

| By Mr. Garrison | 36 |
| By Mr. Garrison | 36 |
| By Mr. Garrison | 36 |
| By Mr. Garrison | 97 |
| By Mr. Garrison | 98 |
| By Mr. Garrison | 124 |
| By Mr. Garrison | 156 |
| By Mr. Garrison | 167 |

- - -

```
 1   APPEARANCES:

 2     On behalf of the Plaintiff:

 3         WIDMAN & FRANKLIN, LLC
           405 Madison Avenue, Suite 1550
 4         Toledo, Ohio  43604  (419) 243-9005
           By:  JOHN D. FRANKLIN
 5         By:  KERA PAOFF

 6     On behalf of the Defendants:

 7         FAEGRE BAKER DANIELS
           300 N. Meridian Street, Suite 2700
 8         Indianapolis, Indiana  46204-1750  (317) 237-8239
           By:  BRIAN R. GARRISON
 9
     ALSO PRESENT:  Jane Fiely
10                  Susan Kreuser

11                       - - -

12                  MR. FRANKLIN:  Go ahead, Teri.

13                  ROBERT W. HUENEFELD,

14   a Witness herein, called by the Plaintiff as if

15   upon Cross Examination, was by me first duly sworn,

16   hereinafter certified, testified and said as follows:

17                       - - -

18                  CROSS-EXAMINATION

19   BY MR. FRANKLIN:

20       Q    Please state and spell your full name for

21   the record, please.

22       A    It's Robert W. Huenefeld,

23   H-U-E-N-E-F-E-L-D.

24       Q    Mr. Huenefeld, what's your current

25   residential address?
```

```
 1        A     6970 Grace Drive, Olmsted Township, Ohio
 2   44138.
 3        Q     What county is that in?
 4        A     Cuyahoga.
 5        Q     How long has that been your residence?
 6        A     Probably for the last 25 years.
 7        Q     Do you reside at that location with anyone
 8   over the age of 17?
 9        A     Yes.
10        Q     Who is that?
11        A     My wife.
12        Q     And what's her name?
13        A     Carol.
14        Q     And is Carol employed outside the home?
15        A     She's not.
16        Q     Have you and Carol ever worked together at
17   the same employment location at the same time?
18        A     No.
19        Q     Have you ever worked together for the same
20   company?
21        A     No.
22        Q     Has Carol ever been employed outside the
23   home?
24        A     Yes.
25        Q     When was the last time she was employed?
```

1      A      Possibly 30 years ago.

2      Q      Where was she working at that time?

3      A      Radioear Corporation.

4      Q      Where was that located?

5      A      That was in the Pittsburgh area.

6      Q      Tell me since you've been 18 what counties

7  and states you've lived in.

8      A      Okay.  Since I was 18, I lived in Bethel

9  Park, Pennsylvania, which is in the Pittsburgh area,

10  and it's Allegheny County.  And then we moved from

11  there to my current location.

12      Q      So you've only lived in Allegheny County

13  and Cuyahoga County?

14      A      True.

15      Q      What's your current business address?

16      A      I work out of my home.

17      Q      For what company?

18      A      Atrium Centers, Inc.

19      Q      Well, if you have to report, what location

20  do you report to?

21      A      My boss is in Columbus at the general

22  office.

23      Q      Who's your boss?

24      A      Susan Kreuser.

25      Q      Is she in this room?

1          A      She is.

2          Q      How long has Susan been your boss?

3          A      Probably four years now.

4          Q      Is she responsible for giving you your

5     evaluations?

6          A      Yes.

7          Q      Is she responsible for deciding if you get

8     a pay increase?

9          A      Yes.

10         Q      Is the company publicly traded?

11         A      I don't believe so.

12         Q      Okay.  Do you have any stock in the

13    company?

14         A      Through an ESOP, I do.

15         Q      Who decides how many shares of the company

16    you get, if you do, in a yearly time period?

17         A      It's decided at a corporate level.

18         Q      Well, to your knowledge, does Susan have

19    input into that?

20         A      I don't think the plan works that way.

21         Q      When was the last time you got an

22    employment evaluation?

23         A      Probably in February.

24         Q      Do you get a yearly evaluation?

25         A      Yes.

1      Q    When you get that yearly evaluation, do

2   you meet with your supervisor?

3      A    I do.

4      Q    So you met with Susan?

5      A    I did.

6      Q    And the two of you talked about your

7   evaluation?

8      A    Yes.

9      Q    Talk about ways that you can improve?

10     A    Yes.

11     Q    What ways did you talk about you could

12  improve this last time you had an evaluation?

13     A    The only specific one I remember is to do

14  more follow up on the audits that I do; in other

15  words, when I do an audit, come back and follow up

16  to see that the suggested improvements have been put

17  in place.

18     Q    What's your date of birth?

19     A    6/6/43.

20     Q    Have you had your deposition taken before?

21     A    Yes.

22     Q    When was the last time you had your

23  deposition taken?

24     A    Oh, boy, maybe 20 years ago.

25     Q    What was the nature of that litigation?

1      A      Let's see.  I was -- it was a

2  discrimination charge that had been filed against

3  LTV Steel.

4      Q      Where was that charge filed?

5      A      I believe it was in Pittsburgh.

6      Q      Was it filed at the state or federal level

7  or did it actually get into the court system?

8      A      I think it was filed at federal level.

9      Q      In court --

10      A      I believe so.

11      Q      -- or was it an administrative charge?

12      A      I don't understand your question.

13      Q      Well, was it filed with the EEOC or did it

14  actually get -- after the EEOC, actually become a

15  lawsuit in federal court?

16      A      It became a lawsuit after the EEOC.

17      Q      Were you named individually as a

18  defendant?

19      A      I was not.

20      Q      What was the caption of the case?

21      A      I don't remember.

22      Q      Where did you have your deposition taken?

23      A      I'm not sure.

24      Q      Was it somewhere in Cuyahoga County?

25      A      I'm not sure.

1       Q    Were you represented by counsel?

2       A    Personally?

3       Q    Yeah.

4       A    No.

5       Q    In the deposition?  Company didn't provide

6    company counsel?

7       A    Yes.

8       Q    Okay.  Who was that?

9       A    I don't remember his name.

10      Q    Any other times you've had your deposition

11   taken?

12      A    Not that I recall.

13      Q    Okay.  I'm sure it's been explained to you

14   and you've, at least, done it one other time but

15   quite a while ago.  We have a court reporter

16   present, so you'll need to keep your answers

17   audible.  I may see that you're nodding your head or

18   shrugging your shoulders, but the court reporter

19   can't take that down.

20          In general conversation, people anticipate

21   questions and start to answer the question before

22   it's completed.  Even though you may correctly

23   anticipate my question, I ask that you allow me to

24   finish my question and I'll allow you to finish your

25   answer.  That way when we read the transcript,

1   there's not the beginning of my question, the

2   beginning of your answer, the end of my question,

3   the end of your answer.

4           If I ask you a question that you don't

5   understand, I want you to tell me that you don't

6   understand my question and what part of my question

7   you don't understand.  I'll then try to rephrase my

8   question and put it in a form that you will

9   understand.

10          There may be times that you give an answer

11  that I don't understand.  That doesn't mean that I

12  don't believe your answer.  You just might be using

13  some phraseology in the workplace I'm unfamiliar

14  with and I may have to ask some follow-up questions

15  so that I completely understand your answer.

16          As long as there's not a question pending,

17  if you need to take a break, just indicate out loud

18  on the record you'd like to take a break and we'll

19  take one.  Okay?

20      A   Okay.

21      Q   Did you review any documents in

22  preparation for your deposition today?

23      A   Yes.

24      Q   What documents did you review?

25      A   Documents that I had before I went to St.

1    Marys to investigate the issue.

2         Q    When you did this document review, how did

3    you obtain the documents you were looking at?

4         A    I got it from our attorney.

5         Q    Were there any documents that you asked to

6    review that you were told you could not review?

7         A    No.

8         Q    So there were documents that you reviewed

9    before you went to St. Marys to investigate what?

10        A    An allegation that there had been physical

11   contact by a supervisor with an employee.

12        Q    Who initially provided you with the

13   information before you went to investigate?

14        A    By information, do you mean the documents?

15        Q    Yeah.

16        A    Okay.  The administrator at St. Marys.

17        Q    Who was that?

18        A    Lorraine.

19        Q    What's her last name?

20        A    Fischio.

21        Q    Did you have a conversation with her

22   before you came down to investigate?

23        A    Yes.

24        Q    Did you have conversations with anyone

25   else before you came down to investigate?

Page 13

```
 1       A     Yes.
 2       Q     Okay.  Other than Lorraine, who did you
 3  have conversations with?
 4       A     Susan Kreuser.
 5       Q     Anyone else?
 6       A     No.
 7       Q     How many times did you talk to Lorraine?
 8       A     I think only once.
 9       Q     How many times did you talk to Susan?
10       A     Once.
11       Q     When you talked to Lorraine, was it in
12  person, by phone, by computer, by smart phone?
13       A     It was by phone.
14       Q     A telephone?
15       A     Yes.
16       Q     Was there anyone else on your end of the
17  call?
18       A     No.
19       Q     When you talked to Susan, was it by phone,
20  by e-mail?
21       A     By phone.
22       Q     Was there anyone else on your end of the
23  call?
24       A     No.
25       Q     Did you review any other documents in
```

1    preparation for your deposition today?

2         A    No.

3         Q    Did you talk to anyone other than the

4    attorney to prepare yourself for today's deposition?

5         A    I talked with Susan.

6         Q    When did you talk to her?

7         A    Yesterday.

8         Q    Was it outside the presence of counsel?

9         A    No.

10        Q    Has anyone provided you with information

11   that was testified to in Jane's deposition?

12        A    No.

13        Q    Did you talk to anyone else to prepare

14   yourself for today's deposition?

15        A    No.

16        Q    Since you've known you were going to have

17   your deposition taken, have you spoken to anyone to

18   prepare yourself, let's say, to recall the events of

19   April of 2013?

20        A    No.

21        Q    The documents that the attorney provided

22   for you to look at, were those documents that you

23   didn't have access to?

24        A    I had had access to them before.

25        Q    Okay.  What do you mean you had access?

1      A      I had seen all the documents before, but I

2  no longer had a copy of it.

3      Q      Is that because you turned them in to

4  someone and didn't keep a copy or --

5      A      No, it's because my filing system is

6  essentially stacking stuff up, and locating those

7  would have been a major undertaking.

8      Q      Well, when you say stacking stuff up, is

9  that in your home office?

10     A      Yes.

11     Q      Well, did anyone ever ask you to go

12 through the stacks at your home office and get any

13 information or any documents that pertained to Jane

14 Fiely, either her employment or her subsequent

15 termination?

16     A      Yes.

17     Q      And did you do that?

18     A      I did.

19     Q      When did you do that?

20     A      I believe it was shortly after the lawsuit

21 was filed.

22     Q      Did you keep a list of what documents you

23 turned over?

24     A      I did not.

25     Q      Did you actually physically go through

1    these stacks and pull the documents out and then

2    deliver them somehow to someone?

3         A    Yes.

4         Q    Who did you deliver the documents to?

5         A    Susan Kreuser.

6         Q    And were you able to look at all of those

7    documents to prepare yourself for today's

8    deposition?

9         A    Yes.

10        Q    You didn't think anything was missing?

11        A    No.

12        Q    Were you able to review every document

13   that you turned over to Susan shortly after the

14   lawsuit was filed?

15        A    I believe so.

16        Q    How did you get the documents from your

17   home office to Susan's?

18        A    I'm not sure whether I mailed them or I

19   scanned them in and e-mailed them.

20        Q    Well, if you scanned the documents in,

21   they'd still be in your computer and at your home,

22   correct?

23        A    Yes.

24        Q    Okay.  Now, did you look at your home

25   computer for any documents related to Jane, either

Page 17

1    her employment or subsequent termination?

2         A    I did when I was first asked to produce

3    all documents that I had.

4         Q    Okay.  What did you do to look for

5    documents related to Jane, either her employment or

6    her subsequent termination on your home computer?

7         A    I went in and conducted searches on those

8    names.

9         Q    Okay.  Well, what did you search?

10        A    I searched files that were in the

11   computer.

12        Q    Well, did you search certain files, all

13   your files, your e-mails?  What did you search?

14        A    I searched all the files.

15        Q    All the files?

16        A    Yes.

17        Q    Okay.  How -- physically how did you do

18   that?

19        A    Okay.  I have -- almost all my information

20   is kept on a -- I call it a stick.  It's a drive.

21   And you can go into the computer and ask it to

22   search for certain things on the whole drive and

23   that's what I did.

24        Q    Well, the stick that you're talking

25   about --

1       A       Yeah.

2       Q       -- what is that?

3       A       It's a memory.

4       Q       Okay.  What -- did you search the hard

5    drive of the computer and the stick?

6       A       No, because I don't store stuff on the

7    hard drive of the computer.

8       Q       Okay.  What do you mean you don't store

9    stuff?

10      A       I don't store documents on the hard drive

11   of the computer.

12      Q       Well, when your documents come into your

13   computer, do you press the delete button, or do you

14   transfer them to the stick?  How does it work?

15      A       Transfer them to the stick.

16      Q       Okay.  Then what do you do with the

17   document itself?  Now it's still there, a version

18   went to the stick.

19      A       Okay.

20      Q       Then what do you do?

21      A       I delete it.

22      Q       Just by hitting the delete button?

23      A       Right.

24      Q       Do you have a program on your computer

25   that shreds documents in your hard drive?

Page 19

1       A    No.

2       Q    Okay.  Do you still have the same hard

3   drive today as you had in April of 2013?

4       A    No.

5       Q    When did you change hard drives?

6       A    I haven't changed.  I don't have my PC.

7   It crashed.

8       Q    Well, so you have a different hard drive?

9       A    No, 'cause I never replaced it.

10      Q    So your computer crashed?

11      A    Right.

12      Q    And you don't have a computer now?

13      A    I don't have a personal computer at home.

14  I do not.

15      Q    Okay.  When did your computer crash?

16      A    Probably three, four months ago.

17      Q    Was it your -- do you own that computer?

18      A    Yes, sir.

19      Q    Did you try to get the computer uncrashed?

20      A    No.

21      Q    Where's the computer right now?

22      A    In my home.

23      Q    In your home?

24      A    Uh-huh.

25      Q    Is it still on your desk or did you move

Page 20

1   it to the garage or where is it?

2        A    Still on the desk.

3        Q    Do you have any plans to in any way

4   destroy the computer?

5        A    I want to replace it.

6        Q    Okay.  But are you going to wait until you

7   get a new computer before you remove that computer?

8        A    Probably.

9        Q    When do you plan on replacing the

10  computer?

11       A    Soon.

12       Q    Well, it's been crashed for three or four

13  months, so what's soon mean?

14       A    Probably within the next 30 days.

15       Q    Well, does the company send you e-mails?

16       A    Yes.

17       Q    How do you read those e-mails?

18       A    Through my office laptop.

19       Q    Okay.  So you have a laptop?

20       A    Yes.

21       Q    Did you -- how long have you had that

22  laptop?

23       A    The current one I got yesterday.

24       Q    Where's the one that you had before

25  yesterday?

1      A     Corporate has it.

2      Q     Tell me how it was yesterday that you

3  changed out your former laptop for your new laptop?

4      A     Okay.  Several months ago now, I guess,

5  Windows came out and said that they were no longer

6  going to maintain the XP software.

7      Q     Okay.

8      A     Which made many computers in our

9  organization useless going forward, and so they

10  embarked on a program to replace all those.

11      Q     And it was -- just happened to be

12  yesterday it was your turn to get a new one?

13      A     No.  I was going to be in Columbus

14  yesterday, so I called and said, look, if I'm going

15  to be down there and you're replacing this thing

16  soon, let's try and do it tomorrow.

17      Q     Okay.  Well, who did you call and say that

18  to?

19      A     The IT department.

20      Q     Okay.  Well, that's -- that's a department

21  in a building.  Did you talk to someone?

22      A     Yes.

23      Q     Who did you talk to?

24      A     Derrick Williams.

25      Q     Was he the guy that just happened to

1   answer the phone or do you -- have you known him in

2   the past?

3        A    I've known him in the past.

4        Q    Okay.  Is he the one you're supposed to

5   call if you have an IT problem?

6        A    He's the one I call if I have an IT

7   problem.

8        Q    Okay.  What's his title?

9        A    I don't know.

10       Q    Is he in charge of the department?

11       A    No.

12       Q    Okay.  Well, put me in the conversation

13  that you had with Mr. Williams.  What did you say,

14  what did he say in response, as best you can recall?

15       A    I called him.  I said I had to be in

16  Columbus yesterday and I knew he was working on

17  replacing my computer, and if it was possible, I

18  would like him to do that when I was down there.

19  And he said that he had just gotten a number of

20  computers in.  He was building those up and we would

21  be able to do that.

22       Q    Okay.  So then what did you do?

23       A    When I got to corporate yesterday, I went

24  to see him.  Took my old one and he programmed the

25  new one and gave it to me to take with me.

1      Q    Okay.  Well, did he transfer all your

2    files?

3      A    No, not -- I'm not -- I'm not computer

4    savvy.  All I know is he got it to where I should

5    have everything I need to do what I did before.

6      Q    What did you do before?  Read your

7    e-mails?

8      A    Read my e-mails, used Word, used Excel,

9    and those programs are on there.

10     Q    Okay.  But didn't you have information

11   stored on your laptop that you wanted to continue to

12   have stored on your laptop?

13     A    No.

14     Q    So there wasn't anything of value other

15   than the programs that run the computer, the

16   software?

17     A    Right.

18     Q    Well, did you search that laptop for

19   information related to Jane's employment or Jane's

20   subsequent termination?

21     A    No.

22     Q    How long had you had that prior laptop?

23     A    Probably three or four years.

24     Q    And how long did you have the computer

25   that crashed?

1          A     My guess is seven years.

2          Q     What -- what was the -- what type of

3     computer desktop did you have before it crashed?

4          A     Dell.

5          Q     Do you remember what model?

6          A     No.

7          Q     Did you order it straight from Dell or did

8     you get it from a store?

9          A     I ordered that one from Dell.

10         Q     Okay.  But you used that computer for both

11    private use and for work use, correct?

12         A     Yes.

13         Q     Okay.  And you used the laptop for

14    personal use or just company business?

15         A     Basically company business.

16         Q     So your home office, let's think back to

17    April of '13, you had the Dell desktop, correct?

18         A     Yes.

19         Q     And you had the company's laptop?

20         A     Yes.

21         Q     What brand and model is that, if you know?

22         A     The kind of laptop was an HP.

23         Q     You stack documents as opposed to filing

24    them.  Did you have file cabinets in your office at

25    home?

Page 25

1      A     I do.

2      Q     Is there anything work related in the file

3  cabinets?

4      A     Yes.

5      Q     What's work related in the file cabinets?

6      A     Expense accounts, audits, re-audits.

7      Q     What was that, pre-audits?

8      A     Re-audits.

9      Q     Re-audits.  Okay.

10     A     And then, you know, miscellaneous

11  information.

12     Q     Do you have personal information in the

13  filing cabinets?

14     A     No.

15     Q     Okay.  So everything in the filing cabinet

16  is business related, correct?

17     A     Essentially.

18     Q     Okay.  What else did you have in your home

19  office in April of '13 by way of equipment to do

20  your day-to-day business for the company?

21     A     I had a printer.

22     Q     Still have the same printer?

23     A     No.

24     Q     Okay.  When did you change out the

25  printer?

1      A    It's probably been a year and a half now.

2      Q    Okay.  So it's been since April of '13?

3      A    Not sure.

4      Q    Okay.  What type of printer?

5      A    HP.

6      Q    Is that something the company provided?

7      A    It is.

8      Q    Okay.  Were you given a certain amount you

9 could spend on a printer or did you -- was a printer

10 delivered or did you pick it up?  How did you get

11 it?

12     A    It was shipped to me.

13     Q    Okay.  Did you have anything else that

14 helped you perform your work-related task in April

15 of '13?

16     A    Not that I can think of.

17     Q    Okay.  Did you have like a dedicated

18 telephone line for work or was it your just home

19 number?  How did that work?

20     A    I have my home phone.

21     Q    Okay.

22     A    And I have a cell phone.

23     Q    Okay.  Do you have any landline that's

24 just dedicated for work purposes?

25     A    No.

1     Q    Okay.  Is the cell phone paid for by the

2  company?

3     A    For the business use, yes.

4     Q    Okay.  So you get reimbursed?

5     A    Correct.

6     Q    Okay.  So you picked out the phone or was

7  it provided to you?

8     A    It was a phone that I had when I came to

9  work for Atrium.

10    Q    Do you still have that phone?

11    A    I do.

12    Q    Okay.  What model is that phone, make and

13  model?

14    A    It's Verizon.

15    Q    Okay.  Well, that's your carrier.  What

16  type of phone do you have?

17    A    It's an LG.

18    Q    Can you -- is it a smart phone?  Can you

19  access the internet?

20    A    No.

21    Q    Don't get e-mails?

22    A    Not on the phone, no.

23    Q    Okay.  What about your car, is that paid

24  for by the company?  Are you reimbursed?  How's that

25  work?

1     A     I get mileage.

2     Q     Okay.  Do you fill out a monthly expense

3   report?

4     A     Every two weeks.

5     Q     Do you have a company credit card that you

6   use?

7     A     Do not.

8     Q     If you take an employee to lunch or

9   dinner, do you typically pay for that lunch or

10  dinner?

11    A     That's something I could expense.

12    Q     How would you, let's say, expense a lunch?

13    A     You list it on the expense account.

14    Q     Okay.  Well, do you have to provide

15  someone with a hard copy or a copy of your credit

16  card?  How does that work?

17    A     Provide a hard copy of the bill and the

18  credit card slip.

19    Q     Who do you provide that to?

20    A     To the accounting department.

21    Q     Okay.  Is there a particular person in the

22  accounting department?

23    A     No.

24    Q     So when you need reimbursed every two

25  weeks, you just send the bills to the accounting

1    department?

2         A    Detailed out on an expense account.

3         Q    Is that something you do by computer or

4    something that you do by mail?

5         A    I generate the expense account on the

6    computer and mail it US mail.

7         Q    You generate it on your laptop?

8         A    Yes.

9         Q    Do you keep copies of the hard receipts?

10        A    Yes.

11        Q    You said that in the filing cabinet there

12   are audits, what are audits?

13        A    I visit the facilities and I audit their

14   human resource files to make sure that they're doing

15   everything they're supposed to be doing with respect

16   to the employees that work there.

17        Q    What do you mean you audit the human

18   resource files?  What does that mean?

19        A    Means that I look for things, like

20   criminal background checks, OIG reports, I-9s.

21        Q    Anything else?

22        A    Performance evaluations, sign off on

23   policies and procedures.

24        Q    Anything else?

25        A    Not that I can think of at the moment.

1      Q    As far as performance evaluations, what do

2   you do?  What are you looking for?

3      A    I'm looking to see that we're doing them.

4      Q    Anything else?

5      A    No.

6      Q    I mean, when you look at a performance

7   evaluation, do you simply look to make sure it's

8   done or do you read the contents of the performance

9   evaluation?

