UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

JANE FIELY,                    )
                               )
            Plaintiff,         )
                               )
      vs.                      ) Case No. 3:13-CV-2005
                               ) Judge Carr
ESSEX HEALTHCARE CORPORATION,  )
et al.,                        )
                               )
            Defendants.        )

                    - - -

            Deposition of CIARA R. McCONN, a

      Witness herein, called by the Plaintiff as if

      upon Cross Examination, pursuant to the Federal

      Rules of Civil Procedure, taken before me, Teri

      Genovese Mauro, Registered Professional

      Reporter, a Notary Public in and for the State

      of Ohio, at the offices of Widman & Franklin,

      405 Madison Avenue, Toledo, Ohio, on Wednesday,

      August 20, 2014, commencing at 2:02 p.m.

                    - - -


         GENOVESE & RENO REPORTING SERVICE
           414 N. Erie Street, Suite 100
               Toledo, Ohio  43624
                 (419) 249-2705

## I N D E X

### DEPOSITION OF CIARA R. McCONN

Cross Examination                    Page

        By Mr. Franklin                  3

                        - - -

Exhibits

        None

                        - - -

Objections

        By Mr. Garrison                 74

        By Mr. Garrison                 90

                        - - -

1    APPEARANCES:

2      On behalf of the Plaintiff:

3        WIDMAN & FRANKLIN, LLC
         405 Madison Avenue, Suite 1550
4        Toledo, Ohio  43604  (419) 243-9005
         By:  JOHN D. FRANKLIN
5        By:  KERA PAOFF

6      On behalf of the Defendants:

7        FAEGRE BAKER DANIELS
         300 N. Meridian Street, Suite 2700
8        Indianapolis, Indiana  46204-1750  (317) 237-8239
         By:  BRIAN R. GARRISON

9

     ALSO PRESENT:  Jane Fiely
10
                          - - -
11

12                    CIARA R. MCCONN,

13   a Witness herein, called by the Plaintiff as if

14   upon Cross Examination, was by me first duly sworn,

15   hereinafter certified, testified and said as follows:

16                          - - -

17                    CROSS-EXAMINATION

18   BY MR. FRANKLIN:

19        Q    Please state and spell your full name for

20   the record, please.

21        A    Ciara McConn.  Ciara Rae McConn,

22   C-I-A-R-A, R-A-E, M-c-C-O-N-N.

23        Q    Ms. McConn, have you ever been known by

24   any other name?

25        A    No.

1     Q     What's your current residential address?

2     A     201 East Skinner Street in Ohio City.

3     Q     Ohio City?

4     A     Yeah.

5     Q     What's the zip code there?

6     A     I get it confused.  It's either 45874 or

7   45891.

8     Q     How long has that been your residential

9   address?

10    A     I --

11    Q     How long have you lived there?

12    A     My parents are divorced and my dad's lived

13  there his whole life.  So --

14    Q     Okay.  But that's how long your dad's

15  lived there.  How long have you lived there?

16    A     For like the past --

17    Q     Is that the only place you've ever lived?

18    A     No.  I've lived several places with my

19  mom, but they have joint custody of me.

20    Q     Okay.  How long have you lived at that

21  location?

22    A     Since November.

23    Q     They currently have joint custody of you?

24    A     No.  I'm 18 now so I fully live with my

25  dad.

1      Q     So have you lived with him since November

2  of '13?

3      A     Yes.

4      Q     Does anyone else live at that location

5  over the age of 17?

6      A     Yes.  My step-mom and my brother.

7      Q     What's your step-mom's name?

8      A     Amy McConn.

9      Q     What's your brother's name?

10     A     Mitchell Vargas, V-A-R-G-A-S.

11     Q     Is Amy employed outside the home?

12     A     Yes.

13     Q     Where is she employed?

14     A     At an insurance company in Celina.  I

15  don't remember what it's called.

16     Q     What's the name of the insurance company?

17     A     I'm not for sure.  She just started

18  working there recently.

19     Q     Where did she work before that?

20     A     She worked at Central Mutual in Van Wert.

21     Q     Is Mitchell employed outside the home?

22     A     He works at some factory, but he's in

23  college.

24     Q     What factory does he work at?

25     A     Greif Brothers, I believe.

1      Q      Where's that located?

2      A      That's in Van Wert.

3      Q      How long has he worked there?

4      A      Over the summer.

5      Q      What school does he go to?

6      A      Ohio University.

7      Q      Main campus?

8      A      Yeah, I believe so.  The one in Athens.

9      Q      What year is he in?

10     A      He's -- when he goes back, this is going

11  to be his second year.

12     Q      Sophomore?

13     A      Yeah.

14     Q      What counties and states have you lived in

15  since you've been 18?

16     A      Van Wert and Ohio City.

17     Q      Just Van Wert?

18     A      (Witness nodded.)

19     Q      What county is that in?

20     A      Van Wert County.

21     Q      You said until recently your parents had

22  shared custody?

23     A      Uh-huh.

24     Q      Where did you live in April of 2013?

25     A      When this happened, I was living with my

1   mom in Van Wert.

2        Q    What was your mom's address?

3        A    816 West Main Street.

4        Q    Van Wert?

5        A    Yeah.  It was Apartment 25.

6        Q    Other than you and your mother, was there

7   anyone else located at that location?

8        A    Huh-uh.

9        Q    No?  What's your current business address?

10       A    My workplace?

11       Q    Yeah.

12       A    McDonald's.

13       Q    Okay.  Which one?

14       A    The one on Shannon Street.

15       Q    Shannon?

16       A    Yeah.  S-H-A-N-N-O-N.

17       Q    Is that in Van Wert?

18       A    Yeah.

19       Q    How long has that been your place of

20   employment?

21       A    Since -- oh, my gosh.  I really don't

22   know.  I've been there off and on for like

23   two-and-a-half years.

24       Q    Who is your immediate supervisor?

25       A    Robin Clay.

1      Q    What's Robin's position?

2      A    She is the store manager.

3      Q    What's your date of birth?

4      A    11/10/95.

5      Q    Have you had your deposition taken before?

6      A    I don't know.

7      Q    Have you ever sat and raised your right

8  hand before a court reporter --

9      A    No.

10      Q    -- and swore to tell the truth?

11      A    Huh-uh.

12      Q    No?

13      A    No.

14      Q    I'm sure it's been explained to you, but

15  you can see that we have a court present so you'll

16  need to keep your answers audible.  I may see that

17  you're nodding your head or shrugging your

18  shoulders --

19      A    Yes.

20      Q    -- but the court reporter can't take that

21  down.  In general conversation, people anticipate

22  the question and start to answer the question before

23  it's completed.

24      A    Uh-huh.

25      Q    Even though you may correctly anticipate

1  my question, I ask that you allow me to finish my

2  question and I'll allow you to finish your answer.

3  That way when we read the transcript, there's not

4  the beginning of my question, the beginning of your

5  answer, the end of my question, the end of your

6  answer.

7          If I ask you a question that you don't

8  understand, I want you to tell me that you don't

9  understand my question and what part of my question

10  you don't understand.  I'll then try to rephrase my

11  question and put it in a form that you will

12  understand.

13      A    Okay.

14      Q    There may be times that you give an answer

15  that I don't understand.  That doesn't mean that I

16  don't believe your answer.  You just may be using

17  some phraseology I'm unfamiliar with and I may have

18  to ask some follow-up questions so that I completely

19  understand your answer.

20          As long as there's not a question pending,

21  if you you'd like to take a break, just indicate out

22  loud on the record that you'd like to take a break

23  and we'll take one.  Okay?

24      A    Okay.

25      Q    Did you review any documents in

1    preparation for your deposition today?

2         A    Yeah.  I re-read my statement.

3         Q    Okay.  Where did you get your statement?

4         A    He sent it to me on my e-mail.

5         Q    Who's "he"?  Instead of pointing for the

6    record, you'll just have to put his name.  Do you

7    know his name?

8         A    Franklin.

9         Q    No.  I'm Franklin.

10        A    No, you're Franklin.

11        Q    You called my office initially.  Did you

12   call Brian then?

13        A    I believe so.

14        Q    I mean, we sent you to him to call.

15        A    So --

16        Q    Is that --

17        A    I'm bad with names, so probably.

18        Q    Okay.  When did you have a chance to

19   review your statement?

20        A    Yesterday.

21        Q    Okay.  Other than reviewing the statement,

22   did you review any other documents?

23        A    Huh-uh.

24        Q    No?

25        A    No.  Sorry.

1       Q    Other than reviewing the statement, did

2   you talk to anyone to refresh your recollection of

3   the events of April of 2013?

4       A    I was talking with him and he just kind of

5   briefed me, I guess, of what was going to happen

6   today.

7       Q    Okay.

8       A    And he asked me to tell him in my own

9   words without looking at the document what had

10  happened.

11      Q    Okay.  Did you do that?

12      A    Yes.

13      Q    Did you talk to anyone other than Brian to

14  refresh yourself about today's --

15      A    Huh-uh.

16      Q    -- deposition?

17      A    No.  Because I haven't talked to Kelsey

18  and she was the only one that knew what happened.

19      Q    Okay.  Well, you and Kelsey did text each

20  other recently about the upcoming deposition, didn't

21  you?

22      A    Yeah.  'Cause I got it and I didn't -- I

23  was assuming that it was about this, because she had

24  called me before letting -- before I had gotten the

25  subpoena letting me know that there was going to be

Page 12

1   lawyers in contact with me because all of this was

2   going on.

3        Q    Okay.  When she called and talked to you,

4   did the two of you talk about what happened --

5        A    Huh-uh.

6        Q    -- in April of 2013?

7        A    No.  We were talking about me going to

8   college and her graduating.

9        Q    Okay.  Did the two of you text each other

10  about what had happened in April of 2013?

11       A    No.

12       Q    Who knows that you're here today having

13  your deposition taken?

14       A    My dad and my brother and my step-mom and

15  my mom.

16       Q    Okay.  What did you tell your mom about

17  having your deposition taken?

18       A    I just told her that I had to come and

19  give my statement of what happened at the nursing

20  home, and she knew, 'cause I had told her when it

21  happened, 'cause I had to write my statement while I

22  was in class.

23       Q    Okay.  What do you mean you told her when

24  it happened?

25       A    I kind of explained to her why I had to

Page 13

1   leave class and write out -- or I typed it on my

2   phone, but to do a statement.

3       Q    I mean, did someone require that you leave

4   class to immediately send in your statement?

5       A    No.  I was at lunch, so I just did it on

6   my phone while I was eating, and then I went -- I

7   e-mailed it to myself and then had the office fax it

8   to the nursing home.

9       Q    Okay.  You said that you told your

10  step-mom --

11      A    No, my mom.

12      Q    Okay.  Did you tell your step-mom that you

13  were having your deposition taken?

14      A    Yes.

15      Q    Okay.  What did you tell her?

16      A    I just told her that I had to go give my

17  statement of what happened when I was working at the

18  nursing home.

19      Q    Okay.  You said you also told your father?

20      A    Yes.

21      Q    Your father brought you here today?

22      A    Uh-huh.

23      Q    Yes?

24      A    Yeah.

25      Q    What did you tell your father?

1       A    I told him that -- about the incident that

2    happened at the nursing home and that I had to come

3    give my statement.

4       Q    Okay.  Do you not have a driver's license?

5       A    No.  My dad doesn't like me driving.  He

6    doesn't even like me driving to Lima so --

7       Q    Okay.  Do you not have a driver's license?

8       A    No, I have a license.  I can drive.

9       Q    Have you been in accidents before?

10      A    Yes.  I got rear ended.

11      Q    Have you been in any accidents that were

12   your fault?