10     A    In the audit, I look to see that it was

11  done.

12     Q    Okay.  You said you sign off on policies

13  and procedures, what does that mean?

14     A    I didn't say I sign off on policies and

15  procedures.

16     Q    Okay.  What did you say?

17     A    I said that I look to see that the

18  employee has signed off on those.

19     Q    So if an employee gets a policy or

20  procedure, they're to sign off on that?

21     A    Correct.

22     Q    Are they given a copy of the policy or

23  procedure?

24     A    Yes.

25     Q    Are they given a copy of their -- is it

Page 31

1    called an acknowledgment?

2         A    If they want it, yes.

3         Q    What do you mean if they want it?

4         A    If an employee asks for one, we would give

5    them one.

6         Q    So they have to ask in order to be given

7    one?

8         A    Normally, yes.

9         Q    What if you look in a file and see

10   discipline, do you review that?

11        A    Not for -- not during the audit, no.

12        Q    Okay.  What's a re-audit?

13        A    Re-audit is when I discover something that

14   isn't being done and I advise the facility that it

15   needs to be done and I come back later to see if

16   they've instituted that.

17        Q    Do you put that advisement in writing?

18        A    Yes.

19        Q    How long do you typically give them to --

20   between the audit and the re-audit?

21        A    Most of the time two or three months.

22        Q    Okay.  You also said there was

23   miscellaneous documents in your filing cabinet.

24   What do those consist of?

25        A    Be letters.

1    Q    Anything else?

2    A    It's really anything that might come

3  across my desk that I feel I may need and I just

4  keep it, keep a copy of it.

5    Q    Do you keep a hard copy of it, but the

6  computer copy you put on the stick and then delete

7  the information?

8    A    Right.

9    Q    What's the memory capability of the stick?

10   A    I'm not sure.

11   Q    Do you have more than one stick?

12   A    I have two.  I back one up all the time.

13   Q    So one is a backup to the other one?

14   A    Correct.

15   Q    Is that how you back up your files, using

16  the stick?

17   A    It is.

18   Q    What's -- can I look at the two sticks and

19  know which one's the backup and which one's the,

20  let's say, original?  Are they different colors?

21  They say something?  You write on them?

22   A    No.

23   Q    Okay.  What brand of stick do you use?

24   A    I think it's a SansDisk [sic].

25   Q    For both sticks?

1       A     Yeah.

2       Q     Did you get both sticks at the same time?

3       A     I believe so.

4       Q     I mean, did you buy a package of two

5    sticks?

6       A     Yeah.

7       Q     Where did you buy it from?

8       A     Probably Best Buy or Sam's.

9       Q     Okay.  Are those the same two sticks

10   you've had the entire time you've been employed by

11   the company?

12      A     I'm not sure.

13      Q     Let's talk about are there times that you

14   review discipline?

15      A     Yes.

16      Q     Are there certain levels you review or you

17   review everyone's discipline?

18      A     I review discipline when there's an HR

19   issue involved.

20      Q     Well, what do you mean if there's an HR

21   issue involved?  Doesn't all discipline contain a

22   component of HR?

23      A     But it's not something I'm involved in.

24      Q     Okay.  Well, give me an example of what

25   you're not involved in.

1      A    Okay.  Let's -- an example would be an

2  employee who has exceeded the number of allowed

3  call-offs in a given period of time.

4      Q    Okay.  So that would be a violation of the

5  attendance policy?

6      A    Correct.

7      Q    Correct?  And you're not involved in that?

8      A    No.

9      Q    Okay.  So we'll cross that off the list.

10  What else?

11      A    An employee could have a job performance

12  problem and there's no other discipline on that

13  issue.  I would not be involved in that.

14      Q    So you're not involved in job performance

15  problems unless there's more than one?

16      A    Right.

17      Q    Well, for purposes of progressive

18  discipline, does written discipline with respect to

19  the same item fall off after a certain amount of

20  time?

21      A    Yes.

22      Q    Okay.  How long is that?

23      A    A year.

24      Q    Okay.  Now, do you review that performance

25  discipline even though the previous discipline may

Page 35

1    have fallen off?

2         A    Not routinely, no.

3         Q    Okay.  When the company issues discipline,

4    is the supervisor to sign off on the discipline?

5         A    Yes.

6         Q    Okay.  Is the employee either to sign the

7    discipline or the supervisor writes refused to sign?

8         A    Yes.

9         Q    Okay.  So is it fair to say an employee

10   wouldn't be given discipline unless the supervisor

11   signed off?

12        A    Normally, right.

13        Q    Okay.  And when you do the -- when you

14   look at the disciplines, do you make sure that the

15   supervisor signs off and the employee either signs

16   off or there's something written that the employee

17   refused to sign?

18        A    Yes, when I'm involved in that situation,

19   yes.

20        Q    Okay.  Do you recall ever reviewing any

21   discipline related to Jane where the discipline was

22   not signed off by the supervisor?

23        A    I don't recall that.

24        Q    Okay.  Well, if there was discipline in

25   her file that wasn't signed off by the supervisor,

1    would you have taken action?

2        A    Yes.

3        Q    Okay.  What action would you have taken?

4        A    I would have reminded the facility that

5    the supervisor is to sign and date any discipline

6    issues.

7        Q    All right.  Well, let's say that the

8    discipline happens months and months before you

9    catch it, what do you do at that point?

10                MR. GARRISON:  Objection.

11        Q    Does the employee still get the

12    discipline?

13                MR. GARRISON:  Objection.  Calls for

14                speculation.

15        A    When I find it, I address it the way I

16    explained to you.

17        Q    Okay.  But is the discipline still given

18    at that point to the employee?  Let's say it's not

19    signed by the supervisor and it's not signed by the

20    employee, what happens to the discipline?

21                MR. GARRISON:  Objection.  Calls for

22                speculation.

23        A    I don't know what the building would have

24    done with it.

25        Q    Okay.  Well, let's say do you have a

Page 37

1    procedure or policy that you use if you find

2    discipline that's not signed off on by the

3    supervisor?

4         A    Yes.

5         Q    Okay.  What's your policy?

6         A    I told you, I would go to the building and

7    say when you issue discipline, the supervisor needs

8    to sign and date that discipline.

9         Q    Okay.

10        A    And I would look for that going forward.

11        Q    Okay.  But is the discipline that you're

12   referencing that causes you to go to the facility

13   and say discipline is supposed to be signed off on,

14   is that discipline that you're using as the example

15   still in place for the employee?

16        A    I don't know what they've done with it.

17        Q    Okay.  Well, you have it in your hand,

18   right?

19        A    No.  I have a copy.

20        Q    Okay.  What do you do with your copy?

21        A    I file it.

22        Q    In one of the file cabinets?

23        A    Yep.

24        Q    So if you found any discipline in Jane's

25   file that wasn't signed off by the supervisor, it

1    would be in your file cabinet, correct?

2         A    Not necessarily.

3         Q    Okay.  Where else could it be?

4         A    In the employee's files.

5         Q    You wouldn't keep a copy of an unsigned

6    discipline?

7         A    Not if it didn't come to me.

8         Q    No.  I'm saying you found it.  You were

9    being diligent in your job and you did an audit of

10   the discipline and you found that the supervisor

11   hadn't signed off, do you keep a copy of that

12   discipline?

13        A    I do not, not as part of the audit.

14        Q    Okay.  What about as part of the

15   non-audit, you just are involved -- you see it when

16   you're looking through a file?

17        A    I would not make a copy.

18        Q    Well, if you found discipline that was in

19   Jane's file that had not been signed off on, would

20   you have noted that somewhere?

21        A    No.

22        Q    Why not?

23        A    'Cause I would have dealt with it right

24   then and there.

25        Q    What do you mean you would have dealt with

1    it?

2         A    I would have gone to the supervisor and

3    said when you write discipline, you need to sign and

4    date that discipline.

5         Q    Okay.  But you wouldn't have noted that

6    anywhere in case the supervisor didn't do --

7         A    No.

8         Q    -- in case the supervisor did it again?

9         A    No.

10         Q    Okay.  When you go to a site to do an

11    audit, do you take your laptop?

12         A    Yes.

13         Q    Do you take your laptop any time you go to

14    a site?

15         A    Yes.

16         Q    Okay.  Do you ever take notes when you go

17    to a site, pen-and-paper-type notes?

18         A    Infrequently.

19         Q    What does infrequently mean?

20         A    That means normally when I'm going through

21    an audit, I'll make reference to things that are not

22    on a checklist that I have, the things that I'm

23    looking for, like the I-9s.  And if there's

24    something that crops up, I'll make a note of that to

25    cover with the administrator before I leave.

1      Q     Okay.  Well, where would you make a note

2  of it?

3      A     On pad.

4      Q     Okay.  What happens to the note?

5      A     After I review it with the administrator,

6  I destroy it.

7      Q     Doesn't the company have a document

8  retention policy?

9      A     Yes.

10     Q     When was the last time you read the

11 company's document retention policy?

12     A     Probably within the last year.

13     Q     Do you believe your notes, written notes

14 aren't covered by that policy?

15     A     I don't think they are.

16     Q     Have you ever asked anyone?

17     A     No.

18     Q     Do you know what a litigation hold is?

19     A     Yes.

20     Q     How long have you known what a litigation

21 hold is?

22     A     A long time.

23     Q     Has anyone ever told you that there's a

24 litigation hold on this case?

25     A     Yes.

Page 41

1      Q    How long have you known there's been a
2  litigation hold on this case?
3      A    I believe since it was filed.
4      Q    Okay.  Well, when was it filed?
5      A    I don't know.
6      Q    Did you make a note of it somewhere?
7      A    I did not.
8      Q    Have you ever been a plaintiff in a
9  lawsuit?
10     A    No.
11     Q    Ever been a defendant in a lawsuit?
12     A    No.
13     Q    Other than today and the time that you
14  told us about with LTV, have you ever been a witness
15  in a lawsuit?
16     A    Yes.
17     Q    Okay.  When was the time that you were a
18  witness in a lawsuit before this one and LTV one?
19     A    Probably 40 years ago.
20     Q    Forty?
21     A    Uh-huh.
22     Q    Yes?
23     A    Yes.
24     Q    What was the nature of that testimony?
25     A    I was a witness to an automobile accident.

1       Q     Any other time you've been a witness in a

2   lawsuit?

3       A     Not that I recall.

4       Q     The time that you were a witness in the

5   auto accident matter, did you actually testify in

6   court?

7       A     We got to court and it was settled in

8   court.

9       Q     When you say "we," who do you mean?  The

10  other witnesses?  Yourself?  Are you talking about

11  yourself in the third person?

12      A     I was there, yes.

13      Q     So when you're using the word "we," you're

14  talking about yourself?

15      A     Right.

16      Q     Have you ever been arrested for a

17  misdemeanor or felony?

18      A     No.

19      Q     Have you ever served in the military?

20      A     No.

21      Q     Have you ever been turned down for service

22  in the military?

23      A     Yes.

24      Q     When was that?

25      A     When I was about 18 years old.

1    Q    When you were about 18?

2    A    Yeah.

3    Q    Why were you turned down?

4    A    I was prediabetic at that time.

5    Q    For medical reasons?

6    A    Yes.

7    Q    You were prediabetic?

8    A    Yes.

9    Q    Are you a high school graduate?

10   A    Yes.

11   Q    When and where did you graduate from high

12   school?

13   A    Bethel Park High School in 1961.

14   Q    Do you have any formal post high school

15   education?

16   A    Yes.

17   Q    Okay.  Take me through that.

18   A    I have a bachelor of science degree in

19   industrial engineering and a master's degree in

20   business administration.

21   Q    Where did you get your bachelor's degree

22   in industrial -- industrial what?

23   A    Engineering.

24   Q    Where did you get that degree?

25   A    University of Pittsburgh.

Page 44

1        Q    What years did you attend the University

2   of Pittsburgh?

3        A    1961 through 1966.

4        Q    Where did you get your master's?

5        A    University of Pittsburgh.

6        Q    What year did you attend the University of

7   Pittsburgh where you obtained your master's?

8        A    Would have been 1966, and then it was for

9   several years.  It was in the evenings, and I don't

10  remember the end date.

11       Q    Well, did it take you more than five

12  years?

13       A    No.

14       Q    Less than five years?

15       A    Yes.

16       Q    Was it being paid for by your employer at

17  the time?

18       A    There was a subsidy.

19       Q    What does that mean?

20       A    They would pay part of it.

21       Q    After graduating with your bachelor's

22  degree in '66, where were you first employed?

23       A    It was called Jones & Lockland Steel

24  Corporation at that time.

25       Q    Jones & Lockland?

1      A     Right.

2      Q     Where were they located?

3      A     Pittsburgh.

4      Q     What position did you hire into?

5      A     Industrial engineer.

6      Q     What were -- what did an industrial

7  engineer do at Lockland at that point?

8      A     We did time studies on work processes.  We

9  developed incentive programs.

10     Q     Anything else?

11     A     That's essentially it.

12     Q     Did you fall under the HR department?

13     A     Not at that time.

14     Q     What was your title when you first hire

15  in?

16     A     I think it was just industrial engineer.

17     Q     Who did you report to?

18     A     I don't remember.

19     Q     Did you have any subordinates?

20     A     No.

21     Q     Were you in a labor union?

22     A     No.

23     Q     Were the employees that you were doing the

24  time studies on in a labor union?

25     A     Yes.

1    Q    Who were they represented by?

2    A    Steelworkers.

3    Q    Do you remember what local?

4    A    No.

5    Q    How long did you hold that position?

6    A    Probably a couple years.

7    Q    What position did you hold next?

8    A    Pardon?

9    Q    What position did you hold next?

10   A    I was a -- I went into the human resources

11   department --

12   Q    Okay.

13   A    -- as a salary organization engineer.

14   Q    At Jones Lockland?

15   A    Yeah.

16   Q    What were your job duties at that point?

17   A    Essentially designing incentive programs

18   for sales personnel.

19   Q    Who was your supervisor?

20   A    Joe Lamberger.

21   Q    What was his title?

22   A    Don't know.

23   Q    How long did you hold that position?

24   A    Probably a year, year and a half.

25   Q    Did you have any subordinates at that

1    point?

2         A     No.

3         Q     I take it you weren't in the union?

4         A     Pardon?

5         Q     You were not in a labor union?

6         A     No.

7         Q     Correct?  What was the next position you

8    held?

9         A     I believe it was manager of personnel

10   services.

11        Q     What was your -- what were your job duties

12   as the manager of personnel services?

13        A     I performed the human resources functions

14   for the steel service center division.

15        Q     How many employees did that cover?

16        A     I don't remember.

17        Q     Did you have any subordinates at that

18   point?

19        A     One.

20        Q     What was that person's title?

21        A     I don't remember his title.

22        Q     Who were you answering to?

23        A     The vice president of sales.

24        Q     Who was that?

25        A     Dawn Stewart.

Page 48

1       Q    Don or Dawn?  I'm sorry.

2       A    Dawn.

3       Q    Dawn.  During the time that you held the

4  title of manager of personnel, were you the subject

5  of any grievances?

6       A    No.

7       Q    Did you testify in any arbitrations?

8       A    No, not at that time.

9       Q    How long did you hold the title of manager

10  of personnel?

11       A    I'm not sure.

12       Q    Give me a range.

13       A    Eight years.

14       Q    Okay.  What was the next position you

15  held?

16       A    Same position, only in one of the basic

17  steel plants.

18       Q    Did you actually have to leave your work

19  site?

20       A    Yes.

21       Q    How far did you have to move?  From one

22  building to another?

23       A    Essentially.

24       Q    Okay.  How many employees did you have HR

25  responsibilities for?

1       A       I don't remember.

2       Q       How long did you hold that position?

3       A       Couple years.

4       Q       Were you the subject of any grievances

5       when you held that position?

6       A       No.

7       Q       Did you testify in any arbitrations when

8       you held that position?

9       A       No.

10      Q       What was the next position you held?

11      A       Assistant to the president of the eastern

12      division.

13      Q       Going back to when you were the manager of

14      personnel in the other building, did you have any

15      subordinates?

16      A       Yes.

17      Q       How many?

18      A       Two.

19      Q       What did the assistant to the president of

20      the eastern division do?

21      A       I was responsible for personnel services

22      and labor relations for that division.

23      Q       How many employees did that cover?

24      A       I don't know.

25      Q       Can you give us a range?

1       A       No.

2       Q       How long did you hold that position?

3       A       Probably two years.

4       Q       Were you the subject of any grievances

5   during that time period?

6       A       No.

7       Q       Did you testify in any arbitrations?

8       A       No.

9       Q       What was the next position you held?

10      A       I was director of personnel services.

11      Q       For Jones Lockland?

12      A       Uh-huh.

13      Q       Yes?  You have to answer audibly.

14      A       Yes.

15      Q       Okay.  What year was that?

16      A       I'm not sure.

17      Q       How long did you hold the position?

18      A       I believe six years.

19      Q       Were you assisting the same president for

20  all six years?  Did the president of eastern

21  division change during your six years?

22      A       I thought you were asking me about the

23  most recent position.

24      Q       No.  The director of -- okay.  Let's go

25  back.  When you're the assistant to the president at

1   eastern division, are you answering to the same

2   person for that whole time or did that person

3   change?

4        A    We're talking about the assistant to the

5   president of the eastern division?

6        Q    Yes.

7        A    I'm reporting to the same person.

8        Q    Who was that?

9        A    What the heck was that name?  David.  I

10  can't recall his last name.

11       Q    Okay.  When you become director of

12  personnel, who do you report to?

13       A    I reported to the general manager of

14  personnel services.

15       Q    Who was that?

16       A    I don't remember.

17       Q    Are you on any medication today that would

18  affect your ability to recall the events of the

19  past?

20       A    No.

21       Q    Okay.  You held that position for six

22  years?

23       A    That's my guess.

24       Q    Was it the same GM of personnel services

25  the entire time?

 1      A     Yes.

 2      Q     Okay.  How many employees did you have HR

 3  responsibilities for as the director of personnel?

 4      A     I don't know.

 5      Q     Did you have any subordinates?

 6      A     No.

 7      Q     Were you the subject of any grievances?

 8      A     No.

 9      Q     Did you testify in any arbitrations?

10      A     No.

11      Q     What was the next position you held?

12      A     I was director of personnel services.

13      Q     How is that different from your previous

14  position?

15      A     I was with a different company.

16      Q     So you left Jones Lockland?

17      A     Yes.

18      Q     Why did you leave?

19      A     They went bankrupt.

20      Q     Did you stay until they closed the doors

21  or were you given some type of severance?  How did

22  that work?

23      A     When I left, there were 13 people left.

24      Q     Okay.  But did 12 of them stay and you

25  left?  I mean, how did it work?  Were you one of the

Page 53

1    last people out the door?

2         A    Yes.

3         Q    What year was that?

4         A    I'm not sure.

5         Q    Was there any gap of time between the time

6    you leave Lockland and the time you start your new

7    job?

8         A    Yes.

9         Q    How long?

10        A    Probably a year and a half.

11        Q    Were you looking for a job during that

12   time?

13        A    I was.

14        Q    Okay.  Where did you ultimately land?

15        A    With Royal Manor.

16        Q    What's Royal Manor?  What do they do?

17        A    They were in the business of long-term

18   care and rehabilitation.

19        Q    You say "they were," are they no longer?

20        A    Correct.

21        Q    What did you do for them as the director

22   of personnel services?

23        A    I handled all the personnel services work

24   at the corporate level.

25        Q    What does that mean?  What were you doing?

1        A    I'd be involved in compensation, training,

2   organizational structure.

3        Q    Did the company have more than one

4   location?

5        A    Yes.

6        Q    How many?

7        A    I think at that time they had ten.

8        Q    Where were they located?  Where's the

9   corporate office?

10       A    Cleveland.

11       Q    Where was your office?

12       A    Cleveland.

13       Q    Who did you report to?

14       A    Victoria Pavel.

15       Q    Can you spell her last name?

16       A    P-A-V-E-L.

17       Q    How long did you hold that position?

18       A    A couple years.

19       Q    Did they get bigger or smaller during

20   those two years?

21       A    They were acquired by Atrium.

22       Q    When?

23       A    2007, I believe.

24       Q    At the time they were acquired, did they

25   have ten facilities?  Did they have more than ten?

1   Less than ten?

2        A    I think they still had ten.

3        Q    Okay.  As the director of personnel

4   services for Royal Manor, did you have any

5   subordinate employees?

6        A    No.

7        Q    Okay.  Did you have to reapply for your

8   position when they were acquired by Atrium?

9        A    I think technically, yes.

10       Q    Did you fill out a new job application?

11       A    I believe we did.

12       Q    When you say "I believe we did," are you

13  talking about everyone who was employed at the time?

14       A    Everyone that went from Royal Manor to

15  Atrium.

16       Q    Okay.  Well, did all the employees go?

17       A    No.

18       Q    Which employees went and which employees

19  didn't go?

20       A    I can't give you names.

21       Q    All right.  Well, I mean, was it just each

22  person was picked on their own merit as opposed to

23  groups of employees that went or didn't go?

24       A    That's my understanding.

25       Q    Well, I mean you would have had some

1    knowledge of that as the director of personnel

2    services, correct?

3         A    Not necessarily.

4         Q    You didn't have any knowledge?

5         A    No.

6         Q    So you weren't involved in hiring any of

7    the new employees?

8         A    No.

9         Q    Okay.  What position were you hired into?

10        A    Regional director/human resources.

11        Q    How did your job responsibilities change,

12   if they did?

13        A    I guess the biggest change was the first

14   thing we had to do was negotiate new labor

15   agreements for the buildings that were organized.

16        Q    Well, did you have a particular block of

17   buildings you were responsible for, particular

18   geographical area?

19        A    Yes.

20        Q    Which was it, buildings or geographical

21   area, or both?

22        A    Buildings.

23        Q    Okay.  Where were your buildings located?

24        A    Generally in Ohio.  They were buildings

25   that used to be Royal Manor.

1     Q    Okay.  Did you have any responsibilities

2   for any buildings that weren't previously Royal

3   Manor facilities?

4     A    Not at that time, no.

5     Q    Okay.  So in Ohio, how many of the

6   buildings were covered under collective bargaining

7   agreement?

8     A    Three.

9     Q    Which buildings were those?

10    A    Darlington, Willow Park, and Broadway.

11    Q    Willow Park, what was the first one you

12  said?

13    A    Darlington.

14    Q    Darlington?

15    A    Uh-huh.

16    Q    And what was the third one?

17    A    Broadway.

18    Q    Where was Darlington located?

19    A    Toledo.

20    Q    Where was Willow Park located?

21    A    Cleveland.

22    Q    Where was the Broadway location located?

23    A    Cleveland.

24    Q    Did the same union represent both of the

25  Cleveland buildings?

1      A     Yes.

2      Q     What union was it?

3      A     SEIU.

4      Q     What local?

5      A     Don't know.

6      Q     You said the facility on Darlington, are

7    you talking about the Darlington House in Toledo?

8    You don't know the name of the building?

9      A     Yeah.  It was Darlington Nursing &

10   Rehabilitation Center.

11     Q     What union represented those employees?

12     A     SEIU.

13     Q     Which local?

14     A     I don't know.

15     Q     What did you have to do by way of the

16   collective bargaining agreement?