13      A    No.

14      Q    When was the last time you worked at

15   St. Marys?

16      A    I don't remember.

17      Q    Was it in this year?  Was it last year?

18      A    It was in last year sometime.

19      Q    Okay.  Was it before Christmas or after

20   Christmas?

21      A    I believe it was before Christmas.

22      Q    Was it before Thanksgiving or after

23   Thanksgiving?

24      A    I think it might have been after

25   Thanksgiving.

1    Q    Okay.  So you think sometime between

2  Thanksgiving and Christmas of '13?

3    A    I think so.

4    Q    Why did you stop working at St. Marys?

5    A    Because with my pay and gas and everything

6  else, it was -- I was back at my McDonald's wages.

7    Q    Okay.  Well, did you ask for a pay

8  increase?

9    A    No.

10   Q    I don't understand why being back at your

11  McDonald wages would have caused you to leave

12  St. Marys?

13   A    Because it was just the drive every single

14  day and I didn't like it, like the driving.  I liked

15  my job there.  I just hated the driving.

16   Q    How long was the drive?

17   A    From Van Wert to St. Marys, I really don't

18  remember how long that is.

19   Q    Well, was it more than 30 miles?

20   A    I -- do you know how far it is from Van

21  Wert to Ohio City?  'Cause I really -- or sorry, Van

22  Wert to St. Marys?  Because I really don't know.

23   Q    Well, you said you didn't like the drive

24  every day.

25   A    Yeah.

Page 16

```
 1        Q    What was it about the drive you didn't
 2   like?  The distance?
 3        A    Just, yeah, the distance of just sitting
 4   in my car driving to work when I could have been
 5   working or doing homework.
 6        Q    But you don't know what that distance is?
 7        A    I don't remember.  It's been a decent time
 8   period since --
 9        Q    Well, how long did you work at St. Marys?
10        A    I don't remember.
11        Q    When did you start there?
12        A    Sometime in 2013.  It had to have been
13   after Christmas.
14        Q    No.  That's when you -- you haven't --
15   when did you start working at the St. Marys'
16   facility?
17        A    It was sometime my junior year after
18   Christmas because -- I believe it was after
19   Christmas, because that was when I got my STNA and I
20   started working --
21        Q    Okay.  So was that in '12?
22        A    Possibly.  'Cause I just graduated this
23   year.
24        Q    So you think that you may have started
25   working in '12?
```

1       A       Yes.

2       Q       Okay.  Where did you get your STNA from?

3       A       At Vantage.

4       Q       Is that a vocational school?

5       A       Yeah.

6       Q       Did you attend a regular high school and

7    the vocational school or just the vocational school?

8       A       No, just the vocational school.  We had

9    our lab and then we had our math and English and

10   classes like that.

11      Q       How long did you go to Advantage [sic]

12   Vocational School?

13      A       For two years.

14      Q       Was that eleven and twelve?

15      A       Yes.

16      Q       Eleventh grade and twelfth grade?

17      A       Uh-huh.

18      Q       Where did you go for ninth and tenth

19   grade?

20      A       Van Wert High School.

21      Q       So when you graduate, do you graduate from

22   Advantage or from Van Wert or both?

23      A       From Van Wert.

24      Q       Other than graduating from Van Wert, do

25   you have any college education?

1        A       No.  I'm going to college in two weeks.

2        Q       Where are you going?

3        A       I -- International Business College.  It's

4    in Fort Wayne.

5        Q       In Portland, Oregon, or Portland, Maine?

6    Did you say -- I thought --

7                MR. GARRISON:  Fort Wayne.

8        A       Fort Wayne.

9        Q       Oh, Fort Wayne.

10               MR. GARRISON:  Close to Portland.

11       Q       How long do you intend on going to college

12   there?

13       A       As of right now, 18 months.

14       Q       What happens at the end of 18 months?

15       A       I get my degree -- or no, my diploma.

16       Q       Okay.  Diploma to do what?

17       A       For medical assisting.

18       Q       And what does a medical assistant do?

19       A       I can take blood pressures, do IVs.  I

20   don't fully know the rest of it.  I just know I can

21   do IVs which is what I mainly want to do.

22       Q       Have you turned in your notice to

23   McDonald's?

24       A       Yes.

25       Q       Do you know someone that goes to that

1   school?

2       A    Yes.   I -- Peyton Dowdy, I believe, is the

3   last name.

4       Q    Whose Peyton Dowdy?

5       A    Her dad was my football coach and she went

6   to Van Wert.

7       Q    When you worked at the St. Marys'

8   facility, were you part time?

9       A    Yes.

10      Q    What was the typical schedule?

11      A    I know I had to work every other weekend

12  and then I think it was like three days a week

13  maybe.

14      Q    Three days a week?

15      A    I think.

16      Q    What days would you typically work?

17      A    I don't remember.

18      Q    Okay.  Did you work on Fridays?

19      A    If I worked that weekend, then I didn't

20  work on Fridays.

21      Q    Okay.  But if you worked on Fridays, then

22  you had the weekend off?

23      A    Yeah.

24      Q    Have you ever been a plaintiff in a

25  lawsuit; you've sued someone?

Page 20

```
 1        A     No.

 2        Q     Ever been a defendant in a lawsuit;

 3   somebody sued you?

 4        A     This is the first any legal anything I've

 5   had to do.

 6        Q     So other than today, you've never been a

 7   witness in a lawsuit?

 8        A     No.

 9        Q     Have you ever given testimony under oath,

10   let's say in an unemployment hearing or --

11        A     Huh-uh.  No.

12        Q     -- Workers' Compensation hearing?

13        A     Nope.

14        Q     Have you ever been arrested for a

15   misdemeanor or felony?

16        A     No.

17        Q     Ever served in the military?

18        A     No.

19        Q     Since you started working at St. Marys,

20   who was your supervisor just by title?

21        A     The DON and the -- I'm not going to be

22   able to think of it.  I can't think of her title or

23   her name right now.

24        Q     Is it the administrator?

25        A     Yeah.
```

1      Q     Yes?

2      A     Yes.

3      Q     Okay.  Do you remember who the DON was?

4      A     It was Jane.

5      Q     Do you remember who the administrator was?

6      A     Lorraine, I think.

7      Q     Okay.  How did you and Jane get along?

8      A     She was my boss.  I mean, she intimidated

9   me but she was my boss.  I didn't really talk to her

10  outside work.

11     Q     Did she intimidate you simply because she

12  was your boss?

13     A     Kind of.

14     Q     Did the administrator intimidate you?

15     A     Huh-uh.

16     Q     Is that because you didn't have any

17  interaction with the administrator?

18     A     No.  She -- just her tone and the way she

19  talked to me was just more friendly and --

20     Q     Was she giving -- did she give you

21  direction as to what to do or did the DON do that?

22     A     They both would.  Like, if there -- if

23  they saw a resident's light on and they went in

24  there to see what they need, if they saw me walking

25  down the hallway, either one would say, you know, so

1   and so needs this.

2       Q     But on a day-in and day-out basis, did you

3   have like a particular wing, let's say the 200 Wing

4   or the 300 Wing or how did that work?

5       A     It was -- I don't remember which hall was

6   which, but it was normally the hall when you first

7   walk in.

8       Q     Okay.  And then would you have things that

9   were scheduled for you to do?

10      A     We had scheduled showers that we would --

11      Q     Okay.  Anything other than scheduled

12  showers?

13      A     No.

14      Q     If a patient turned on their light, would

15  you go and see what they needed?

16      A     Yes.

17      Q     Sometimes they would need you to change

18  their diaper?

19      A     Yes.

20      Q     Sometimes they need you to roll them over?

21      A     (Witness nodded.)

22      Q     Sometimes -- yes?

23      A     Yes.

24      Q     Sometimes they need you to help them go to

25  the restroom?

1      A      Yes.

2      Q      Sometimes they would need you to help them

3      eat?

4      A      Yes.

5      Q      Okay.  Were you evaluated in your

6      position?  In other words, did you get anything in

7      writing saying you were doing your job good or bad

8      or --

9      A      No.  I don't think I was there long enough

10     for an evaluation.

11     Q      Why did you want to work there?

12     A      Because Gabby, who initiated the

13     scheduling, I don't know what her title was, but

14     Gabby's daughter worked with me at McDonald's and

15     she had me talking to Gabby about me working there

16     because she thought I'd be a good fit.

17     Q      So did you work basically the two jobs at

18     that point, the job at St. Marys and McDonald's?

19     A      No.  Just St. Marys.

20     Q      When you left St. Marys, did you give them

21     a written resignation?

22     A      Yes.

23     Q      Who did you give that to?

24     A      I put it in the box that we put like for

25     request time off.  I don't know -- I believe it went

Page 24

1  to Gabby.

2      Q    After Jane left, did someone else become

3  the DON?

4      A    Yeah, but I don't remember her name.

5      Q    Was it Erika?

6      A    I don't remember.

7      Q    Okay.

8      A    I only saw her a handful of times.

9      Q    How did you come to find out that Jane was

10  no longer working at St. Marys?

11      A    When they had her office door open and

12  there was just like her computer in there.

13      Q    Okay.  So you noticed she wasn't sitting

14  at her desk?

15      A    Yeah, and her office looked cleaned out.

16      Q    Did you ever then ask --

17      A    Yeah.

18      Q    -- anyone "Where's Jane"?

19      A    I believe I asked one of the nurses, and

20  whoever it was, they told me that she had either

21  been fired or quit or --

22      Q    Were -- strike that.  Did Jane ever issue

23  any type of discipline to you?

24      A    No.

25      Q    Who could issue discipline to you?  Could

1   another STNA issue discipline?

2        A     I don't believe so.

3        Q     Could an LPN issue discipline?

4        A     I think they could.

5        Q     Could an RN issue discipline?

6        A     I think.  I -- I never had any

7   disciplinary issues so I didn't really know.

8        Q     Taking you back to April 19th, 2013, did

9   you witness anything out of the ordinary between

10  Jane and Kelsey?

11       A     Yes.

12       Q     Okay.  For the record, who is Kelsey?

13       A     Kelsey is the STNA that I worked with, one

14  of them.

15       Q     So she was your coworker?

16       A     Yes.

17       Q     Are you and Kelsey Facebook friends?

18       A     I believe so.

19       Q     Do you have any other type of social

20  media?

21       A     Twitter and Instagram.

22       Q     Do you follow Kelsey or does she follow

23  you on Twitter?

24       A     Huh-uh.  No.  Sorry.

25       Q     What's the other one?

1        A        Instagram.

2        Q        Are the two of you connected by way of

3    Instagram?

4        A        No.

5        Q        Would the two of you, before this incident

6    with Jane, ever socialize outside the workplace?

7        A        No.

8        Q        Had you ever been over to Kelsey's house?

9        A        No.

10        Q        Did Kelsey have a boyfriend you were aware

11    of?

12        A        At the time, I think she did.

13        Q        Who was it, do you remember?

14        A        I don't remember.

15        Q        Okay.  Let's go back to the day of

16    April -- April 19th, 2013.  What would your typical

17    schedule be?  Second shift?

18        A        Yes.

19        Q        What time did second shift start and stop?

20        A        I know it got done at 11:00.  I forget

21    what time it started, but I know I normally got

22    there later since I had school and driving from

23    school to nursing home.

24        Q        Okay.  So what would you typically do when

25    you got to work?

1      A    When I got to work, I would put myself in

2    the break room and then go clock in, and at that

3    time, we would normally be passing linens and doing

4    ice and just checking and seeing if the residents

5    needed anything.

6      Q    Did you have some set day-in and day-out

7    operation that you performed?

8      A    I -- we -- me and Kelsey would pass linens

9    on our half of the hallway and then Darla would do

10   her half, and then we would go get the ice.  Then me

11   and Kelsey would do that, then Darla would do it.