17     A     Arrive at a new collective bargaining

18   agreement.

19     Q     The collective bargaining agreement didn't

20   have language in it that transferred over to the new

21   company?

22     A     It did not.

23     Q     What did you do by way of getting a new

24   collective bargaining agreement for those three

25   facilities?

1       A     I assisted our labor counsel in developing

2    the new labor agreement.

3       Q     Who's your labor counsel?

4       A     Tom Diehl.

5       Q     Did you actually attend bargaining

6    sessions?

7       A     Yes, sir.

8       Q     For the Toledo facility, who sat on the

9    other side for the union?

10      A     Kyle Huff.

11      Q     How long was the -- what were the terms as

12   far as length of time with a contract?

13      A     I believe it was three years.

14      Q     Okay.  Then what did you do with the other

15   seven facilities, the ones that weren't covered

16   under a collective bargaining agreement?

17      A     I don't understand your question.

18      Q     Did you have any responsibilities --

19      A     Yes.

20      Q     -- for those seven facilities?

21      A     Yes.

22      Q     What were your responsibilities?

23      A     General human resources work.

24      Q     Are you the HR person that would be like

25   the first-line HR person related to those

1   facilities?  In other words, is there an HR person

2   located at the facility?

3       A    Yes.

4       Q    Okay.  What title do they hold?

5       A    Varies.

6       Q    Okay.  Well, tell me the various titles.

7       A    Manager/human resources, director/human

8   resources; in some cases that function rested with

9   the business office manager.

10      Q    So the ones that it rested with the

11  business office manager, they still held the title

12  of business office manager?

13      A    Yes.

14      Q    Okay.  They didn't hold a manager title or

15  a director title of HR?

16      A    No.

17      Q    Okay.  How did that -- how did your

18  responsibilities change over time, if they did?

19      A    I don't think they really have.

20      Q    Okay.  So you still have the ten

21  facilities?

22      A    No.

23      Q    Okay.  Well, that changed then, right?

24      A    Okay.

25      Q    Yes?

1        A     Yes.

2        Q     Okay.  Well, tell me how that changed.

3        A     I have more of them.

4        Q     Okay.  Tell me the seven that you had at

5   the beginning that were Royal facilities that

6   weren't covered by a collective bargaining

7   agreement?

8        A     Hmmm.  Austinburg, Blossom.  Those are the

9   only two I can recall.  Atrium did not acquire all

10  ten of those buildings.

11       Q     Okay.  Which ones did they acquire?

12       A     They acquired the three that I told you

13  had labor agreements --

14       Q     Okay.

15       A     -- and Blossom and Austinburg.  There may

16  have been another one that I'm not thinking of.

17       Q     Okay.  So you didn't have responsibilities

18  for ten facilities at the beginning, you had

19  responsibilities for six facilities?

20       A     Initially, yes.

21       Q     Then how does that change?

22       A     Once we got labor agreements in place in

23  those three buildings, then Atrium divided their

24  total number of facilities essentially in half.

25       Q     Okay.  What was the -- your half?  What

1    were they designated?  Blue team?  The green team?

2    The one team?  The southern --

3        A    There wasn't any designation that I'm

4    aware of.

5        Q    Okay.  So is it just by your name, these

6    are the facilities that Bob has?

7        A    I guess.

8        Q    Who was your counterpart?  You said they

9    divided it in half.

10       A    I don't remember the lady's name.

11       Q    Okay.  What year is that?

12       A    That's probably two thousand -- late 2008.

13       Q    Okay.  When they're divided, do you still

14   keep the six that we talked about?

15       A    I did.

16       Q    Okay.  And if you remember that sixth one

17   in the course of the deposition, will you tell me?

18       A    Sure.

19       Q    Which ones -- which other ones were added?

20       A    I picked up buildings in Michigan and

21   Wisconsin.

22       Q    Okay.  Well, how many buildings did you

23   pick up in Michigan?

24       A    I ended up in total with about 22

25   buildings.

1      Q    How many facilities do you end up with in

2  Michigan?

3      A    I don't remember.

4      Q    Okay.  When you say buildings, it could be

5  one facility has seven buildings?

6      A    No.  When I say buildings, I'm talking

7  facilities.  They could be in different sizes but --

8      Q    So you'd be dealing with 22

9  administrators?

10     A    Yeah.

11     Q    Okay.  How many in Wisconsin?

12     A    I think there were only three in

13  Wisconsin.

14     Q    Okay.  So at the point that it's divided,

15  you have the six prior Royal facilities, pick up 22

16  facilities in Michigan, and three in Wisconsin; is

17  that fair?

18     A    No.

19     Q    Okay.  Why isn't that fair?

20     A    What I said was I have 22 total.

21     Q    Okay.  How many in Michigan?

22     A    I don't remember.

23     Q    What are the facilities' names in Michigan

24  that you picked up?

25     A    One of them was King.

1      Q      King?

2      A      Yep.

3      Q      Okay.

4      A      And I had Gladwin, and I had one in the

5   UP.  I don't remember the name of that now.

6      Q      Okay.

7      A      And then the ones in Wisconsin.

8      Q      What were the names in --

9      A      Oh, Marshall was another one I had in

10  Michigan.

11     Q      Okay.  Do you remember the names of the

12  ones in Wisconsin?

13     A      Tomah was one of them.

14     Q      Tomah?

15     A      Tomah.  I don't remember the other two.

16     Q      Okay.  Now, has that changed over time?

17     A      Yes.

18     Q      Okay.  When was the next change?

19     A      My counterpart left at some point.  I

20  don't remember exactly when.  And at that point they

21  regionalized the HR assignment.

22     Q      What were the names of the various

23  regions?

24     A      I don't know that they gave them names.

25     Q      Okay.

1       A       I had all of Ohio and Kentucky.

2       Q       How many facilities did you have in Ohio?

3       A       Twenty.

4       Q       How many in Kentucky?

5       A       Two.

6       Q       Okay.  But your region didn't have a

7   designation?

8       A       Not that I'm aware of.

9       Q       Okay.  How many regions were there at that

10  point?

11      A       I believe the company has and -- has five

12  regions.

13      Q       Which new facilities did you pick up in

14  Ohio?

15      A       What do you mean by new?

16      Q       When they go to the regionalized division,

17  do you pick up facilities in Ohio?

18      A       Yes.

19      Q       Okay.  Which facilities do you pick up?

20      A       I pick up Salem and there's three

21  buildings there.  I picked up the Pines, Canton.

22      Q       How many facilities of Pines?  One?

23      A       Yeah.

24      Q       Okay.

25      A       Dixon.

1    Q    Picked up a facility in Canton?

2    A    Yep.

3    Q    How many?

4    A    One.

5    Q    What's the name of that?

6    A    The only one that's multiple is Salem.

7    Q    Okay.  What's the name of the Canton

8  facility?

9    A    Canton.

10   Q    Just called Canton?

11   A    Canton Health Care.

12   Q    Okay.

13   A    Talmadge.

14   Q    Is that named after the road?  Talmadge

15  Road?

16   A    I have no idea.

17   Q    Where is it located?  What county?

18   A    It's in the Akron area.

19   Q    Summit?

20   A    I'm not sure.

21   Q    Okay.  You don't know Talmadge to be a

22  road in Summit County?

23   A    I don't.

24   Q    Okay.  How many times have you been to the

25  Talmadge facility?

1      A    Numerous times.

2      Q    Okay.  Which other facilities?

3      A    Dixon, Evergreen, Woodside, Lexington.

4      Q    Is that in Kentucky?

5      A    Pardon?

6      Q    Lexington, is Lexington in Kentucky?

7      A    No.

8      Q    It's in Ohio?

9      A    You asked me for Ohio, right?

10     Q    Right.  Where's a Lexington in Ohio?

11     A    In Lexington, Ohio.

12     Q    What's the big city near Lexington?  Don't

13  know?

14     A    No.

15     Q    Okay.  Where else?

16     A    I gave you Evergreen?

17     Q    Yes.

18     A    Okay.  That's all I can think of at the

19  moment.

20     Q    Which facility did Jane work?

21     A    Oh, Jane worked at St. Marys.

22     Q    Is that another facility you picked up?

23     A    Yep.  And another one I picked up in that

24  area is Springfield.

25     Q    Okay.  Any others you can remember?

1    A    I think that's all of them, but I'm not

2  sure.

3    Q    When you pick up the new facilities when

4  they go to this regional model, do you remember what

5  year that is?

6    A    My guess is it's probably around 2008 or

7  '9.

8    Q    Are you saying late '8, '9?

9    A    Yeah, probably.

10    Q    Okay.

11    A    I'm not sure.

12    Q    When you pick up the new facilities in

13  Ohio and Kentucky, do you visit each facility?

14    A    Yes.

15    Q    When you visited the St. Marys facility,

16  who was the administrator?

17    A    What was his name?  There was a gentleman

18  who was the administrator at that time, and I don't

19  recall his name.

20    Q    Is his first name Matt?

21    A    Yeah.

22    Q    Okay.  What did you do like the first

23  day -- the first time you go to a facility?  Do you

24  introduce yourself to the employees?

25    A    I introduce myself to the management

1    group.  I met with the administrator.  I met with

2    the DON and any other department heads that were

3    available just to tell them who I was and put a face

4    with the name.

5         Q    Do you remember during that visit meeting

6    Jane?  Was she the DON?

7         A    She was, and I don't remember that

8    specifically, but I made it a point to meet each

9    administrator and each DON that --

10        Q    Did you take notes during your meeting?

11        A    No.

12        Q    Other than the administrator and the DON,

13   who are the department heads at the St. Marys

14   facility?  Not by their names, but by their titles.

15        A    Most buildings have a maintenance

16   supervisor.

17        Q    Okay.

18        A    And that would be someone I would normally

19   meet.

20        Q    Okay.

21        A    The business office manager and the person

22   that handles human resource functions.

23        Q    Well, at the St. Marys facility when you

24   first go there, who was handling the HR functions?

25        A    I believe that was in the accounting area.

1       Q      You believe it was in the accounting area?

2       A      Accounting area.

3       Q      What was the name of the person?

4       A      Claudette was the person that was handling

5    HR for that building at that time.

6       Q      Okay.  Well, when you first take on the

7    responsibilities of the St. Marys facility, what did

8    the HR person like Claudette do by way of HR

9    responsibilities?

10      A      They would handle the benefit functions.

11   People would want to enroll or change their benefit

12   elections.  They would handle the personal action

13   forms, people coming on board, people terminating,

14   people transferring to different jobs.

15      Q      Anything else?

16      A      They would keep the records, personnel

17   records.

18      Q      What does keep the records mean?

19      A      It means they have a file and anything

20   that applies to that employee would go into that

21   file.

22      Q      Anything else?

23      A      Not that I can think of.

24      Q      What do you mean that anything that

25   applies to the employee goes in the file?

1      A     If the employee brings in information, say

2   they graduated from school or something and wanted

3   that in their file, they would give it to her and

4   she would file it in their file.

5      Q     What if the employee wants to make the

6   company aware of a medical condition, does that go

7   in the file?

8      A     Yeah.  It wouldn't go in the personnel

9   file.  It would go in their medical file.

10     Q     Okay.  Where's the medical file located?

11     A     Medical files are in the same office, but

12  in a separate location from the personnel file.

13     Q     Well, when you made your first trek

14  through the facilities that you picked up in Ohio

15  and Kentucky, did you make sure that the files were

16  separated?

17     A     Absolutely.

18     Q     How did you do that?

19     A     By physically checking where they were.

20     Q     Now, did you go through everyone's

21  personnel file to see if there was information

22  related to medical conditions in the file?

23     A     I would do that in my audits.

24     Q     So your first visit wasn't an audit?  It

25  was just an informational visit?

1      A    In most cases the first visit was an

2   introduction.  In some cases, I do what I call a

3   mini audit.  I might look at two or three files.

4      Q    When you would do the mini audit, would

5   you keep notes?

6      A    No.

7      Q    When you were talking initially to the

8   management employees at St. Marys, were you doing it

9   in a group or individually, if you recall?

10     A    In most cases I met with them

11  individually.

12     Q    Okay.  You're talking about St. Marys?

13     A    Yeah.

14     Q    Do you have a specific recollection of

15  meeting them individually?

16     A    No.

17     Q    So you're just guessing?

18     A    You asked me what I normally would do.

19     Q    I'm asking you at St. Marys --

20     A    Okay.

21     Q    -- during your initial visit --

22     A    Okay.

23     Q    -- did you meet with the employees

24  together or separate?

25     A    I don't remember.

1      Q    Do you remember any of the conversation

2  that you may have had with Jane during that first

3  visit?

4      A    Not specifically, no.

5      Q    At some point are you made aware that Jane

6  had left the company, just up and quit?

7      A    Yes.

8      Q    Do you remember what year that was?

9      A    I do not.

10      Q    How did you become aware of that?

11      A    I was advised by the administrator and

12  asked to help search for a replacement.

13      Q    Who was the administrator?

14      A    I don't remember her name.

15      Q    Was it Brandy?

16      A    Yes.

17      Q    Okay.  Now, did she advise you by text

18  message, by a letter, by phone, how did it work?

19      A    I don't remember.

20      Q    Okay.  However she communicated that fact

21  with you, did you take any notes?

22      A    No.

23      Q    Just kept it in your head?

24      A    Yeah.

25      Q    Did you ask her any questions?

1        A    I don't recall.

2        Q    After you're made aware by Brandy of the

3    need for a DON, what do you do, if anything?

4        A    One of my functions was to post jobs on

5    CareerBuilder.

6        Q    Would you do that with your laptop or with

7    your desktop?

8        A    Either one.

9        Q    Did you post the DON position on

10   CareerBuilder?

11       A    I don't specifically remember doing that

12   for St. Marys.

13       Q    Okay.  Did you contact anyone at St. Marys

14   and give them this information?

15       A    Which information?

16       Q    That there was a DON absent at the

17   facility.  I mean, did you just keep the information

18   to yourself?  Brandy calls and you just post it and

19   that's the end of it?

20       A    I'm afraid I'm not following you.

21       Q    Okay.  Brandy calls you and tells you that

22   she no longer has a DON?

23       A    Right.

24       Q    And she needs the position filled?

25       A    Okay.

1      Q    Right?  Do you do anything other than post

2  on CareerBuilder?  Do you contact anyone else in the

3  company?

4      A    I may have checked with my boss to make

5  sure that she was aware that that was a vacancy.

6      Q    Was that Susan or was it someone else?

7      A    It depends on what the time frame was.

8  I'm not sure.

9      Q    Well, who was your boss initially?

10     A    Initially we reported directly to the CEO.

11     Q    Who was that?

12     A    Jason Reese.

13     Q    Okay.

14     A    And then we had a VP of human resources.

15     Q    Who was that?

16     A    Kim.  I don't recall her last name.

17     Q    Okay.  Then who did you report to?

18     A    Then Susan.

19     Q    Do you remember calling Jason?

20     A    No.

21     Q    Do you remember calling Kim?

22     A    Don't remember that, no.

23     Q    Okay.  Did you call anyone else?

24     A    No.

25     Q    Okay.  Did you collect applications?

1       A     No.  I did not do that for any jobs that I

2  posted.

3       Q     So you just posted the job and then you

4  didn't have any further interaction with the

5  posting?

6       A     Correct.

7       Q     Okay.  Who did?

8       A     In jobs below the administrator level, it

9  was the administrator that handled it for that

10 building.

11      Q     Okay.  So in this case, it would have been

12 Brandy that handled it?

13      A     Yeah.

14      Q     Okay.  Are you involved in the interview

15 process for a DON?

16      A     I'm not.

17      Q     Do you know who is?

18      A     I don't know specifically who is, no.

19 It's the clinical side of the operation.

20      Q     Did you have -- prior to the phone call

21 from Brandy about needing a DON -- have any

22 interactions with Brandy that were negative in your

23 opinion?

24      A     I don't understand the question.

25      Q     Yeah.  Was anyone complaining about

1   Brandy's management style before you were contacted

2   by Brandy that she needed a DON?

3       A    No.

4       Q    About how many times had you been to the

5   facility before you got that phone call?

6       A    I have no idea.

7       Q    Well, do you note each time you go to a

8   facility?

9       A    I put it on the calendar.

10      Q    Okay.  Do you also ask for reimbursement?

11      A    Yes.

12      Q    Okay.  So if I look at your expense

13  reports, would I know on what occasions you went to

14  different buildings?

15      A    Yes.

16      Q    Okay.  Was that DON position filled at

17  some point?

18      A    I don't recall.

19      Q    So as you sit here today, you don't know

20  if it was ever filled?

21      A    I don't.

22      Q    You don't have any follow-up

23  responsibility once you post for a job?

24      A    No.

25      Q    Were you ever made aware that Jane had

1    come back?

2        A    Yes.

3        Q    Okay.  So you were aware the position was

4    filled once again by Jane, correct?

5        A    Eventually, yes.

6        Q    Okay.  Well, I thought that you told me

7    that you weren't aware of whether the position was

8    filled.  Now you recall Jane filled it?

9        A    And I don't know what happened in the

10   interim.

11       Q    Okay.  Didn't ask you that.

12       A    Okay.

13       Q    Did I?  I asked you if you know if the

14   position was ever filled?

15       A    Yes.

16       Q    Okay.  Do you know how long it remained

17   vacant --

18       A    No.

19       Q    -- before it was filled?

20       A    No.

21            MR. GARRISON:  John, when you get to

22            a stopping point, can we take a break?

23            MR. FRANKLIN:  Now's fine.

24            (Whereupon, a recess was taken at

25            11:37 a.m. and resumed at 11:49 a.m.)

1    BY MR. FRANKLIN::

2         Q    I think you indicated you don't know how

3    long the position was vacant; is that true?

4         A    That's true.

5         Q    Who advised you that the position had been

6    filled, if anyone?

7         A    I don't remember.

8         Q    Did you have any way of vetoing the hire

9    of a DON?

10        A    No.

11        Q    It's totally out of your realm of

12   responsibility?

13        A    Yes.

14        Q    You can't hire a DON.  Can you fire a DON?

15        A    No.

16        Q    What makes you say that?

17        A    Because it's true.

18        Q    Well, I mean, can you recommend that a DON

19   be terminated?

20        A    I guess I could make a recommendation.

21        Q    Have you ever recommended that a DON be

22   terminated?

23        A    No.

24        Q    Have you ever recommended that any

25   employee be terminated since you've held the

1   position with the company?

2        A    Not that I recall.

3        Q    Did you make a notation somewhere when you

4   found out that Jane came back as DON?

5        A    No.

6        Q    When Jane came back as DON, do you

7   remember who the administrator was?  Was it still

8   Brandy?

9        A    I'd be guessing.

10        Q    Okay.  Do you recall at some point Brandy

11   not being the administrator?

12        A    Yes.

13        Q    When do you recall that happening?

14        A    I couldn't tell you exactly when.

15        Q    Was it shortly after Jane came back?

16        A    I don't know.

17        Q    Okay.  Well, did someone inform you that

18   Brandy was no longer the administrator?

19        A    Yes.

20        Q    Who informed you of that?

21        A    I don't recall.

22        Q    Did you post the position on

23   CareerBuilder?

24        A    I'm not sure.

25        Q    Was it your -- within your

1    responsibilities for the facilities that you have HR

2    responsibilities for to post position of

3    administrator?

4         A    If it's going to go on CareerBuilder, I

5    post it there.

6         Q    Well, who decides if it's going to go on

7    CareerBuilder?

8         A    At the administrator level, that gets

9    decided at corporate.

10        Q    At the DON level, you decide it?

11        A    No, the administrator would decide it.

12        Q    Are there other ways that the company goes

13   about hiring, let's start with a DON?

14        A    Yeah, we've used search firms in the past.

15        Q    Is that something that you're responsible

16   for?

17        A    No.

18        Q    Who is?

19        A    I believe Susan is.

20        Q    Okay.  Any other ways other than posting

21   the job on CareerBuilder and using search firms that

22   a DON is hired at a company?

23        A    At one point I think we used newspaper

24   advertising.

25        Q    Newspaper advertising in a particular area

1  or in some types of national newspapers?

2       A    I'm not sure.

3       Q    Okay.  Any other ways?

4       A    Not that I can recall.

5       Q    Okay.  How are administrators, how is that

6  position advertised?

7       A    That's handled at the corporate level.

8       Q    Okay.  So you've never been asked to post

9  a position for administrator on CareerBuilder?

10      A    Yes, I have.

11      Q    Okay.  So we know that's one way.  Any

12  other ways that you're aware of?

13      A    Again, I'm sure we use search firms.

14      Q    Did you ever post for an administrator's

15  position for the St. Marys facility on

16  CareerBuilder?

17      A    I don't recall.

18      Q    When you found out that there would be an

19  opening for administrator, had the position already

20  been vacated?

21      A    I'm not following your question.

22      Q    Well, someone tells you that we're going

23  to need an administrator at St. Marys, correct?  Is

24  that how it works?

25      A    It could.

1     Q    Well, if you're responsible for posting,

2    that comes from outside the facility and you're told

3    to post the position, correct?

4     A    If we're posing on CareerBuilder, that's

5    correct.

6     Q    But when you find out that there's an

7    opening for administrator at the St. Marys facility,

8    was the position already vacant or was there like a

9    two-week or four-week period of time you had to

10   look?

11    A    I don't remember.

12    Q    Does the company have the ability to put

13   an interim administrator at a facility?

14    A    Yes.

15    Q    Okay.  I mean, isn't it true that a

16   facility has to have a licensed administrator that's

17   responsible for that facility?

18    A    Yes.

19    Q    Do you know if the position of

20   administrator was ever staffed by an interim

21   administrator at the St. Marys facility during the

22   entire time you've been responsible for that

23   facility?

24    A    I do not know.

25    Q    Okay.  Who's the next administrator you

Page 84

1    recall after Brandy?

2         A    I think it was Lorraine.

3         Q    Did you have any responsibilities for

4    hiring Lorraine?

5         A    No.

6         Q    Did you have any responsibilities for

7    Lorraine's orientation?

8         A    Yes.

9         Q    What were your responsibilities?

10        A    Essentially I meet with the administrator,

11   met with her and explained my role in the

12   organization and how I could be of service to her

13   and to St. Marys.

14        Q    Did you take notes during that orientation

15   process?

16        A    No.

17        Q    During the time that you've been hired by

18   the company, and leaving Jane's situation to the

19   side for a minute, have you ever investigated any

20   complaints of discrimination?

21        A    Would you repeat the question?

22        Q    Sure.  During the time that you've held

23   your position with the company, have you

24   investigated any complaints of discrimination?

25        A    Yes.

Page 85

1       Q    Have you investigated complaints of

2   harassment?

3       A    Yes.

4       Q    Have you investigated complaints of

5   retaliation?

6       A    Yes.

7       Q    Okay.  Have you ever investigated a

8   complaint of age discrimination?

9       A    I don't recall that.

10      Q    Have you ever investigated a complaint of

11  race discrimination?

12      A    Yes.

13      Q    More than once?

14      A    Probably.

15      Q    Okay.  During the time that you worked for

16  the company, have you investigated complaints of

17  gender discrimination?