12     Q    Why would you and Kelsey be doing things

13   together?

14     A    Because normally me and Kelsey were on the

15   same hall.

16     Q    Were there only two STNAs on that hall?

17     A    Yes.

18     Q    Do you remember what hall that was?

19     A    No.  I know it was the first hall when you

20   walk in.

21     Q    Would the two of you then be tending to

22   the same patients?

23     A    No.  We -- normally we would have the cart

24   up against one of the walls and Kelsey would do one

25   half of the hallway and I would do the other half.

1        Q     So what did you witness out of the

2    ordinary, if anything, between Kelsey and Jane on

3    April 19th, 2013?

4        A     I saw that after me and Kelsey were done

5    passing their dinner trays, me and Kelsey noticed

6    that the resident -- I can't remember her name, but

7    that she didn't have a supper tray.  So Kelsey went

8    to the kitchen to ask them where her supper tray

9    was.  She -- the kitchen had told Kelsey that she

10   was supposed to be eating in the dining room.

11       Q     Okay.  So -- and I'm trying not to

12   interrupt, but unfortunately I think kind of just in

13   sentences as opposed to totality of stories.  Who

14   was it, you or Kelsey, that noticed a particular

15   resident didn't have a dinner tray?

16       A     I don't remember, 'cause I know we were

17   passing them together.

18       Q     Okay.  But why were you passing dinner

19   trays?  Why weren't you -- why weren't people eating

20   in the dining room?

21       A     Because some of the residents would eat in

22   their rooms and some of them would eat in the dining

23   room.  I don't --

24       Q     Did they have a choice?

25       A     Yes.

Page 29

1      Q    I mean, what if they didn't want to eat in

2  the dining room?  Were they allowed to eat in their

3  rooms?

4      A    I believe so.

5      Q    Is that under something called the

6  patient's rights?

7      A    Yes.

8      Q    Do you know what patient's rights are?

9      A    Yeah.  The basics of needs and being

10  comfortable and things like that.  I don't remember.

11      Q    Well, have you ever read the patient's

12  rights?

13      A    Yeah.  We had to read it in Vantage.

14      Q    Did you ever have to read it when you were

15  employed by St. Marys?

16      A    Yes.

17      Q    Okay.  So it wasn't the patient or a

18  family member that notified you?  The two of you,

19  one of you or both of you noticed the person didn't

20  have a dinner tray?

21      A    I believe that it was near Kelsey that

22  noticed that it was --

23      Q    And then why did she go down to the

24  kitchen as opposed to you?

25      A    Because there was a call light on, so I

Page 30

1    said I would get the call light and Kelsey went down

2    to the kitchen.

3         Q    Okay.  So the two of you split up at that

4    point?

5         A    Yes.

6         Q    What room was the call light on?

7         A    It was the first room on the left.

8         Q    Okay.  And then from -- in relation to the

9    first room on the left, where did you notice the

10   room without the dinner tray?

11        A    It was directly across the hall.

12        Q    Okay.  So it would be the first room on

13   the right?

14        A    It was the second room on the right.

15        Q    Second room on the right.

16        A    At that time, the very, very first room

17   was just like an extra room that there was a table

18   and chairs in.

19        Q    Okay.  In relation to that -- the room on

20   the left and the right, where's the kitchen; up a

21   floor, down a floor, on the same floor?

22        A    It was on the same floor.

23        Q    Okay.  How far away?

24        A    20 feet.

25        Q    Okay.  Do you have to go through doors?

1    What do you have to do?

2        A    You --

3        Q    Paint a picture for me.

4        A    The -- both of the rooms were right here.

5    Then you went this way, turned the corner, and then

6    the dining room was over here and the kitchen was

7    like right here.

8        Q    Okay.  Do you have to go through the

9    dining room to get to the kitchen?

10        A    No.  We could go in the kitchen door.  We

11    just had to put a hair net on before we actually

12    stepped past the threshold, I guess.

13        Q    Well, let's say I don't want to put a hair

14    net on.  How do I get into the kitchen?

15        A    Then you would walk through the dining

16    room.

17        Q    Okay.  And then I could just talk to

18    someone in the kitchen?

19        A    Yes, because there was a door from the

20    dining room to the kitchen.

21        Q    Do you guys carry hair nets with you?

22        A    No.  There were hair nets in the -- by the

23    sinks in the kitchen.

24        Q    I mean, I could use somebody else's hair

25    net?

1      A    No.  Like there was -- I don't know how to

2  explain it.  There was a box of new hair nets that

3  we would pull out.

4      Q    Oh, okay.  So the hair nets are -- I would

5  go in the kitchen door and there would be a hair net

6  there?

7      A    Yes.

8      Q    And if I went through the dining room, I

9  wouldn't need a hair net?

10     A    No.  You'd still need a hair net, but you

11 weren't allowed to go through the threshold of

12 the -- from the dining room to the kitchen without a

13 hair net.

14     Q    Okay.

15     A    But we could stand there and talk to them.

16     Q    Who's in the kitchen?  Is it a vendor?  Is

17 it employees?

18     A    It's the employees.  I believe there was

19 two of them on most nights.

20     Q    What are they called?  Like, do they have

21 a designation of kitchen aide or --

22     A    We just --

23     Q    -- kitchen people?

24     A    -- called them the kitchen people.

25     Q    Okay.  Was there like a head kitchen

Page 33

1   person, a subordinate kitchen person --

2        A    Yes.

3        Q    -- or are they both on the same level?

4        A    It just depended on the night of who was

5   like the higher cook and who was just the assistant

6   cook.

7        Q    Okay.  But there was typically some

8   delineation?  They weren't both on the same level?

9        A    Yes.

10       Q    Okay.  Who did the kitchen people report

11  to?

12       A    I believe they reported to Jane and

13  Lorraine.

14       Q    Okay.  So you think the kitchen people

15  might have reported to the DON?

16       A    Yes.

17       Q    Okay.  So you go to tend to the room that

18  had the call light.  Do you remember what you did

19  there?

20       A    I know she was a two assist, so I had

21  step -- I don't remember what she needed, but I had

22  to step back out of the hallway 'cause I needed

23  Kelsey's help, and I stood outside the hallway for a

24  couple seconds waiting for Kelsey to come back.

25       Q    What's a two assist mean?

```
 1        A     They -- you have to have two people to
 2   move them up in bed or change their Depends or get
 3   them from --
 4        Q     Why couldn't you just use like a Hoyer
 5   Lift?
 6        A     Because you have to have two people for a
 7   Hoyer.  You have to have two aides to use a Hoyer.
 8        Q     Was this person -- did this person need a
 9   Hoyer or just two people?
10        A     No, just two people.
11        Q     Okay.  If they need a Hoyer, is the sign
12   like hung on the wall or something?
13        A     It was in their charts.
14        Q     Okay.  So would you check their charts
15   before you would administer any type of aid?
16        A     No.
17        Q     Okay.  Then how did you know this
18   particular person didn't need a Hoyer Lift which
19   would include the two of you plus the lift?
20        A     Because I never seen her on a Hoyer before
21   and she was heavy enough that I couldn't do it by
22   myself, but light enough that two people could do it
23   just fine.
24        Q     Okay.  So what happens after you realize
25   you need two people?  What do you do?
```

1       A     I stepped out to go look for Kelsey.

2       Q     Okay.

3       A     'Cause I know I needed Kelsey to help with

4    her.  And then that was when the altercation between

5    Kelsey and Jane happened.

6       Q     Okay.  Just instead of painting it with a

7    conclusion.  Tell us what you saw.

8       A     I saw Kelsey talking to the resident that

9    this was about, her daughter, because she was there

10   that night.

11      Q     Okay.  So there was no confrontation, as

12   you say, at this point?

13      A     Yes.  Correct.

14      Q     Okay.  So you see -- I thought that you're

15   in the room directly across or it's one down from

16   where you're at?

17      A     It's just -- like they're facing each

18   other.

19      Q     So you see Kelsey talking to the patient?

20      A     The patient's daughter.

21      Q     Well, I mean, it's the patient that

22   decides where they want to eat, right?  Not the

23   patient's daughter?

24      A     Yeah, but Kelsey was talking to her and I

25   didn't hear --

1      Q    Okay.

2      A    -- what they were saying.

3      Q    So you couldn't hear what they were

4  talking about?

5      A    No.

6      Q    You just saw them talking?

7      A    Yes.

8      Q    Okay.

9      A    And I knew already that she did not have a

10  supper tray yet, so I assumed that's what they were

11  talking about.

12      Q    Okay.  But you couldn't hear it?

13      A    No.

14      Q    So the rest -- what they were talking

15  about is just an assumption?

16      A    Yes.

17      Q    Okay.  So you see Kelsey talking, do you

18  see Jane at that point?

19      A    I do not believe so.

20      Q    Okay.  So tell us everything you

21  witnessed.

22      A    So after then, I remember that Kelsey came

23  out in the hallway and that Jane -- I don't remember

24  how Jane had gotten there, whatever, but I remember

25  that Jane talked to Kelsey.  They started talking

1   and I was standing beside Kelsey because I didn't

2   think -- I thought it was just going to be a simple

3   just five-second conversation and then I could get

4   Kelsey to help me with my resident.

5        Q    Okay.  Well, if Kelsey is talking to the

6   DON --

7        A    Yes.

8        Q    -- what makes you presume it's just a

9   five-second -- going to be a five-second

10  conversation as opposed to the DON giving Kelsey

11  some instruction or maybe some discipline or some

12  counseling?

13       A    There wasn't.

14       Q    I mean, I'm just interested into why you

15  made the assumption it was just going to be a

16  five-second conversation?

17       A    Because I figured that it was going to be

18  about the resident not having the dinner tray and

19  her daughter wanted her to eat in her room so her

20  daughter could visit with her.

21       Q    Okay.  But that isn't what happened,

22  right?

23       A    Yes.  That wasn't the conversation that

24  happened between them.

25       Q    So after the five seconds, after you

1  realized this is going to be longer than a

2  five-second conversation, do you still stay there?

3      A    Yes.

4      Q    Why?

5      A    Because it started to get a little heated

6  and I didn't know what was going to happen.

7      Q    What were you going to do?

8      A    I didn't know.  That was the first time I

9  had ever worked in a nursing home health care

10  facility.

11      Q    Okay.

12      A    And all of it was new to me.

13      Q    Well, you knew the DON wasn't giving you

14  any instruction, correct?

15      A    Yes.

16      Q    And you weren't involved in the

17  conversation?

18      A    Correct.

19      Q    So why didn't you just go do your job?

20      A    'Cause I needed Kelsey to help me.  I

21  couldn't do it.

22      Q    You couldn't have done any other job at

23  the facility except the job that required two

24  people?

25      A    I don't remember if there was any other

1   call lights on at the time.

2        Q    Well, do you always have to have a call

3   light or couldn't you just check on a resident and

4   see if they need anything?

5        A    Yes, I can do that.

6        Q    Okay.  Why didn't you?

7        A    I don't remember.

8        Q    I mean, there are lots of other things you

9   could do with a resident than whatever the other

10  resident needed by way of the two of you --

11       A    Uh-huh.

12       Q    -- turning the resident over, correct?

13       A    Yes.

14       Q    So were you just standing there out of

15  curiosity?

16       A    I don't remember.  It was over a year ago.

17       Q    I'm just trying to see your motive for

18  standing there.  What, did you think you were going

19  add to the conversation or add to the situation or

20  prevent or you just don't know?