18      A    No.

19      Q    During the time that you've worked for the

20  company, have you investigated complaints of

21  disability discrimination?

22      A    Not that I recall.

23      Q    During the time that you've worked for the

24  company, have you investigated complaints of

25  national origin discrimination?

Page 86

1       A       No.

2       Q       During the time that you've worked for the

3   company, have you investigated complaints of

4   religious discrimination?

5       A       Not that I recall.

6       Q       During the time that you've worked for the

7   company, have you investigated complaints of FMLA

8   interference?

9       A       No.

10      Q       During the time that you've worked for the

11  company, have you investigated complaints of FMLA

12  retaliation?

13      A       No.

14      Q       During the time that you've worked for the

15  company, have you investigated complaints of age

16  harassment?

17      A       No.

18      Q       During the time that you've worked for the

19  company, have you investigated complaints of racial

20  harassment?

21      A       Not that I recall.

22      Q       During the time that you've worked for the

23  company, have you investigated complaints of gender

24  harassment?

25      A       No.

1       Q    During the time that you've worked for the

2  company, have you investigated complaints of

3  disability harassment?

4       A    No.

5       Q    During the time that you've worked for the

6  company, have you investigated complaints of

7  national origin harassment?

8       A    No.

9       Q    During the time that you've worked for the

10  company, have you investigated complaints of

11  religious harassment?

12       A    No.

13       Q    During the time that you've worked for the

14  company, have you investigated any complaints

15  related to harassment -- I'm sorry, related to

16  retaliation?

17       A    No.

18       Q    So as we sit here now, I mean you've

19  indicated that you have investigated complaints of

20  race discrimination; is that fair?

21       A    Yes.

22       Q    Okay.  And you said probably more than

23  one?

24       A    Yeah.

25       Q    Okay.  Tell me about the first one that

1   you investigated.

2        A    I can't remember specifics.

3        Q    Okay.  Well, I'm not asking for specifics.

4   Tell me the -- what the complaint was and how you

5   went about investigating it.

6        A    Essentially the employee was saying that

7   they felt they were being treated differently

8   because of their race.

9        Q    Okay.  What position did the employee

10  hold?

11       A    Again, I don't remember the specific case.

12       Q    Who was the alleged discriminator?  Who

13  were they complaining treated them differently

14  because of their race?

15       A    Again, I don't remember the specific case.

16       Q    Do you remember which facility?

17       A    No.

18       Q    Do you remember what you did by way of

19  investigating?

20       A    Yes.  I would have talked to --

21       Q    No.  Just hold on.

22       A    Okay.

23       Q    Are you saying you would have; in other

24  words, you're guessing, or I did?

25       A    Okay.  No, I don't remember the specific

1    case.

2         Q    How about the second one, do you remember

3    who was complaining and what they were complaining

4    about?

5         A    Not specifically, no.

6         Q    Do you remember which facility?

7         A    Do not.

8         Q    Do you remember what you did by way of

9    investigation?

10        A    Do not.

11        Q    Okay.  Have you attended any training

12   related to investigating complaints of

13   discrimination?

14        A    Yes.

15        Q    Okay.  During the time you've worked for

16   the company have you attended those trainings?

17        A    It was prior to that.

18        Q    Which company were you working for at the

19   time?

20        A    LTV Steel.

21        Q    What time period?

22        A    Over the course of my employment with them

23   which was from 1966 to 2000 and something.

24        Q    Okay.  But you don't recall specifically?

25        A    No.

1       Q     Okay.  Did you get written materials?

2       A     Yes.

3       Q     Do you have any of those written materials

4    today?

5       A     I don't know if I still have that or not.

6       Q     Okay.  During the time that you've worked

7    for the company, have you received any training on

8    investigating a complaint of harassment?

9       A     Not that I recall.

10      Q     Okay.  During the time that you've worked

11   for the company, have you received any training

12   dealing with complaints of retaliation?

13      A     No.

14      Q     During the time that you've worked for the

15   company, have you received any training on

16   investigating a complaint of FMLA interference?

17      A     No.

18      Q     During the time that you've worked for the

19   company, have you received any training on

20   investigating complaints of FMLA retaliation?

21      A     No.

22      Q     Are you responsible for administering for

23   the facilities that you have responsibilities for

24   the FMLA policies and procedures?

25      A     I didn't understand your question.

Page 91

1      Q    Sure.  Do you have any responsibilities
2   related to the FMLA for the company for the
3   locations that you have HR responsibilities for?
4      A    No.
5      Q    Who has that responsibility?
6      A    That's handled at corporate.
7      Q    What do you mean it's handled at
8   corporate?
9      A    FMLA leaves and FMLA issues are handled at
10   the corporate level.
11      Q    How do you know that?
12      A    Because I've been told that.
13      Q    By who?
14      A    By Susan.
15      Q    Do you know who at the corporate level
16   handles it?
17      A    No.
18      Q    Well, does any -- is there anyone
19   responsible for the FMLA policies and procedures at
20   the individual locations?
21      A    I don't know what you mean by responsible.
22      Q    Well, I mean is there someone if I need
23   FMLA leave I can contact at the local level?
24      A    Yes.
25      Q    Okay.  For St. Marys, who was that?

1      A     That would have been Georgette.

2      Q     Georgette?

3      A     No, that's not her name.  The HR person

4   there.

5      Q     The one that you testified --

6      A     Yes.

7      Q     -- to?  I think you said her name was

8   Claudette?

9      A     Uh-huh.

10     Q     Okay.

11     A     Sorry.  Yes.  Claudette.

12     Q     Did you provide any training related to

13  the FMLA to Claudette?

14     A     I did not personally, no.

15     Q     Well, were you there when she was trained?

16     A     No.

17     Q     So do you know who, if anyone, you've been

18  told trained her?

19     A     No.

20     Q     Did you ever talk to her about her role in

21  the FMLA process?

22     A     Yes.

23     Q     Okay.  How many times?

24     A     I don't remember.

25     Q     Well, more than once?

1      A    Yes.

2      Q    More than twice?

3      A    I don't know.

4      Q    Is it documented anywhere that you did

5  that?

6      A    No.

7      Q    You're just testifying from memory?

8      A    Yes.

9      Q    Okay.  Tell me what you talked about with

10  respect to the FMLA with Claudette?

11      A    I would have asked her how she handles --

12      Q    Are you guessing again?

13      A    No.  I asked her how she handles the FMLA

14  process.

15      Q    Okay.  And what did she say?

16      A    She says that she has the employee

17  complete the request for an FMLA leave and if

18  there's -- if they need medical certification, she

19  gives them those forms and when she gets them

20  completed, she forwards them to corporate.

21      Q    Okay.  Do you have notes of that

22  conversation?

23      A    I do not.

24      Q    Okay.  Does an employee have to ask for

25  FMLA leave, specifically I need FMLA leave?

Page 94

1        A     I don't know.

2        Q     At your jobs prior to working for the

3    company, let's say when you worked for Royal, were

4    you responsible for administering any portion of the

5    FMLA program?

6        A     No.

7        Q     Have you ever had that responsibility at

8    any of the companies that you've worked for?

9        A     I don't recall having that responsibility.

10       Q     Have you received any training related to

11   the FMLA?

12       A     Yes.

13       Q     Okay.  When was the last time you received

14   FMLA training?

15       A     I don't know.

16       Q     Was it before or after Jane was terminated

17   from the company?

18       A     Before.

19       Q     Okay.  You don't recall learning in any of

20   your trainings whether an employee has to ask for

21   FMLA leave?

22       A     It's my understanding that there are

23   situations where it's obvious that FMLA applies.

24       Q     Okay.  Tell me about those situations.

25       A     Pregnancy situations, a prime example.

1      Q    You think pregnancy situations are

2    obvious?

3      A    That they may be eligible for FMLA.

4      Q    What do you mean they may be obvious?

5    Because the woman's getting heavier?

6      A    First of all, I didn't say they may be

7    obvious.

8      Q    Okay.  You said pregnancy discrimination

9    [sic] is an example where it may be obvious?

10     A    Where they may be eligible for an FMLA

11   leave.

12     Q    Okay.  Well, we're talking about times

13   when an employee -- whether they have to ask for

14   FMLA leave or not, and you said there are times it's

15   obvious, and I asked you for an example of those

16   times and you said pregnancy.

17     A    Okay.  If that's what I said, that's not

18   what I meant.

19     Q    Okay.  Then give me a time when it's

20   obvious.

21     A    What's obvious to me is the employee may

22   qualify for an FMLA leave.

23     Q    Okay.  They may qualify if what?

24     A    If they're pregnant.

25     Q    Okay.  But where -- I'm asking you does an

1  employee actually have to ask for FMLA leave in

2  order to get the leave?

3       A    No.

4       Q    Okay.  Why not?

5       A    They may not be capable of asking for an

6  FMLA leave.

7       Q    Why not?

8       A    They may be in the hospital in a coma.

9       Q    Do you have any other examples other than

10 a coma?

11      A    I don't.

12      Q    At the particular facility, and let's talk

13 about St. Marys, who is -- who decides whether an

14 employee may need FMLA leave?  Is it Claudette?

15      A    No.

16      Q    Who is it?

17      A    It's corporate.

18      Q    Corporate?

19      A    (Witness nodded.)

20      Q    And corporate's not located at the

21 facility, correct?

22      A    Right.

23      Q    Are you indicating that someone needs to

24 call corporate and then they decide whether someone

25 may or may not need FMLA leave?

Page 97

1      A    No.  As I explained earlier, Claudette

2   gives an employee paperwork that the employee

3   completes.  If there's medical testimony that needs

4   to be given, there's a form for that.  Those forms

5   get sent to corporate.  Corporate reviews that and

6   other information and determines whether or not an

7   FMLA leave applies.

8      Q    Let's take your example of someone in a

9   coma.

10     A    Okay.

11     Q    How does corporate get involved?  Does

12  someone call corporate?

13     A    Calls or sends in a notice.

14     Q    Okay.  They send a notice to corporate?

15  What's the notice look like?

16     A    It can be an e-mail saying that we've got

17  an employee who's in the hospital in a coma not

18  working, can we place them on FMLA leave.

19     Q    What about if it's an employee who's

20  simply sick but not in a coma?

21          MR. GARRISON:  Objection.  Calls for

22          speculation.

23     Q    Are they always -- are they required by

24  the company to contact the FMLA person at the

25  facility?

1          MR. GARRISON:  Objection.  Calls for

2          speculation.

3     A    I don't know how that works.

4     Q    At the St. Marys facility, is there some

5  type of notice hanging on the wall or anywhere else,

6  an employee bulletin board, indicating to the

7  employees if they need FMLA leave to contact

8  Claudette?

9     A    I don't know.

10    Q    Of all your facilities that you currently

11 have responsibilities for, how many don't have a

12 designated person with an HR designation in their

13 title?

14    A    Probably only two or three.

15    Q    Okay.  Which two or three?  St. Marys?

16    A    Yeah, St. Marys.  I don't think the one at

17 Salem Springlake in Kentucky does.

18    Q    Salem Springlake, Kentucky?

19    A    Right.  And I don't believe Dixon does.

20 Those are the only ones I can recall at this time.

21    Q    Why are those particular facilities manned

22 for HR purposes by someone in the business office?

23    A    Basically the size.

24    Q    Well, is there some type of numerical

25 cutoff?

Page 99

1        A     I don't know that there's a numerical

2   cutoff, but the smaller facilities can't justify a

3   full-time HR person.   There's nothing else.

4        Q     Well, are there part-time HR people that

5   work at the other facilities?

6        A     No.

7        Q     Okay.  So they're either full time or

8   they're -- it's handled by the business office?

9        A     The functions are in the part of the job

10  that's handled in the business office, right.

11       Q     Are there surveys that are done of the

12  employees related to their satisfaction?

13       A     Yes.

14       Q     Tell me about those.   Is that a company

15  wide --

16       A     Yes.

17       Q     Do all -- do all employees participate?

18       A     All employees are requested to

19  participate.

20       Q     Okay.  So I don't have to participate if I

21  don't want to?

22       A     We can't force you.

23       Q     Okay.  Well, you could.  You could say

24  everyone participates or you're terminated, right?

25  It could be a requirement of the job?

1      A     It's a confidential survey.

2      Q     Okay.  Well, I mean, you could agree to

3    keep the person's identity confidential, correct?

4      A     No.

5      Q     You can't agree to that?

6      A     No.

7      Q     Okay.  Why not?

8      A     Because it doesn't work that way.

9      Q     Okay.  So how is it generated?  I mean, is

10   it something that happens quarterly, annually?

11     A     Annually.

12     Q     Does it have a name?

13     A     It's an employee satisfaction survey.

14     Q     Employee satisfaction.  Okay.  And is it a

15   document that comes to me in a computer e-mail or

16   how do I get the document?

17     A     It's available to you on-line through our

18   Relias system which is a training system.

19     Q     Okay.  What computer do I use to fill it

20   out?  Is there a computer in the facility?

21     A     There are computers at the facility, yes.

22     Q     Okay.  Do I have to sign out the computer

23   for a particular period of time?

24     A     No.

25     Q     Okay.  So how am I initially made aware

1   that the annual employee satisfaction survey is

2   available?

3        A    There are notices posted and management in

4   the facility make sure that everyone's aware of it,

5   encourages people to participate.

6        Q    Well, how do you know that management

7   encourages people to participate?

8        A    Because I've seen them do it.

9        Q    Okay.  Well, have you seen it done at the

10  St. Marys facility?

11       A    No.

12       Q    And of the times that you claim you've

13  seen them do it, do you have any notes?

14       A    No.

15       Q    Okay.  So the employee, let's say they

16  hear about it from their supervisor, they go on-line

17  to a particular website?  How does it work?

18       A    Right.

19       Q    They go on-line to a website?

20       A    Right.

21       Q    And then the computer has questions and

22  they type in answers or they type in scores?  I

23  mean, how does it work?

24       A    They type in answers.

25       Q    So for each question, if the employee so

1    chooses, they type in an answer?

2         A    Right.

3         Q    They don't put in a numerical score

4    like -- or answer, I'm satisfied or unsatisfied

5    or --

6         A    Yeah.  You're picking from a range of

7    responses.

8         Q    Okay.  And for each range of response, do

9    I get the opportunity to type in something if I

10   choose to support my picking of satisfied or

11   unsatisfied or neutral?

12        A    Yes.

13        Q    Okay.  It doesn't require me if I go to

14   one extreme or the other I have to put in a

15   response?

16        A    No.

17        Q    Okay.  What's the purpose of the annual

18   employee satisfaction survey?

19        A    To determine how satisfied our employees

20   are and identify areas of weakness where we could

21   work to improve things.

22        Q    Okay.  But you have no way of knowing

23   which employees filled out the survey, correct?

24        A    Correct.

25        Q    Is there a way to tell if the same

1  employee fills out the survey five different times?

2       A    You can only fill it out once because you

3  go on to -- you log on under your code to get into

4  the system and you have a survey there.  Once you

5  complete it, the survey's gone.

6       Q    What do you mean you go under your code?

7  How does that work?

8       A    Told you it was on our Relias system which

9  is a training -- computerized-training program.  And

10  you log in under your code to get into the system

11  and then once a year there's a survey on there that

12  you're requested to complete.

13       Q    Okay.  But if I log in under my code,

14  doesn't the company know who logged in?

15       A    No.  Because once the survey goes, it goes

16  into a pile with all the others.

17       Q    Someone told you that?

18       A    Right.

19       Q    Who told you that?

20       A    Susan.

21       Q    And that's what you tell the employees?

22       A    Right.

23       Q    About how many employees are there at the

24  St. Marys facility?

25       A    I don't know.

Page 104

1         Q     More than 50?

2         A     I don't know.

3         Q     So you don't even know the range of

4    employees?

5         A     I do not.

6         Q     Well, how many beds are there?

7         A     I don't know.

8         Q     What's the standard census at the

9    facility?

10        A     I don't know.

11        Q     Are you indicating St. Marys is one of the

12   smaller facilities based on your testimony of why

13   there's not an HR person staffing the facility?

14        A     That's one of my smaller facilities, yes.

15        Q     Are you measuring it's smaller in physical

16   size, smaller in employees, there's a lower number

17   of employees, what's your measurement?

18        A     All those.

19        Q     Okay.  So since the number of employees is

20   one of your measurables, you can't give me the range

21   of employees that staff the facility?

22        A     Right.

23        Q     Is the facility staffed 24/7?

24        A     Yes.

25        Q     Does it have more facilities -- more

1    employees during a certain shift?

2          A    Yes.

3          Q    Okay.  Tell me what the various shifts

4    are.  Since you can't tell me how many employees,

5    I'm going to walk you through it.

6          A    Okay.

7          Q    Okay.

8          A    There's a daylight shift, which is

9    normally 7:00 to 3:00, an afternoon shift which is

10   normally 3:00 to 11:00, and a night shift that's

11   normally 11:00 to 7:00.

12         Q    Do the employees -- do the residents eat

13   at the facility?

14         A    Yes.

15         Q    They get three meals at least?

16         A    Yes.

17         Q    Is there a dietary department?

18         A    Yes.

19         Q    How many people staff the dietary

20   department at St. Marys?

21         A    I don't know.

22         Q    What departments are there at St. Marys?

23         A    There's the clinical department.

24         Q    Okay.

25         A    There's the administrative department.

1        Q     Okay.

2        A     You have a maintenance.  You have dietary

3    and housekeeping and laundry.

4        Q     What do -- by title, which employees staff

5    the clinical department?

6        A     That would be nurses, STNAs, the DON, unit

7    managers.

8        Q     Unit managers?

9        A     Yes.

10        Q     Anything else?

11        A     Depending on whether or not they have a

12    therapy department, there could be therapy personnel

13    in that.

14        Q     Okay.  What -- by title, which employees

15    staff the administrative portion of the facility?

16        A     The administrator, business office

17    manager, payroll, social services, admissions, and

18    marketing.

19        Q     Which employees staff the dietary?

20        A     Dietary manager, cooks, and dietary aides.

21        Q     What's the classification of employees

22    that staff housekeeping?

23        A     You would have a housekeeping supervisor

24    and housekeepers.  They also have a floor

25    technician.

Page 107

1      Q      Floor tech?

2      A      Uh-huh.

3      Q      Where does an activities director fall, if

4    they do?

5      A      That would be an administrative function.

6      Q      What does an activities director do?

7      A      Develops programs and implements his

8    programs involving activities for residents in the

9    facility.

10     Q      Now, we'll go through the various units of

11   people.  Are there nurses 24/7?

12     A      Yes.

13     Q      RNs, LPNs, or both?

14     A      Both.

15     Q      What about STNAs, they staff through all

16   the shifts 24/7?

17     A      Yes.

18     Q      What about the DON?

19     A      The DON works normally days, but that can

20   be covering all three shifts.

21     Q      What about unit managers?

22     A      Normally they're associated with a shift.

23     Q      Okay.  What about the therapy department?

24     A      Normally they are on daytime.

25     Q      What about the business office manager?

1        A      Daylight position.

2        Q      Payroll?

3        A      Daylight position.

4        Q      Social services?

5        A      Normally daylight position.

6        Q      The administrator and marketer?

7        A      Administrator is another position like the

8    DON.  They normally work days but they can be there

9    for any and all shifts.

10       Q      What about marketing?

11       A      Normally daytime position.

12       Q      Activities director?

13       A      Normally a daytime position.

14       Q      Dining?

15       A      Dietary manager usually bridges shifts.

16   Cooks are on a specific shift as are dietary aides.

17       Q      What about housekeepers?

18       A      Normally daylight positions.

19       Q      What's a classification employee that

20   makes up maintenance?  Maintenance supervisor?

21       A      Yeah.

22       Q      And then what?  Are there assistants to

23   the maintenance supervisor?

24       A      Not in all cases.  Depends on the size of

25   the building.

1      Q     What about St. Marys?

2      A     I think there's only one individual.

3      Q     When I look at an employee satisfaction

4  survey, do I know how many employees responded to

5  that survey?  Is it --

6      A     In total, yes.

7      Q     How do I know that?

8      A     Because there's a count of how many

9  responded.

10     Q     Do I know from looking at the survey what

11 position the employee holds that responds?

12     A     No.

13     Q     If an employee complains about their

14 supervisor in the employee satisfaction survey, you

15 don't know which employee it is, correct?

16     A     Right.  It's anonymous.

17     Q     Do you recall there being any problems

18 that you were aware of that Jane was having at the

19 St. Marys facility?

20     A     No.

21     Q     With respect to the employee satisfaction

22 surveys for the sites that you have responsibility

23 for, do you look at those?

24     A     Yes.

25     Q     What are you looking for?

1     A     Looking for areas where -- that we ought

2    to be focusing on improving.

3     Q     Okay.  Well, I mean, do you take into

4    account that, you know, there might be two or three

5    employees that are just upset about an issue that

6    they're dealing with whereas there might be 30 or 40

7    other employees who are happy with their situation?

8     A     It still may be an issue that we need to

9    look into.

10     Q     Okay.  So even one disgruntled commentator

11    on the employee satisfaction survey will get you to

12    investigate, if possible, what that person is

13    complaining of?

14     A     Yeah.

15     Q     Having said that, do you write in the

16    margins of the survey?  Do you take notes of the

17    survey?  What do you do?

18     A     Actually that rests with management of the

19    facility.

20     Q     What do you mean by that?

21     A     They get the results of the survey and

22    they look it over and they determine the areas that

23    they should be addressing.

24     Q     I thought you told me you reviewed it?

25     A     You asked me if I review it.

1      Q     Yeah.

2      A     I do.

3      Q     Do you just review it for kicks and

4   giggles?

5      A     I wouldn't put it that way.

6      Q     Okay.  What are you reviewing it for?

7      A     I review it for information.

8      Q     Okay.  Well, what do you do with that

9   information?

10     A     I look at it and I determine if there's

11  anything that I should be asking the administrator

12  about from my perspective.

13     Q     Okay.  Having said that, that you look for

14  things that you need to talk to the administrator

15  about, do you take notes on your copy of the survey?

16     A     No.

17     Q     Do you take notes anywhere?

18     A     No.

19     Q     You get a survey from every facility?

20     A     Uh-huh.

21     Q     Yes?

22     A     Yes.

23     Q     So you just keep in your head the

24  complaints that you may need to deal with for each

25  facility without writing it down?

1       A       When I'm going there, yes.

2       Q       When you're going there?

3       A       Yeah.

4       Q       Now tell me about that.  Do you just

5       review the survey when you're going there?

6       A       I review the surveys when they come out

7       and then whenever I'm going to visit a facility, I

8       will refer back to that and look at issues that I

9       want to raise.

10      Q       So you do the work twice?

11      A       Yeah.

12      Q       You look at it when you're -- and you

13      don't make any notations and then you look at it

14      again and you look at the areas that you need to

15      address?

16      A       Right.

17      Q       How long is it between the time that you

18      see a survey and the time that you go to a facility?

19      A       It varies.

20      Q       What does that mean?  Could be four or

21      five months?