21       A    I really don't remember.

22       Q    You just decided to stand there?

23       A    Yes.

24       Q    Okay.  How close were you to Jane and

25  Kelsey?

Page 40

1        A     Kelsey and Jane were facing each other and

2    I was standing over here looking at them.

3        Q     Okay.  But I want to know the distance;

4    like ten feet, five feet, one foot,

5    thirty centimeters?  Put it in whatever you --

6        A     Maybe --

7        Q     Are you counting tile ceilings?

8        A     Four feet.

9        Q     Four feet.  Okay.  So you're four feet

10   away.  Where are you then in relation to the room

11   where you saw Kelsey talking to the relative of the

12   patient?

13       A     The room was behind me.

14       Q     Okay.  So you are, in your best estimate,

15   four feet.  Could you have been six or seven feet

16   away?

17       A     I don't believe I was that far away.

18       Q     Okay.  Wherever they were standing, the

19   door to the family that concerned the food was

20   behind you?

21       A     Yes.

22       Q     How far behind you?

23       A     It was very close behind me.  I mean, it

24   had to have been a foot or less.

25       Q     Okay.  What are you observing?

1      A     That Kelsey and Jane were talking to each

2   other and Jane was getting upset.

3      Q     Okay.  Well, how could you tell Jane was

4   getting upset from your vantage point?

5      A     From her tone of voice and the expression

6   on her face.  Wasn't just a --

7      Q     Okay.  What was the expression on her

8   face?

9      A     Just an angered expression.

10     Q     I don't know what that is.  I mean was she

11   showing her teeth like a dog or --

12     A     No.

13     Q     -- what does an angered expression look

14   like?

15     A     I just -- I don't know how to explain

16   that.

17     Q     I mean, was her face red?  I'm just --

18   describe her demeanor because I take it you've had

19   no medical training that would show she was having a

20   stroke or anything.  So just in layman's terms, what

21   were you witnessing?

22     A     She -- I don't know how to explain her

23   having an angry look on her face.

24     Q     Yet you came to that conclusion.  So

25   people come to conclusions based on something even

Page 42

1   if it's ridiculous.  What is your testimony as to

2   why you thought she was angry?

3        A    I don't really know how to explain that

4   any more than I remember that she had an angered

5   look on her face.

6        Q    Okay.  Could you hear what she was saying?

7        A    Yes.  I don't remember word for word what

8   she was saying, no.

9        Q    Okay.  Well, was she chastising Chelsea

10  [sic] for not doing something?

11       A    What is that?

12       Q    Was she upset with her, in your opinion,

13  about not doing something or about doing something?

14       A    Yes.

15       Q    Okay.  Which is it, Chelsea didn't do

16  something or Chelsea did do something?

17       A    That Kelsey --

18       Q    Kelsey, I'm sorry.

19       A    -- told the resident that the kitchen had

20  told Kelsey that she needed to eat in the dining

21  room.  Do you need me to repeat that?

22       Q    Yeah.  Sure.

23       A    Kelsey told the resident that the kitchen

24  had told Kelsey that the resident needed to eat in

25  the dining room.

Page 43

1      Q    And that's what you think Jane was upset

2   about?

3      A    Yes.

4      Q    That's what you heard?

5      A    Yes.

6      Q    Okay.  Did you hear anything where Jane

7   said you shouldn't have told the resident that I

8   said she had to eat in the dining room and not the

9   kitchen?

10     A    I know that Kelsey said that it had to be

11  approved through, I know, at least, Gabby for

12  someone to permanently eat either in their room or

13  in the dining room.

14     Q    That's what you heard Kelsey say to Jane?

15     A    Something in those words.  Not exact.  It

16  was over a year ago.  So I'm not going to quote

17  Kelsey on her exact words.

18     Q    Okay.  And you're not going to quote Jane

19  on her exact words, right?

20     A    Correct.

21     Q    I mean, 'cause you just don't remember

22  what Jane said and not remember what Kelsey said?

23  Right?

24     A    Yes.

25     Q    Okay.  So was Kelsey -- did she have a

1    stern tone in her voice?

2        A    No.

3        Q    She was calm?

4        A    Kelsey just seemed like she was trying to

5    explain.

6        Q    How does someone seem like they were just

7    trying to explain?

8        A    Just a calm voice.

9        Q    Okay.

10       A    Just a normal --

11       Q    Did it look like she was going to cry?

12       A    No.

13       Q    Okay.

14       A    Not at first.

15       Q    Not at first?

16       A    Yes.

17       Q    Okay.  How long were you standing there

18   not doing your job?

19       A    It wasn't -- the whole altercation wasn't

20   that long.  I don't remember.

21       Q    I want to know how long you were standing

22   there.

23       A    I don't remember how long I was standing

24   there.

25       Q    Well, was it like minutes?

1      A     Yes.

2      Q     Was it -- you were there for minutes?

3      A     Yes.

4      Q     Okay.  You never put your hands up and

5  just walked away?

6      A     No.

7      Q     Okay.  So tell me more of this story.

8  What were you witnessing?  I mean, Kelsey apparently

9  had a calm demeanor and Jane was apparently upset

10  and you were just standing there watching it all.

11  What else did you see or hear?

12     A     I -- they continued talking and then Jane

13  had put her hand on Kelsey's shoulder and pushed

14  Kelsey back and Kelsey kind of stumbled back up

15  against the wall.

16     Q     Oh, she stumbled?  How far was she from

17  the wall?

18     A     Maybe three feet from the wall.

19     Q     Three feet?  Jane, the 60-year-old female

20  hit Kelsey, the 22-year-old female, with such force

21  that she fell back three feet; is that your

22  testimony?

23     A     She didn't punch her.  She had her --

24     Q     No.  Pushed with such force that she went

25  back three feet.  That's what you want your

Page 46

1    testimony to be?

2        A    Yes.

3        Q    Okay.  Which hand did Jane use to push?

4        A    I don't remember.

5        Q    Well, this is important.  You're

6    visualizing from the side and you are the person

7    that's standing there watching it all for minutes.

8    Which hand did Jane use to push Kelsey?

9        A    I do not remember.

10       Q    Which shoulder did Jane push on Kelsey?

11       A    I don't remember.

12       Q    So you can't tell us what arm or hand Jane

13   used and you can't tell us what shoulder Jane

14   allegedly pushes, but you know that somehow Kelsey

15   gets shoved into the wall?

16       A    Yes.

17       Q    Is that your testimony?  Okay.  Do you

18   know if Jane is right-hand dominant or left-hand

19   dominant?

20       A    I don't know.

21       Q    Do you know what that means?

22       A    Yes.  Like right-handed, left-handed,

23   which one you write with.

24       Q    Okay.  So what did you witness after

25   witnessing Kelsey stumble?

1        A    I -- Kelsey just had a very shocked look

2    on her face.

3        Q    Okay.  What's a shocked look?

4        A    Jaw dropped.  In, like, awe look on her

5    face.

6        Q    A jaw dropped, in-awe look, what's an

7    in-awe look?

8        A    Just, oh, my gosh, that really happened

9    kind of look.

10       Q    I don't know what an, oh-my-gosh look

11   looks like.

12       A    Just a shocked look.  I don't --

13       Q    Yeah.  You're back to using the word

14   shocked again.  We've come full circle?

15       A    I don't know how to explain facial

16   expressions.

17       Q    Well, tell me what you're observing.  You

18   apparently observed her jaw drop.  What else did you

19   observe that led you to the conclusion she was in

20   shock?

21       A    Just the expression on her face.

22       Q    Okay.  You're not testifying that she was

23   from a clinical standpoint in shock?

24       A    No.  Like she wasn't like medically in

25   shock.

1    Q    Was she crying?

2    A    She looked like she was getting ready to

3  cry.

4    Q    Okay.  And you still stood there and

5  watched?

6    A    Yes, 'cause I was worried about Kelsey at

7  that point.

8    Q    And if you were worried about Kelsey, why

9  did you just stand there and watch?  Why didn't you

10  go interact into what was happening?  I mean, tell

11  Jane, that's enough, tell Kelsey, come with me, do

12  anything to calm down the event?

13    A    I don't know.

14    Q    Well, I mean you say that you were worried

15  about Kelsey, and I'm just wondering how you think

16  you were helping her by standing there for minutes

17  watching the event?

18    A    I don't know how I was helping her

19  watching it.

20    Q    I mean, did you try to get a nurse to

21  come?  Did you do anything to cause anyone else to

22  intervene?

23    A    No.  I knew one of the nurses was in the

24  dining room and I didn't know where the other one

25  was.

Page 49

1        Q    Well, was there anyone else in the area

2   that was even closer than you?

3        A    Closer to them --

4        Q    Yeah.

5        A    -- than me?  No.

6        Q    Okay.  So when you're making this

7   two-minute or minute's long observation, is there

8   anyone else in the area?

9        A    No.

10       Q    Just you?

11       A    Yes.

12       Q    Okay.

13       A    And then after it was all done, Darla, one

14  of the other aides, came down the hallway from the

15  kitchen or from the dining room.

16       Q    Did you ever see Jill?

17       A    Yeah.  She was standing there when that

18  happened with Kelsey.

19       Q    Oh, see, you didn't tell me that.  You

20  said you were the only one who was there.

21       A    Oh, wait.  Wait.  I'm bad with names.

22  That one's Jane, right?  And Jill's the --

23       Q    Well, did you witness her or her or her or

24  me?  Who was there that night?

25       A    No, it was me and Kelsey and her.

1       Q    Okay.  You're pointing to someone, who are

2   you pointing to?

3       A    Jane, I believe.  I'm bad with names.

4       Q    Okay.  Well, wasn't Jane the DON?

5       A    Yes.

6       Q    Did you not know who your DON was?

7       A    Yeah, I knew that she was my DON.  I'm bad

8   with names and faces.

9       Q    You just didn't know her name?

10      A    Like I have a hard time matching up a name

11  with a face.

12      Q    Okay.  Well, you know -- if I tell you

13  this is Jane --

14      A    Yes.

15      Q    -- you know that she was the one that

16  you're observing apparently in the conversation with

17  Kelsey, right?

18      A    Yes.

19      Q    And you said it's just you watching?

20      A    Yes.

21      Q    And then after it was done, Darla came up

22  from the dining room?

23      A    Yes.

24      Q    That's your testimony?

25      A    Yes.

1        Q    And then I asked you about someone named

2    Jill; do you know who Jill is?

3        A    That was the -- she was -- yeah, she was

4    the --

5        Q    She's not an STNA.  Keep going.

6        A    I know she was -- she wasn't a nurse.

7    She -- Jill was the -- one of the nurses, I believe.

8        Q    Well, first you've said she wasn't a

9    nurse, now you say she is a nurse.  Which is it?

10       A    I don't remember.  It has been a while

11   since I've worked there and it's --

12       Q    But you would know Jill to look at her?

13       A    Yes.

14       Q    And you know the difference between Jill

15   and Darla?

16       A    Yes.

17       Q    So you know from your testimony so far the

18   only person that came up to the scene was when it

19   was done, Darla came up from the dining room?

20       A    Yes.

21       Q    Are you still standing there?

22       A    Yes.

23       Q    Okay.  So you witnessed the entire event

24   and you just stood there?

25       A    Yes.

1      Q     Yet at the event is exactly what you're

2  testifying to?

3      A     Yes.

4      Q     Okay.  So you see and hear after Kelsey

5  stumbles back and you say her jaw dropped and she

6  had a shocked look on her face, what did you observe

7  next?

8      A     I don't remember what happened after it

9  was all done.

10     Q     No.  That was -- that was the end of it?

11     A     I believe so, 'cause that was the last

12  thing that I remember was Kelsey stumbling back

13  against the wall and being -- having a shocked look

14  on her face.