22      A       Could be.

23      Q       Do you know who Barry DeRossett is?

24      A       Yes.

25      Q       Who is he?

1          A     He's a regional director of operations.

2          Q     Is he responsible for the same region you

3     are?

4          A     He has buildings in my region.

5          Q     Not all buildings in your region?

6          A     Right.  He does not have all the buildings

7     in my region.

8          Q     Which buildings does he have

9     responsibilities for in your region?

10         A     He has St. Marys, he has Springfield, he

11    has Crittenden, and Salem Springlake.

12         Q     Cripton?

13         A     Crittenden.

14         Q     Crittenden.  And what was the other one?

15         A     Salem Springlake.

16         Q     What is a regional director do to your

17    knowledge?

18         A     He's responsible for the overall operation

19    of a number of facilities.

20         Q     Well, how does his job differ from yours?

21         A     I only focus on human resources and labor

22    relations if it's a union building.

23         Q     What's he responsible for, to your

24    knowledge?

25         A     I --

1       Q    Is he not responsible for the human

2  resource or labor relations functions?

3       A    He's responsible for the overall operation

4  of those facilities including those functions.

5       Q    So are you a direct report to him?

6       A    I am not.

7       Q    You have dotted-line reporting

8  responsibilities to him?

9       A    In a sense, yes.

10      Q    And then you have direct reporting

11  responsibilities to Susan?

12      A    Yes.

13      Q    Has Barry ever contacted you about Jane?

14      A    We've had conversations about her

15  performance, yes.

16      Q    Okay.  When was the first time you had a

17  conversation with Barry about Jane's performance?

18      A    I don't recall exactly when that was.

19      Q    Well, I'm not asking for exact.  Let's

20  start with a year.

21      A    I don't know.

22      Q    You can't tell me the year?

23      A    (Witness shook head.)

24      Q    You can't tell me the month, correct?

25      A    Correct.

1       Q     Certainly can't tell me the day?

2       A     Right.

3       Q     Having said that, since you don't

4    remember, did you take notes of your conversations

5    with Barry that related to Jane?

6       A     Did not.

7       Q     Why not?

8       A     Didn't feel a need to.

9       Q     Why not?

10       A     I didn't feel a need to.

11       Q     What makes you decide whether you're going

12    to take notes of an event related to your employment

13    or not?

14       A     If I think I need to, then I take notes.

15       Q     Okay.  Well, give me a situation where

16    you've taken notes.

17       A     I can't think of a specific one.

18       Q     I mean, has there ever been a time you've

19    taken notes of any situation during the entire time

20    you've worked with the company?

21       A     Yes.

22       Q     Okay.  Tell me about one of those times.

23       A     Okay.  When I was directed to go to

24    St. Marys and investigate allegations of a

25    supervisor putting their hands on an employee, I

1   took notes in preparation -- or during my

2   investigation in order to prepare the memo that I

3   finally developed.

4        Q    Okay.  That's good.  Where are those

5   notes?

6        A    When I was done developing the memo, I

7   threw them away.

8        Q    When did you throw them away?

9        A    As soon as the memo was developed.

10       Q    What does -- I don't even know how you

11  develop a memo.  When you completed the memo?  When

12  it was in final form?  What does "when I developed

13  the memo" mean?

14       A    When the memo was finished.

15       Q    Okay.  Was there -- did you start the memo

16  like one day and finish it a different day?

17       A    I don't remember.

18       Q    Did other people look at the memo and make

19  comments and then you put it in final form?

20       A    No.

21       Q    Okay.  What computer did you use to draft

22  that memo?

23       A    It could have been either one or both.

24       Q    Either one or both?

25       A    Yes.

1        Q     So it could have been the laptop that

2    crashed three or four months ago, right?

3        A     Uh-huh.

4        Q     Yes?

5        A     Yes.

6        Q     Or it could have been the laptop that you

7    traded in yesterday?  'Cause those are the two

8    places that you could have typed it on, right?

9        A     Wait a minute.  I think you said laptop

10   twice.

11       Q     No.  There's the desktop that crashed?

12       A     You said laptop.

13       Q     Okay.  There's the desktop that crashed?

14       A     Right.

15       Q     It could have been on that?

16       A     Could have been.

17       Q     And it could have been, also, on the

18   laptop that you turned in yesterday?

19       A     Yes.

20       Q     Do you know what metadata is?

21       A     No.

22       Q     When you took these notes of your

23   investigation, was it on a spiral notebook?  Was it

24   just pages from a -- went by the copy machine and

25   pulled off paper?  What did you do?

1        A      It was a pad like that.

2        Q      Legal pad?

3        A      It was a pad like that.

4        Q      Okay.   What color?

5        A      White.

6        Q      Was it something that you had at your

7   office or you went out and bought once you got down

8   there?

9        A      No.   Something I have at my office.

10       Q      Other than allegedly taking notes during

11  the investigation involving Jane, is there -- has

12  there ever been a time since you've worked for the

13  company other than Jane's investigation that you

14  took written notes?

15       A      Yes.

16       Q      Okay.   When?

17       A      I don't know specifically.

18       Q      Do you have any copies of those notes?

19       A      No.

20       Q      Because you threw them away?

21       A      Right.   I was done with them.

22       Q      Did you copy verbatim in your memo about

23  Jane's situation exactly what you had written on

24  your pad of paper?

25       A      No.

1      Q    So you chose what you were going to

2   include in the memo and what you were going to not

3   include in the memo?

4      A    No.

5      Q    No?  You didn't make that decision?

6      A    No.

7      Q    Who did?

8      A    I used everything that was in my notes.

9      Q    Other than your word for that, is there

10   any other way that you can prove that everything

11   that was on your handwritten notes appear in your

12   typed memo?

13      A    No.

14      Q    In other words, did you share your

15   handwritten notes with someone else that may have

16   read them?

17      A    No.

18      Q    Okay.  The memo that you prepared, did you

19   start it when you were down at the facility and work

20   on it once you got home or how did that work?

21      A    That's probably what I did, but I can't be

22   positive.

23      Q    Okay.  Because I want to know all the

24   computers that you've used for that memo.

25      A    Okay.

1      Q     So it could have been the computer at the

2  facility?

3      A     No.

4      Q     Which computers could it have been?  The

5  desktop that crashed?

6      A     The laptop and the desktop.

7      Q     Okay.  The laptop you gave -- turned in

8  yesterday and the desktop that's at your house

9  crashed?

10     A     Right.

11     Q     You didn't use any other computers?

12     A     Correct.

13     Q     Before you created the final version of

14  that memo, did you share it with anyone?

15     A     No.

16     Q     Did you let anyone read it?

17     A     No.

18     Q     How long after you create the memo do you

19  throw away the notes?

20     A     As soon as I'm done.  When I create the

21  memo, I go back through my notes.  My notes consist

22  of bullet points, words, just to jog my memory, and

23  I go back and I line out every one of them to make

24  sure it's been included in the memo.

25     Q     And we have your word for that?

1      A     You do.

2      Q     Well, has anyone ever seen you use that

3    method where you have a bunch of bullet points and

4    you cross those out as you've created a memo?

5      A     No.

6      Q     Did you use the same pad of paper for the

7    entire investigation or did you use different pads

8    of paper?

9      A     Same pad.

10     Q     Did you have anything written on your pad

11   of paper before going to investigate?

12     A     No.

13     Q     What caused you to go down to St. Marys

14   and conduct any type of investigation?

15     A     Susan called me and said that there was a

16   problem at St. Marys and she felt I should go down

17   and investigate it on site.

18     Q     Okay.  Before you get that call from

19   Susan, had you had any conversations with Barry

20   about Susan's -- or about Jane's conduct in the

21   workplace?

22     A     I believe so.

23     Q     Okay.  Well, tell me about the first time

24   that you have the conversation with Barry before you

25   talk to Susan and are sent down to St. Marys.

1       A       My recollection is that we had

2  conversations about performance issues with Jane and

3  her job as the DON.

4       Q       Were these over the telephone?

5       A       Yes.

6       Q       Okay.  When was the first time you had one

7  of those conversations with Barry over the phone?

8       A       I don't remember.

9       Q       Did you take notes?

10      A       No.

11      Q       What do you recall during the first

12 conversation with Barry about Jane's conduct in the

13 workplace?

14      A       I really can't give you any specifics.

15      Q       Well, after talking to Barry the first

16 time, did you conduct any type of investigation of

17 what Barry was saying?

18      A       I talked with the administrator.

19      Q       By phone?

20      A       Yes.

21      Q       Did you take notes?

22      A       No.

23      Q       Okay.  So after having the discussion with

24 Barry and then talking to the administrator, did you

25 do anything else?

Page 123

1    A    Not that I can remember specifically.

2    Q    Well, for example, did you talk to Jane?

3    A    No.

4    Q    Do you remember any of the conversation

5    that you had with the administrator after talking to

6    Barry?

7    A    Yes.

8    Q    Okay.  Which administrator?

9    A    I had conversations with both of the women

10   that were there as administrators.

11   Q    About Jane's conduct?

12   A    And her performance, yes.

13   Q    Okay.  Do you remember their names?

14   A    I said Lorraine, and the one that --

15   Brandy preceded her.

16   Q    So you talked to Brandy?

17   A    Uh-huh.

18   Q    And you talked to Lorraine?

19   A    Yes.

20   Q    You talked to Brandy about Jane's conduct

21   after talking to Barry?

22   A    Will you repeat the question?

23   Q    I was asking you about your conversations

24   that you had with Barry before going down and

25   investigating.  You remembered you talked to him

1    about some performance issue and then you said you

2    contacted the administrator.  After talking to Barry

3    about Jane, was there ever a time you talked to

4    Brandy?

5         A    I don't think Brandy reported to Barry.  I

6    could be wrong on that, but I know Lorraine reported

7    to Barry.

8         Q    Okay.  Well, you said that you had

9    conversations with Brandy and Lorraine and I -- tell

10   me about your conversations with Brandy related to

11   Jane.

12        A    Okay.  She was complaining about Jane's

13   performance and the way she went about doing her job

14   and the way she related to her as the administrator.

15        Q    Okay.  Well, those seem to be conclusions

16   that she was complaining about the way she related.

17   What are the specifics?

18        A    Well, I can't give you specifics in

19   Brandy's case.

20        Q    Why not?

21        A    Because I don't remember.

22        Q    Well, that's why you take notes, right?

23             MR. GARRISON:  Objection.

24             Argumentative.

25        Q    Don't you take notes so you can recall the

Page 125

1    events of the past?

2         A    When I need to, yes.

3         Q    Okay.  And you didn't feel that this

4    conversation that you had with Brandy warranted

5    taking notes?

6         A    No.

7         Q    Okay.  Did you have more than one

8    conversation with Brandy about Jane or --

9         A    Yes.

10        Q    -- just the one?  Okay.  During any of the

11   conversations that you had with Brandy about Jane,

12   did you take notes?

13        A    No.

14        Q    Does that mean that you didn't feel the

15   situation warranted a note?

16        A    I didn't feel I needed to take notes.

17        Q    Okay.  Do you remember when the first

18   conversation took place that you had with Brandy?

19        A    No.

20        Q    Do you remember when any of the subsequent

21   conversations took place?

22        A    No.

23        Q    Is there something we can look at, like a

24   calendar you may have?

25        A    That wouldn't tell you that.  It only

1    tells you when I was in the building.

2         Q    Okay.  So there's a calendar that exists

3    that shows us when you were in the building?

4         A    Yes.

5         Q    Okay.  How many times did you have

6    conversations with Brandy about Jane's work

7    performance?

8         A    I'd say several.

9         Q    Okay.  What does that mean?

10        A    Two or three.

11        Q    Okay.  Were those always precipitated by

12   calls from Barry or was this Brandy calling you

13   unrelated to Barry's conversations with you about

14   Jane?

15        A    As I said earlier, I don't know that Barry

16   was involved with the facility when Brandy was

17   there.

18        Q    Okay.  Well, who was Barry's predecessor?

19        A    I think Paul Gustafson was the --

20        Q    Did you have any conversations with Paul

21   about Jane's work performance?

22        A    Not that I recall.

23        Q    Did you have more than one conversation

24   with Barry about Jane's work performance?

25        A    I'm not sure.

1      Q    Okay.  Did you have more than one

2  conversation with Lorraine about Jane's work

3  performance?

4      A    Yes.

5      Q    Okay.  During any of the conversations

6  that you had with Lorraine, did you take notes?

7      A    No.

8      Q    When was the first conversation you had

9  with Lorraine?

10     A    I don't know.

11     Q    How many conversations did you have with

12  Lorraine?

13     A    Probably three or four.

14     Q    And of those three or four, you didn't

15  take notes?

16     A    No.

17     Q    Do you remember any of your discussions in

18  any of the three or four conversations you had with

19  Lorraine about Jane's work performance?

20     A    Not specifically.

21     Q    Okay.  When Susan called you, she simply

22  told you to go down there to St. Marys and

23  investigate?

24     A    Essentially, that's right.

25     Q    And she told you it was a claim of a

1    supervisor putting her hands on an employee?

2        A    Yes.

3        Q    Did you have any other information?

4        A    Not at that time, no.

5        Q    Okay.  When did you first receive any

6    other information related to that situation?

7        A    Later that day.

8        Q    Okay.  Was that once you were at the

9    facility?

10       A    No.

11       Q    Who did you receive the information from?

12       A    Lorraine.

13       Q    Was that based on a phone call you made to

14   her, a phone call she made to you, an e-mail she

15   sent you?

16       A    I think it was an e-mail she sent me.

17       Q    Okay.  Did you ask her for information

18   before you went down there?

19       A    I'm not sure I requested that or she just

20   sent those.

21       Q    Okay.  Well, did you go down that same

22   day?

23       A    Yes -- not to the facility.  I went down

24   there, but I didn't get to the facility until the

25   first thing the next morning.

1      Q    Why?  What were you doing down there?

2      A    Pardon?  I don't understand your question.

3      Q    You said you went down there but not to

4 the facility.  What were you doing in that area?

5      A    Staying there so I could be there first

6 thing in the morning.

7      Q    What time did you leave your home to go

8 there?

9      A    I don't remember.

10      Q    Where did you stay?

11      A    I don't remember.

12      Q    Did you expense your stay?

13      A    I did.

14      Q    So you would have had to provide a hard

15 copy of your hotel bill?

16      A    I did.

17      Q    Then what time did you arrive at the

18 facility?

19      A    Right around 8:00 the next morning.

20      Q    Do you remember what day of the week that

21 was?

22      A    My recollection is it was a Tuesday, but

23 I'm not positive of that.

24      Q    Okay.  Well, do you recall who you first

25 talked to, if anyone, at the facility when you got

1    there?

2         A    Probably Lorraine, but I don't remember --

3    can't say specifically.

4         Q    Who's the first person that you talk to

5    that you took notes?

6         A    The STNA who was upset by the interaction

7    between her and the DON.

8         Q    Do you remember her name?

9         A    I think it was Kelsey.

10        Q    Okay.  So is it when you first talk to

11   Kelsey that you take notes?

12        A    Yes.

13        Q    Well, isn't it when you first talk to

14   Kelsey's mother that you take notes?

15        A    No.

16        Q    You don't take any notes of your

17   conversation with mother?

18        A    No.

19        Q    Did you document your conversation with

20   mother in your report?

21        A    I may have referred to the fact that

22   that's how I got in touch with her.

23        Q    Well, did you talk to her mother first?

24        A    Yes.

25        Q    Okay.  And you didn't document your

1   conversation with the mother?

2        A    Did not.

3        Q    Okay.  As best you can, tell us your

4   conversation with mother.

5        A    I asked to speak to Kelsey.  She said she

6   wasn't there.  I told her who I was and that I would

7   like to talk to her and she said that she would get

8   a hold of her and have her call me.

9        Q    Any other conversation that you can recall

10  with mother?

11       A    No.

12       Q    Did you ask mother how Kelsey was feeling?

13       A    No.

14       Q    Did mother volunteer that information?

15       A    Not that I recall.

16       Q    Did she tell you Kelsey was upset?

17       A    Do not remember that happening.

18       Q    Before you talked to mother, did you have

19  a written statement from Kelsey?

20       A    Yes.

21       Q    Did anyone make you aware of whether or

22  not Kelsey's father was a policeman?

23       A    No.

24       Q    Did that weigh into your decision?  Did

25  that weigh into your investigation?

Page 132

1      A     Can we back up the question?

2      Q     Sure.

3      A     What was your question?

4      Q     I asked you if you were made aware of

5   whether or not Kelsey's father was a policeman.

6      A     And I said no.

7      Q     Okay.  I'm just asking you, you read in

8   her statement, did you not, that if it wasn't

9   handled internally, she would take it externally?

10     A     Yes.

11     Q     Did you ever ask her what that meant?

12     A     No.

13     Q     Did you ask anyone what that meant?

14     A     No.

15     Q     Did you have an idea as to what it meant?

16     A     No.

17     Q     To your knowledge, had law enforcement

18   been contacted at that point?

19     A     Not that I was aware of.

20     Q     Okay.  I mean law enforcement hadn't

21   interviewed any of the employees that you were aware

22   of, correct?

23     A     Not that I was aware of.

24     Q     Hadn't interviewed Lorraine?

25     A     Not that I was aware of.

1       Q    Okay.  So you read Kelsey's statement.

2  You call the mom and ask to speak with Kelsey.  Mom

3  tells you she's not there and she'd get a hold of

4  her and have her call you back?

5       A    Right.

6       Q    How long was it, if ever, until she called

7  you back?

8       A    I'm thinking maybe a half an hour.

9       Q    During that half hour, what did you do, if

10  anything?

11      A    I don't recall.

12      Q    Did you try to get a hold of Jane before

13  talking to Kelsey?

14      A    I'm not sure -- I did try to get a hold of

15  Jane.  I'm not sure where that fit in the time line.

16      Q    Okay.  So after Kelsey calls you back, do

17  you have a conversation with her?

18      A    Yes.

19      Q    Did you take notes of that conversation?

20      A    Yes.

21      Q    Is that in your notebook?

22      A    On my pad, yes.

23      Q    So is what's in your pad related to what

24  Kelsey says the first thing that gets in your pad?

25      A    Yes.

1       Q    So we don't have the documentation with

2    mom.  We have the documentation with Kelsey?

3       A    Correct.

4       Q    Okay.  As best you can recall, what did

5    Kelsey say?

6       A    She told me that she had been confronted

7    by Jane, that Jane put her hands on her shoulder and

8    shoved her into the wall, and then was screaming at

9    her and waving her hand in her face.

10      Q    Okay.  Well, you're making physical

11   gestures which you couldn't have seen talking to

12   Kelsey, correct?

13      A    Right.

14      Q    Because you were talking to her by phone?

15      A    You asked me what she told me.  I just

16   told you what she told me.

17      Q    Okay.  But you were wagging your finger

18   when you did it.  I'm just putting that on the

19   record.  Now, you had met Jane before --

20      A    Oh, yes.

21      Q    -- that day, correct?  Had you ever met

22   Kelsey?

23      A    No.

24      Q    I mean, did you know the age difference

25   between the two?

1      A      Probably.

2      Q      I mean, did you know Kelsey was young?

3      A      I'm not sure that I knew her exact age at

4   that point.

5      Q      Okay.  I'm not asking her exact age.  Did

6   you know that she was relatively young?

7      A      I don't know that I knew that.

8      Q      Okay.  Never asked?

9      A      (Witness shook head.)

10      Q      Did you look in Kelsey's personnel file

11   before or after you talked to Kelsey?

12      A      I'm not sure whether I looked before or

13   after, but I did look in her personnel file.

14      Q      Well, if we had your notes, would we know

15   if you looked in her personnel file before or after

16   you talked to her?

17      A      No.

18      Q      That wasn't in your notes?

19      A      No.

20      Q      Did Kelsey tell you anything else?

21      A      She explained the situation surrounding

22   the events, the fact that --

23      Q      What did she say?

24      A      She said that a resident had not gotten

25   her meal, that the resident's daughter was there and

1   was questioning why she had not received her meal

2   yet, and she went to check on that, found out the

3   reason, came back and explained it to the resident

4   and her mother or -- yeah, to the resident's family

5   member and her mother and that the meal was being

6   sent up.

7        Q    Okay.  What was the explanation?  Did she

8   tell you that?

9        A    Yep.  That someone had designated her as

10  being -- going to eat in the dining room.

11       Q    Okay.  Can a resident eat wherever they

12  want?

13       A    They can.

14       Q    Is that part of resident's rights?

15       A    Sure.

16       Q    What are resident's rights?

17       A    They're rights that the resident has while

18  they're staying within the facility.

19       Q    Okay.  I mean, is it their legal rights?

20  Is it their moral rights?  Does it change, every

21  facility has different patient rights?  How does it

22  work?

23       A    No.  They're legal rights.

24       Q    Okay.  Did you ask Chelsea -- or Kelsey if

25  the daughter heard what was being said?

1      A     Would you ask the question again?

2             MR. FRANKLIN:  Can you read it back.

3             (Whereupon, the court reporter read

4             back the previous question.)

5      A     I don't recall that question.

6      Q     Did you ask for the name of the resident?

7      A     No.

8      Q     Did you ever talk to the resident?

9      A     No.

10     Q     Did you ever talk to the daughter?

11     A     No.

12     Q     Why not?

13     A     We do not like to involve residents and

14  their family members in internal issues.

15     Q     Okay.  Well, I know that's your

16  preference, but weren't you questioning Kelsey as to

17  whether the family heard what Jane was saying?

18     A     I need your question again.

19             MR. FRANKLIN:  Teri.

20             (Whereupon, the court reporter read

21             back the previous question.)

22     A     Again, I don't remember asking her that

23  question.

24     Q     So are you saying that issue didn't play

25  into your investigation whether the family heard

1   what Jane was saying or not?

2        A     No, I'm not saying that.

3        Q     Okay.  Well, if it played into your

4   investigation, why wouldn't you have asked the

5   daughter what did you hear?

6        A     Because I did not want to involve the

7   resident's family member.

8        Q     After you talk to Kelsey, what do you do

9   next by way of your investigation?

10       A     I think at that point, and, again, this is

11  my recollection, I contacted Jane.

12       Q     Okay.  By phone?

13       A     Yes.

14       Q     And what happened?

15       A     I explained to Jane why I was there.

16       Q     So you got a hold of her this time?

17       A     Right.  And asked if we could meet

18  together.  I told her that I would be willing to go

19  wherever she wanted to go.  She didn't have to come

20  into the facility if she didn't want to do that.  I

21  would meet with her wherever was convenient for her.

22       Q     What did she say?

23       A     She said she did not feel up to doing

24  that.

25       Q     Did she say why?

1       A     No.

2       Q     She said I don't feel up to doing that?

3       A     Right.

4       Q     Okay.  Did you copy down what she said on

5   the pad of paper?

6       A     I made notes, yes.

7       Q     And if I saw the pad of paper, it would

8   say "I don't feel up to it"?

9       A     That's my recollection.

10      Q     And if she used those words, you would

11  have put that in your memo, correct?

12      A     Words to that effect, yes.

13      Q     What are words to that effect?  That

14  sounds pretty specific, "I'm not up to it."  Did you

15  say why?