15     Q     Okay.  Did Kelsey say anything?

16     A     Not that I remember.

17     Q     Okay.  So then the incident was done?

18     A     I -- as to what I remember, yes.

19     Q     Okay.  Where did Jane go?

20     A     I don't remember.

21     Q     Well, did she just vanish?

22     A     No.

23     Q     Okay.  Which way did she walk?

24     A     I do not remember.

25     Q     Okay.  Did you say anything to Jane?

Page 53

1      A      No.

2      Q      Did Jane see you were there?

3      A      Yeah.  I'm not invisible, so I'm fairly

4   sure she knew I was standing there.

5      Q      Well, Jane's not invisible and you can't

6   tell me where she went, right?

7      A      Yes.

8      Q      How do you know that given that Jane's

9   vision was forward talking to Kelsey that she even

10  saw you there?

11     A      I don't have proof of that.  I mean, I

12  can't see out of her eyes, so I don't know.

13     Q      Right.  So you don't know if she saw you.

14  Did she ever say hello or sorry you witnessed that

15  or any words to let you know that she noticed you

16  there?

17     A      Not that I remember.

18     Q      Okay.  So does Jane leave somehow and then

19  is that when Darla comes up from the dining area?

20     A      Yes.

21     Q      Okay.  After Jane's gone --

22     A      Yes.

23     Q      -- Darla comes up?

24     A      Yes.

25     Q      And Darla's an STNA?

1      A     Yes.

2      Q     And what does Darla say or do?

3      A     I do not remember.

4      Q     Okay.  Did Darla say anything to you?

5      A     I don't remember.

6      Q     Did Darla say anything to Kelsey?

7      A     I do not remember.

8      Q     Okay.  You just know that she came out of

9  the dining room?

10     A     Yes.

11     Q     Are the dining room doors typically shut

12  or open?

13     A     They were open at that time because there

14  were residents down in the dining room.

15     Q     Okay.  So you don't know if Darla was just

16  around the corner listening to everything or if

17  Darla was on the other side of the dining room?

18     A     Correct.

19     Q     You just know you saw her coming?

20     A     Yes.

21     Q     Then did you, given what you just

22  witnessed, go over and talk to Kelsey?

23     A     I believe so.  I don't remember though.

24     Q     Did you say anything to Kelsey about the

25  incident?

1      A     I know that I asked her if she was okay.

2      Q     Okay.  Other than that, I mean, did you

3   see like any contusions?  Did you see any blood?

4      A     No.

5      Q     Okay.  So from a visual inspection, you

6   didn't see that she was physically harmed?

7      A     Correct.

8      Q     Was she crying?

9      A     She was tearing up.  She was not --

10      Q     See, I don't know what tearing up is.

11      A     She had tears in her eyes.

12      Q     Okay.  So she was crying?

13      A     Yes, but they -- I mean, they were not

14   falling out of her eyes.  I don't know how else to

15   explain that.

16      Q     Well, did you offer her a Kleenex?

17      A     No, because the only Kleenex that were

18   around were in the residents' rooms.

19      Q     Is there something that precludes you from

20   going into a resident's room and getting a Kleenex?

21      A     The Kleenexes are theirs.  I --

22      Q     They buy their own Kleenexes?

23      A     No.  The nursing home buys them and then

24   they pay for them and I don't understand the whole

25   billing aspect but --

1      Q    Do you think that you would have been

2  violating some type of work rule if you would have

3  got Kelsey a Kleenex out of one of the resident's

4  rooms?

5      A    No.

6      Q    Okay.  In fact, you were supposed to be

7  going back into a resident's room with Kelsey to

8  help a resident?

9      A    Yes.

10     Q    Correct?  Did you do that?

11     A    I don't remember.

12     Q    I thought you told me that you needed to

13 turn a resident so --

14     A    I don't remember --

15     Q    -- you could change their diaper?

16     A    -- what the resident needed.  I just

17 remember that I needed to be in that room and it was

18 a two assist.

19     Q    Okay.  Well, what are the possibilities

20 for a two assist?

21     A    She could have needed to go to the

22 bathroom.  I don't remember if she had a portable

23 toilet.  She could have needed to do that.  I could

24 have needed to turn her.  It could have been simple

25 things.

1      Q    Or she might have been sitting in her own

2    feces and needed to be cleaned, correct?

3      A    Yes.

4      Q    So would you have just left her in that

5    condition?

6      A    No.

7      Q    Okay.  So did you ever go back in the room

8    and do anything?

9      A    I know I went back in there and finished

10   whatever it was that I needed to do, but I don't

11   remember what it was.

12     Q    Okay.  But you said whatever you needed to

13   do required two people?

14     A    Yes.

15     Q    So did you take someone else in there with

16   you?

17     A    Yes, I believe Kelsey was in there with

18   me.

19     Q    See, I don't like testimony "I believe."

20   Either Kelsey was in there, you have present day

21   recollection she was in there or you don't?

22     A    I don't.

23     Q    Okay.  Do you recall asking Darla to

24   assist you --

25     A    No.

1      Q    -- with whatever needed to be done in the

2  room?

3      A    No.

4      Q    Because your testimony is Darla's coming

5  out of the dining facility?

6      A    Yes.

7      Q    Couldn't you have asked her to assist you?

8      A    Yes.

9      Q    Okay.  But you don't have any recollection

10  that you did that?

11      A    Correct.

12      Q    And you don't have any recollection of

13  asking anyone else to assist you, correct?

14      A    Correct.

15      Q    But you know whatever needed to be done

16  got done, correct?

17      A    Yes.

18      Q    And if you're worried about using a

19  Kleenex, I'm sure you're concerned about whatever

20  the patient needed required two people and you were

21  going to get -- use two people to do it, right?

22      A    Yes, because I can't -- she was heavy

23  enough that I couldn't roll her and hold her and

24  everything else by myself.

25      Q    Okay.  So is there a document that we

1    could look at to know that you did something that

2    night with that resident?  Like do you sign off like

3    resident's -- you put in the notes or in the chart

4    like resident's light was on, two of us came in and

5    did whatever it is?

6         A    No.  We don't specifically write down

7    every single thing that we had done with the

8    residents that night.

9         Q    Even when it requires two people?

10        A    Yes.

11        Q    Okay.  When you ask Kelsey, allegedly, if

12   she's all right, what does she say?

13        A    I don't remember.

14        Q    Okay.  What do you do next?  Do you do

15   something with Kelsey, like walk her down to the

16   restroom, walk her to the nursing area?  Do you do

17   anything?

18        A    I don't remember.

19        Q    What did you do the rest of the night?

20   Did you do anything?

21        A    Yeah, I know I worked, but I don't --

22        Q    Well, let's say the incident happened at

23   dinnertime.  Let's say around 5:30, sometime between

24   5:00 and 5:30, 5:00 and 6:00, take your pick.  Your

25   shift doesn't end until 11:00, correct?

Page 60

1       A    Yes.

2       Q    So you had to have done something for the

3   next five or six hours --

4       A    Yes.

5       Q    -- to earn a paycheck, right?

6       A    Yeah.

7       Q    So what did you do?

8       A    I took care of my residents.  I can't

9   specifically tell you I went into one room and did

10  this and then did this.

11      Q    Well, did you and Kelsey ever work

12  together in a two-person operation after that?  I

13  mean, did anyone else need a two-person?

14      A    I'm sure they did.  I can't recall that

15  but --

16      Q    Well, you didn't try to do it with just

17  yourself, right?

18      A    No.

19      Q    Did you ever ask Darla that night for

20  assistance?

21      A    I don't think Darla was on the hall with

22  me that night.

23      Q    Okay.  So if -- strike that.  Who would

24  you have asked for assistance other than Kelsey that

25  night?

1       A    One of the nurses, if they were right

2    there or if I could find them.

3       Q    By the way, since you don't know their

4    names, what do you say?  "Hey you"?  Is that what

5    you call a nurse?

6       A    No.  I haven't been there for over a year

7    and I don't remember the nurses' names.

8       Q    Okay.  So when you were there, you knew

9    the nurses' names?

10      A    Yes.

11      Q    And if I showed you a photo, you would

12   know who the nurses are?

13      A    Probably.

14      Q    Okay.  You know who Jill is?  You now

15   recall that she's a nurse?

16      A    Yes.

17      Q    How about June?

18      A    June, I think she was the STNA on the

19   rehab.

20      Q    Okay.  Did you ask her for any help that

21   night?

22      A    I don't remember.

23      Q    Did you ever talk to Kelsey again that

24   night?

25      A    I'm sure I did.  She was on the hall with

1  me, but I don't recall every one of our

2  conversations or any of them.

3       Q    Well, this night in particular, you

4  witnessed what you claim was Jane shoving Kelsey and

5  her stumbling against the wall.  Had that happened

6  any other night?

7       A    No.

8       Q    So I would think this night stood out

9  because apparently you were concerned about Kelsey's

10 wellbeing, correct?

11      A    Yes.

12      Q    You asked her afterwards if she was okay?

13      A    Uh-huh.

14      Q    Right?

15      A    Yes.

16      Q    And you stood there for minutes witnessing

17 what was going on, correct?

18      A    Yes.

19      Q    So is there anything else about that night

20 and your interaction with Kelsey that sticks out?

21      A    No.

22      Q    About how old was Kelsey, if you remember,

23 when all this happened?

24      A    I know she was in college.  I don't

25 remember how old she was.

1      Q    Did you and Kelsey do anything outside the

2   workplace?

3      A    No.

4      Q    Ever ride in her car?

5      A    I think we might have went to break

6   together once or twice.

7      Q    In her car.

8      A    Sat in her car.

9      Q    When you were on break together, would you

10   do anything in her car?

11      A    We would sit out in her car and eat or she

12   would smoke a cigarette.

13      Q    Okay.

14      A    Just talk.

15      Q    You didn't smoke?

16      A    No.

17      Q    When you were sitting out in her car with

18   her, was it before or after the incident with Jane?

19      A    No.  That wasn't that night.  I'm just

20   saying that we have.

21      Q    No, and I'm asking you if you have done it

22   before and after that night?

23      A    I believe so.

24      Q    Okay.  When you were sitting in her car

25   with her during the breaks, did you read her witness

1   statement that she had written --

2       A    No.

3       Q    -- about what happened?

4       A    Huh-uh.  No.

5       Q    No?  Did the two of you ever compare

6   witness' statements?

7       A    No.

8       Q    Did you ever tell her what you wrote?

9       A    No.

10      Q    Did she ever tell you what she wrote?

11      A    No.

12      Q    Does the company not have a facility for

13  you to take a break in?

14      A    Yes.  We had a break room.

15      Q    There's a break room.  Then why do you go

16  sit in her car?

17      A    Just so Kelsey can smoke and it's outside

18  and we weren't allowed to smoke inside.

19      Q    I guess I'm curious as to why two STNAs

20  get to take a break at the same time.  Doesn't that

21  leave the patients without an STNA?

22      A    No.

23      Q    Well, who takes care of them if you're on

24  break?

25      A    The other STNAs.  There was a total of

1   four STNAs working at one time.

2        Q    Okay.  Well, when I asked you if you asked

3   the other STNA for help, you kind of looked at me

4   and said, well, so and so works rehab.  Is that one

5   of the four you're talking about?

6        A    Yes.

7        Q    Well, so you could have easily asked

8   another STNA to assist you, 'cause you claim there's

9   four?

10       A    Yes.

11       Q    So that night, it was -- that particular

12  night it was you, Kelsey, Darla --

13       A    Yes.

14       Q    -- and June?

15       A    I believe June was there.

16       Q    Okay.  But there's no work rule that says

17  that the two STNAs that are assigned to a particular

18  floor can't take their breaks at the same time?

19       A    I don't remember.

20       Q    Okay.  Well, I'm just curious, before the

21  two of you take your breaks together, and you go

22  outside, in particular, do you tell the other STNA,

23  either the one or the other or both that are left in

24  the building that you're taking a break?