16      A     She didn't say why.

17      Q     No.  Did you ask why?

18      A     No.

19      Q     She didn't tell you she was sick?

20      A     I don't recall her saying I'm sick.

21      Q     When you say I don't recall, are you

22  saying it may have happened, you just don't have

23  present day recollection?

24      A     Right.

25      Q     Okay.  Then what happens?

```
 1       A    I asked her if she felt up to talking to
 2   me on the phone.
 3       Q    Okay.  What did she say?
 4       A    She said yes, that that wouldn't be a
 5   problem.
 6       Q    Okay.  So put us in the conversation.
 7   What does she say, what do you say as best you can
 8   recall?
 9       A    I asked her to tell me what took place the
10   night before, and she took me through the issue with
11   the tray.  I asked her if she grabbed Kelsey's
12   shoulder and pushed her against the wall, and she
13   said she didn't remember touching Kelsey.
14       Q    Okay.  Anything else?
15       A    I asked her if Kelsey tried to leave and
16   she reached out and grabbed her shoulder again and
17   she, again, said I don't remember touching her.
18       Q    Okay.  So those two things would have been
19   in your final report, correct?
20       A    Yes.
21       Q    That you asked her twice and both times
22   she responded I don't recall?
23       A    Right.
24       Q    Or I don't remember?
25       A    (Witness nodded.)
```

Page 141

1      Q    Anything else?

2      A    Not that I recall at this point.

3      Q    Well, did you ask her if she had raised

4   her voice?

5      A    Yes, I did.  I asked her if she was -- if

6   she was speaking loudly, and she said she was not.

7   She was speaking very quietly.

8      Q    Okay.  Anything else?

9      A    Not that I recall.

10      Q    Well, based on her response, did you

11   conclude that she had put her hands on Kelsey?

12      A    Based on all of the evidence, I concluded

13   that she had put her hands on Kelsey.

14      Q    Okay.  Well, up to that point, you had

15   Kelsey saying she did?

16      A    Uh-huh.

17      Q    And you allegedly have Jane saying that

18   she doesn't remember?

19      A    Right.

20      Q    And is it at that point that you make the

21   conclusion that she did put her hands on Kelsey?

22      A    No.

23      Q    Okay.  So it's at a different time?

24      A    Yes.

25      Q    Okay.  So after you talk to Jane, what did

1  you do?

2       A    At that point, I think I interviewed

3  either a nurse or an STNA.  I'm not sure of the

4  order.

5       Q    Okay.  Well, you interviewed both a nurse

6  and an STNA?

7       A    Yes.

8       Q    When you interview the nurse, did you come

9  to some conclusions like the nurse wasn't there the

10  whole time; based on the nurse's testimony, it must

11  have been a lengthy confrontation?  Did you do

12  anything like that or did you just hear what the

13  nurse had to say?

14       A    When I was talking to the nurse, I was

15  listening to what the nurse was saying.

16       Q    Okay.  Did you take down what the nurse

17  said?

18       A    Yes.

19       Q    And that was on your notes --

20       A    Yes.

21       Q    -- your notebook?  Did the nurse provide

22  you with a written statement?

23       A    I believe she -- there was a written

24  statement that Lorraine had provided me with from

25  the nurse.

1      Q    Okay.  In the nurse's written statement,

2   did she say that she ever saw Jane put her hands on

3   Kelsey?

4      A    I don't believe she did.

5      Q    Well, did you ask her that question?

6      A    Yes.

7      Q    And what did she say?

8      A    She said that she arrived late.  She had

9   been called away and came back and she did not see

10  that.

11     Q    So consistent with her written

12  testimony -- with her written statement, she said

13  she didn't see Jane put her hands on Kelsey,

14  correct?

15     A    That's my recollection.

16     Q    And then you interviewed an STNA.  By the

17  way, do you remember the nurse's name?

18     A    I'm not sure.

19     Q    Okay.  Then you interviewed an STNA?

20     A    Yes.

21     Q    Okay.  How did you know to interview a

22  particular STNA?

23     A    She had also provided a statement and said

24  that she was a witness to what transpired.

25     Q    Okay.  Well, did you know that because

1  Lorraine gave you a copy of her statement?

2      A    Yes.

3      Q    Did you ask Lorraine what she did in order

4  to make sure that she got all of the eyewitnesses to

5  the incident to write reports?

6      A    No.

7      Q    I mean, you didn't have her explain to you

8  how these particular people came to give written

9  statements and whether or not there were other

10 people that could have given written statements,

11 too?

12     A    I don't remember talking to her about

13 that.

14     Q    Okay.  So what did the STNA say?

15     A    The STNA said that she witnessed Jane grab

16 her shoulder and push her into the wall.

17     Q    Okay.  Anything else?

18     A    She said that she was speaking loudly and,

19 in fact, yelling at Kelsey.

20     Q    Okay.

21     A    And she said it wasn't so much that she

22 was yelling but it was more what she was saying.

23 She said she was talking to her like she was stupid.

24     Q    How does someone talk to someone like

25 they're stupid?

1      A    That was her assessment.

2      Q    Okay.  Well, did you ask her when she's

3  using this hyperbole what she means by the words

4  that she's using?

5      A    Yes.

6      Q    Okay.  What did she say?

7      A    And she's saying that she's treating her

8  like she doesn't know what she's doing.

9      Q    Maybe she didn't know what she was doing,

10 correct?

11     A    I wouldn't think so.

12     Q    Well, when she said she's treating her

13 like she doesn't know what she was doing, what did

14 you conclude from that?

15     A    I concluded from that that we did not

16 handle this in a professional manner.

17     Q    Is that when you came to the conclusion

18 that Jane put her hands on Kelsey?

19     A    No, I really didn't reach that conclusion

20 until I had talked with everyone.

21     Q    Okay.  Well, who else did you talk to?

22 Well, you didn't talk to the residents or the

23 daughter, right?

24     A    Correct.

25     Q    Okay.  Who else did you talk to?

1       A    Do you want me to go back and amend

2   something?  You asked me what all Jane and I talked

3   about.

4       Q    Yeah.  If at any time you want to correct

5   your statement or add to it --

6       A    Okay.  I asked Jane why she chose to

7   confront the employee on the floor in front of other

8   staff, residents, and resident family members, and

9   she said because she thought it was only going to

10  take a couple of minutes or a minute.  And I said

11  when it continued, why didn't you take it to your

12  office and remove it from the floor.

13      Q    Okay.  Well --

14      A    She said I don't recall --

15      Q    Okay.

16      A    -- or I don't know.

17      Q    You said staff, resident and staff --

18  family members, correct?

19      A    Pardon?

20      Q    You said that you asked her why she was

21  handling the situation in front of staff, residents,

22  and residents' family members?

23      A    Yes.

24      Q    Okay.  Well, do you have one resident that

25  you interviewed that said she heard Jane having any

1   type of confrontation with Chelsea -- Kelsey?  Do

2   you have one resident that told you they heard

3   anything?

4        A    I didn't talk to a resident.

5        Q    Okay.  And do you have one resident's

6   family member that you talked to that said I heard

7   the confrontation?

8        A    I told you I didn't talk to the family

9   member.

10       Q    Okay.  So isn't it true that the only

11  people that you know that may have heard this

12  conversation are staff members?

13       A    What I know based on what I was told was

14  this confrontation took place on the floor and not

15  in a private office where it should have.

16       Q    Okay.  So now it's that it happened on the

17  floor and not in a private office?

18       A    Right.

19       Q    What if Jane thought it was a teaching

20  moment for all staff members, something as important

21  as being reminded of a resident's right?

22       A    She wasn't using it as a teaching moment.

23  She was disciplining an employee on the floor in

24  public space.

25       Q    Well, did she write the employee up?

Page 148

1       A    I don't know.

2       Q    You said she was disciplining her.  It

3   sounds like she was giving her some type of

4   instruction, but she didn't give her any formal

5   discipline, correct?

6       A    You can discipline without it being formal

7   discipline.

8       Q    Uh-huh.  Well, did you ever ask Jane if

9   she was issuing Kelsey any type of discipline?

10      A    I did not.

11      Q    Did you ask Kelsey if she received any

12  type of discipline?

13      A    I did not.

14      Q    Did you look in her file to see if Jane

15  had put any discipline in her file?

16      A    I reviewed her file.

17      Q    Okay.  Did you see any discipline related

18  to that situation?

19      A    I did not.

20              MR. GARRISON:  John, off the record

21          for a question when you get a chance.

22              MR. FRANKLIN:  Yeah.  Go ahead.

23              (Whereupon, a recess was taken at

24          1:18 p.m. and resumed at 1:45 p.m.)

25

Page 149

1   BY MR. FRANKLIN:

2       Q    Going back to the memo that you created,

3   you created that once you were back at your home

4   office?

5       A    I may have started it at St. Marys before

6   I left.

7       Q    May have started it on what, your laptop?

8       A    Yes.

9       Q    So you were at St. Marys on that Tuesday,

10  did you stay the next day?

11      A    No.

12      Q    Okay.  So you may have created -- started

13  the document on Tuesday and you ended it on what

14  day?

15      A    The next day.

16      Q    Next day?

17      A    Yeah.

18      Q    Did you base any part of that memo on any

19  conversations you had with Barry?

20      A    No.

21      Q    Before finalizing the memo, did you have

22  any written communication with Barry?

23      A    No.

24      Q    Did you have written communication with

25  Barry after creating the memo?

Page 150

 1      A    No.

 2           (Whereupon, Plaintiff's Exhibit 1 was

 3           marked for identification.)

 4      Q    Handing you what's been marked as

 5   Plaintiff's Exhibit 1.  If you can take a moment to

 6   look at that document, please.  Let me know when

 7   you're done.

 8      A    Excuse me.  Were you talking to me?

 9      Q    Yes.

10      A    I didn't hear what you said.

11      Q    I said take a moment to look at the

12   document, let me know when you're done.

13      A    Okay.

14      Q    Have you seen Plaintiff's Exhibit 1 prior

15   to today?

16      A    Yes.

17      Q    For the record, what does Plaintiff's

18   Exhibit 1 appear to be a copy of?

19      A    A memo that I created as a result of my

20   investigation of this situation.

21      Q    Okay.  If we look at the first full

22   paragraph, it starts off on Tuesday, April 23rd, I

23   visited St. Marys to investigate; do you see that?

24      A    Uh-huh.

25      Q    So is that the date you arrived,

1   April 23rd?

2        A    At the facility, yes.

3        Q    And the last sentence of that full

4   paragraph says Kelsey has been disciplined only once

5   and that was for failure to complete her

6   Silverchair; do you see that?

7        A    Yes.

8        Q    So does that mean you had looked at her

9   file?

10       A    Yes.

11       Q    Why did you put the word only in there?

12       A    I thought it was appropriate.

13       Q    Well, I mean you're supposed to conduct a

14  neutral investigation, correct?

15       A    Right.

16       Q    And you could have simply said Kelsey has

17  been disciplined once and that was for failure to

18  complete her Silverchair, correct?

19       A    Could have, yes.

20       Q    You inserted the word "only"?

21       A    I inserted all those words.

22       Q    Okay.  You write in the second full

23  paragraph, I contacted Kelsey through her mother and

24  asked if we could both sit down together and discuss

25  the incident.  Is that what you said to the mother

1   that you wanted to sit down with Kelsey and discuss

2   the incident?

3        A    No.  I called her mother and I asked for

4   Kelsey.

5        Q    Okay.  But you say I contacted Kelsey

6   through her mother, and through her mother you asked

7   if the two of you could sit down together?

8        A    No.  I asked Kelsey if we could sit down

9   together and discuss the incident.

10       Q    You claim she said she had school and

11  would not have time to do that, but she agreed to

12  discuss it over the phone.  Kelsey was still very

13  emotional on the subject.  What did you mean by

14  that?

15       A    Her voice was shaky.

16       Q    Well, I mean, you don't know if she just

17  worked out or something like that, correct?

18       A    To me, she sounded emotional.

19       Q    Did you -- did you ask her why her voice

20  was shaky?

21       A    I did not.

22       Q    So you simply came to the conclusion that

23  her shaky voice evidenced that she was being

24  emotional?

25       A    Yes.

1      Q    Then you write she was very responsive to

2  all my questions.  What did you mean by that?

3      A    When I asked a question, she answered it

4  without hesitation and seemed comfortable answering

5  all my questions.

6      Q    Is there a list somewhere of the questions

7  that you asked?

8      A    No.

9      Q    You then write in the fourth paragraph,

10  when Kelsey returned to the resident's room, she

11  advised them as to what she had learned and that the

12  tray was on its way.  The daughter was upset because

13  this change had not been discussed with her or her

14  mother; do you see that?

15      A    Yes.

16      Q    Did you ask her what she meant by the

17  daughter was upset?

18      A    No.

19      Q    Did you ask her to describe the daughter's

20  demeanor?

21      A    No.

22      Q    You just took her word for it that

23  whatever she was witnessing evidenced that the

24  daughter was upset?

25      A    Especially when she said I want to talk to

1   the DON.

2        Q    Okay.  Well, the DON is Jane, right?

3        A    Right.

4        Q    How do you know she said I want to talk to

5   the DON?  Were you there?

6        A    I was not.

7        Q    Okay.  So who's telling you that part of

8   the story?

9        A    Kelsey.

10       Q    In the final full paragraph on the first

11  page, you write she said Jane grabbed her shoulder

12  and pushed her back into the wall behind her.  Jane

13  criticized Kelsey for the way she handled the

14  situation.  Do you see that?

15       A    Yes.

16       Q    Now, you're not -- you're not -- strike

17  that.  It's of no concern to yours that the DON is

18  criticizing one of her employees, are you?  I mean

19  you're not saying that's part of the discipline?  I

20  mean, DONs can criticize employees?

21       A    They can.

22       Q    Okay.  In fact, part of their job is to

23  provide criticism, constructive or not, and

24  discipline when needed, correct?

25       A    Correct.

1    Q    Did it -- strike that.  Did you think when

2   the employee is telling you that she's being

3   criticized for the DON talking to her in a

4   particular way that she might exaggerate whether

5   there was actually a physical confrontation?

6    A    At that point, I didn't make any

7   determinations as to whether or not that was true.

8    Q    Based on your experience, you didn't have

9   a conclusion at that point that an employee who's

10  being criticized may exaggerate the circumstances of

11  the criticism?

12   A    No.

13   Q    How long had you been in HR at that point?

14   A    Probably 40 years.

15   Q    If you turn with me to the second page of

16  Plaintiff's Exhibit 1, first full paragraph, the

17  resident's daughter said to Kelsey, quote, I can't

18  believe she spoke to you like that, end quote, and

19  offered to write a statement.  Do you see that?

20   A    Uh-huh.

21   Q    Yes?

22   A    Yes.

23   Q    Okay.  Is this Kelsey giving you this

24  information or the daughter?

25   A    It was Kelsey.

1    Q    Okay.  When you put it in quotes, are you

2    saying that's exactly what Kelsey said?

3    A    Yes.

4    Q    So at that point were you copying it

5    directly from your notebook and putting it in the

6    memo?

7    A    From my pad, yes.

8    Q    And if we looked at your pad that's

9    probably in a landfill at this point, we would see

10   that you actually put those words in quotes?

11   A    Yes.

12   Q    Now, she indicated to you that the

13   daughter offered to write a statement; is that

14   correct?

15   A    Correct.

16   Q    Did you ever ask the daughter either in

17   person or by mail or otherwise to write a statement?

18   A    I did not.

19        MR. GARRISON:  Objection.  Asked and

20        answered.

21   Q    To your knowledge, is the mother still a

22   resident of the facility?

23   A    I have no idea.

24   Q    In the second full paragraph, you start

25   out, Jane had contacted Lorraine and advised her she

1    was not feeling well and she would be off ill

2    through Wednesday.  Do you see that?

3         A    I do.

4         Q    When did that occur?

5         A    I believe that Lorraine put that in an

6    e-mail to me the evening of the 22nd.

7         Q    So this portion of your memo is based on

8    an e-mail from Lorraine as opposed to a face-to-face

9    conversation with Lorraine?

10        A    That's my recollection.

11        Q    Okay.  So you indicate I called Jane and

12   explained the reason for my visit and told her I

13   would really like to meet with her face to face and

14   that I was willing to do that anywhere that might be

15   convenient for her.  Do you see that?

16        A    I do.

17        Q    Did you suggest going over to her house?

18        A    I did not say I would go to her house.  I

19   said anywhere.

20        Q    Well, I mean, did you make a

21   recommendation, her house, the nearest restaurant to

22   her house, anything to that effect?

23        A    I don't remember talking about that, but I

24   didn't invite myself into her house.

25        Q    Okay.  But if you had made a

1   recommendation as to where you could have met with

2   her, would that have been on your tablet?

3        A    Yes.

4        Q    Okay.  You then write she said she was not

5   up to doing that.  I asked her if she was able to

6   discuss the situation over the phone.  She said she

7   was able to do that.  Do you see that?

8        A    Yes.

9        Q    When she says to you that she's not up to

10  it, did you ask her what she meant by that?

11       A    No.

12       Q    At the point where she says I'm not up to

13  it, did you know that Jane had contacted Lorraine

14  and advised her she wasn't feeling well?

15       A    Yes.

16       Q    So you knew that the "not up to it" was

17  based on Jane not feeling well, correct?

18       A    All I know is she said she wasn't up to

19  doing that.

20       Q    Okay.  But you knew prior to your contact

21  with Jane that she had contact with Lorraine and

22  Lorraine told you that Jane was sick?

23       A    Yes.

24       Q    Okay.  You say, looking at the third full

25  paragraph, say the third sentence from the bottom,

1    she said she doesn't think she ever touched Kelsey.

2    Do you see that?

3        A    Yes.

4        Q    Okay.  Is that exactly what she said?

5        A    Yes.

6        Q    Then why didn't you put that in quotes

7    like you did the quote the resident's daughter said

8    to Kelsey, quote, I can't believe she spoke to you

9    like that, end quote?

10       A    I could have.  I didn't.

11       Q    No, I'm asking why you didn't?  You just

12   made a choice?

13       A    Yeah.

14       Q    If I look at your original notes that you

15   destroyed, would I see that particular sentence in

16   quotes or did you not quote it at the time?

17       A    I don't think I quoted it at the time.

18       Q    Okay.  Because if you had, you would have

19   transferred it onto the memo as an exact quote,

20   correct?

21       A    I may have.

22       Q    You may have?

23       A    Right.

24       Q    So you didn't -- you don't have a practice

25   of transferring notes, particularly those in quotes,

1    verbatim from your handwritten notes to your memo?

2         A    Correct.

3         Q    I asked her if at any point -- and I'm

4    reading from the third paragraph still.  Now I'm at

5    the second sentence from the bottom.  I asked her if

6    at any point Kelsey started to walk away and she

7    grabbed her shoulder.  Again Jane said she did not

8    remember touching Chelsea -- or Kelsey.  Do you see

9    that?

10        A    Yes.

11        Q    And, again, that's not quoted, correct?

12        A    Correct.

13        Q    But you're testifying here today that

14   that's verbatim what she said?

15        A    Yes.

16        Q    Now, when you're talking to Jane, are you

17   talking to her on a speaker phone?

18        A    No.

19        Q    Barry wasn't present?

20        A    No.

21        Q    Was there anyone else in the room that was

22   present who could have heard maybe your side of the

23   conversation?

24        A    I don't recall anybody else being there.

25        Q    Is there anyone that could testify that

1   during the conversation with Jane you took notes?

2         A     No.

3         Q     Where were you when you had this

4   conversation with Jane?

5         A     In Lorraine's office.

6         Q     Where was Lorraine?

7         A     Not in her office.

8         Q     Okay.  I mean, do you have the ability to

9   just tell her to leave her office, that you need to

10  use it?

11        A     I could always ask that.

12        Q     Okay.  But I'm just asking within the

13  hierarchy of the business model, can you send

14  Lorraine out of her office for a particular period

15  of time?

16        A     I don't believe I can.

17        Q     You then in the last paragraph of the

18  second page write I asked her if we change a

19  resident's dining routine would that not be at the

20  direction of the clinical department as opposed to

21  dietary doing it.  She said that was true, but then

22  insisted that a resident can eat wherever they want.

23  Did I read that correctly?

24        A     You did.

25        Q     Okay.  And it's true, a resident can eat

1   wherever they want?

2        A    Yes.

3        Q    Correct?  Okay.  You then write and I'm

4   reading from the third sentence, last paragraph of

5   the second page, we have a statement from an RN

6   stating that she could hear the confrontation

7   between Jane and the dietary employees, and that

8   while Jane was speaking loudly, the dietary

9   employees never raised their voices in this

10  situation.  Do you see that?

11       A    Yes.

12       Q    Who is -- where does that statement exist?

13       A    It was in one of the statements that I got

14  from Lorraine.

15       Q    Okay.  Did you, yourself, talk to the RN?

16       A    Did not.

17       Q    Why not?

18       A    I didn't feel I needed to.

19       Q    Well, you talked to Kelsey?

20       A    Yes.

21       Q    You talked to Ciara?

22       A    Okay.

23       Q    Didn't you?

24       A    Yep.

25       Q    Okay.  Why wouldn't you talk to the RN?

1      A    I was focused on the incident between

2  Kelsey and Jane.

3      Q    Okay.

4      A    Not the incident that occurred in the

5  dietary department.

6      Q    Okay.  So that was really not an incident

7  you were focused on?

8      A    While it was inappropriate, it was not the

9  incident I was focused on.

10     Q    What was inappropriate?  Jane was to bring

11 the dietary department into her office and have the

12 conversation?

13     A    Supervisor should not be, quote, talking

14 so loud that it can be heard in other rooms.

15     Q    Okay.  What other room was this heard in?

16     A    Pardon?

17     Q    What other room was this conversation

18 between Jane and dietary heard in?

19     A    The dining room.

20     Q    How do you know that?

21     A    That's what the nurse testified to.

22     Q    Okay.  That's what the nurse --

23     A    She was in the dining room.

24     Q    -- said?

25     A    Yes.

1      Q    To you?

2      A    No.

3      Q    Well, you said testified.

4      A    In her statement.

5      Q    Oh, that's what she wrote in her

6  statement?

7      A    Right.

8      Q    Okay.  She didn't testify to that,

9  correct?

10      A    She wrote it in her statement.

11      Q    The statements that Lorraine collected,

12  were they notarized?

13      A    No.

14      Q    Do you know if the employee gave any type

15  of affirmation or oath to the truthfulness of their

16  written statements?

17      A    Not that I'm aware of.

18      Q    Looking at the next -- the first paragraph

19  of the third page, starting with the second --

20  second from the bottom sentence, you write she said

21  she also left to answer a call light and returned

22  before the confrontation ended.  Clearly this was an

23  extended confrontation.  Do you see that?

24      A    Yes.

25      Q    How do you know how long she was gone when

1    she went to answer the call light?

2         A    Jane was telling me that this took a

3    minute.  You don't answer a call light and return in

4    a minute.

5         Q    How do you know?

6         A    Experience.

7         Q    Okay.  So you don't think there's ever a

8    time when you can remedy a situation with a call

9    light in a minute?