25       A    Yeah.

1      Q     Where could I look to find that

2    information as to whether when you and Kelsey took

3    your breaks outside of the facility that you told

4    the other STNAs?  Is it written in a log somewhere?

5      A     No.  It's just -- I tell Darla, hey, I'm

6    going to go on my supper break now, and then if it's

7    just me going, then I go tell Kelsey, I'm going to

8    go on my supper break now.

9      Q     Well, I understand if you're taking a

10   break just by yourself.  I get that.  But you're

11   telling me two people are assigned to a floor, and

12   if the two people who are assigned to a floor both

13   leave at the same time, who watches that floor?

14     A     I -- there -- it's all one floor.  Like

15   it's one story.  But I know that Darla was there

16   that night and most nights when me and Kelsey were

17   there, it was also with Darla and then whoever was

18   on rehab or assisted living.

19     Q     Well, why is it that you and Kelsey are

20   STNAs together and, like, Darla is somewhere

21   separate and, let's say, June is somewhere separate?

22     A     Because June was on assisted living and

23   then me, Kelsey, and Darla would be on the nursing

24   home side.

25     Q     Okay.  But do you get to pick what side

1   your on?  Like when you go in during the day, do you

2   get to say, hey, I'm on the rehab side?

3       A    No.  They had it written up on the

4   blackboard.

5       Q    Okay.  Were you always -- were you ever

6   the person that was on the rehab side?

7       A    No.

8       Q    Okay.  So it just seems like you and

9   Kelsey are always working together.  Is that a fair

10  statement?

11      A    For the most part, yes.

12      Q    Would you say the two of you are paired up

13  like 95 percent of the time?

14      A    Like 80 percent of the time, because I

15  know I've worked with Darla a bunch on the other

16  hall -- or on that hall, too.

17      Q    Okay.  Do you ever work with June?

18      A    I believe she was on the nursing home side

19  a couple times.

20      Q    Did you ever work Saturdays, so you worked

21  a different shift?

22      A    I think I might have worked first shift

23  once.

24      Q    Now, did you ever talk to anyone about

25  what happened other than giving a statement?  I know

Page 68

1    you gave a written statement --

2         A    Yes.

3         Q    -- but did you ever talk to anyone?

4         A    I talked to a lawyer on the phone.  I

5    don't remember who the lawyer was or where he was

6    from.

7         Q    How long after the incident do you talk to

8    a lawyer?

9         A    I know that was relatively soon after the

10   incident.

11        Q    Did the person identify himself as a

12   lawyer?

13        A    Yes.

14        Q    Was his name Bob?

15        A    I don't remember.

16        Q    Was his name Barry?

17        A    I do not remember.

18        Q    Was it Brian?

19        A    I don't remember his name.

20        Q    Okay.  But whoever it was, shortly after

21   the incident, told you that the person was a lawyer?

22        A    Yes.

23        Q    Did the person ask you questions about

24   what happened?

25        A    Yes.

1       Q    Okay.  Did you say I put everything in my

2   written statement?

3       A    No.  I believe I talked to them about what

4   had happened.

5       Q    Okay.  Did they tell you that what you

6   said would be protected by privilege of some kind?

7       A    I do not remember.

8       Q    Was there anybody else with you when you

9   were talking to this person who claimed to be a

10  lawyer?

11      A    No.  I was on the phone with them.

12      Q    Okay.  In relation to the incident, let's

13  say the incident happened April 19th, 2013, on a

14  Friday --

15      A    Uh-huh.

16      Q    -- how long was it until you talked to

17  this person who claimed they were a lawyer?  One

18  week?  Two weeks?  A month?

19      A    I would probably say less than a month.

20      Q    Less than a month.  Did you ask the lawyer

21  any identifying questions like what bar are you a

22  member of?  Where are you calling me from?  Who do

23  you represent?

24      A    No.

25      Q    Okay.  Did the lawyer volunteer any of

1    that information?  Did he say I'm a lawyer and I

2    represent the company?

3         A    I don't remember.  I'm sure that he had

4    said something about the fact that he was working

5    for the nursing home.

6         Q    Okay.  This is important that you think,

7    because I don't want to get anyone in trouble that

8    shouldn't be in trouble.  Do you specifically recall

9    this lawyer saying I work for the nursing home?

10        A    No.

11        Q    Okay.  You just think that he might have

12   said that?

13        A    Yes.

14        Q    Okay.  Did you take any notes during that

15   phone conversation?

16        A    No.

17        Q    I presume it was a guy.  Was it a guy?

18        A    Yes, I remember.

19        Q    You could tell by the voice?

20        A    Yes.

21        Q    Did the person give you his first and last

22   name?

23        A    I don't remember.

24        Q    How long was it between the time that you

25   give your written statement and the time that you

1   talk to the person who says he's a lawyer?

2       A    I believe it was within a month.

3       Q    So I think before I asked you the time

4   between the incident and the time that you talked to

5   the person who said they were a lawyer.  Now I'm

6   trying to figure out between the time that you wrote

7   your statement and the time that the person called

8   and told you that he was a lawyer.

9       A    I know that I had written my statement

10  very -- like I believe it was within a week of this

11  happening --

12      Q    Okay.

13      A    -- that I had written my statement.  And

14  then I also believe, if I'm remembering correctly,

15  that it was like within a month period from when I

16  had written my statement to when he had called me.

17      Q    Okay.  Did the person who told you that

18  they were a lawyer say that they had a copy of your

19  written statement?

20      A    I don't remember.

21      Q    Was there anything that you told the

22  person who said they were a lawyer that was

23  different than what was on your written statement?

24      A    I do not believe so.

25      Q    Okay.  I take it, given that you claim

1   that you typed the statement on your telephone, that

2   you still have a copy of that statement?

3       A    No.

4       Q    Okay.  When you talked to the person who

5   said they were a lawyer, did you have a copy of it

6   then?

7       A    I might have then.  I don't remember.

8       Q    Okay.  Why do you not no longer have a

9   copy on your phone?

10      A    Because I had erased it off of my e-mail

11  and I no longer have that phone.

12      Q    When did you get rid of that phone?

13      A    I don't know.

14      Q    Well, can you give us like a season maybe?

15      A    It had to have been maybe a little over a

16  year ago, because the current phone I have right now

17  I've had for a little over a year.

18      Q    And were you still working for the company

19  at the time you got the new phone?

20      A    No.

21      Q    So you had already left the company?

22      A    Yes.

23      Q    If the incident happened in April of '13,

24  when do you think you left the company?

25      A    I do not remember.

1       Q    Okay.  I thought you said sometime between

2    Thanksgiving and Christmas?

3       A    I believe so.  I've worked several jobs in

4    the past two years.  I really don't remember.

5       Q    Okay.  But even a year ago from today, you

6    would have still been working for the company under

7    that testimony?

8       A    I believe so.

9       Q    Okay.  Then would you have still had that

10   phone?

11      A    I --

12      Q    You said you got rid of the phone after

13   you left the company.  That doesn't make sense to me

14   given --

15      A    I believe it was.

16      Q    -- what you're telling me.  If you left

17   the company after Thanksgiving of '13 but before

18   Christmas of '13, that whole year wouldn't be up

19   until this Thanksgiving?

20      A    I know that I -- my -- the phone that I

21   have right now that I'm in a two-year contract.

22      Q    Okay.

23      A    I am almost halfway done with that.  I'm a

24   little over halfway down.

25      Q    Okay.  Doesn't that lead you to believe

Page 74

1    you were still working for the company when you

2    switched phones?

3          A    I don't remember.

4          Q    Did Kelsey ever ask you to witness her

5    witness' statement that she drafted?

6          A    Did what?

7          Q    Did Kelsey ever ask you to witness,

8    particularly on April 19th, a statement that she may

9    have filled out?

10         A    I don't remember.

11         Q    Did you know that she filled -- claims to

12   have filled out a statement and slid the statement

13   under Lorraine's door?

14         A    I don't remember.

15         Q    Did Kelsey ever tell you that she had

16   indicated on her statement that if something wasn't

17   done internally, she would involve the outside

18   authorities or words to that effect?

19         A    I don't understand what you just said.

20         Q    I'm asking you if Kelsey ever told you on

21   her witness' statement that she had threatened that

22   if something wasn't done about the situation

23   internally she was going to go outside the facility?

24         A    No.

25              MR. GARRISON:  Objection to form.

1      Q     Did you understand that Kelsey's father

2   was a deputy sheriff?

3      A     Yes, I knew that from prior conversations

4   about family.

5      Q     What conversation would you have with her

6   when she would say my dad's a deputy sheriff?

7      A     Just her talking about him getting home

8   late or being tired or --

9      Q     Well, you knew she didn't live with her

10  dad, right?

11     A     Yes.

12     Q     She lived with her step-dad and mom?

13     A     I thought that was -- I thought she lived

14  with her dad.

15     Q     Did Kelsey ever tell you that she wrote on

16  her witness' statement I feel strongly something

17  needs to be done internally or else I will involve

18  outside authority?

19     A     No.

20     Q     Did you hear Kelsey at any time the night

21  of the April 19th, 2013, say that she felt she was

22  being treated like a slave?

23     A     No.

24     Q     You hear her say there was a good chance

25  she wouldn't be back on Monday?

1       A     No.

2       Q     Did you hear Kelsey that night say I hate

3    this place?

4       A     Not that I remember.

5       Q     What does "not that I remember" mean?  She

6    may have said it, you just don't have present day

7    recollection?

8       A     Yes.

9       Q     Did you hear Kelsey say I don't know if

10   I'll be back on Monday that night?

11      A     Not that I remember.

12      Q     Did you hear Kelsey say I'm tired of being

13   a slave?

14      A     Not that I remember.

15               MR. GARRISON:  Take a couple

16            minutes --

17               MR. FRANKLIN:  Sure.

18               MR. GARRISON:  -- before you dive

19            into documents?

20               (Whereupon, a recess was taken at

21            3:25 p.m. and resumed at 3:33 p.m.)

22   BY MR. FRANKLIN:

23      Q     Handing you what's been previously marked

24   as Plaintiff's Exhibit 16.

25               MS. PAOFF:  6.

1        Q      6.  I'm sorry.  Have you seen this

2   document prior to today?

3        A     Yes.

4        Q     Is this the document you reviewed in

5   preparation for your deposition?

6        A     Yes.

7        Q     For the record, what does this document

8   appear to be a copy of?

9        A     This is a copy of my statement.

10        Q     Okay.  At the top, it says Clara Schriver.

11        A     Ciara.

12        Q     Ciara.  Is that then a name you used to go

13   by?

14        A     No.  That was the name that I had on my

15   phone.  It's my ex-boyfriend's last name.  I -- my

16   legal name since I was born has been Ciara Rae

17   McConn.

18        Q     Okay.  But how long have you ever used

19   that name Ciara Schriver?

20        A     I had it on my e-mail and on my Facebook

21   for a while.

22        Q     Well, what's a while?

23        A     I don't know.  I was with him for two

24   years.

25        Q     Years?  Days?  Months?  Seconds?  Minutes?

Page 78

1       A     Maybe a year, eight months, something to

2    that effect.

3       Q     Did you ever refer to yourself by that

4    name?

5       A     No.

6       Q     Did you ever use that name in any legal

7    documents?

8       A     No.

9       Q     The two of you have a joint checking

10   account or savings account?

11      A     No.

12      Q     So the only time you used it was on your

13   Facebook?

14      A     And my e-mail.

15      Q     And on your phone?

16      A     Yeah.  I believe I had it on the e-mail

17   and my phone.

18      Q     E-mail and phone.  Where were you sending

19   it to?