10        A    In most cases not.

11        Q    Based on your experience as an STNA?

12        A    No.

13        Q    Experience as an LPN?

14        A    No.

15        Q    RN?

16        A    No.

17        Q    You write in the second paragraph, Page 3,

18   Jill said she never saw Jane grab Kelsey, but

19   admitted that she was not there all of the time and

20   that it may have happened before she got there or

21   while she had to step away.  Do you see that?

22        A    Yes.

23        Q    Is that something she said to you --

24        A    Yes.

25        Q    -- this nurse?  Okay.  Why do you use the

1    word admitted?

2         A    Because that's what she said.

3         Q    She says I admit I wasn't there all the

4    time?

5         A    Yes.

6         Q    So you weren't relying on her written

7    statement; you were relying on something she said to

8    you?

9         A    Right.

10        Q    And that would have been in your notebook?

11        A    Been on my pad.

12        Q    When you threw away the pages from the

13   pad, did you throw the entire pad away or just the

14   pages you had used?

15        A    Just the pages I had used.

16        Q    How many pages had you used?

17        A    I have no idea.

18        Q    Well, I mean, can you give us, since we

19   don't have it, some type of estimate?

20        A    No.

21        Q    So you don't know if you used every page

22   or you used one page?  That's your testimony?

23        A    I used more than one page, but I have no

24   idea how many.

25        Q    Looking at the third paragraph, the last

1   sentence, it says Jill was very upset and really did

2   not want to get involved, but answered my questions

3   completely.  Do you see that?

4       A    Yes.

5       Q    What were you witnessing that evidenced

6   that Jill was upset?

7       A    She really told me that.  She said I'm

8   upset.

9       Q    Those words?

10      A    And I really don't want to be involved.

11      Q    And what did you say?

12      A    I said to her as an employee of this

13  company, you have an obligation to tell us what you

14  know.

15      Q    Well, did you say anything like rest

16  assured, you won't be retaliated against?

17      A    No.

18      Q    You just barked out as an employee of this

19  company, you have an obligation to tell us what you

20  know?

21              MR. GARRISON:  Objection.

22              Argumentative.

23      A    I did not bark out at anyone.

24      Q    Were you talking like you're talking to me

25  in a stern voice?

1    A    No.

2    Q    Well, how did you say it to her?

3    A    Just the way I said it before.

4    Q    Okay.  Where did you interview Jill?

5    A    Where?

6    Q    Yeah.

7    A    At the facility.

8    Q    Was it in Lorraine's office?  Was it --

9    A    Yes, that's where I was.

10    Q    -- somewhere else?

11    A    I was in Lorraine's office the entire

12    time.

13    Q    Okay.  How is it that someone like Jill

14    came to be in Lorraine's office?

15    A    My recollection is that Jane would have --

16    or Lorraine would have brought her, told her I

17    wanted to talk with her.

18    Q    So Lorraine, the administrator, brings her

19    to someone she knows to be a regional HR?

20    A    Right.

21    Q    Do you tell the employee before you start

22    asking them questions who you are?

23    A    Yes.

24    Q    Do you tell them your position in the

25    company?

1        A    I do.

2        Q    And do you tell them that they have an

3    obligation to tell the company what they know of a

4    particular situation?

5        A    Yes.

6        Q    At any point do you tell the employee that

7    they won't be retaliated against?

8        A    Not -- no.

9        Q    You, in the -- one, two, three --

10   fourth paragraph start out I interviewed Ciara

11   McConn, an STNA who witnessed Jane's confrontation

12   with Kelsey.  Do you see that?

13       A    Yes.

14       Q    Very first paragraph.  How did you speak

15   to her?  In person?

16       A    I believe that was on the phone.

17       Q    Okay.  Was anyone else present when you

18   talked to her?

19       A    Barry may have been present for that, but

20   I'm not positive.

21       Q    Well, not may have been, you wrote in here

22   the conversation was handled on a speaker phone with

23   Barry present.

24       A    Oh, okay.

25       Q    Correct?

Page 170

1        A    Yes.

2        Q    Okay.  So did you tell her Barry was in

3   the room?

4        A    Yes.

5        Q    Why was Barry in the room for that

6   conversation that you were having and not the prior

7   conversations --

8        A    Because --

9        Q    -- with the other witnesses?

10       A    Because he had just arrived at the

11  facility.

12       Q    But you didn't think that you should

13  interview all of the employees in a consistent

14  manner with either you doing it or you and Barry

15  doing it?

16       A    No.

17       Q    Okay.  Did Barry ask any questions?

18       A    I don't believe he did.

19       Q    Did Barry take notes?

20       A    Not that I'm aware of.

21       Q    You didn't witness him taking notes?

22       A    I did not.

23       Q    Did he witness you taking notes?

24       A    I don't know.

25       Q    Okay.  Were you taking notes during the

1  conversation with --

2      A    Yes.

3      Q    -- Ciara?

4      A    Yes.

5      Q    Did you review Ciara's personnel file like

6  you had reviewed Kelsey's personnel file?

7      A    I don't remember doing it.

8      Q    Did it ever come to the forefront of your

9  thought that Kelsey and Ciara wanted the DON gone,

10  terminated --

11     A    No.

12     Q    -- long before the alleged confrontation?

13     A    No.

14     Q    Did you ask other employees if there was

15  any perceived bad blood, so to speak, between the

16  DON and Kelsey?

17     A    No.

18     Q    Did you ask any employees if there was any

19  alleged bad blood between the DON and Ciara?

20     A    No.

21     Q    Did you ask if Kelsey and Ciara were

22  friends?

23     A    No.

24     Q    Did you ask if they were contemporaries,

25  the same age?

Page 172

1       A     No.

2       Q     About what time does the phone call with

3   Ciara take place?

4       A     The only thing I can tell you for sure it

5   was in the afternoon.

6       Q     Well, was Ciara at the facility at any

7   point when you were there?

8       A     I don't believe so.

9       Q     Was it her day off?

10      A     I don't know.

11      Q     Well, do you specifically recall asking

12  Lorraine to get Kelsey -- or to get Ciara and bring

13  her into the office and being told she's not

14  available?

15      A     I was made aware when I arrived in the

16  morning who was in the building and who was not in

17  the building.

18      Q     You write in the fifth paragraph, based on

19  my investigation, I believe that Jane grabbed

20  Kelsey's arm twice during this confrontation.  Do

21  you see that?

22      A     I do.

23      Q     What do you base that conclusion on that

24  she grabbed her arm?

25      A     The testimony of Kelsey, Ciara, and Jane.

1       Q      You based it on the conversation with

2    Jane?

3       A      Yes.

4       Q      Because Jane allegedly said she couldn't

5    remember?

6       A      Correct.

7       Q      You write in the second-to-last sentence

8    of the fifth paragraph, the yelling at employees has

9    been an ongoing problem and seems to have escalated.

10   I believe that discipline up to and including

11   discharge is in order.  Do you see that?

12      A      Where are you at again?

13      Q      Fifth paragraph.

14      A      Okay.

15      Q      Last two sentences.

16      A      All right.  Fifth paragraph.  Yes.

17      Q      All right.  What did you mean by the

18   yelling at employees has been an ongoing problem?

19      A      I meant that the previous two

20   administrators had spoken to me on a number of

21   occasions about Jane's interaction with employees.

22      Q      Okay.  Had you spoken to Jane about the

23   alleged comments where administrators have been

24   telling you that she had been yelling at employees?

25      A      No.

1          Q     Did you write her up?

2          A     No.

3          Q     Issue any discipline?

4          A     I didn't.

5          Q     Did you have the administrators issue

6     discipline?

7          A     That's not my role.

8          Q     So the answer is no?

9          A     Correct.

10         Q     Well, did you recommend discipline?

11         A     I did not.

12         Q     Okay.  Is that your role?

13         A     No.

14         Q     Because it looks like in the last

15    paragraph you're recommending discipline.  I believe

16    discipline up to and including discharge is in

17    order.  Do you see that?

18         A     Yes.

19         Q     So where Jane's concerned, you took it

20    upon yourself to recommend discipline, correct?

21         A     In this case, I recommended discipline.

22         Q     Okay.  Now, if I want to look anywhere to

23    verify that any administrator talked to you about

24    Jane yelling at employees, what could I look at?

25         A     I don't know.

Page 175

1        Q    Well, is there anything in your home

2   office I can look at?

3        A    No.

4        Q    Is there anything on your calendar I can

5   look at?

6        A    No.

7        Q    Do you have any files in the trunk of your

8   car?

9        A    No.

10       Q    Do you have an office at any facility?

11       A    No.

12       Q    You don't have an office at Columbus?

13       A    No.

14       Q    Isn't one of the purposes of discipline to

15  correct an employee's behavior?

16       A    Yes.

17       Q    Then if you believed these calls from

18  administrators that Jane was yelling at employees

19  and you believe that to be inappropriate, why

20  wouldn't you either give her some type of discipline

21  or recommend to the administrator that discipline be

22  issued?

23       A    I don't give discipline.

24       Q    I know.  You don't have a problem

25  recommending it, right?

1     A     Right.

2     Q     Okay.  So why didn't you ever recommend

3  it?

4     A     I don't know that I didn't.

5     Q     Okay.  But we don't know what you said to

6  the administrators because you didn't write anything

7  down?

8     A     Okay.

9     Q     Correct?

10     A     Correct.

11     Q     Are you telling me you can't issue

12  discipline?

13     A     Right.

14     Q     Can people above your reporting level

15  issue discipline?

16     A     Yes.

17     Q     Okay.  Can people below your reporting

18  level issue discipline?

19     A     I don't know what you mean by reporting

20  level.

21     Q     Well, you report to somebody?

22     A     Yes.

23     Q     You have dotted-line reporting

24  responsibilities to Barry and you have solid-line,

25  it seems like, reporting responsibilities to Susan,

1    correct?

2         A    Correct.  Uh-huh.

3         Q    To your knowledge, can either of those two

4    individuals issue discipline?

5         A    Yes.

6         Q    Has someone told you that you can't issue

7    discipline?

8         A    Discipline is issued by the supervisor.  I

9    supervise no one.

10        Q    Okay.  Who were you sending this memo to?

11        A    I believe I sent this to Barry and to

12   Susan.

13        Q    Okay.  What do you mean you believe?  Was

14   it attached to a cover letter?

15        A    I'm sure I e-mailed it.

16        Q    Okay.

17        A    And I know it went to Susan because she's

18   the one that gave me the assignment to go to

19   St. Marys.  Since Barry was there and I referenced

20   him in the memo, I probably sent it to him, but I

21   can't testify specifically that I -- that I included

22   him.

23        Q    After sending out the memo, were you made

24   aware that Jane had returned to work?

25        A    I didn't catch the last part of that.

1      Q     After you draft the memo --

2      A     Okay.

3      Q     -- and I think you've dated April 24th --

4      A     Okay.

5      Q     -- 2013, were you made aware that Jane had

6   returned to work?

7      A     I don't remember being made aware of that.

8      Q     Did anyone make you aware that Jane was no

9   longer employed by the company?

10     A     At some point, yes.

11     Q     Okay.  At what point?

12     A     I don't know.

13     Q     Well, months later, weeks later, days

14  later, hours later than the 24th of April?

15     A     I don't know.

16     Q     Who made you aware?

17     A     I'm not sure.

18     Q     Did you take any notes of who told you

19  Jane was no longer with the company?

20     A     No.

21     Q     Did you take any notes of when you may

22  have had a conversation with anyone related to

23  Jane's no longer working for the company?

24     A     No.

25     Q     What's your understanding as to why Jane

1    no longer works for the company?

2         A    I really don't have an understanding of

3    it.

4         Q    What do you mean by that?

5         A    I mean I don't know that she was

6    discharged.  I don't know whether she voluntarily

7    quit.

8         Q    Did you ever ask anyone?

9         A    No.

10         Q    You certainly thought she should be

11    discharged, correct?

12         A    I did.

13         Q    So you -- it's your testimony that you

14    didn't inquire as to whether anyone had followed

15    your recommendation?

16         A    Right.

17         Q    Were you ever responsible for putting an

18    ad in CareerBuilder to replace Jane?

19         A    I don't remember placing such an ad.

20         Q    Okay.

21         A    If one got placed on CareerBuilder, I

22    placed it.

23         Q    Okay.  So you don't remember if you did or

24    you didn't?  You may have or you may not have?

25         A    We don't advertise all DON positions on

1    CareerBuilder.

2         Q     Okay.

3         A     As I indicated earlier.

4         Q     But you advertise some?

5         A     Yes.

6         Q     Have you, meaning after the 24th, had any

7    further discussions by way of investigating Kelsey's

8    claims?

9         A     No.

10        Q     If -- strike that.  You would agree with

11   me the administrator is Jane's supervisor, correct?

12        A     Yes.

13        Q     So Lorraine is Jane's supervisor?

14        A     Yes.

15        Q     And you would admit that as her

16   supervisor, Lorraine has the ability to terminate

17   Jane?

18        A     Not without approval.

19        Q     Approval from who?

20        A     The director of -- the director of

21   operations and the vice president of human

22   resources.

23        Q     Really?  Where could I read that?

24        A     I don't know.

25        Q     Okay.  So it's your testimony that the

1  administrator can't terminate the DON without

2  speaking to the VP of HR and the CEO?

3      A    No.

4      Q    COO?

5      A    No.

6      Q    Who?

7      A    Regional director of operations.

8      Q    Okay.  Regional director.  And who is

9  that?

10     A    In this case?

11     Q    Yes.

12     A    It was Barry.

13     Q    And the VP of HR was who?

14     A    Susan.

15     Q    Now, are you saying that goes for anyone

16  that the administrator wants to terminate or just

17  the DON?

18     A    Goes for anyone that the administrator

19  wants to terminate.

20     Q    Okay.  So before the administrator can

21  terminate, you claim it has to go through the VP of

22  HR and the regional director?

23     A    Correct.

24     Q    And you can't point to me where that's in

25  writing?

1        A    It's been communicated.  I can't point to

2   you where it's been in writing.

3        Q    Well, who has it been communicated by?

4        A    By the vice president of human resources.

5        Q    Okay.  When?

6        A    I don't know.

7        Q    Was it like in a meeting of a bunch of

8   people or when you were driving down the road?  I

9   mean, when did this alleged policy happen?

10       A    I don't remember when -- when.

11       Q    Has that been the policy ever since you

12  were employed by the company?

13       A    No.  But it has been the policy for a long

14  time.

15       Q    Okay.  So when did the policy start?

16       A    Years ago.

17       Q    Okay.  Five years ago?  Two years ago?

18       A    I don't know.

19       Q    I mean, is there a form that has to be

20  signed by each of those people before someone's

21  terminated?

22       A    No.

23       Q    Since April 23rd, 2013, has Barry sent you

24  any memos?

25       A    I'm sure he has.

1        Q        Okay.  Do any of those memos reference

2    Jane?

3        A        Not that I recall.

4        Q        Is it fair to say that you didn't review

5    any memos by Barry before drafting your memorandum?

6        A        Yes.

7        Q        And you're sure of that?

8        A        Yes.

9        Q        Do you have any role in contesting

10   someone's unemployment?

11       A        No.

12       Q        Who does?

13       A        It's handled between corporate and the

14   individual facility.

15       Q        Well, who at the corporate level handles

16   it if you don't?

17       A        Lynley Wolfe.

18       Q        Who?  Dudley?

19       A        Lynley.

20       Q        Lynley?

21       A        Wolfe.

22       Q        Male or female?

23       A        Female.

24       Q        What's her title?

25       A        I'm not sure.

Page 184

1        Q     How do you know she's the one that handles

2    it?

3        A     I've been told she's the one that handles

4    it.

5        Q     Have you ever met her?

6        A     Yes.

7        Q     Is she located in Columbus?

8        A     Yes.

9        Q     Has she ever asked for your input as to

10   whether a claim should be contested for unemployment

11   or not contested?

12       A     No.

13       Q     Did anyone ever ask you if Jane's claim

14   for unemployment should have been contested or not

15   contested?

16       A     No.

17       Q     Do you know who Tracy Hurt is?

18       A     Yes.

19       Q     Who is she?

20       A     She was a person that worked at corporate

21   and I believe was involved in unemployment with

22   Lynley.  In other words, she worked for Lynley.

23       Q     She worked for Lynley?

24       A     That's my recollection.

25       Q     Are you indicating she's no longer

1   employed by the company?

2        A    I believe she's not.

3        Q    Do you know when she left the company?

4        A    Do not.

5              (Whereupon, Plaintiff's Exhibit 2 was

6              marked for identification.)

7        Q    Handing you what's been marked as

8   Plaintiff's Exhibit 2.  If you could take a moment

9   to look at that document and let me know when you're

10  done.

11       A    Okay.

12       Q    Have you seen this document prior to

13  today?

14       A    I do not remember seeing this document

15  before today.

16       Q    Are these -- it's -- I think it's called a

17  note.  Are these notes put in an employee's file?

18       A    They could be.

19       Q    I mean, do you think this type of note

20  based on your experience is a proper note to put in

21  someone's employee file?

22       A    I don't know.

23       Q    I mean, it's not -- you'd agree with me

24  it's not signed, correct?

25       A    Correct.

Page 186

1      Q    And whoever drafted the note didn't bother

2   to put their name, correct?

3      A    Not on this page.

4      Q    Okay.  I mean, do you think -- do you have

5   some knowledge that there's other pages to this

6   document?

7      A    I do not.

8              (Whereupon, Plaintiff's Exhibit 3 was

9          marked for identification.)

10     Q    Handing you what's been marked as

11  Plaintiff's Exhibit 3.  If you could take a moment

12  to look at that document, please.

13     A    Okay.

14     Q    Have you seen this document prior to

15  today?

16     A    I have not.

17     Q    This document says statement form at the

18  top.  Do you see that?

19     A    I do.

20     Q    Is this a document that's used in the

21  normal course of business?

22     A    I don't know.

23     Q    Okay.  Does each facility use their own

24  forms to fill out or are there standard forms that

25  are issued by the company?

1       A    There are standard forms, but facilities

2   will create their own forms for their own use at

3   times.

4       Q    Okay.  Do you as the HR person responsible

5   for those facilities have to approve the documents

6   that are created by the -- each location before

7   they're put into practice?

8       A    No.

9       Q    Do you review those during an audit?

10      A    Yes.

11      Q    And if you don't think it's an appropriate

12  document, you'll tell the administrator of the

13  facility?

14      A    Correct.

15              (Whereupon, Plaintiff's Exhibit 4 was

16              marked for identification.)

17      Q    Handing you what's been marked as

18  Plaintiff's Exhibit 4, if you could take a moment to

19  look at that document and let me know when you're

20  done.

21      A    Okay.

22      Q    Have you seen this document prior to

23  today?

24      A    Yes.

25      Q    For the record what does this document

Page 188

1    appear to be a copy of?

2         A    It's a copy of a statement made by an

3    employee at St. Marys.

4         Q    Okay.  And the employee's name is Jill

5    Roby?

6         A    Yes.

7         Q    And she's an LPN?

8         A    Yes.

9         Q    Okay.  Now, did you actually talk to Jill

10   or did you read the statement or both?

11        A    I believe that I read -- I certainly read

12   the statement.

13        Q    Okay.

14        A    And I believe I talked with Jill.

15        Q    Okay.  Well, did you talk to her by phone

16   or did you talk to her in person?

17        A    I'm not sure.

18        Q    So you can't tell me if Barry was present

19   during that phone conversation?

20        A    My investigation, I believe the only thing

21   Barry was present for was the conference call.  The

22   phone call that I had on the speaker phone.

23        Q    Isn't it true that you didn't talk to

24   Jill?

25        A    I just said I don't remember.

1     Q    If you look at the third page of Jill's

2  statement, she writes then Kelsey got an attitude.

3  She stated that's the thing I hate about this place.

4  No one tells us anything.  No one communicates with

5  each other.  I don't know if I'll be back on Monday.

6  I'm tired of being a slave.  Do you see that?

7     A    I do.

8     Q    Kelsey then stormed away.  Do you see

9  that?

10    A    Yes.

11    Q    I didn't see any of that information on

12 your memo.  Is it because you didn't believe Jill?

13    A    No.

14    Q    Was it because you didn't think what I

15 just read is relevant?

16    A    Right.

17    Q    Right.  The fact that Kelsey stormed off

18 and said that she hates the workplace, that's not

19 relevant?

20    A    I didn't think it related to my

21 investigation.

22    Q    I thought that Kelsey's demeanor and

23 actions would be relevant to your investigation?

24    A    Yeah.  And this shows that she was, in

25 fact, upset.

1        Q    Well, it --

2        A    I just said that.

3        Q    -- shows that she was mad, doesn't it?

4        A    My interpretation is she was upset.

5        Q    She also writes in her statement that she

6    could sense frustration in both of their voices.  Do

7    you see that on the last page?

8        A    Yes.

9        Q    You didn't think that was important to put

10   in your memorandum?

11       A    No.

12       Q    Wasn't the demeanor of both the supervisor

13   and the STNA important to your story?

14       A    Yes.

15            (Whereupon, Plaintiff's Exhibit 5 was

16            marked for identification.)

17       Q    Handing you what's been marked as

18   Plaintiff's Exhibit 5.

19       A    Okay.

20       Q    Have you seen Plaintiff's Exhibit 5 prior

21   to today?

22       A    Yes.

23       Q    For the record, what does Plaintiff's

24   Exhibit 5 appear to be a copy of?

25       A    It's a statement provided by an employee

Page 191

1   at St. Marys.

2        Q    Okay.  And that employee is Kelsey?

3        A    Yes.

4        Q    Correct?

5        A    Yep.

6        Q    Did you have this document in your

7   possession before you talked to Kelsey?

8        A    Yes.

9        Q    Look on the second page, the second

10  paragraph, she writes I feel strongly something

11  needs to be done internally or else I will involve

12  outside authority; do you see that?

13       A    Yes.

14       Q    Last sentence.

15       A    Uh-huh.

16       Q    Did you ever talk to anyone at -- employed

17  by the company as to what that statement could mean?

18       A    I don't recall having a discussion on

19  that.

20       Q    Okay.  So you're not saying it didn't

21  happen, you just don't remember?

22       A    Right.

23       Q    If you had the conversation with someone

24  at the company, would you have noted it in your pad?

25       A    It depends on what I would have found out.

```
 1        Q    Okay.  Did -- strike that.

 2              (Whereupon, Plaintiff's Exhibit 6 was

 3        marked for identification.)

 4        Q    Handing you what's been marked as

 5   Plaintiff's Exhibit 6.

 6        A    Okay.

 7        Q    Have you seen this document prior to

 8   today?

 9        A    Yes.

10        Q    For the record, what does this document

11   appear to be a copy of?

12        A    It's a statement made by an employee of

13   St. Marys.

14        Q    Okay.  Did you have this document at the

15   time you created the memo?

16        A    I believe I did.

17        Q    Did you have the document at the time that

18   you talked to Ciara over the phone with Barry

19   present?

20        A    I believe I did.

21        Q    Did you read in this document that Ciara

22   says Jane was not yelling at Kelsey?

23        A    Yes.

24        Q    Okay.  Did you believe that statement to

25   be true?
```

1        A     I believe that was her interpretation.

2        Q     Okay.  Well, how can you interpret it any

3   other way other than she said Jane was not yelling?