20      A     I sent it to my -- I believe I resent it

21   to my e-mail, and then I know I had it faxed to

22   St. Marys, because I had one of the ladies in the

23   office at Vantage fax it to the nursing home because

24   I did not know how to do it.

25      Q     Okay.  So where it says to Ciara Schriver

1   from Ciara Schriver, you were sending it to

2   yourself?

3        A     Yes.

4        Q     And then you forwarded it to 61, dash,

5   admin -- I don't see where you sent it to your

6   office at Advantage [sic]?

7        A     No.  I had it faxed.  Like I had printed

8   it out.

9        Q     Okay.

10       A     I opened up my e-mail and I printed this

11  out.  And then I went to the office and had the

12  office fax this to the nursing home because I didn't

13  know how to do it, but I was standing there while

14  she did it.

15       Q     Okay.  So you weren't at school at the

16  time?  You were at work?

17       A     No.  When this happened, I was at school.

18  When I typed this, I was at school.

19       Q     Okay.  Because I see a date of April 21st,

20  2013.  Do you see that?  Where it says to Ciara

21  Schriver from Ciara Schriver, and then there's a

22  date in the middle.  Do you see that?

23       A     Oh, yeah, I see that.

24       Q     And that says April 21st, 2013, do you see

25  that?

Page 80

1      A    Yes.

2      Q    Okay.  And that date is Sunday and I don't

3  think you were at school on Sunday.

4      A    I know that I had the office fax this to

5  the nursing home.

6      Q    Okay.  Well, that's what I -- that's what

7  I'm having a hard time understanding and making

8  sense of your testimony.  You would agree on

9  April 21st, 2013, at 6:43, dash, 43 p.m. eastern

10  standard time you were not in college -- were not in

11  school rather, correct?

12      A    Yes.

13      Q    You weren't either at the vocational

14  school nor were you at your high school?

15      A    Yes.

16      Q    Correct?

17      A    Yes.

18      Q    Then how does it have April 21st if you

19  were claiming that you were at school?

20      A    I know that I had this faxed from my -- or

21  from Vantage to the nursing home.  I don't remember

22  when I typed this and sent it to myself.  I

23  obviously sent it to myself at that exact date and

24  time.

25      Q    Okay.

1      A    But I thought that I had did this at

2    school.

3      Q    Yeah.  That was your testimony.  Your

4    testimony, I think, was I did it at school and then

5    I said what was the urgency, and you said, no, I did

6    it on a break.  You might have even told me you did

7    it over lunch.

8      A    Yes.  I was at school when -- I remember

9    specifically that I was at school when I typed this

10   or when I had done it on my phone.

11     Q    Okay.  Then give me the day you were at

12   school and done it on your phone?

13     A    I cannot tell you the exact date and time

14   that I did it at school on my phone because I don't

15   remember.

16     Q    Well, we know it wasn't April 21st at

17   6:43 p.m., right?

18     A    That I was not at school, that is correct.

19     Q    Okay.  So what's that date and time

20   signify?

21     A    I don't know.

22     Q    I mean, did you type out your statement

23   and then somebody made changes to your statement?

24     A    No.  I'm the only one that has access to

25   my e-mail, 'cause I log out of it on my phone when

Page 82

1    I'm not on it.

2         Q    But you have no explanation as to how that

3    date and time appears on this document?

4         A    Correct.

5         Q    Okay.  I want to kind of start more at the

6    bottom.  The second -- I'm not sure if it's a

7    paragraph.  It says the whole time Jane was talking

8    to Kelsey?

9         A    Okay.

10        Q    It says the whole time Jane was talking to

11   Kelsey like she was a child or someone who could not

12   comprehend common day-to-day things.  Do you see

13   that?

14        A    Yes.

15        Q    What was she saying that evidences that

16   she was talking to Kelsey like a child?

17        A    The tone of voice she uses, 'cause she has

18   talked to me in that tone before and it's a very

19   putting-down tone.

20        Q    Okay.  So it was like condescending?

21        A    What do --

22        Q    Okay.

23        A    I don't know what that means.

24        Q    Okay.  Since I apparently can't come up

25   with the right word, can you just -- and it won't be

Page 83

1    picked up on the record, but I'll try to describe

2    it -- tell me what voice Jane was using?

3        A    Like belittling.  Talking to you like

4    you're a child and you can't comprehend anything.

5        Q    Okay.  But I don't understand that tone.

6    You didn't use any different tone than you've used

7    throughout this entire deposition.

8        A    I don't -- I don't know how to do or

9    describe that tone --

10       Q    You just know -- you can't do or describe

11   the tone --

12       A    -- more than what I've said.

13       Q    -- but whatever you heard, you think it

14   was she was treating Kelsey like she was a child?

15       A    Yes.  The tone of --

16       Q    A child of four or five, a child of 12 or

17   13, what?

18       A    Like a child under 10.

19       Q    Okay.  Do you have any kids yourself?

20       A    No.

21       Q    Other than Jane, has anyone else in your

22   life talked to you as if you were a child?

23       A    Yes.  My grandma.

24       Q    Okay.  So could it be something that is

25   connected with someone's age as opposed to the tone

Page 84

1   that you're hearing?

2        A    No.  No.  Like my grandma talks to me like

3   I am a baby and she uses the baby voice.

4        Q    Okay.  Well, was Jane using a baby voice?

5        A    No.

6        Q    Okay.  You -- in the next paragraph up,

7   you start out by saying Jane was not yelling at

8   Kelsey, but it was way more than just a calm tone of

9   a regular conversation.  Kelsey kept trying to

10  explain to Jane that she was just doing what she was

11  told.  Jane kept getting more and more mad.  She

12  grabbed Kelsey's shoulder and shoved her back

13  against the wall and was about five to six inches

14  away from Kelsey's face and was telling Kelsey that

15  she needed to get it through her head and listen to

16  Jane.  Right after that, Darla asked me to help her

17  with another resident so I left at that point.  Do

18  you see that?

19       A    Yes.

20       Q    Now, you told me that Darla came into the

21  situation after it was over.  Jane had vanished and

22  Darla was coming from the dining room.  And in this,

23  it appears that while it was happening, Darla asked

24  you to help her with other residents.  I'm trying to

25  put two and two together.  I mean, at what point in

1    the story does Darla come into the story?

2         A    After Jane had pushed Kelsey.

3         Q    Okay.  Well, I thought you told me after

4    Jane disappeared, then Darla comes?

5         A    I mean, she didn't just poof.  I just

6    don't remember how she --

7         Q    Okay.  And you never told me that Darla

8    asked you for help.

9         A    Yeah, because I did not remember that.

10        Q    And that would have been the perfect

11   situation for you to say before I go to help you,

12   Darla, can you help me with this two-person

13   operation, but it doesn't sound like you did?

14        A    I do not remember.

15        Q    Okay.  So you're not saying it didn't

16   happen, now you're saying I don't remember asking

17   Darla for help?

18        A    I do not remember if I asked Darla for

19   help.

20        Q    If you had heard Jane talk to you like

21   this in the past as if you were a child, was that

22   in -- when Jane was upset that you hadn't done

23   something right or was she counseling you or

24   teaching you or what was she doing?

25        A    It was when I was taking one of the

1    resident's hose off and when I was pulling -- when I

2    was rolling them down, I had scratched her and I had

3    torn her skin and it was bleeding.  And Darla was

4    instructing me on how to take socks off and was

5    talking to me like a little kid who does not know

6    how to put socks on.

7         Q    Well, not -- for the record, it was Jane

8    that was instructing you, not Darla?

9         A    Yes.  Sorry.

10        Q    Well, I mean, she's the DON and you took

11   the socks off someone and whether you meant to

12   scratch them and cut their skin or not, you still

13   did it, right?

14        A    Yes.

15        Q    So you don't think that she has a

16   responsibility to go over with you the right way to

17   do it?

18        A    Yes.  I understand that.

19        Q    Okay.  So she was counseling you after you

20   had done something wrong?

21        A    Yes.

22        Q    Correct?

23        A    Yes.

24        Q    Did you write an incident report that she

25   had talked to you in a voice that you thought was

1   like that of talking to a child?

2        A    I do not know if I put that in my report.

3   I know that I had to write a report on -- that I had

4   scratched one of the residents and that I left a

5   skin tear on her leg.

6        Q    Yeah.  Well, I got that you had to write

7   that incident.  I mean, that's mandated by law that

8   you write that incident report, correct?

9        A    Yes.

10        Q    In that same incident report, did you say

11   in spite of what I did, Jane talked to me like I was

12   a child?

13        A    I don't know.

14        Q    When did that incident take place?

15        A    That was very soon after I started.

16        Q    Do you think that the DON was acting

17   properly when she counseled you about rolling down

18   someone's socks and not tearing their skin?

19        A    What do you mean acting properly?

20        Q    Well, I mean was she doing something that

21   you thought was improper about talking to you about

22   tearing someone's skin?

23        A    No.

24        Q    If you knew that she was using a tone of

25   voice that she uses when she's providing some type

1    of counseling, why didn't you leave instead of stand

2    there for two minutes and witness what was going on?

3         A    I don't remember.

4         Q    Do you not like that kind of work, being

5    an STNA?

6         A    No.  I love that.  I -- just it was taking

7    too much for me with being in school, so that's why

8    I'm back at McDonald's.

9         Q    It takes too much from you for being in

10   school; you're not even in school yet?

11        A    No.  When I was in high school.

12        Q    It was too much to go to high school and

13   work a part-time job?

14        A    It was too much for me to get off at

15   11:00 at night and not have time to do my homework

16   and be back up for school in the morning on time.

17        Q    You, in the second, looks like, paragraph,

18   say Friday night Jane and Kelsey were talking and

19   Jill was standing behind Jane and I walked over

20   because I needed to ask Kelsey a question about a

21   resident.  So apparently when you wrote this, you

22   remember the nurse's name and that she was standing

23   behind Jane?

24        A    Yes.

25        Q    Okay.  Now, as you sit here, does it

1   refresh your recollection seeing it in your own

2   writing, even though I think you read this earlier

3   today --

4        A    No.  I read it yesterday.

5        Q    Okay.

6        A    I did not read it today.

7        Q    Did it not refresh your recollection

8   yesterday that Jill was standing behind Jane?

9        A    No.  I do not today remember Jill standing

10  behind Jane.

11       Q    Okay.  When Jane is having the

12  conversation with Kelsey, did Kelsey at any point

13  just say you're right, Jane, I won't do it again or

14  words to that effect?

15       A    Not that I remember.

16       Q    Was she countering everything Jane said

17  with words?

18       A    What do you -- I don't understand.

19       Q    Well, I mean Jane would say something and

20  Kelsey would say something back?  I mean, did you

21  get that there was a back-and-forth exchange?

22       A    I mean, they were having a conversation.

23       Q    I mean, do you think at some point just

24  because a person's your supervisor that maybe you

25  just better say, okay, I understand your position,

Page 90

1    and go about doing your work?

2        A    In some cases, yes; in others, no.

3        Q    Okay.  So are you typically -- are you one

4    of those people that if the boss -- for instance,

5    when Jane was telling you, you know, here's how you

6    roll down the socks so you don't cut a little hole

7    in someone's skin, were you like back and forth or

8    did you just say I understand?

9            MR. GARRISON:  Objection to form.

10       A    No.  I --

11       Q    Go ahead.

12           MR. GARRISON:  Go ahead.

13       A    I said that I understand.

14       Q    Okay.

15       A    I mean, she was trying to show me how to

16   correctly take someone's sock off without scratching

17   them.

18       Q    Okay.  But you thought she was doing it in

19   a sense where she was talking to you as a child?

20       A    Yes.  Her tone of voice was.

21       Q    How long did the interaction go on between

22   you and Jane when you -- she was giving you this

23   instruction about how to properly take off someone's

24   socks?

25       A    Just a couple minutes.  Just, you know,

1    roll them down and don't do this.  Like do that to

2    roll them down.