4        A     That was her opinion, she was not yelling.

5        Q     Well, it seems like when her opinion

6   supported what you wanted to write in your memo, you

7   wrote -- you used her opinion and just ignored other

8   parts of her statement; is that --

9        A     No.

10       Q     -- true?  Hmm.  When you sent the memo to

11   Susan, did you include the witness statements?

12       A     I believe she had them also.

13       Q     What do you -- how do you mean you believe

14   it?

15       A     My recollection is that the e-mail that I

16   got, she got copied on.

17       Q     So you had all of the statements already

18   in an e-mail?

19       A     I told you that.

20       Q     So all of the witness statements before

21   you go down there, you have in an e-mail?

22       A     That's what I said.

23       Q     Did you ask any of the witnesses as to who

24   else was in the vicinity that may have heard what

25   was being said between Jane and Kelsey?

Page 194

1       A     Yes.

2       Q     Okay.  And did you write down the list?

3       A     No one gave me a list.  No one was aware

4   of anyone else that heard that.

5       Q     Okay.  So you must have said here are the

6   people that witnessed, and you gave the list and

7   then they didn't add to the list; is that fair?

8       A     That's fair.

9       Q     Did you say anything to them like if you

10  tell me who else is involved, they won't be

11  retaliated against?

12      A     No.

13      Q     I mean, did you understand at that point

14  of your investigation when you're talking to these

15  witnesses that they're afraid of being involved?

16      A     I wouldn't characterize it as being afraid

17  of being involved.

18      Q     Okay.  Why not?  Didn't one of them tell

19  you that she was afraid?

20      A     No.  She said she just didn't want to be

21  involved.

22      Q     Are you aware some of these people no

23  longer work at the facility?

24      A     I'm not aware of that specifically, no.

25      Q     Does Lorraine still work at the facility?

1       A       No.

2       Q       When did she leave?

3       A       I'm not sure.

4       Q       What do you mean you're not sure?

5       A       I can't give you the date that Lorraine

6   left.

7       Q       Can you give me the year?

8       A       No.

9       Q       So you don't know if it was '13 or '14?

10      A       Correct.

11      Q       Tell me the circumstances surrounding

12  Lorraine no longer working for the company?

13      A       I don't know the circumstances.

14      Q       Did she resign?

15      A       I don't know.

16      Q       That isn't something you'd be made aware

17  of in your position as HR?

18      A       No.

19      Q       Well, somebody made you aware she no

20  longer works there, right?

21      A       Right.

22      Q       Who was that?

23      A       I don't remember.

24      Q       Did you have to advertise for her job?

25      A       I may have.

1       Q     If an employee in the position of

2   administrator, DON, leaves the company without

3   giving four weeks' notice, are they penalized?

4       A     Yes.

5       Q     What's the penalty?

6       A     You give up any accrued but unused PTO

7   time.

8       Q     That includes vacation time, correct?

9       A     Yeah.

10      Q     Do you know if she had to give up her

11  accrued vacation time?

12      A     I don't know.

13      Q     Do you know where she works now?

14      A     I do not.

15      Q     How long was the position vacant, if it

16  was?

17      A     I don't know.

18      Q     Did you find out she wasn't the

19  administrator by going to the facility and finding

20  out?

21      A     No.

22      Q     So you knew before you went to the

23  facility?

24      A     Yes.

25      Q     Did someone serve as interim

1    administrator?

2         A     I believe so.

3         Q     Who was that?

4         A     I do not know.

5         Q     How long was this person interim

6    administrator?

7         A     I don't know.

8         Q     Who's the administrator now?

9         A     There's a lady there, and I do not recall

10   her name at this point.

11        Q     Did you ever meet her?

12        A     Yes.

13        Q     Did you take down her name on a pad of

14   paper?

15        A     Yes.

16        Q     Did you throw that pad of paper away yet?

17        A     Yes.

18        Q     Before you committed her name to memory?

19        A     I put her name on my e-mail list.

20        Q     So when you got the new laptop, your

21   e-mail list was on there?

22        A     Yes.  It was on the stick.

23              (Whereupon, Plaintiff's Exhibit 7 was

24              marked for identification.)

25        Q     Handing you what's been marked as

1    Plaintiff's Exhibit 7.  If you could take a moment

2    to look at that document, please.

3         A    Okay.

4         Q    Have you seen this document prior to

5    today?

6         A    Yes.

7         Q    For the record, what does this document

8    appear to be a copy of?

9         A    It's two copies of e-mails.

10        Q    Okay.  Do we read from the bottom up?

11        A    If you want to go in the order in which

12   they were sent, yes.

13        Q    Okay.  So it looks like there's an e-mail

14   to Susan from the administrator of St. Marys,

15   correct?

16        A    Correct.

17        Q    And then it looks like Susan sends the

18   document to you and puts on the subject line please

19   review.  Lorraine gave a list of the employees that

20   should be interviewed.  Do you see that?

21        A    Yes.

22        Q    So did you already know about the incident

23   before the e-mail?

24        A    Yes.

25        Q    Okay.  And then you write thanks for the

1    information.  That gave me a pretty good picture of

2    what took place.  I will coordinate with Lorraine

3    and interview everyone tomorrow.  Do you see that?

4         A    Yes.

5         Q    What gave you a pretty good picture?

6         A    The statements from the employees.

7         Q    Where does it say that you reviewed the

8    statement of the employees?

9         A    It doesn't say that.

10         Q    Well, who sent to it to you?  Was there an

11    attachment?

12         A    Lorraine sent me a copy of all the

13    statements from the employees via e-mail.

14         Q    Okay.  Wait a minute.  Let's go in order.

15    It looks like Susan sent to you a document that says

16    please review.  Lorraine gave a list of employees

17    that should be interviewed.

18         A    Okay.

19         Q    You respond, thanks for the information.

20    That gave me a pretty good picture of what took

21    place.  I'm just trying to find out what gave you,

22    because I don't see them attached?

23         A    I don't see them attached either, but I

24    told you earlier that I received the statements from

25    all the employees who wrote statements regarding

1    this incident.  I had those, and I reviewed them.

2         Q    Okay.  Who sent those to you?

3         A    Lorraine.

4         Q    Okay.  You would admit in this document of

5    e-mails we don't see that e-mail to you; is that

6    fair?

7         A    Correct.

8         Q    And it doesn't contain a list of

9    attachments.  On the first page of this document,

10   there's a part that looks like it was blackened.  Is

11   that something that was redacted or are you -- is

12   there something I'm not supposed to see?

13        A    I don't know.  My suspicion is that this

14   is a logo.

15        Q    Of what?

16        A    Atrium Centers.

17        Q    Like the picture at the bottom with the

18   whatever it is?

19        A    Yeah.

20        Q    Door or something?

21        A    Yeah.  That's my guess.

22        Q    During your conversation with Jane, did

23   she appear to be reading a document to you on the

24   phone?

25        A    No.

1      Q    Are you denying that she told you on the

2  phone that she never touched Chelsea -- Kelsey?

3      A    Could you ask the question again?

4      Q    Sure.  Handing you what was previously

5  marked as Defendants' Exhibit DD.

6              MR. FRANKLIN:  Did you bring your

7          exhibits?

8              MR. GARRISON:  No.

9              MR. FRANKLIN:  Here, I'll give you

10         mine.

11     Q    Handing you what was previously marked as

12  Defendants' Exhibit DD.

13             MR. GARRISON:  That's already been

14         marked.

15     A    All right.  Okay.

16     Q    Do you recall if these words were spoken

17  to you during the conversation you had with Jane?

18     A    You mean all these words?

19     Q    Yes.

20     A    No.

21     Q    Are you saying it never happened?

22     A    I don't recall her saying all these words

23  to me.

24     Q    Okay.  But see again, you say I don't

25  recall.  Does that mean it could have happened, you

1   just don't have present day recollection?

2        A    No.

3        Q    Okay.

4        A    Because she was responding to my

5   questions.

6        Q    So she never out loud read this document

7   to you?

8        A    No.

9        Q    She never told you I did not touch Kelsey

10  in any way?

11       A    No.  She clearly said to me I do not

12  remember touching Kelsey.

13       Q    You don't have that conversation taped by

14  any chance, do you?

15       A    No.

16       Q    And you're testifying that Barry didn't

17  overhear that conversation?

18       A    Correct.

19            (Whereupon, Plaintiff's Exhibit 8 was

20            marked for identification.)

21       Q    Handing you what's been marked as

22  Plaintiff's Exhibit 8.

23       A    Okay.

24       Q    Have you seen this document prior to

25  today?

1       A     Yes.

2       Q     For the record, what does this document

3   appear to be a copy of?

4       A     It's an e-mail, let's see, originally from

5   Lorraine to Susan and then from Lorraine to me.

6       Q     Okay.  And she writes Jane is not sure if

7   she'll feel well enough to be here in the a.m.  Says

8   she has a doctor's appointment at 4:00 today.  Her

9   home number is, and then she gives it, if you want

10  to talk to her directly.  I'm giving this -- I'm

11  giving you this info because her cell phone appears

12  to be out of service.  It says, thanks, Lorraine.

13  Do you see that?

14      A     Yes.

15      Q     Did you call her on the number that's

16  listed in the e-mail or a different number, if you

17  recall?

18      A     I called her home number when I talked to

19  her.

20      Q     Okay.  So you think you called her on the

21  number that's listed in the document?

22      A     I believe so.

23      Q     Okay.  And by the time you got this

24  document, you knew that she had a doctor's

25  appointment, correct?

Page 204

```
 1        A     Yes.

 2              (Whereupon, Plaintiff's Exhibit 9 was

 3        marked for identification.)

 4        Q     Handing you what's been marked as

 5   Plaintiff's Exhibit 9.  If you could take a moment

 6   to look at that, please.

 7        A     Okay.

 8        Q     Have you ever seen this document prior to

 9   today?

10        A     I don't remember this document

11   specifically.

12        Q     Okay.  In June of 2013, was there anything

13   that you can recall that was happening in relation

14   to Jane's termination from employment?

15        A     Not that I'm aware of.

16              (Whereupon, Plaintiff's Exhibit 10

17        was marked for identification.)

18        Q     Handing you what's been marked as

19   Plaintiff's Exhibit 10.  Have you seen this document

20   prior to today?

21        A     I don't remember it specifically.

22        Q     Okay.  Well, does your handwriting appear

23   on this document?

24        A     I don't see my handwriting anywhere.

25        Q     Okay.  Do you know what these types of
```

Page 205

1    documents are?

2        A    This is a performance evaluation.

3        Q    Okay.  Well, it says Performance

4   Evaluation B.  Does that have any significance at

5   the company?

6        A    We had two types of performance

7   evaluation, one for supervisors and one that's not.

8        Q    Okay.  So B would equal supervisor?

9        A    No, I'm not a supervisor.

10       Q    Okay.  So B is not supervisor.  What do

11  you consider yourself then?  Management?

12       A    Yes.

13       Q    I notice on this document there's no date.

14  Is that typical of a performance evaluation?

15       A    There should be a date.

16       Q    And it looks like you never signed the

17  document either, correct?

18       A    Correct.

19       Q    And there's no notice on the document that

20  you refused to sign?

21       A    Right.

22       Q    Correct?  Is it your testimony that you

23  have never refused to sign an evaluation?

24       A    Yes.

25                  (Whereupon, Plaintiff's Exhibit 11

1           was marked for identification.)

2      Q    Handing you what's been marked as

3  Plaintiff's Exhibit 11, have you seen this document

4  prior to today?

5      A    Yes.

6      Q    For the record, what does this document

7  appear to be a copy of?

8      A    A performance evaluation.

9      Q    For what time period?

10     A    I don't know.

11     Q    Did you sign the document?

12     A    I did not.

13     Q    Do you see your supervisor's signature on

14 the document?

15     A    No.

16     Q    Do you recognize any of the handwriting on

17 the document?

18     A    Yes.

19     Q    Okay.

20     A    My handwriting.

21     Q    It's your handwriting?

22     A    Yes.

23     Q    On the entire document?

24     A    I believe so except for the name.

25     Q    Was this some type of self evaluation?

1    A    I believe it was.

2    Q    Where does it say that on the document?

3    A    It doesn't.

4    Q    Were you asked to do a self evaluation?

5    A    Yes.

6    Q    By who?

7    A    My supervisor.

8    Q    Is that Susan?

9    A    Depends on the timing.

10   Q    Yeah.  What time is the document?

11   A    Told you already, I don't know.

12   Q    You don't know what this document covers?

13   A    I told you that.

14   Q    Even by reading the comments inside, you

15   can't tell what time period this covers?

16   A    No.

17              (Whereupon, Plaintiff's Exhibit 12

18              was marked for identification.)

19   Q    Handing you what's been marked as

20   Plaintiff's Exhibit 12.

21   A    Okay.

22   Q    Have you seen this document prior to

23   today?

24   A    Yes.

25   Q    For the record, what does this document

1    appear to be a copy of?

2         A    That's a performance evaluation.

3         Q    Okay.  Covering what time period?

4         A    Year prior to January 22nd, 2014.

5         Q    Okay.  So this would have been 2013?

6         A    Pardon?

7         Q    Does this cover 2013?

8         A    Yes.

9         Q    And is that your signature on the

10   document?

11        A    It is.

12        Q    Does your handwriting appear anywhere on

13   the document other than where you signed it?

14        A    No.

15                  (Whereupon, Plaintiff's Exhibit 13

16                  was marked for identification.)

17        Q    Handing you what's been marked as

18   Plaintiff's Exhibit 13.  Take a moment to look at

19   that, please.

20        A    Okay.

21        Q    Have you seen this document prior to

22   today?

23        A    The first page, I have not.  The next two

24   pages, I have.

25        Q    Okay.  What are the next two pages?

1       A     Performance evaluation.

2       Q     For what time period?

3       A     The year prior to February 2014.

4       Q     So you got an evaluation for the year

5  prior to January 22nd, 2014, and then you got

6  another evaluation a month later?

7       A     (Witness shrugged.)

8       Q     Yes?

9       A     I don't know.

10       Q     Well, you were there, is that what

11  happened?

12       A     I don't know.

13       Q     You don't know if you got an evaluation,

14  one in January, one in February?

15       A     Correct.

16       Q     Is that your signature on the third page

17  of Plaintiff's Exhibit 13?

18       A     It is.

19       Q     Okay.  Does that help refresh your

20  recollection as to whether you got an evaluation in

21  January of '14 and February of '14?

22       A     It doesn't.

23       Q     Did you change job responsibilities from

24  January to February of '14?

25       A     I did not.

1      Q    Does your handwriting appear anywhere on

2   Plaintiff's Exhibit 13 other than the signature on

3   the third page of the document?

4      A    No.

5            MR. FRANKLIN:  Let's take like ten

6         minutes.

7            MR. GARRISON:  All right.

8            (Whereupon, a recess was taken at

9         3:19 p.m. and resumed at 3:36 p.m.)

10  BY MR. FRANKLIN:

11     Q    When was the last time you were in

12  Columbus on business?

13     A    Oh, geez.  Well, that had to be a regional

14  meeting.

15     Q    When was that?

16     A    July.

17     Q    July of?

18     A    This year.

19     Q    '14?

20     A    Yes.

21     Q    Is the meeting one day, several days?

22     A    We come in, have dinner the night before,

23  and the meeting is the next day.

24     Q    Okay.  Where's the meeting at?

25     A    It varies, but this year it was in the

Page 211

1    corporate office.

2        Q    What's the purpose of the regional

3    meeting?

4        A    It's really two-fold, to get all the

5    regional people together for a social the night

6    before, and then the day of the meeting, we go over

7    important business issues.

8        Q    Okay.  Well, what level of employee is

9    included in the regional?  Are there administrators

10   there?

11       A    No.  They're not regional.

12       Q    Okay.

13       A    They're people that are in the various

14   regions that have multiple facilities.

15       Q    Okay.  Multiple facilities HR wise or --

16       A    No.  There would be clinical people there.

17       Q    Okay.  So someone like Barry would be

18   there?

19       A    Yes.

20       Q    Okay.  Someone like you?

21       A    Yeah.

22       Q    What other positions?

23       A    Dietary people.  As I said, clinical

24   people, people that are regional nurses, you know,

25   anyone that's regional.

Page 212

1     Q    Are all of the facilities that you have

2   responsibility for skilled facilities?

3     A    Yes.

4     Q    Are there any facilities that are a

5   combination, skilled and unskilled?

6     A    Yes.

7     Q    Which facilities are those that you have

8   responsibility for?

9     A    Austinburg has assisted living.  St. Marys

10  of the Woods has assisted living and independent

11  living.  St. Marys has an assisted living section.

12  I went through them.  That might be all of them.

13    Q    Have you negotiated the second contract at

14  the Toledo -- at Darlington?

15    A    Yeah.  I think we've negotiated three now

16  which we no longer own incidentally.

17    Q    The last time that you negotiated the

18  Darlington contract, who was on the other side of

19  the table?

20    A    Kyle Huff.

21    Q    Kyle?

22    A    Yeah.

23    Q    Are there facilities that you gave me the

24  names of that you no longer have?

25    A    Darlington and Willow Park are two.

1       Q     Okay.

2       A     I can't think of anybody else that I gave

3    you -- well, no, I didn't mention that one.  So no,

4    I don't think there are any others.

5       Q     Which ones do you currently have that are

6    covered under a collective bargaining agreement?

7       A     Only Camelot.

8       Q     Camelot?

9       A     Youngstown.

10      Q     Which bargaining unit?

11      A     That's Teamsters.

12      Q     What local?

13      A     Don't know.

14      Q     Who do the Teamsters represent?

15      A     The STNAs.

16      Q     Okay.

17      A     Housekeeping, laundry.  I think they also

18   represent activities in that building, but I'm not

19   sure of that.

20      Q     Have you ever had to testify in an

21   arbitration hearing?

22      A     Certainly not with Atrium.  I don't

23   remember back with LTV Steel whether I ever had to

24   do that or not.

25      Q     You don't have any plans currently to in

1   any way destroy your desktop computer, do you?

2        A    No.

3        Q    Okay.  Even if you move it, you'll

4   preserve it somewhere?

5        A    I've been told to do that.

6        Q    Okay.  Like don't put it in your garage

7   because it could get rained on or something like

8   that?

9        A    Yeah.

10       Q    Okay.  Have you taken it anywhere to try

11  to get it fixed?

12       A    No.  Because it's a Windows XP.

13       Q    Okay.

14       A    And it's not worth the money to try and

15  fix it because I have to replace it anyway.

16       Q    So no one's looked at it, no professional

17  IT person?

18       A    No, not really.

19       Q    Well, when you say no, not really, what

20  does that mean?

21       A    Well, I've talked with Derrick and Derrick

22  said, well, if it's an XP, what are you fooling

23  around with this for.

24       Q    Right, but no one's actually put hands on

25  it?

1       A     Right.

2       Q     Can you sign into the company servers

3    through your desktop when -- before it crashed?

4       A     What I do from my desktop is get on my

5    e-mail.

6       Q     Okay.

7       A     Everything else I work on the memory

8    stick.  So -- well, that's not true.  There are

9    certain programs.  For instance, I can access the

10   optimum turnover statistics for the buildings, so

11   yeah, I can access that.

12      Q     You can do that from the desktop?

13      A     Either one.  Either one.

14            MR. FRANKLIN:  I have no further

15            questions.

16            MR. GARRISON:  A couple to clarify.

17                      - - -

18            DIRECT EXAMINATION

19   BY MR. GARRISON:

20      Q     Bob, could you look at Plaintiff's

21   Exhibits 12 and 13.  Specifically the first -- the

22   top right-hand corner of 12.

23      A     Okay.

24      Q     What type of review was Plaintiff's

25   Exhibit 12?

1      A    Management performance evaluation.

2      Q    And below that in the boxes where your

3   name says Robert W. Huenefeld, bottom right-hand

4   corner says type of review, self evaluation?

5      A    Yes.  Yeah, that means that I did this.

6      Q    That you completed --

7      A    Yep.

8      Q    -- the substance of this?

9      A    I was asked to do a self evaluation of

10  myself in preparation for our meeting on my

11  performance evaluation.

12     Q    Which is Plaintiff's Exhibit 13?

13     A    Yes.

14     Q    The last two pages of it anyway?

15     A    Right.  We normally do those in February

16  associated with the corporate meeting.

17     Q    All right.

18          MR. GARRISON:  Nothing further.

19                    - - -

20               RECROSS-EXAMINATION

21  BY MR. FRANKLIN:

22     Q    Why weren't you able to testify to that

23  when I asked you the question?

24     A    Because I didn't see where it said self

25  evaluation.

1        Q    Someone pointed that out to you?

2        A    Yeah.  He just did now.

3        Q    Okay.  There's a signature on the one

4    marked as Plaintiff's Exhibit 12 beside your

5    signature.  Whose signature --

6        A    Yes.

7        Q    -- is that?

8        A    Susan's.

9        Q    These memory sticks that you're speaking

10   of --

11       A    Yes.

12       Q    -- you have no plans to do anything to

13   destroy --

14       A    No.

15       Q    -- any documentation --

16       A    Absolutely not.

17       Q    -- on the memory sticks?  Do you carry the

18   memory sticks with you when you go from site to

19   site?

20       A    Oh, yes.

21       Q    For instance, did you download the memory

22   sticks last night on your computer?

23       A    No.

24       Q    The memory sticks have enough space to

25   hold everything that you have?

Page 218

1       A    Yeah.  I mean, you can get up to like 32

2    gigabytes.

3       Q    Yeah, but what is yours?

4       A    I don't know.  I just go in and I look

5    under properties and see how much I've used and I'm

6    nowhere near filling it so --

7       Q    Okay.

8       A    -- I don't worry about it.

9            MR. FRANKLIN:  Nothing further.

10           THE REPORTER:  Signature?

11           MR. GARRISON:  Yes, please.

12           (Whereupon, the deposition was

13           concluded at 3:45 p.m.)

14                    - - -

15

16

17                    _____

                         ROBERT W. HUENEFELD
18

19

20

21

22

23

24

25

Page 219

1                    C-E-R-T-I-F-I-C-A-T-E

2          I, Teri Genovese Mauro, a Notary Public in and

3    for the State of Ohio, duly commissioned and

4    qualified, do hereby certify that the within-named

5    Witness, ROBERT W. HUENEFELD was by me first duly

6    sworn to tell the truth, the whole truth and nothing

7    but the truth in the cause aforesaid; that the

8    testimony then given by him was by me reduced to

9    stenotype in the presence of said Witness,

10   afterwards transcribed upon a computer; that the

11   foregoing is a true and correct transcription of the

12   testimony so given by him as aforesaid.

13          I do further certify that this deposition was

14   taken at the time and place in the foregoing caption

15   specified and was completed without adjournment.

16          I do further certify that I am not a relative,

17   employee or attorney of any of the parties hereto,

18   or otherwise interested in the event of this action.

19          IN WITNESS WHEREOF, I have hereunto set my hand

20   and affixed my seal of office at Toledo, Ohio, on

21   this 19th day of September, 2014.

22

23                            TERI GENOVESE MAURO
     My Commission expires         Notary Public
24   June 8, 2018.            in and for the State of Ohio

25