3         Q    Okay.  And you seem to be taking exception

4    to the fact that you believe she talked to you in a

5    child's voice?

6         A    She talked to me like I was a child.

7         Q    Okay.  How -- what would you have liked

8    her to have done?

9         A    I mean, at least talk to me like I was a

10   human.

11        Q    Aren't children human?

12        A    Yes.  But she was talking to me like I

13   knew nothing, absolutely nothing.

14        Q    Well, maybe at the time you put a scratch

15   on one of the residents, she felt that way, like you

16   absolutely knew nothing.  Was the resident bleeding?

17        A    Yes.

18        Q    Okay.  I presume that's one of the

19   resident's rights, the right to not be cut by the

20   STNA?

21        A    Yes.

22        Q    Okay.  When you talked to the person that

23   said that they were a lawyer, was anybody else on

24   the phone?

25        A    I do not believe so.

1       Q     Did you ever talk to anyone from the

2    company where they said someone else is on the

3    phone?

4       A     I don't remember.

5       Q     Did the person that told you they were an

6    attorney ask you to do anything?  Other than give

7    them information over the phone, did they give you a

8    project to do or something to do afterwards?  Like

9    canvass the other employees or anything to that

10   effect?

11      A     Not that I remember.

12      Q     Tell me how it works between a vocational

13   high school and the -- your regular high school.  Do

14   you go to both schools at the same time?

15      A     No.

16      Q     How does it work?

17      A     I went to Van Wert, my home school,

18   freshman and sophomore year.

19      Q     Okay.

20      A     And then junior year, I went to Vantage

21   for health tech.

22      Q     Vantage?

23      A     Yes.

24      Q     For health tech?

25      A     And junior year, I had lab in the

1    afternoon, so I would go to my -- I can't remember

2    my exact classes, but I know that I had English and

3    math and some kind of history class, and I believe I

4    was -- I had a science class.  I would go to those

5    four periods and I would go to lunch and I would go

6    to my lab, which is my health tech.

7         Q    Okay.  So your junior year, did you go

8    back to Van Wert --

9         A    No.

10        Q    -- for half a day?

11        A    No.  We had classrooms for English and

12   math and science at Vantage.

13        Q    Okay.  And then what happens your senior

14   year?

15        A    It was the same thing, but I had my lab in

16   the morning and my classes in the afternoon.

17        Q    So you still take some type of core

18   curriculum when you're a junior and a senior?

19        A    Yes.

20        Q    I mean is it like basic English, basic

21   math, or I mean are they accelerated classes,

22   advanced classes?  What are the core classes?

23        A    I -- I still have to take the classes that

24   I -- by the State of Ohio that I have to take in

25   order to graduate.

1      Q    Do you still have to take the same testing

2    that the State of Ohio requires you to test to pass

3    high school?

4      A    Yes.

5              MR. FRANKLIN:  Let's take five

6              minutes, Brian.  I think I'm almost done.

7              (Whereupon, a recess was taken at

8              3:57 p.m. and resumed at 4:05 p.m.)

9    BY MR. FRANKLIN:

10     Q    When was the last time you talked to

11    Lorraine?

12     A    Probably when -- I believe it was last

13    time I was actually there.

14     Q    Did Lorraine try to talk you out of

15    leaving?

16     A    I don't remember.

17     Q    You don't think that would be something

18    you'd remember?

19     A    I do not remember.

20     Q    Were you asked to leave?

21     A    No.

22     Q    Did you tell Lorraine why you were

23    leaving?

24     A    Yes.

25     Q    What did you tell her?

1        A    I told her something to the fact with me

2    driving so much and not getting home until late and

3    with me putting as much money as I was into gas,

4    wear and tear on my car, that it just wasn't worth

5    it to me with the pay.

6        Q    Would it have been worth it if you were

7    moved from part time to full time?

8        A    No, because I still would have been

9    driving back and forth every day and I wouldn't have

10   been able to balance school and work if I was full

11   time.

12       Q    The school that you're going to is 18

13   months, this business school?

14       A    Yes.

15       Q    Do you have a spring break in that school?

16       A    I think.  I don't 100 percently [sic]

17   remember.

18       Q    Are you going to keep your residence as

19   your current residence?

20       A    No.  I'm moving to Indiana.

21       Q    Okay.

22       A    Going to live in the dorms.

23       Q    You're going to live in the dorms?

24       A    Yes.  It's an hour and 15 minutes away

25   from my dad's house.  I'm not driving that far.

1      Q    Well, in March there's a trial date in

2  this case.  I'm just wondering if you're going to be

3  available for trial?

4      A    I would prefer not to miss school.

5      Q    Well, if subpoenaed to come to court and

6  you end up being there, are you going to be upset

7  with Jane?

8      A    No.

9      Q    I mean, are you going to tell the truth?

10     A    Yes.

11     Q    You're not going to take it out on her

12 that you're missing school, are you?

13     A    No.

14     Q    Who do you stay in contact with at

15 St. Marys?  Anyone?

16     A    No one really.  I haven't talked to Kelsey

17 for a long time until she called me and said that

18 there was going to be a lawyer in contact with me.

19     Q    Anyone else?

20     A    I talked to Miranda, but we were friends

21 before she worked there because we worked at

22 McDonald's together and we never worked together.

23     Q    What position did Miranda hold?

24     A    I believe she's an STNA.

25     Q    Is she still there?

1       A    Yes.  I quit there and then later on she

2    got a job.

3       Q    Okay.

4       A    But we text every once in a while.

5       Q    Do you have a Facebook account?

6       A    Yes.

7       Q    Which current or former employees of

8    St. Marys are you Facebook friends with?

9       A    I believe I have Jill on there.  I know I

10   have Kelsey on there, and I have Vicki on there, and

11   I have Miranda on there.  I don't know if you want

12   to know that.

13      Q    Anyone else?

14      A    I don't believe so.

15      Q    Do you have Liz?

16      A    Who.

17      Q    Liz?

18      A    I --

19      Q    Worked in the cafeteria?

20      A    I don't think so.

21      Q    Do you have Darla?

22      A    No.  I have Cassie on there.  She worked

23   there for a while.

24      Q    What did she do?

25      A    She was an STNA.

1      Q    Anyone else, current or former employees

2  of St. Marys that are your Facebook friends?

3      A    I don't think so.

4      Q    Is your Facebook private or public?

5      A    It's private.

6      Q    Was Jill your Facebook friend when you --

7  when she was still working there when you were still

8  there?

9      A    Yes.

10     Q    Kelsey, was she your Facebook friend while

11 the two of you were still working there together?

12     A    Yes.

13     Q    Okay.  What about Vicki?

14     A    Vicki was while I was working there.

15     Q    Miranda?

16     A    That was way before she worked there and I

17 worked there.

18     Q    Cassie?

19     A    Cassie, it was while I was working there.

20     Q    Have you had to use St. Marys for any type

21 of reference since you've left?

22     A    I put it down as a prior job when I got a

23 job at Vancrest which was a nursing home in Van

24 Wert.

25     Q    Okay.  Do you know what they said about

1    you, whether you were a good employee --

2         A    No.

3         Q    -- or did they just give your date of hire

4    and date of separation?

5         A    I do not know.  They don't tell us that.

6         Q    But the truth would be that you resigned

7    from there, correct?

8         A    Resign means quit, right?

9         Q    Yeah.

10        A    Yes.

11        Q    You didn't file for unemployment?

12        A    No.

13        Q    How long is it between the time that you

14    quit and the time you either start working at

15    McDonald's or get your hours increased?

16        A    I went from working at St. Marys to

17   Vancrest.

18        Q    How many hours do you get at McDonald's

19   currently?  Are you still there?

20        A    Yeah.  For right now, until I leave for

21   college.  Like 20 a week maybe.

22        Q    How many does Vancrest give you?

23        A    I don't work there any more.

24        Q    Okay.  Where do you work?

25        A    I work at McDonald's.

1      Q    Just McDonald's 20 hours a week?

2      A    Yes.

3      Q    Is there the opportunity to work part time

4   and you just don't want to work part time?

5      A    I am working part time.

6      Q    Is there an opportunity to work full time?

7      A    No.  I have to be management and when I

8   went back to McDonald's, I asked to be management,

9   but Robin who is the store manager told me that she

10  wasn't going to give me management because I was

11  leaving for college.

12     Q    So your testimony is the most amount of

13  hours you can get without going into management is

14  20?

15     A    No.  The most amount of hours I can get a

16  week is 28 hours.

17     Q    Twenty-eight?

18     A    Yes.  I averagely get scheduled 20 and

19  then I get called in several hours.

20     Q    Is that filling other people's -- if they

21  call off?

22     A    Yes.

23     Q    When you were at Vancrest, did you get any

24  type of evaluation?

25     A    I don't think so.

1        Q    Who was your immediate supervisor?

2        A    I can't think of her name.  She -- the DON

3    for Vancrest has quit since I was there.

4        Q    Okay.  But you don't remember who she was?

5        A    I don't remember her name.

6        Q    How do you know she's since quit?

7        A    Because she quit while I was there.

8        Q    And then someone else became the DON?

9        A    Yes.

10       Q    Who was that?

11       A    I don't remember.

12       Q    How long was it before you left?

13       A    It was shortly before I left.

14       Q    Were you worried at all that giving a

15   statement in this case could be used as some form of

16   retaliation, would cause you to be retaliated

17   against by anyone?

18       A    No.

19       Q    Why did you write then I do not want this

20   to put my job into jeopardy or make it so that

21   anyone is treating me wrong because of this?  Why

22   would you write that if you weren't worried about

23   any type of retaliation?

24       A    While I was working there.  I did not want

25   to be treated differently because I wrote a

1   statement while I was working in St. Marys.

2       Q    Okay.  Well, did anyone treat you --

3       A    No.

4       Q    -- differently?  Did anyone retaliate

5   against you?

6       A    No.

7       Q    Just so I understand, if subpoenaed to

8   come in and testify in March of '15, you'll come in

9   and tell the truth?

10      A    Yes.

11      Q    You intend on legally changing your

12  residence though?

13      A    No.  I'm going to keep my residence at my

14  dad's.

15      Q    At your dad's?

16      A    Yes, so that I don't have to change my

17  license plate, get a different state license plate

18  and all that stuff.

19              MR. FRANKLIN:  I have no further

20          questions.

21              MR. GARRISON:  I don't have anything.

22          Reserve signature.

23              (Whereupon, the deposition was
            concluded at 4:15 p.m.)
24                          - - -

25                      _____
                        CIARA R. McCONN
                        CIARA R. McCONN

1                    C-E-R-T-I-F-I-C-A-T-E

2        I, Teri Genovese Mauro, a Notary Public in and

3    for the State of Ohio, duly commissioned and

4    qualified, do hereby certify that the within-named

5    Witness, CIARA R. MCCONN was by me first duly sworn

6    to tell the truth, the whole truth and nothing but

7    the truth in the cause aforesaid; that the testimony

8    then given by her was by me reduced to stenotype in

9    the presence of said Witness, afterwards transcribed

10   upon a computer; that the foregoing is a true and

11   correct transcription of the testimony so given by

12   her as aforesaid.

13       I do further certify that this deposition was

14   taken at the time and place in the foregoing caption

15   specified and was completed without adjournment.

16       I do further certify that I am not a relative,

17   employee or attorney of any of the parties hereto,

18   or otherwise interested in the event of this action.

19       IN WITNESS WHEREOF, I have hereunto set my hand

20   and affixed my seal of office at Toledo, Ohio, on

21   this 3rd day of October, 2014.

22

23                           TERI GENOVESE MAURO
     My Commission expires        Notary Public
24   June 8, 2018.            in and for the State of Ohio

25