UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

JANE FIELY,                     )
                                )
            Plaintiff,          )
                                )
      vs.                       ) Case No. 3:13-CV-2005
                                ) Judge Carr
ESSEX HEALTHCARE CORPORATION,   )
et al.,                         )
                                )
            Defendants.         )

                    - - -


            Deposition of LORRAINE R. FISCHIO, a

      Witness herein, called by the Plaintiff as if

      upon Cross Examination, pursuant to the Federal

      Rules of Civil Procedure, taken before me, Teri

      Genovese Mauro, Registered Professional

      Reporter, a Notary Public in and for the State

      of Ohio, at the offices of Marshall & Morrow,

      250 S. Civic Centre Drive, Columbus, Ohio, on

      Monday, August 18, 2014, commencing at 10:11

      a.m.

                    - - -


            GENOVESE & RENO REPORTING SERVICE
            414 N. Erie Street, Suite 100
                 Toledo, Ohio  43624
                  (419) 249-2705

I N D E X

DEPOSITION OF LORRAINE R. FISCHIO

Cross Examination                    Page

     By Mr. Franklin                   3

                    - - -

Plaintiff's Exhibits

     14                              123

     15                              131

     16                              132

     17                              164

     18                              178

     19                              179

     20                              180

     21                              207

     22                              209

     23                              258

     24                              278

     25                              283

     26                              284

                    - - -

Objections

     By Mr. Garrison                  12

     By Mr. Garrison                  64

     By Mr. Garrison                 241

     By Mr. Garrison                 282

```
 1   APPEARANCES:

 2     On behalf of the Plaintiff:

 3         WIDMAN & FRANKLIN, LLC
           405 Madison Avenue, Suite 1550
 4         Toledo, Ohio  43604  (419) 243-9005
           By:  JOHN D. FRANKLIN
 5         By:  KERA PAOFF

 6     On behalf of the Defendants:

 7         FAEGRE BAKER DANIELS
           300 N. Meridian Street, Suite 2700
 8         Indianapolis, Indiana  46204-1750  (317) 237-8239
           By:  BRIAN R. GARRISON
 9
     ALSO PRESENT:  Jane Fiely
10                  Susan Kreuser

11                         - - -

12                  LORRAINE R. FISCHIO,

13   a Witness herein, called by the Plaintiff as if

14   upon Cross Examination, was by me first duly sworn,

15   hereinafter certified, testified and said as follows:

16                         - - -

17                  CROSS-EXAMINATION

18   BY MR. FRANKLIN:

19        Q    Please state and spell your full name for

20   the record, please.

21        A    Lorraine, L-O-R-R-A-I-N-E, R., Fischio,

22   F-I-S-C-H-I-O.

23        Q    Miss Fischio, what's the R stand for?

24        A    Renee.

25        Q    Have you been known by any other names?
```

1          A     My maiden name is Calim, C-a-l-i-m.

2          Q     When did you get married?

3          A     1983.

4          Q     At that time, did you take your husband's

5     name?

6          A     Uh-huh.  I did.

7          Q     What's your husband's first name?

8          A     Richard.

9          Q     What's your current business address?

10         A     75 Mote Drive, M-O-T-E, Covington,

11    C-O-V-I-N-G-T-O-N, Ohio, 45318.

12         Q     What business is located at that address?

13         A     Covington Care Center.

14         Q     And how long has that been your business

15    address?

16         A     Three months.

17         Q     What's your residential address?

18         A     9604 Cemetery Road, Wapakoneta, Ohio,

19    45895.

20         Q     How long has that been your residence?

21         A     Since 2004.

22         Q     Do you reside at that location with anyone

23    over the age of 17?

24         A     My husband.

25         Q     Anyone else?

1        A    My son.

2        Q    What's his name?

3        A    Nicholas, N-I-C-H-O-L-A-S.

4        Q    What's his last name?

5        A    Fischio.

6        Q    What's his age?

7        A    Thirteen.

8        Q    Okay.  Anyone else over the age of 17?

9   That was --

10       A    No.

11       Q    -- my question.  Okay.  Just you and

12  Richard?

13       A    Uh-huh.

14       Q    Yes?

15       A    Uh-huh.  Yes.

16       Q    What's your date of birth?

17       A    8/28/61.

18       Q    Have you had your deposition taken before?

19       A    One time probably 30 years ago.

20       Q    What was the nature of that case?

21       A    I worked for a shoe store and they had

22  something that came up missing.

23       Q    Did they blame you?

24       A    No, but they asked everybody to sit

25  through questioning.

1      Q    You had to raise your right hand and swear

2  to tell the truth?

3      A    (Witness nodded.)

4      Q    Was there a court reporter present?

5      A    I don't remember if there was or wasn't.

6      Q    Was there an actual -- was there actually

7  a lawsuit filed?

8      A    I don't know.

9      Q    Were you represented by counsel?

10     A    No.

11     Q    Okay.  What was the final -- what did they

12 finally discover in that case?

13     A    I don't know for sure.

14     Q    Did you have to sit through a polygraph?

15     A    No, I don't think so.  I think I just was

16 asked a series of questions.

17     Q    Was it by an attorney?

18     A    I don't know who it was.

19     Q    Well, I'm sure it's been explained to you

20 but you can see that we have a court reporter, so

21 you'll need to keep your answers audible.  I may see

22 that you're nodding your head or shrugging your

23 shoulders, but the court reporter can't take that

24 down.

25     A    Okay.

1       Q     In general conversation, people anticipate

2    questions and start to answer the question before

3    it's completed.  Even though you may correctly

4    anticipate my question, I ask that you allow me to

5    finish my question and I'll allow you to finish your

6    answer.  That way when we read the transcript,

7    there's not the beginning of my question, the

8    beginning of your answer, the end of my question,

9    the end of your answer.

10          If I ask you a question that you don't

11   understand, I want you to tell me that you don't

12   understand my question and what part of my question

13   you don't understand.  I'll then try to rephrase my

14   question and put it in a form that you will

15   understand.

16          There may be times that you give an answer

17   that I don't understand.  That doesn't mean I don't

18   believe your answer.  You just may be using some

19   phraseology in the workplace I'm unfamiliar with and

20   I may have to ask some follow-up questions so that I

21   completely understand your answer.

22          If at any time you want to take a break,

23   as long as there's not a question pending, just

24   indicate out loud on the record you'd like to take a

25   break and we'll take one.  Okay?

1  A  Okay.

2  Q  Did you review any documents in

3 preparation for your deposition today?

4  A  I did.

5  Q  What documents did you review?

6  A  I have copies here if you want to see

7 them.

8  Q  Sure.

9  A  Oh, no, I don't.  I left them in the car.

10 I reviewed -- I reviewed some statements that I

11 acquired from some staff and I reviewed some

12 employee evaluations.

13  Q  Anything else?

14  A  Couple of e-mails.

15  Q  Who were the e-mails from and to, and what

16 was the nature of the e-mail?

17  A  One e-mail was from me to Susan Kreuser,

18 the HR person.

19  Q  And what did it say?

20  A  That I had tried to reach Jane and that I

21 was unsuccessful and that I didn't think her phone

22 number was still in service.

23  Q  Okay.  What other e-mails did you review?

24  A  I reviewed one that was written to me by

25 Bob Huenefeld.

1          Q      What was the nature of that e-mail?

2          A      It was like a summary of his findings.

3          Q      And that was from Bob, what's his last

4    name?

5          A      It's Huenefeld.

6          Q      What was your understanding as to the

7    position he held at the company at the time?

8          A      I think he was like an HR director.

9          Q      What position did you think Susan held?

10         A      Susan is the -- I think she's vice

11   president of HR.

12         Q      Did you have an understanding that Susan

13   held a higher position than Bob?

14         A      Yes.

15         Q      Okay.  Any other e-mails that you

16   reviewed?

17         A      Huh-uh.  No.

18         Q      No?  You said statements that I acquired?

19         A      Uh-huh.

20         Q      Statements from who?

21         A      Statements from staff that work with Jane.

22         Q      Do you remember the staff members?

23         A      Most of them.

24         Q      Who were they?

25         A      They were Kelsey Quellhorst.

1        Q    Okay.

2        A    Darla Michael.  Ciara, I don't recall her

3   last name.  Jill Roby.  Liz Miller.  There's a lot

4   of other staff that -- Ken Freeman.

5        Q    Ken?

6        A    Uh-huh.  Ken Freeman.  Amanda Hayes.

7   Shelby, I don't recall her last name.  Marge

8   Luedeke.

9        Q    What's Marge's last name?

10       A    Luedeke, it's L-U-E-D-E-K-E.

11       Q    Okay.

12       A    That's about it.

13       Q    What position did Kelsey hold when you

14   took her statement?

15       A    She was a state-tested nursing assistant.

16       Q    Is that an STNA?

17       A    Yes.

18       Q    What position did Darla hold?

19       A    The same.

20       Q    STNA?

21       A    Uh-huh.  Yes.

22       Q    What about Ciara?

23       A    Same, STNA.

24       Q    What about Jill?

25       A    Jill was a nurse.

```
 1        Q      LPN or RN?

 2        A      LPN.

 3        Q      What about Liz Miller?

 4        A      Liz is a diet -- food service supervisor.

 5        Q      How about Ken?

 6        A      Maintenance.

 7        Q      Amanda Hayes?

 8        A      LPN.

 9        Q      How about Shelby?

10        A      I think Shelby's an RN.

11        Q      What about Marge?

12        A      Activity director.

13        Q      Did you just give me a list of all the

14   staff that you remember or all of the statements

15   that you reviewed?

16        A      Those were all the statements I reviewed.

17        Q      Were the statements that you reviewed in

18   typed form or handwritten form?

19        A      Some were typed, some were handwritten.

20        Q      Okay.  Was Kelsey's handwritten or typed?

21        A      I think hers was handwritten.

22        Q      Okay.  What about Darla?

23        A      I think hers was handwritten.

24        Q      Ciara?

25        A      Hers, I think, was typed.
```

1       Q    Jill?

2       A    I don't recall if it was typed or

3   handwritten.

4       Q    Liz?

5       A    Hers was handwritten.

6       Q    Ken?

7       A    Handwritten.

8       Q    Amanda Hayes?

9       A    I don't know.

10      Q    Shelby?

11      A    I don't know.

12      Q    Marge?

13      A    Hers was typed.

14      Q    Do you recall what Amanda Hayes, the

15  nature of what she wrote?

16      A    This -- this pertained to an incident that

17  happened maybe a couple years ago regarding an

18  altercation that her and Jane got into it at the

19  nursing station over.

20      Q    Okay.  So you took -- she gave you a

21  handwritten note regarding an incident that happened

22  years earlier?

23           MR. GARRISON:  Objection.  Form.

24      Q    Go ahead and answer, if you can.

25      A    Well, she -- this is a couple -- a couple

1    years ago we had been having some problems, and I

2    asked the staff to give me some feedback, and she

3    either told me verbally or wrote it in writing.  One

4    of the two.

5         Q    Well, typically if you write something,

6    it's in writing?

7         A    Well, she either gave me a verbal report

8    or she wrote it, but she gave me the information

9    that she had had a conflict with Jane at a nursing

10   station.

11        Q    Okay.  You told me -- I asked you -- I

12   think I asked you about all of the documents that

13   you reviewed and you said one of the documents was

14   from Amanda --

15        A    Uh-huh.

16        Q    -- Hayes?

17        A    Right.

18        Q    So you recall reviewing a document from

19   Amanda Hayes that she had written years ago or that

20   you had asked her to write based on something that

21   happened years ago?

22        A    Well, this -- I had asked her to write a

23   statement of an event that happened back in 2011 or

24   2012.  Those were part of the statements.

25        Q    Okay.  But you asked her when?

1      A    Back at that time to write a statement.

2      Q    Okay.  Did she write the statement?

3      A    She either wrote it or she told me

4   verbally and I wrote it, one of the two.  I can't

5   remember if she wrote it herself or if she just told

6   me about it and I wrote it down.

7      Q    So when you're saying that you reviewed a

8   document from Amanda Hayes, it may have been a

9   document that you drafted?

10     A    It might have been at that time.  I can't

11  recall.

12     Q    Okay.  But when did you draft the

13  document?  At the time of the incident or years

14  later?

15     A    No.  No.  It was at the time of the

16  incident.  It would have been sometime in 2011 or

17  2012.

18     Q    Okay.  But you don't recall if you

19  reviewed your own handwriting or someone else's

20  handwriting?

21     A    Well, two years ago I would have gotten

22  the information from Amanda in some fashion, either

23  a personal interview or a handwritten note.

24     Q    Okay.  You told me that you reviewed

25  documents in preparation for the deposition?

1       A    I looked over some statements.

2       Q    Okay.  And one of the documents was

3   Amanda's document, correct?

4       A    Uh-huh.

5       Q    Is that a document that you drafted or

6   that she drafted?

7       A    I'd have to look at it again to tell you.

8       Q    Okay.  When did you review these documents

9   in preparation for your deposition?

10      A    About 25 minutes ago.

11      Q    Okay.  So you don't remember from 25

12  minutes ago if it was your handwriting or Amanda's?

13      A    Well, I reviewed a lot of documents at one

14  time.  Some were handwritten and some were typed.

15  I'd have to just look at it again and I can tell

16  you.

17      Q    Okay.  So with respect to Amanda Hayes, it

18  may or may not be handwritten, you don't know,

19  correct?

20      A    Correct.

21      Q    And it may or may not be something you

22  drafted?

23      A    It was something -- if it's something that

24  I typed up at the time, it was based on a report

25  from her.

1      Q    Okay.  Well, where did you get the report?

2   Why not just put the report in?

3      A    Because at that time she asked me not to

4   expose her to Jane.  She was worried about some type

5   of retaliation.

6      Q    Oh, really?  Did you write that down

7   somewhere?

8      A    No.  That was just the way -- some of the

9   people gave me statements in writing and some people

10  chose not to.

11     Q    Okay.  Well, is there a list somewhere of

12  all of the people that you asked for statements

13  from?

14     A    No.  I walked -- I went out and talked to

15  the staff at the time.  I had some reports that

16  there were conflicts, and I went out and asked the

17  staff to give me any information they had regarding

18  their relationships with Jane.

19     Q    Okay.  When was that?  Are we talking in

20  '13 or '10 or '11?

21     A    No, we're talking about sometime back in

22  2011 or 2012.

23     Q    2011 or 2012 you asked the staff members

24  to write if they had problems with Jane or --

25     A    I had gotten some verbal reports that

1    there were problems and I asked -- I met with Jane

2    and I told Jane about some of the issues and Jane

3    didn't believe me, didn't feel that that affected

4    her in any way, and asked for proof.  So I went out

5    and said, okay, I'll find proof.  And I asked the

6    staff to give me information regarding good and bad

7    interactions with Jane.

8         Q    Okay.  This prior time --

9         A    Uh-huh.

10        Q    -- the time in '11 or '12, of the list of

11   people that you gave me, which ones are you saying

12   gave you the information in '10 or '11 or '11 and

13   '12?  Amanda?

14        A    Amanda.

15        Q    Okay.  What about Shelby?

16        A    Shelby, uh-huh.

17        Q    Now, Shelby's statement, was that

18   something that you wrote or you typed?

19        A    I have to look at it again.  It's been too

20   long ago, but Shelby gave me a handwritten note and

21   I probably retyped it or put it into some type of

22   report.

23        Q    Okay.  But when you reviewed the documents

24   in preparation for your deposition 25 minutes ago,

25   now maybe 30 minutes or so ago, did you look at

1   what, let's say, Shelby actually wrote or were you

2   looking at what you wrote from Shelby's alleged

3   note?

4        A    I believe I looked at both.

5        Q    Both?

6        A    I believe.

7        Q    Okay.  Is your name on the one that you

8   typed or wrote?

9        A    Yes.  Yes.

10       Q    Okay.  And is Shelby's name on the one

11   that she wrote or typed?

12       A    I don't remember.

13       Q    Okay.  How about Ken, was his --

14       A    Ken's name was on the bottom.

15       Q    -- in '10?

16       A    I remember seeing it.

17            MR. GARRISON:  Wait till he finishes

18            his question.

19       Q    Was his in '11 or 12 or was it in '13?

20       A    I don't recall the exact date.

21       Q    Okay.  Well, I'm just trying to figure out

22   if it's based on this final --

23       A    This was --

24       Q    -- confrontation or the prior?

25       A    This was some time ago.  This would have

Page 19

1   been '11 or '12.

2        Q     '11 or '12?

3        A     Uh-huh.

4        Q     Okay.  What about Liz Miller, was hers '11

5   and '12 or '13?

6        A     Liz was current.

7        Q     Current.  So hers was a current statement.

8   What about Jill?

9        A     Current.

10       Q     What about Ciara?

11       A     Current.

12       Q     What about Darla?

13       A     Current.

14       Q     What about Kelsey?

15       A     Current.

16       Q     Now, is there a list somewhere of -- back

17   in '11 or '12 of the people that you asked that just

18   decided not to?

19       A     No.

20       Q     Why not?

21       A     It wasn't a formalized -- we weren't doing

22   a formal investigation.

23       Q     When you say "we," are you talking about

24   yourself in the third person or are you talking

25   about yourself?

```
 1        A      I'm talking about myself and the company.

 2   This was not a formal investigation.

 3        Q      Well, you said we didn't conduct a formal

 4   investigation.  Are you talking about you and other

 5   people or just you?

 6        A      Just me.

 7        Q      So you're talking about yourself in the

 8   third person?

 9        A      Uh-huh.  Uh-huh.

10        Q      Yes?

11        A      Yes.

12        Q      So how do you know that Jane didn't

13   believe the accusations that you were making in 2011

14   and 2012 where you thought you needed to get proof?

15   What did she say?

16        A      Well, Jane did not recall any of the

17   incidents.  I don't believe she could recall

18   anything specific, and I needed to give her

19   information to use to coach.

20        Q      Okay.  Did you do that?

21        A      I did.  I met with Jane.

22        Q      Along with the handwritten notes that you

23   had from the employees?

24        A      I gave her a packet of information to

25   review.
```

1      Q    Okay.  Was it the handwritten notes from

2   the employees?

3      A    I can't recall.  I believe it's the same

4   form that I just reviewed.  Some probably were

5   handwritten, some weren't.

6      Q    Well, did you give her the handwritten

7   notes from the employees or the handwritten -- or

8   the typed or handwritten notes that you created?

9      A    I think I gave her both, but I --

10      Q    Okay.  Did you give her both to keep?

11      A    I handed them to her to review.

12      Q    Okay.  Did you tell her she could keep

13   them or she had to turn them back in?

14      A    I don't remember.

15      Q    Okay.  Did you tell her that some of these

16   I created from conversations or what I read?  Did

17   you tell her that?

18      A    I don't recall.

19      Q    Okay.  You said that was -- you were using

20   it for coaching?

21      A    Yes.

22      Q    Is that a term of art?  Is that something

23   that's used in the business?  What is coaching?

24      A    Well, I think coaching is trying to help

25   someone understand.  Help them focus on areas that

1   need improvement.

2        Q    Is coaching part of discipline?

3        A    No.

4        Q    Okay.  The e-mails that you reviewed from

5   you to Susan, were those things that happened in '11

6   and '12 or in '13?

7        A    I think it was just the issue of the

8   current day of '13.

9        Q    '13?

10       A    (Witness nodded.)

11       Q    The document that you reviewed from Bob,

12  did that concern things in '11 and '12 or things in

13  '13?

14       A    '13.

15       Q    The documents that you reviewed in

16  preparation for your deposition, did you have those

17  at home or were they supplied to you by someone?

18       A    I had a copy that I had with me.

19       Q    You had a copy of the documents?

20       A    I had a copy of the information that I

21  sent to Bob Huenefeld and, yes, I had a copy.

22       Q    So a copy at your home?

23       A    I'm not sure.  I think I had them at work,

24  and when I left the company, I probably kept them.

25       Q    You kept company documents when you left?

1       A     Well, they weren't -- I don't believe they

2   were company documents.

3       Q     Why do you believe they weren't company

4   documents?  You're talking about employees'

5   statements?

6       A     Well, I don't know.  When I cleaned out my

7   desk, I took them with me.

8       Q     Okay.  My question is do you consider

9   employee statements company documents?

10      A     Yes.

11      Q     Okay.  Do you consider e-mails that are to

12  and from individuals who work for the company

13  company documents?

14      A     Yes.

15      Q     So why -- what documents did you take that

16  you didn't consider to be company documents?

17      A     I didn't take any documents that I didn't

18  consider to be company documents.

19      Q     Okay.  Did you have a notebook that you

20  wrote on at work?

21      A     Yes.

22      Q     Okay.  What happened to the notebook?

23      A     I think I destroyed it, but I can't

24  recall.

25      Q     Well, tell me about the notebook.  Was it

1  a spiral-bound notebook, a three-ring binder?  What

2  was it?

3       A    I kept a couple of notebooks.

4       Q    Okay.

5       A    And I cleaned out my desk.  I don't recall

6  what I did with them.  I probably pitched them.

7       Q    Not asking that yet.

8       A    Oh.

9       Q    Were they spiral notebooks?  Were they

10  three-ring notebooks?  What were they?

11       A    Normally I would use a legal tablet.

12       Q    Okay.  So when you say you had a couple of

13  notebooks, were they both legal tablets?

14       A    Yes.

15       Q    Okay.  Were they the size that I'm holding

16  up or were they bigger legal tablets?

17       A    They're the normal size.

18       Q    Okay.  What distinguished the two

19  notebooks?  Did you put certain information on one

20  notebook and certain information in the other

21  notebook?  How did that work?

22       A    I used one for a to-do list.

23       Q    Okay.  What was the other one for?

24       A    General notes.

25       Q    Did you only go through the one legal pad

1    while you were there?  Did you go through several?

2         A    I don't recall.  More than one.

3         Q    Okay.  Well, did you save those notebooks?

4         A    No.

5         Q    Does the company have a document retention

6    policy that you're aware of?

7         A    No.

8         Q    Did anyone ever talk to you about a

9    litigation hold?

10        A    No.

11        Q    No one ever told you to save documents

12   related to the day-and-day operations of the

13   facility, in particular Jane?

14        A    No.

15        Q    Were there anything in those documents

16   related to Jane, either her employment or

17   termination?

18        A    No.

19        Q    Then what were the documents -- what did

20   you put in the second notebook?  What notes were in

21   there?

22        A    Nothing related to Jane.  Just work issues

23   that needed to be addressed.

24        Q    Isn't Jane a work issue?

25        A    Not a primary one, no.

Page 26

```
 1        Q    Well, are you saying you only put primary
 2   issues in the notebook?
 3        A    Yes.  Pretty much, yes.
 4        Q    Where -- do you have any of those
 5   notebooks left?
 6        A    No.
 7        Q    Okay.  When was the last time you saw one
 8   of your notebooks?
 9        A    Well, I think I disposed of one or two the
10   night that I cleaned my desk out.
11        Q    Okay.  When was that?  When did you clean
12   your desk out?
13        A    Sometime around March or April this year.
14        Q    March or April of 2014?
15        A    Uh-huh.
16        Q    Yes?
17        A    Yes.
18        Q    You have to answer audibly.  Did you look
19   through the notebook before you threw it away?
20        A    I looked through everything before I
21   pitched it.
22        Q    Okay.  But did you look through the
23   notebook before you threw it away?
24        A    Not to study it.  I just probably rifled
25   through it to see if there was anything stuck in it
```

Page 27

1    before I just -- I cleaned out a bunch of stuff and

2    just put it in the shredder.

3         Q    Well, before you cleaned out a bunch of

4    stuff and put it in the shredder, did you make sure

5    that there was nothing in the documents related to

6    Jane's employment or termination?

7         A    There was nothing there in my -- about

8    Jane, no.

9         Q    Well, you said you rifled through it and

10   you didn't study it.

11        A    Uh-huh.

12        Q    Does that mean you just flipped through it

13   to make sure nothing was stuck in between the pages?

14        A    These were things that weren't relevant to

15   anything.  These were just notes of telephone calls

16   or notes of activities I needed to work on, things

17   of that nature.  There was nothing of a specific

18   employee type --

19        Q    What do you mean there was nothing

20   relevant?  Were you making that decision?

21        A    Yes.

22        Q    Now, the notes that you looked at to

23   prepare yourself for today's deposition, were they

24   provided by the attorney or did you bring those

25   notes with you?

1       A     They were provided by the attorney.

2       Q     Okay.  So all of the documents that you

3  had, the e-mails that you discussed and the

4  evaluations, those were documents the attorney

5  provided, correct?

6       A     Yes.

7       Q     Okay.  Did you have any documents that you

8  brought --

9       A     No.

10       Q     -- or reviewed in preparation for your

11  deposition?

12       A     No.  I downloaded from the computer is

13  what I reviewed.

14       Q     What do you mean you downloaded from the

15  computer?

16       A     I got a copy of something from either

17  Susan or Brian with notes on it and reviewed those.

18       Q     Okay.

19       A     Whatever.

20       Q     From Susan or Brian?

21       A     Uh-huh.

22       Q     Do you know if it was from Susan or if it

23  was from Brian because that makes a difference?

24       A     I don't recall.

25       Q     Do you still have the e-mail?

1      A    I don't -- this was months ago.  I don't

2   recall.  I think I was still employed with the

3   company at that point.

4      Q    Okay.

5           MR. GARRISON:  He's asking you about

6           this -- preparation for this deposition.

7           The documents you reviewed in preparation

8           for today.  Am I right, John?

9           MR. FRANKLIN:  Absolutely.

10           MR. GARRISON:  And who you received

11           those documents from.

12      A    That's what I'm saying.  I printed off a

13   copy of those documents from somebody a while ago,

14   and after I left the company, I held on to them

15   because I figured we would need them, but I

16   didn't -- I don't recall who sent them to me.

17      Q    Okay.  Well, let's just get a list of

18   documents that you held on to when you left.  Were

19   they the documents we've already discussed?  Yes?

20      A    Yes.

21           (Whereupon, Susan Kreuser came into

22           the room.)

23      Q    Any other documents?

24      A    No.

25      Q    Did you ever produce the notebooks to

1   anyone above your reporting level so they could look

2   through the notebooks to see if there was anything

3   that may be relevant to this case?

4        A    No.  And the notebooks I'm describing are

5   just work notebooks that you would use in everyday

6   office practices.

7        Q    Those are the notebooks we'd like to look

8   at.  Do you have private notes at home related to

9   Jane or Jane's termination?

10       A    No.

11       Q    Do you have -- did you keep any documents

12  on any kind of external drive or stick related to

13  your employment?

14       A    No.

15       Q    So you didn't forward like your e-mails

16  anywhere?

17       A    No.

18       Q    Did you have a company laptop?

19       A    No.

20       Q    Did you have a company desktop?

21       A    Yes.

22       Q    Did you transfer the information from the

23  hard drive on the desktop to anywhere?

24       A    No.

25       Q    Did you leave the computer when you left?

1       A       Yes.

2       Q       Did you wipe anything from the computer?

3       A       No.

4       Q       With respect to e-mails, did you delete

5    e-mails or did you just save every e-mail?

6       A       I didn't delete anything --

7       Q       Okay.

8       A       -- that I recall.

9       Q       Do you have a laptop at home?

10      A       No.

11      Q       Do you have a desktop at home?

12      A       Yes.

13      Q       Is there -- are there any documents

14   related to your former employer at home on that

15   desktop?

16      A       I don't recall.

17      Q       Well, did you look through it?

18      A       No.

19      Q       When did you leave the company?  What was

20   the date?

21      A       I don't recall.  Sometime toward the -- I

22   think it was towards the middle to end of March of

23   this year.

24      Q       Middle or end of March?

25      A       I think so.

1    Q    When did you start with your new employer?

2    A    I started there on -- I think May, first

3    week of May.

4    Q    Why did you leave the company?

5    A    I got a better offer.

6    Q    Had you been looking for work?

7    A    Yes.

8    Q    How long had you been looking?

9    A    Probably two, three months.

10   Q    Two or three months before you left?

11   A    Yes.

12   Q    So would you -- would your testimony be

13   that you started looking for a job in January of

14   '14?

15   A    Probably close to there.

16   Q    Why were you looking for another job?

17   A    I felt like I had accomplished most of the

18   things that needed to be done there, and I was

19   looking for a different opportunity and more money.

20   Q    You think that you accomplished everything

21   that needed to be done there?

22   A    Uh-huh.

23   Q    Yes?

24   A    Yes.

25   Q    Okay.  What were the things that you

1  accomplished that led you to the conclusion that you

2  had accomplished everything that needed to be done

3  there?

4      A    Well, we had consistently high occupancy.

5  We rolled into a five-star facility.

6      Q    What does that mean?

7      A    Five star rating is like -- it's a CMS

8  rating and it's from 1 to 5.  It determines how well

9  a facility is viewed by the community.  Five star

10  being the highest.  We -- we did the application to

11  the American Health Care Society.  We got the silver

12  award which is a very good --

13      Q    When did you get the silver award?

14      A    Sometime -- I think we got notice

15  sometime -- I don't know, a couple weeks after I

16  left.

17      Q    Had you ever got the silver award before?

18      A    No.

19      Q    Is there a bronze, silver, and gold?

20      A    Yes.

21      Q    Had you ever gotten the bronze before?

22      A    Yes.

23      Q    When did you get the bronze?

24      A    Sometime back in, I think, 2012.

25      Q    While Jane was the DON?

Page 34

1       A      Yes.

2       Q      What else did you feel that you

3  accomplished?

4       A      I felt like the building was stable and

5  that the -- that it was being well ran and good

6  community reputation.

7       Q      Well, I mean, you didn't get the gold

8  award, right?

9       A      Well, they're progressive.  You have to go

10  through steps.

11      Q      Okay.  Well, so there was something left

12  to accomplish, correct?

13      A      I don't think the building would ever have

14  been capable of achieving a gold standard.

15      Q      Why not?

16      A      There were some things that needed to be

17  completed.

18      Q      Like what?

19      A      More computer -- I think we needed better

20  computerized systems for tracking.  We needed to

21  probably improve the physical plant a little bit

22  more.

23      Q      The physical plant?

24      A      Uh-huh.

25      Q      What does CMS stand for?

1        A     Center for Medicare Services.

2        Q     Well, did you apply for other positions

3   within the company?

4        A     There truly weren't any other positions

5   within Atrium available.

6        Q     So your testimony is no --

7        A     No.

8        Q     -- you didn't apply?

9        A     No, I didn't apply.

10       Q     You said there weren't any positions

11  available.  How do you know that?

12       A     Well, in order to go further in the

13  company, I felt like you really needed to be more

14  mobile and I wasn't willing to travel extensively.

15       Q     Okay.  Well, I mean, were you looking at

16  job opportunities on-line?

17       A     I was actually approached by another

18  company.

19       Q     Okay.  But I'm saying for -- you said that

20  you didn't think there was anything within the

21  company available, and I asked you how you knew

22  that.

23       A     Uh-huh.

24       Q     And I'm just wondering is there like an

25  intranet that you could look at?  Was there a phone

1  that you could call and check job openings?  How did

2  that work?

3       A    Well, I would say word of mouth.

4       Q    Word of mouth.  Okay.  Anything other than

5  word of mouth?

6       A    There -- you could have gone to possibly

7  CareerBuilder.  That was popular.

8       Q    So you would go onto CareerBuilder to see

9  if there was an opening within your own company?

10      A    Yes.

11      Q    Did you ever do that?

12      A    No.

13      Q    Okay.  Again, I'm trying to find out how

14 you knew there were no openings within the company.

15 Other than word of mouth, is there something else

16 that you looked at?

17      A    There may have been openings in the

18 company, but nowhere in my immediate area.  I wasn't

19 willing to drive more than --

20      Q    Okay.  But how do you know that?

21      A    That would be something I would determine

22 from my boss, my supervisor.

23      Q    Who's your supervisor?

24      A    Barry DeRossett.

25      Q    Did you ever ask Barry if there were any

1    openings?

2         A    No.

3         Q    Did you ever ask anyone in human resource

4    if there were any openings, like Bob?

5         A    No.  If there had been an opening, Bob

6    probably would have shared it with me.

7         Q    Why?  Did you tell Bob share with me any

8    openings within the company?

9         A    No, but it was a very small company and

10   word of mouth between administrators would have -- I

11   would have found out if there was an opening.

12        Q    What do you mean it was a small company?

13   How many facilities does the company operate?

14        A    Well, in my area, there were only, I

15   think, three within my driving distance, even close.

16        Q    Okay.  But how many overall do you think

17   the company operates?

18        A    Probably 40, 40 or 50.

19        Q    Well, did you call Susan and ask her if

20   there were any openings?

21        A    No.

22        Q    Did you have the other position before you

23   left?

24        A    It was fairly simultaneous, within a day

25   or two.

1      Q    Well, I mean which happened first?  You

2    told me that you left in March and began your new

3    job in May.

4      A    Uh-huh.

5      Q    So that's a couple months --

6      A    Uh-huh.

7      Q    -- where you weren't working.

8      A    Uh-huh.

9      Q    So did you leave and then get the job at

10   Coventry or did you already have the job at Coventry

11   and then leave?

12     A    I -- it was close.  I was in the process

13   of negotiating, but I don't -- I can't recall which

14   came first, if I left or took the offer.  It was

15   somewhere during a period of a few days.

16     Q    I mean, did you go to anyone at the

17   company and say I have this offer from Coventry, but

18   I'd really like to stay here, is there anything you

19   can do?

20     A    No.

21     Q    Were you asked to find another job?

22     A    No.

23     Q    Was there something that was going on that

24   you weren't happy with at the company so you decided

25   to leave other than your claim that there weren't

1   any jobs available above your reporting level at

2   that time?

3        A    There were a couple of things that were

4   frustrating.  Staffing levels were not really

5   properly maintained.  We had a need for a sheltered

6   walkway that was taking quite a while to deliver.

7   And basically, I had -- the size of the building was

8   small.  I think I had maxed out any potential there

9   and was looking to go on to a different -- larger

10  opportunity.  So --

11       Q    What do you mean the staffing levels

12  weren't properly maintained?  What does that mean?

13       A    We were struggling to maintain and keep

14  staff, and we were meeting our state-required goals

15  but doing it by using department managers to

16  supplement.

17       Q    What jobs were you not able to maintain?

18       A    We were able to maintain the

19  state-required staffing.

20       Q    I get that, but you said that you used

21  other employees to fill certain roles?

22       A    Uh-huh.

23       Q    I mean, what were you having trouble --

24  which job, STNAs?

25       A    STNA.

1      Q      Okay.  How would you get STNAs to work

2   there?

3      A      Well, we would advertise.

4      Q      Okay.  Advertise where?

5      A      In CareerBuilder and the newspaper.

6      Q      On CareerBuilder?

7      A      Uh-huh.

8      Q      And what newspaper?

9      A      The Daily Standard.

10     Q      Anything else?

11     A      Try to do some employee recruitment.

12     Q      Okay.  How would you do that?

13     A      Ask our good employees for referrals.

14     Q      Well, did you do something for the good

15   employee if they referred someone?

16     A      We would give them some form of

17   compensation.

18     Q      Okay.  Financial compensation?

19     A      I think we paid out some kind of a

20   recruitment bonus, but I don't remember how much or

21   how often.

22     Q      Okay.  An STNA, how long does it take a

23   person to get that certification?  Is there like a

24   class?

25     A      Somewhere between two to four weeks maybe.

1      Q     Where do they take those classes, if they

2   do?

3      A     In our area, it was probably the Apollo,

4   JVS.

5      Q     Okay.  Did you recruit there?

6      A     We would call or put a poster up.

7      Q     Other than STNAs, were you having trouble

8   maintaining any other positions?

9      A     No.  That was primarily --

10     Q     Okay.  When you left in March of '14, was

11  Kelsey still working?

12     A     As far as I recall.

13     Q     Okay.  Was Ciara still working?

14     A     I don't remember.

15     Q     Was Jill still working?

16     A     Yes.

17     Q     How do you know that for sure?

18     A     Well, she -- I think she was still working

19  at the time I left.  She called me the other day and

20  I think she said she's still there.

21     Q     Why did she call you the other day?

22     A     Just to say hello and to let me know she's

23  pregnant.

24     Q     Did you talk about Jane in any way?

25     A     No.

1       Q     Was Darla still there?

2       A     I don't think so.

3       Q     Was Liz still there?

4       A     When I left?

5       Q     Yes.

6       A     Yes, Liz was there.

7       Q     Was Amanda still there?

8       A     Yes.

9       Q     Was Shelby still there?

10      A     No.

11      Q     When did she leave?

12      A     Couple years ago.

13      Q     Did she resign?

14      A     I think so.  I don't recall for sure.

15      Q     So are you saying that you don't have

16   present day recollection?

17      A     Yes.  That would be a good --

18      Q     Okay.  What about Marge?

19      A     Marge is still there.

20      Q     Who do you stay in contact with now that

21   you've left?

22      A     I've talked to several people in the last

23   few months.  I've talked to Erika Ritenour.

24      Q     Is she the new DON?

25      A     Yes.

1       Q    Okay.  Who else?

2       A    Gabbie.

3       Q    What's Gabby's position?

4       A    Gabby is a unit manager.

5       Q    Okay.  Who else?

6       A    I've talked to Kat Klosterman.

7       Q    Kat?

8       A    Katherine Klosterman.

9       Q    What's her position?

10      A    Katherine is the MDS nurse.

11      Q    What's MDS stand for?

12      A    Minimum data set.

13      Q    Okay.  Anyone else?

14      A    Talked to Lisa Inskeep.

15      Q    What position did she hold?

16      A    Missions marketing.

17      Q    Okay.  Anyone else?

18      A    I think that's it.

19      Q    Did you talk to any of these employees

20  about Jane --

21      A    No.

22      Q    -- in any way?

23      A    No.

24      Q    Didn't talk to Lisa about her?

25      A    No.  I don't recall that.

1      Q     Well, when you say you don't recall,

2   again, does that mean it could have happened, you

3   just don't have present day recollection?

4      A     I don't -- no.  I'd say no.

5      Q     Okay.

6      A     I can't remember the verbiage of every

7   phone call, but no, I don't remember that.

8      Q     Okay.  When you say you don't remember --

9      A     No present day recollection.

10     Q     Okay.  Is it possible that you talked to

11  Cathy about Jane?

12     A     No.

13     Q     Is it possible you talked to Gabby about

14  Jane?

15     A     No.

16     Q     Is it possible you talked to Erika about

17  Jane?

18     A     No.

19     Q     To your knowledge, who took your place?

20     A     I don't know.

21     Q     Has it been permanently filled or is it

22  filled with an interim director -- administrator?

23     A     Oh, wait, there was a gentleman there that

24  took over for me.  His name was Bob.

25     Q     What's his last name?

1     A    Riley.

2     Q    Was it your understanding he was an

3  interim administrator or he was going to be the

4  full-time administrator?

5     A    I think he was just temporary.

6     Q    Okay.  How many places did you put in your

7  application to in order to find the job at Coventry?

8     A    One.  That was it.

9     Q    That was the only place you looked?

10    A    That was the only place I applied.

11    Q    Okay.  Did you know someone that worked

12  there?

13    A    I knew someone that recommended me for the

14  job, yes.

15    Q    Who was that?

16    A    Amy Kentner.

17    Q    Kentner?

18    A    Uh-huh.

19    Q    Yes?

20    A    Yes.

21    Q    What position did she hold with Coventry,

22  if she did?

23    A    She works for the same corporation.  She

24  works at a different facility.  It's the same

25  corporation.

Page 46

1        Q    What position does she hold?

2        A    Administrator.

3        Q    She's an administrator?  Did the two of

4    you ever work together?

5        A    Yes.

6        Q    Okay.  Where did the two of you work

7    together at?

8        A    At Wapak Manor.

9        Q    Where's Wapak Manor?

10       A    It's in Wapakoneta, Ohio.

11       Q    What did the two of you do there?

12       A    I was the administrator and she was the

13   director of nursing.

14       Q    Okay.  And then she went from a DON to

15   administrator?

16       A    Yes.

17       Q    Okay.  When did that happen, if you know?

18       A    Sometime maybe 2012, 2011.

19       Q    Okay.  We'll get back to that.  Tell me

20   all of the counties and states you've lived in as an

21   adult since you've turned 18.

22       A    Okay.  What was it, county and state?

23       Q    County and state.

24       A    Summit County, Ohio.

25       Q    Okay.  That's in Akron, right?

Page 47

```
 1        A    Right.

 2        Q    What years or year did you live in Summit

 3   County?

 4        A    I lived there from 1980 --

 5        Q    Okay.

 6        A    -- to 1987.

 7        Q    Okay.  What other county and state did you

 8   live in?

 9        A    I lived in Shelby County.

10        Q    Ohio?

11        A    Ohio.

12        Q    Anywhere else?

13        A    I've lived in Allen County, Ohio.

14        Q    Lima?

15        A    Bluffton.

16        Q    Bluffton.  All right.

17        A    And I've lived in Auglaize County.

18        Q    Is that everywhere you've lived?

19        A    Since I've been 18?

20        Q    Yes.

21        A    Yes.

22        Q    Have you ever been a plaintiff in a

23   lawsuit?  You've sued someone?

24        A    I'm trying to recall.  No.

25        Q    Have you ever been a defendant in a
```

Page 48

1    lawsuit?

2         A    Yes.

3         Q    Okay.  When were you a defendant in a

4    lawsuit?

5         A    I was a defendant in a lawsuit from

6    Moulton Gas Company in -- sometime in the '80s.

7         Q    Who was suing you?

8         A    Moulton Gas Company.

9         Q    They were suing you?

10        A    (Witness nodded.)

11        Q    What were they suing you for?

12        A    It was something about -- they moved a

13   tank, a propane tank.  They filled it up and did

14   something else to it and then charged us for it and

15   we actually -- well, then I guess I was the

16   defendant, but then we actually didn't have to pay

17   it.  They did it on their own or something.  I don't

18   know.  They just did it and there was some

19   confusion.

20        Q    Well, did they sue you?

21        A    Yes, they did.

22        Q    Okay.  Where was the lawsuit filed?

23        A    Somewhere around Shelby County.

24        Q    Was it in state court or federal court?

25        A    I guess it was state.

1       Q       Was your husband also sued?

2       A       Yes.

3       Q       Anyone else a defendant in that case?

4       A       No.

5       Q       Okay.  How did the case conclude?

6       A       They dropped it and agreed they made a

7   mistake and didn't charge us for it.

8       Q       They dismissed the case?

9       A       Yes.

10      Q       And they agreed in writing they made a

11  mistake?

12      A       No.  They just said that they had done --

13  they sent a letter or something that said that they

14  had acted wrongly or something and said that we

15  didn't have to pay the bill.

16      Q       Did you have a lawyer?

17      A       No.

18      Q       Any other times you've been a defendant in

19  a lawsuit?

20      A       No.  That's it.

21      Q       Other than today and the case with Moulton

22  Gas and the first case you told us about where you

23  had your deposition taken about 30 years ago, have

24  you ever been a witness in a lawsuit?

25      A       No.

1       Q    Okay.  Other than the times we've already

2   talked about, have you ever given testimony under

3   oath?

4       A    No.

5       Q    Have you ever testified, for instance, in

6   an unemployment hearing?

7       A    No.

8       Q    Have you ever testified for the Ohio Civil

9   Rights Commission?

10      A    No.

11      Q    No administrative testimony?

12      A    No, not that I can recall.

13      Q    Have you ever been arrested for a

14  misdemeanor or felony?

15      A    No.

16      Q    Have you ever served in the military?

17      A    No.

18      Q    Are you a high school graduate?

19      A    Yes.

20      Q    When and where did you graduate from high

21  school?

22      A    Wapakoneta Senior High School, 1979.

23      Q    Do you have any formal post high school

24  education?

25      A    Yes.

Page 51

1          Q     Tell me about that.

2          A     I have a bachelor's in organizational

3    management and business.

4          Q     Okay.  Is that a BS or a BA?

5          A     BA.

6          Q     And what college did you go to to obtain

7    that degree?

8          A     University of Akron.

9          Q     What year did you attend the University of

10   Akron?

11         A     1980 to '85.

12         Q     Did you attend any other schools before

13   you attended the University of Akron?

14         A     I attended Kent State University for like

15   one quarter.

16         Q     What year did you attend Kent State?

17         A     Either '80 or '81.

18         Q     Kent State was on quarters then?

19         A     I think so.  I went for -- I went for six

20   or eight weeks or something like that.

21         Q     And then did you transfer or drop out or

22   what happened?

23         A     I don't remember if I transferred or

24   started at UA.  I don't remember.

25         Q     What classes were you taking at Kent

1    State?   What was your course of study there?

2         A    I don't remember.

3         Q    Was your initial course of study at the

4    University of Akron organizational and business?

5         A    Was my what, please?

6         Q    Was that your initial course of study,

7    what you got your degree in?

8         A    Yes.

9         Q    Did you go full time?

10        A    Part of the way, and part time some of the

11   time.

12        Q    Okay.  Well, did you start out full time

13   and switch to part time?  How did it work?

14        A    I started out -- I think I started out

15   full time and switched to part time.

16        Q    Okay.  Do you have any other formal post

17   high school education?

18        A    I've started my master's right after that,

19   but I didn't finish it.

20        Q    Where did you attempt to get your master's

21   at?

22        A    University of Akron.

23        Q    What do you mean that you started to get

24   your master's?  Did you go there a year?

25        A    I think I took two or three courses.

1       Q    What were you getting your master's in?

2       A    I wasn't sure at that point.

3       Q    You weren't attempting to get like an MBA

4  or anything?

5       A    I was thinking business, but I wasn't sure

6  at that point.

7       Q    What caused you to drop out?

8       A    We moved.

9       Q    What year was that that you stopped going

10  to the University of Akron?

11       A    Either -- left in either '85 or '86.

12       Q    Other than your driver's license, do you

13  hold any license or certifications?

14       A    Well, I have my administrator's license.

15       Q    Okay.  When did you first get that?

16       A    Oh, I think it was in 1991 or '92.

17       Q    How do you go about getting an

18  administrator's license?

19       A    Well, you have to fill out your

20  application.

21       Q    Okay.

22       A    And then I think you have to be accepted,

23  and then you have to take an internship of some

24  type.

25       Q    Okay.  What do you mean you have to be

1   accepted?  Do I need to have a particular degree?

2   Do I need to have a degree?

3        A    Well, at that time you had to have a

4   degree, but based on what type of degree you had, it

5   was determined how long your internship would be.

6        Q    Okay.  So how long was your internship?

7        A    Nine months.

8        Q    For those nine months, do you get paid?

9        A    I did not.  I did an unpaid internship.

10       Q    What's your position when you're doing the

11  unpaid internship?

12       A    Well, you're working throughout the

13  building and whatever part of your education you're

14  doing.

15       Q    Well, I mean, you wanted an

16  administrator's license.  Did you shadow the

17  administrator?  Did you --

18       A    Yeah.

19       Q    -- do STNA work?  What did you do?

20       A    You do both.  I was an STNA and I also

21  shadowed the administrator.  Worked in the kitchen.

22       Q    Anything else?

23       A    That's pretty much it.

24       Q    Do you have any medical training?

25       A    I have my STNA and I'm CPR certified.

1       Q       Okay.  Any other medical certifications?

2       A       No.

3       Q       Any medical degrees?

4       A       No.

5       Q       Any medical license?

6       A       No.

7       Q       After that nine months, what happens?

8    After the internship.

9       A       Then you sit for a state and federal test.

10      Q       I mean, is it two tests or one test?

11      A       It is two tests.

12      Q       So does it matter what -- if I sit for the

13   state test first or the federal?  Does it matter?

14      A       I don't know that it matters.

15      Q       Okay.  Can I take them both on the same

16   day?

17      A       I don't know.  I guess you could if you

18   wanted to.

19      Q       Okay.

20      A       I don't know.  They schedule them for you.

21      Q       All right.  What type of test?  Is it like

22   multiple choice?  Is it true/false?  Is it matching?

23   Is it essay?  What is it?

24      A       I don't recall exact type of question.

25      Q       Wait.  But I'm asking for the format.  Was

Page 56

1   it multiple choice or was it true/false or was it

2   essay?  Was it combination?  Say for the state test.

3   Let's start there.

4       A    I'm sorry, I don't recall the exact type

5   of questions they were.

6       Q    How long did the test take, the state

7   test?  How long were you given?

8       A    I don't remember.

9       Q    Did you get -- did you know if you passed

10  right at the time you take the test or is it weeks

11  later, months later?

12      A    I remember I had to wait several weeks to

13  find out if I passed.

14      Q    Okay.  Do you have to pass one test in

15  order to take the next test or could you have taken

16  the state test on one day and then the very next day

17  taken the federal test?

18      A    I don't know.

19      Q    Okay.

20      A    I just took them.

21      Q    Took -- which did you take first?

22      A    I think I took the state first.

23      Q    Did you wait to get your score before

24  moving on to the next test?

25      A    I don't recall.

Page 57

```
1        Q    Okay.  With respect to the federal test,
2   is it -- do you know how long it is?
3        A    I don't remember for sure.
4        Q    Is it matching, true/false, multiple
5   choice or essay or a combination?
6        A    I don't remember.
7        Q    Did you pass the state test on the first
8   try?
9        A    Yes.
10       Q    Did you pass the federal on the first try?
11       A    Yes.
12       Q    Okay.  Once you pass the federal, so now
13  you've passed both tests, what happens next in order
14  to get your administrator's license?
15       A    I got a letter in the mail.
16       Q    Okay.
17       A    With my license.
18       Q    Okay.  So nothing else happens?
19       A    No.
20       Q    You pass both those tests, you're in?
21       A    (Witness nodded.)
22       Q    How long does the license last?
23       A    They're granted annually.
24       Q    Do you have to do anything to maintain the
25  license?  Pay money or take a test or --
```

```
 1       A    Yes.

 2       Q    -- take continuing education?  What do you

 3   do?

 4       A    I do 20 hours of education.

 5       Q    Yearly?

 6       A    Yearly.

 7       Q    Okay.  What else?

 8       A    There's a fee, an annual fee.

 9       Q    Okay.  Anything else?

10       A    No.

11       Q    Who's the certifying body?

12       A    It's a group out of Columbus.

13       Q    Okay.  But what are they called?

14       A    They're called BENHA.

15       Q    Benhall?

16       A    B-E-N-H-A.

17       Q    L-L?  Benhall?

18       A    No, BENHA.

19       Q    Is that an acronym for something?

20       A    Yeah.  I'm trying to remember what it's

21   the acronym for.  It's an examiner board.

22       Q    Okay.  And that's who you pay the fee to?

23       A    Right.

24       Q    Anything else you have to do to maintain

25   your license other than the 20 hours of education
```

Page 59

1   and the fee?

2        A     Not that I know of.

3        Q     Is that an every year thing?

4        A     Yes.

5        Q     Okay.  Do you ever provide any of the

6   education?  In other words, you talk to individuals

7   so they can get their hours for their education

8   component?

9        A     We do some education on-line through

10  Silverchair Relias.

11       Q     No.  Do you ever do it?

12       A     Oh.

13       Q     Like you stand up in front of a group and

14  you say here's the topic I'm going to speak on and

15  you speak for an hour or two?  You provide the

16  education?

17       A     Twenty years ago they did it that way.

18  Now it's on-line.

19       Q     Is there someone speaking on-line?

20       A     No.

21       Q     Just read things on-line and take --

22       A     Yes.

23       Q     Do you take a test at the end of what you

24  read?

25       A     Yes.

Page 60

1        Q    Do you have like a yearly convention, this

2   BENHA?

3        A    No, not through BENHA.  There's an annual

4   convention through Ohio Health Care but it's not

5   required.

6        Q    Okay.  Do you go to the annual convention?

7        A    Once every three, four years maybe.

8        Q    Do they provide written materials at the

9   BENHA -- or at the Ohio Health Care convention?

10       A    Yes.

11       Q    Have you kept your written materials?

12       A    No.

13       Q    Okay.  When you've gone to the annual

14  convention put on by the Ohio Health Care, have they

15  ever given you any type of training related to the

16  FMLA?

17       A    I don't recall.

18       Q    In your education that you get on-line

19  that you read and then take a test, has there ever

20  been a component directed to the FMLA?

21       A    I don't recall.

22       Q    Okay.  Have you ever received any training

23  related to FMLA?

24       A    Yes.

25       Q    Okay.  How many times?

```
 1       A    Once or twice.

 2       Q    Okay.  Let's talk about the first time.

 3   When did that occur?

 4       A    Probably when the law came out.

 5       Q    Okay.  When did the law come out?

 6       A    I don't recall the exact date, but it's

 7   been a while.  Several years.

 8       Q    Several years?

 9       A    Several years ago, I think.  Yeah.

10       Q    So you think on the first year it came

11   out, you got some training?

12       A    I think so.

13       Q    Okay.  You received any training since

14   then?

15       A    I received an in-service, I think, from

16   Atrium.

17       Q    When was that?

18       A    Maybe two years ago.

19       Q    Was it before or after Jane left the

20   company?

21       A    Before.

22       Q    Okay.  Where did the in-service take

23   place?

24       A    Somewhere in Columbus.

25       Q    Columbus is a pretty big city.  Where do
```

Page 62

1   you think you got the training?

2        A    Either at one of the Hiltons, either in

3   Easton maybe or downtown.

4        Q    Was the entire in-service related to FMLA?

5        A    No.

6        Q    How much of the in-service was related to

7   FMLA?

8        A    Maybe an hour, hour and a half of the day.

9        Q    Okay.  Did you get any written materials?

10       A    There's normally a handout.

11       Q    Okay.  But I don't want to know what

12   normally happened.  Do you --

13       A    I don't recall.

14       Q    -- recall --

15       A    I don't recall.

16       Q    Let me finish my question.  Do you recall

17   getting any written materials for this hour,

18   hour-and-a-half session you had on FMLA?

19       A    I don't recall.

20       Q    Well, did you typically keep the materials

21   from the in-service?

22       A    Yes.

23       Q    Okay.  Where would you keep that?

24       A    In an office drawer somewhere.

25       Q    Okay.  Well, did you consider the

Page 63

1    materials that you got when you went to an

2    in-service your property or company property?

3         A    I didn't consider it.  I didn't think

4    about it.

5         Q    Well, when you left in March of '14, did

6    you take your -- any written materials with you?

7         A    No.

8         Q    Okay.  So you left all the written

9    materials at the -- in your desk?

10        A    They would be somewhere in the office

11   unless I threw them away.  I cleaned my office out.

12        Q    Well, why would you throw away information

13   related to the FMLA?

14        A    For one, it was probably outdated.

15        Q    You think that the materials that you may

16   have received two years ago were outdated?

17        A    Possibly, yes.

18        Q    Okay.

19        A    There had been other circulations on FMLA

20   information.

21        Q    Did you throw those away?

22        A    They were on-line.

23        Q    Okay.  So you still had access to those?

24        A    Yes.

25        Q    So your testimony would be if you got

1    written materials related to the FMLA at this

2    in-service that was an hour, hour and a half, you

3    probably threw it away because it was outdated?

4         A    From two years ago, yes.

5         Q    Yeah.  Okay.  You thought that the entire

6    FMLA had been rewritten in those two years?

7                   MR. GARRISON:  Objection to form.

8         A    I believe there have been several policy

9    changes to FMLA more recently than two years ago.

10        Q    And you learned that from something

11   on-line?

12        A    Yes.

13        Q    Okay.  What is the something on-line

14   called?

15        A    It would be an update from Susan or

16   from -- in Atrium's policy.

17        Q    Is it your testimony that if any part of

18   your in-service training was outdated in any way,

19   you would just throw it away?

20        A    I -- yeah, I would actually probably put

21   it in the shredder, yeah.

22        Q    Well, if -- did you consider it your

23   property to put in the shredder?

24        A    No.  But you can only operate with one set

25   of policies at a time.  So as policy updates are

Page 65

1  issued, you discard your old policy and work with

2  your update.

3       Q    Are you saying like at the in-service

4  training that lasted an hour, hour and a half, you

5  only got a few pages or were they something inch

6  thick?  I mean what are you throwing away and

7  replacing?

8       A    These would have been policy changes for

9  Atrium.

10      Q    I mean, did you go through your old

11  materials and have the new materials in hand and

12  replace pages or did you just take what you had,

13  throw it in the shredder and start anew with a new

14  policy?

15      A    Well, it depends on how updates are

16  presented.

17      Q    Okay.  Well, how is the FMLA updates

18  presented?

19      A    I don't recall the exact, but if it were

20  changes to an existing policy, then I would update

21  that.  If it were easily to do, if it were a whole

22  new, then I would discard the old and use the

23  current.

24      Q    Well, would the new policy say this

25  replaces Policy 280.5 or something like that?

1      A      Usually, yes.

2      Q      Okay.

3              MR. GARRISON:  John, do you mind if

4          we take a five-minute break?

5              MR. FRANKLIN:  That's fine.

6              MR. GARRISON:  Thanks.

7              (Whereupon, a recess was taken at

8          11:29 a.m. and resumed at 11:40 a.m.)

9  BY MR. FRANKLIN:

10     Q      When you were at the University of Akron,

11 were you employed anywhere?

12     A      Yes, I was.

13     Q      Where were you employed?

14     A      I was employed by Brown, Gertz & Hodge.

15     Q      Doing what?

16     A      I was a legal secretary.

17     Q      What kind of law did they practice?

18     A      They practiced -- they practiced domestic

19 relations, collections.  That was pretty much it.

20     Q      Did you work there full time or part time?

21     A      Full time.

22     Q      Who was your immediate supervisor?

23     A      Bob Brown.

24     Q      What was his position?

25     A      He was an attorney there.

Page 67

```
 1        Q     Okay.  But did he hold --

 2        A     Partnership.

 3        Q     Was it a partnership, and he held --

 4        A     Yes.

 5        Q     Do you know what position he held?  Was he

 6   the managing partner?

 7        A     I think so.

 8        Q     What?

 9        A     I think so.

10        Q     How long did you work there?

11        A     Till 1985.

12        Q     Then where were you employed?

13        A     Then -- then I was employed by Aerospace.

14        Q     Aerospace?

15        A     A-E-R-O-S-P-A-C-E, Manufacturing.

16        Q     Where were they located?

17        A     They were in Maplewood, Ohio.

18        Q     Why did you leave the law firm?

19        A     We moved back to this side of the state.

20        Q     You moved back to Maplewood?

21        A     Back to Shelby, Auglaize County.

22        Q     What did you do at Aerospace

23   Manufacturing?

24        A     I did -- I did the government contracting

25   work.
```

1       Q      You did the government contracting?

2       A      I sold the parts to the government, to

3    DCASMA.

4       Q      What was your position?

5       A      I was -- I don't know what -- trying to

6    remember what my title was.  I was just a

7    contracting agent, I guess.

8       Q      Were you paid based on the contract?

9       A      No.  I was salary.

10      Q      Who was your immediate supervisor?

11      A      Would have been Patricia.

12      Q      What's her last name?

13      A      I don't remember her last name.

14      Q      What's her title?

15      A      She was the vice president of something,

16   but I don't remember what.

17      Q      How long did you work there?

18      A      From 1986 sometime until 1989.

19      Q      Was Patricia your immediate supervisor for

20   the entire three years?

21      A      Yes.

22      Q      If you remember her last name in the

23   course of the deposition, will you tell me?

24      A      Yeah.

25      Q      Does Aerospace Manufacturing still exist

1    to your knowledge?

2         A    I don't know.

3         Q    Why did you leave there?

4         A    I -- I was thinking of going into

5    insurance.

6         Q    What does that mean, you were thinking of

7    going into insurance?

8         A    I was -- I actually took a program and got

9    my insurance license.

10        Q    Which license?

11        A    Life, accident, and health.

12        Q    What did you have to do to get your

13   license in life, accident, and health?

14        A    I had to -- came to Columbus for four

15   weeks.  Took some education.  Then I sat for tests.

16        Q    Did you pass the first time?

17        A    Yes.

18        Q    How long was the test?

19        A    Couple hours maybe.

20        Q    Did you know right then whether you passed

21   or not?  Was it multiple choice?

22        A    I did find out right away that I passed.

23        Q    Was it multiple choice?

24        A    I think so.

25        Q    When you -- were you still working for

1    Aerospace when you sat for your test?

2         A    No.

3         Q    Did you have to be sponsored by a

4    particular agency in order to sit for the test?

5         A    Yes.

6         Q    Okay.  How long were you looking for a job

7    when you were working for Aerospace?

8         A    I don't recall.  Not long.

9         Q    Did you have the job with the insurance

10   company before you left Aerospace?

11        A    Yes.

12        Q    Which insurance company?

13        A    Aon Corporation.

14        Q    Aon?

15        A    Aon.

16        Q    Where were they located?

17        A    Their main office is in Chicago.

18        Q    Okay.  Where was the office you worked out

19   of?

20        A    It was in Lima.

21        Q    Who did you work for in the Lima office?

22        A    A good friend.  Linda Sprenger.

23        Q    Linda Sprenger?

24        A    Uh-huh.

25        Q    Yes?

1       A       Yes.

2       Q       You said she's a good friend.  Why did you

3   add that?

4       A       Because we're still friends today.

5       Q       How were you paid?  Was it commission?

6       A       I was paid salary and commission both.

7       Q       So it was salary plus commission?

8       A       Yes.

9       Q       What was Linda's position?

10      A       Linda was my supervisor.

11      Q       Okay.  But what was her title?

12      A       Regional manager.

13      Q       Did she work out of the Lima office too?

14      A       Yes.

15      Q       How long did you hold that position?

16      A       Approximately two years.

17      Q       Then what position did you hold?

18      A       Then I went to administrators to do my

19   internship and start that process.

20      Q       Why did you leave the insurance field?

21      A       Hmmm, recommendation of my parents, my

22   mother.

23      Q       Your mom recommended that you leave the

24   insurance field and go into -- be an administrator?

25      A       Yes.

1      Q    What position did your mom hold?  Has she

2  been an administrator?

3      A    My mom just retired.  She was a 52-year

4  diploma grad nurse and a director of nursing.

5      Q    You said she was a diploma grad nurse,

6  what does that mean?

7      A    She had a three-year diploma grad.  She

8  wasn't a BS or an LPN.  She was an RN diploma grad.

9      Q    So she was an RN?

10      A    Uh-huh.  Yes.

11      Q    And she was a DON somewhere?

12      A    Yes.

13      Q    Where at?

14      A    Wapak Manor.

15      Q    Did you work there at some point before

16  you worked for the insurance company?

17      A    At Wapak Manor?

18      Q    Yes.

19      A    No.

20      Q    Okay.  So you go from regional manager,

21  did you start to work at Wapak Manor at that point?

22      A    No.  I sat for my administrator's

23  training.  My mother was a DON at Wapak Manor.

24      Q    Okay.  Where was the training?  You said

25  it was a nine-month --

1    A    It was at IHS of Spring Creek at Huber

2  Heights.

3    Q    IHS?

4    A    Yes.

5    Q    Of Spring Creek?

6    A    Yes.

7    Q    What did you add after that?

8    A    What did I -- excuse me?

9    Q    You said IHS at Spring Creek and then you

10  said something after that.

11    A    In Huber Heights, Ohio.

12    Q    Why was it there that you got your

13  nine-month internship?  Did you know someone there?

14    A    Yes.  I got a recommendation from a friend

15  to apply there.

16    Q    Okay.  Did you have the recommendation

17  before you left the insurance company?

18    A    I don't recall.

19    Q    Did you resign from the insurance company?

20    A    Yes.

21    Q    Did you put the resignation in writing?

22    A    I don't remember.

23    Q    What reason did you give your friend Linda

24  for leaving?

25    A    Better opportunity.  I don't recall for

1    sure.

2         Q     Did you tell her because your mom wanted

3    you to?

4         A     I don't remember.

5         Q     Okay.  Who did you know at the Huber

6    Heights facility?

7         A     I didn't know anyone there.  I met with

8    someone that recommended that I go there.

9         Q     Who was that?

10        A     That was Dr. Yost.

11        Q     Is he a medical doctor?

12        A     I don't know what kind of doctor he is for

13   sure.

14        Q     Well, I mean, was he -- does he practice

15   medicine?  Is he a professor at a university?  Has a

16   PhD?

17        A     He is -- he is a senior executive with

18   Otterbein Homes.  I don't know what his practice is.

19        Q     How did you know Dr. Yost?

20        A     My mother knew him.

21        Q     And is that who you -- was that your

22   mentor for the nine months, Dr. Yost?

23        A     No.  I think he knew the administrator and

24   her name was Shirley Wing.

25        Q     Shirley?

1        A     Wing.

2        Q     Okay.  So Shirley was the person that

3    provided you with the nine months?

4        A     Yes.

5        Q     Okay.  And you weren't paid?

6        A     No.

7        Q     When you leave the insurance company and

8    go to do this internship, did you apply for

9    unemployment?

10       A     No.

11       Q     Did you hold any paying job while you

12   worked at the Huber Heights facility?

13       A     No.

14       Q     Okay.  At the end of the nine months, did

15   you apply for a position at the Huber Heights

16   facility?

17       A     No.

18       Q     Okay.  So at the end of the nine months,

19   do you sit for the test?

20       A     I can't recall if I went to the University

21   of North Carolina.  I did on-line education during

22   the nine months.  There's another part to the

23   program.  And I made a trip to North Carolina, but I

24   don't remember if it was before or after the end of

25   the nine months.

Page 76

1       Q     Well, how long was the trip for?

2       A     I was there for about a week maybe.

3       Q     So did you attend classes for five days?

4       A     I did testing and classwork, yes.

5       Q     Was the testing for the state exam or the

6    federal exam that you told us about?

7       A     No.  It may have been related.  It was to

8    complete my education, my core of knowledge

9    requirement.

10      Q     Okay.  So I mean, did you attend class at

11   the University of North Carolina remotely?

12      A     Yes.

13      Q     Was this for a particular certificate?

14      A     Yes.

15      Q     Okay.  What's the certificate called?

16      A     Core of knowledge.

17      Q     After you get that core of knowledge, is

18   that when you sit for the state and federal tests?

19      A     Yes.

20      Q     Okay.  How long does that process last?

21   During the nine months, are you taking the test, or

22   do the nine months have to run and then you take the

23   test?

24      A     The nine months have to run before you can

25   test.

Page 77

1      Q    Okay.  So how long is it until you can

2  become an administrator, until you became an

3  administrator?  We'll take the nine months at Huber

4  Heights and then how many more months for testing

5  and to find out the results?

6      A    Maybe 11 months total, right around there.

7      Q    Okay.  During that 11 months, did you work

8  anywhere that you were paid?

9      A    No.

10     Q    Well, it seems like the nine months runs

11 and then you take the test.  Were you studying for

12 the test during the extra two months?

13     A    Yes.

14     Q    Is that when you went to North Carolina

15 after the nine months runs?

16     A    I can't remember.  I can't remember.

17     Q    During the two months that you're

18 studying, you don't work anywhere?

19     A    No.

20     Q    Okay.  Then are you looking for work?

21     A    Yes.

22     Q    Presuming that you're going to get your

23 license?

24     A    Yes.

25     Q    Okay.  Are you interviewing?

1      A    Yes.

2      Q    Okay.  So did you have a job lined up as

3   soon as you got your license?

4      A    Yes.

5      Q    Okay.  Where did you have a job lined up?

6      A    Heritage Manor.

7      Q    Where's that located?

8      A    Minster, Ohio.

9      Q    Minster?

10     A    Yes.

11     Q    What position did you have lined up?

12     A    Administrator.

13     Q    Who is Heritage Manor owned by at that

14   time?

15     A    At that time -- at that time, the owner

16   was Mrs. Semmelsberger.

17     Q    Did she work at the facility?

18     A    No.

19     Q    Okay.  How did you know she was the owner?

20     A    I met her once.

21     Q    Okay.  Did she interview you for the

22   position?

23     A    No.

24     Q    Were you replacing an administrator?

25     A    Yes.

1       Q       Who were you replacing?

2       A       First name was Ken.

3       Q       Okay.  Remember his last name?

4       A       No, I don't.

5       Q       Was Ken an interim administrator or was he

6    their full-time administrator?

7       A       I don't know.

8       Q       Why did Ken leave, if you know?

9       A       Ken was, I think, moving to South

10   Carolina, maybe.

11      Q       Did Ken help train you?

12      A       Somewhat.

13      Q       How long was he there when you were there?

14      A       Maybe a week.

15      Q       Did you have your license when you started

16   working there or did you start working there in

17   anticipation of your license?

18      A       I didn't work until I had my license.

19      Q       Okay.  And Ken, did he work with you for

20   that first week?

21      A       I think so.

22      Q       Okay.  Who actually hired you?

23      A       I don't recall the gentleman's name.

24      Q       Okay.  What position did he hold?

25      A       I think he was the regional person at the

1    time.

2         Q    Did he hold some type of license, if you

3    know?

4         A    I don't know for sure.

5         Q    Was he on the clinical side or the

6    administrative side?

7         A    He was the administrative side.

8         Q    Was there a DON when you started working

9    there?

10        A    Yes.

11        Q    Who was that?

12        A    Her name is Judy.

13        Q    What's her last name?

14        A    Last name is Poeppelman.

15        Q    Poeppelman?

16        A    Yeah, I think so.  P-O-E-P-P-E-L-M-A-N, I

17   think.

18        Q    Were you introduced to her before or after

19   you were hired?

20        A    I don't remember.

21        Q    How did you and Judy get along?

22        A    Okay.

23        Q    Okay.  How long did you work there as an

24   administrator?

25        A    I think it was like 1996.

1      Q    Okay.  So from what year to 1996?

2      A    From -- I think it was from 1992.

3      Q    To 1996?

4      A    I think so.

5      Q    Did you get yearly evaluations?

6      A    I don't recall.

7      Q    Who did you consider to be your immediate

8  supervisor?

9      A    Probably would have been Joe Conte.

10     Q    What was Joe's position?

11     A    He was the regional person.

12     Q    Is he the one that hired you?

13     A    No.

14     Q    Okay.  Who hires you?  What's his name?

15     A    I don't remember his name.  I think his

16  first name is Jim, but I don't remember his name.

17  But he wasn't there long.

18     Q    Okay.  But Jim was your supervisor to

19  begin with?

20     A    Yeah, for a short time, I guess.

21     Q    Okay.  Then Joe became your supervisor?

22     A    Yes.

23     Q    So whoever held that regional position was

24  your supervisor?

25     A    Yes.

```
 1          Q    How long was Joe your supervisor?

 2          A    Maybe three years.

 3          Q    Did you tell me you can't recall Joe's

 4    last name?

 5          A    His last name is Conte.  I do remember

 6    Joe.  C-O-N-T-E.

 7          Q    Then who replaces Joe?

 8          A    It was a woman.  I don't remember her last

 9    name.

10          Q    What was her first name?

11          A    Carolyn.  Carol or Carolyn.

12          Q    Did you have any other regional managers

13    before you leave?

14          A    No.

15          Q    Why did you leave there?

16          A    I got a better offer.

17          Q    Had you been looking for another place of

18    employment?

19          A    I don't recall.

20          Q    Well, who did the better offer come from?

21          A    The better offer came from -- the better

22    offer came from Heartland.

23          Q    Heartland?

24          A    Heartland.

25          Q    Did they have another title?  Was it
```

1   Heartland Health Care, Home Care, something?

2        A     It was HCR.

3        Q     HCR Manor Care?

4        A     I don't remember the manor care part.  I

5   just remember it was the HCR.

6        Q     Okay.  Do you know where HCR's located?

7        A     They're out of Toledo.

8        Q     Okay.  Who contacted you from HCR?

9        A     I don't remember.

10       Q     Had you applied to HCR?

11       A     I must have.

12       Q     Well, where were they asking you to go?

13       A     To Piqua.

14       Q     How far was that from your home?

15       A     Oh, 25 miles.

16       Q     Why was it a better job?

17       A     It had better pay.

18       Q     Better pay for an administrator?

19       A     Yes.

20       Q     Any other reason it was a better job?

21       A     Bigger company.

22       Q     HCR?

23       A     Yes.

24       Q     Why is a bigger company a better company

25   in your opinion?

1      A     Well, it was more stable.

2      Q     Was Heritage Manor not stable?

3      A     It had -- it had a lot of owners.  There

4  was a lot of conflict there between ownership and I

5  know we had a lot of maintenance issues, I recall,

6  that weren't being addressed.

7      Q     How did the owner conflict affect you as

8  an administrator of the facility?

9      A     Well, one would come in one week and tell

10  you, yes, on one issue, and then the other one would

11  come in the next week and there was a lot of

12  conflict there.  There was not a clear path of

13  instruction.

14      Q     And you thought if you went to Manor Care

15  that would resolve that issue?

16      A     I don't know that I thought about it that

17  way.

18      Q     I mean, isn't it true the only reason you

19  left was the pay was -- you were getting paid more?

20      A     That was a big factor, yes.

21      Q     Okay.  Did you have any problems staffing

22  STNAs at Heritage Manor?

23      A     I don't remember.

24      Q     Who interviewed you from HCR?

25      A     My regional director was Sherri Woods.

1       Q    Okay.  Is that who interviewed you?

2       A    Yes.

3       Q    How long was it between the interview and

4   the time you get the job?

5       A    I don't remember.

6       Q    Were they interviewing you for a

7   particular facility or just to be an administrator

8   with HCR?

9       A    I don't remember when I found out where I

10  was going.

11      Q    Okay.

12      A    I don't remember if it was actually Piqua

13  or in general at the first interview.

14      Q    Well, I mean were you applying for a

15  position in Piqua or were applying for a position

16  with HCR?

17      A    I don't recall.

18      Q    Do you resign from Heritage?

19      A    Yes.

20      Q    Put your resignation in writing?

21      A    I don't recall.

22      Q    How much notice did you give Heritage?

23      A    I'm very good about giving 30 days, but I

24  don't recall if that was exact.

25      Q    Well, why did you tell me you're very good

Page 86

1   about giving 30 days?

2        A    I try never to leave an employer.

3        Q    Okay.  But my question is how long did you

4   give Heritage before you started --

5        A    I don't recall.

6        Q    -- working?

7        A    I don't recall.

8        Q    And you don't recall if it was in writing?

9        A    No.

10       Q    Who did you give your resignation to,

11  whether it was verbally or orally -- verbally or in

12  writing?

13       A    I don't recall.

14       Q    Would you have gone above Sherri to give

15  your resignation?

16       A    Probably not.

17       Q    Okay.  So where's the facility in Piqua

18  located?  What's the address?  What road?

19       A    I don't remember the address.  It's right

20  off of Route 36.

21       Q    Was it a skilled facility or non-skilled?

22       A    Skilled.

23       Q    How many beds?

24       A    It was licensed for a hundred beds.

25       Q    How many was Heritage licensed for?

Page 87

1      A     It was 119.

2      Q     Who was the DON when you started working

3   at Piqua?

4      A     It was Barb.

5      Q     What's her last name?

6      A     Tremont, I think.

7      Q     Tremont, you think?

8      A     I think it's Tremont.

9      Q     How long was Barb your DON?

10      A     Barb was my DON for a year.

11      Q     One year?

12      A     Yeah.

13      Q     How did you and Barb get along?

14      A     Okay.

15      Q     What does okay mean?

16      A     We did our job and got along well, I

17   guess.

18      Q     Got along well.  Did you socialize with

19   Barb outside of work?

20      A     No.

21      Q     Who was your supervisor at that point?

22      A     Sherri.

23      Q     How long was she your supervisor?

24      A     For a year.

25      Q     Then what happens?

Page 88

```
 1        A    What do you mean?

 2        Q    Well, did you stay in that position?

 3        A    No.

 4        Q    You left that position?

 5        A    Yes.

 6        Q    Did you go to work for another company?

 7        A    Yes.

 8        Q    So you left HCR?

 9        A    Yes.

10        Q    Did you go to a company that was bigger

11   than HCR?

12        A    I'm trying to remember where I went.  Yes.

13        Q    Where did you go?

14        A    Not bigger, but bigger responsibility.  I

15   went to Champaign Residential Services.

16        Q    Champaign Residential Services.  Why did

17   you leave after only one year?

18        A    Better opportunity.

19        Q    Well, had you applied for this position

20   with Champaign Residential Services?

21        A    I did.

22        Q    How long had you been looking for work

23   once you get hired by HCR?

24        A    Probably for three to four months.

25        Q    When you say better opportunity, are you
```

Page 89

1   saying that basically you were going to get paid

2   more money?

3        A    Yes.

4        Q    I mean, was there something about the

5   Piqua position that you didn't like?  It looks like

6   you worked there maybe eight months before you

7   started applying for other jobs?

8        A    Yes.

9        Q    What didn't you like about Piqua?

10       A    Their staffing ratio was too low.

11       Q    I'm sorry?

12       A    Their staffing ratio was too low.

13       Q    What does that mean?

14       A    There weren't enough direct care staff in

15  relationship to the acuity of the patient.

16       Q    When you say direct care, are you talking

17  about STNAs?

18       A    And nurses.

19       Q    LPNs or RNs?

20       A    I don't recall which.

21       Q    Well, were you -- did you make your

22  concerns known to anyone in HCR?

23       A    Yes, I did.

24       Q    Who did you make your concerns known to?

25       A    Sherri.

1        Q    Did you do that in writing?

2        A    I don't remember.

3        Q    Well, how often did you complain to Sherri

4    that you thought the staffing ratios were too low?

5        A    I don't remember how often.

6        Q    Well, I mean did you complain more than

7    once?

8        A    Yes.

9        Q    More than five times?

10       A    I don't remember.

11       Q    Okay.  Did you ever go above Sherri's

12   reporting level and complain that the staffing

13   levels were too low --

14       A    No.

15       Q    -- in the direct care?  Direct care is on

16   the clinical side?

17       A    Yes.

18       Q    Okay.  So did you go to someone on the

19   clinical side and make complaints?

20       A    Yes.

21       Q    Okay.  Who did you go to?

22       A    I went to the regional nurse.

23       Q    Who's that?

24       A    I don't recall her name.

25       Q    You went to her.  What does that mean you

Page 91

1    went to her?

2         A    I talked with her when she was in the

3    building.

4         Q    Okay.  Face-to-face conversation?

5         A    Yes.

6         Q    Did you take notes of the conversation?

7         A    No.

8         Q    Okay.  Put us in the conversation as best

9    you can recall.

10        A    I recall telling her that the skilled unit

11   was too heavy, that there were people at risk of

12   choking, people at risk of falling out of bed.  We

13   needed additional staffing.

14        Q    Okay.  What did she say?

15        A    No.

16        Q    Okay.  No, because she didn't agree with

17   your assessment?

18        A    Because that was the staffing pattern of

19   that company and all of the homes were handled the

20   same way.

21        Q    So all of the manor care homes you

22   believed -- I mean, strike that.  All of the HCR

23   homes you believe were handled that same way?

24        A    That's what I was told.

25        Q    Okay.  By the nurse that you can't

1    remember her name?

2         A     Correct.

3         Q     But she was a regional nurse?

4         A     Yes.

5         Q     For what region?

6         A     Whatever region the Piqua home is in.

7         Q     Okay.  Well, you worked there, what region

8    is it in?

9         A     Don't remember what region it's called.

10        Q     Did you ever receive any discipline when

11   you worked there?

12        A     No.

13        Q     Were you responsible for hiring STNAs?

14        A     Yes.

15        Q     Okay.  Was that subject to some

16   limitation?

17        A     Yes.

18        Q     Okay.  Was the limitation in writing?

19        A     I don't recall.

20        Q     How would you go about hiring STNAs when

21   you worked at Piqua?

22        A     I don't recall specifics.

23        Q     Was it -- did HCR provide you with some

24   type of advertising?

25        A     Probably.

1     Q     I mean, did they handle it?

2     A     I don't recall exactly who handled it.

3     Q     Well, when you worked at Piqua, do you

4     remember who from HCR was responsible for doing the

5     advertising for STNA positions?

6     A     No.

7     Q     When you were interviewing for other

8     positions outside of the Piqua HCR facility, were

9     you asked why you wanted to leave?

10    A     I'm sorry.  Can you repeat that again?

11    Q     Yeah.  When you were interviewing for

12    positions outside of the Piqua facility, were you

13    being asked why do you want to leave Piqua?

14    A     Yes.

15    Q     Did you say staffing ratio?

16    A     Yes.

17    Q     Okay.  To how many interviewers did you

18    say staffing ratio?

19    A     One.

20    Q     Okay.  Was that the only interview that

21    you had was for the Champaign Residential Services

22    job?

23    A     To the best of my recall, yes.

24    Q     Okay.  When you resign from Piqua, do you

25    tell or write the reason that you're leaving is

1   staffing ratio?

2        A     No, I don't think so.

3        Q     Why not?

4        A     I don't remember what I put in my

5   resignation, but I don't think it would have been

6   staffing.

7        Q     But that was the truth?  That's why you

8   were leaving?

9        A     That was part of it.

10       Q     That and money?

11       A     Yes.

12       Q     Anything else?

13       A     It was a different type of opportunity I

14   was going to be going with.

15       Q     How was it different?

16       A     Instead of a nursing home facility, it was

17   an ICFMR and it was 14 group homes.

18       Q     I'm sorry.  It was what?

19       A     It was an intermediate care facility.

20       Q     ICNR?

21       A     ICFMR.

22       Q     ICFMR.  Okay.  What does that mean?

23       A     That is an intermediate care facility for

24   mental retardation.

25       Q     I mean, did you have to hold the same

1    administrator's license?

2         A     It wasn't a requirement, no.

3         Q     Okay.  So then was it a step down?

4         A     No.

5         Q     I mean, you worked -- you did the nine

6    months of the internship and the two months of

7    testing and you went to North Carolina so you could

8    get your administrator's license?

9         A     Uh-huh.

10        Q     And you didn't even need it for this job?

11        A     It was a different type of position.  It

12   was a county administrator role.

13        Q     As opposed to what?

14        A     As opposed to a single-facility

15   management.  It was multiple facilities.

16        Q     Okay.  Which county?

17        A     Allen.

18        Q     Allen County.  Was the funding source the

19   county?

20        A     No.  It wasn't.  It was -- actually,

21   partially it was and partially it was state and

22   federal.  There was some county funds involved.

23        Q     So state, federal, and county funds?

24        A     Yes.

25        Q     Any other funding source?  No?

1       A       Private pay.

2       Q       Okay.

3       A       Privately maybe.

4       Q       So you're saying insurance covered some of

5    the costs or when you say private pay, you're

6    talking about an individual actually paying?

7       A       An individual actually paying.

8       Q       Okay.  So what was your job there?

9       A       I was the county administrator.

10      Q       How many buildings did you have

11   responsibilities for?

12      A       I had one 32-bed facility.

13      Q       Okay.

14      A       And 14 group homes.

15      Q       How many people are in a group home?

16      A       Four to seven.

17      Q       Is there a DON?

18      A       Yes.

19      Q       Okay.  Who was the DON?

20      A       The DON was Judy.

21      Q       What's Judy's last name?

22      A       Ditto, D-I-T-T-O.

23      Q       Had you two ever worked together before?

24      A       No.

25      Q       Okay.  Where was she located?  Same

Page 97

1    building as you?

2         A    Yes.  Yes.

3         Q    How did you get along with her?

4         A    Fine.

5         Q    How long did you hold that job?

6         A    Seven or eight years.

7         Q    Did you receive annual evaluations?

8         A    I don't recall for sure.

9         Q    Did you receive written evaluations?

10        A    Yes.

11        Q    Who would give you your evaluation?  Who

12   was your supervisor?

13        A    Mark.

14        Q    He was your supervisor and gave you the

15   evaluation?

16        A    Yes.

17        Q    What was Mark's last name?

18        A    Schlater, S-C-H-L-A-T-E-R.

19        Q    What was his title?

20        A    Regional manager.

21        Q    What was the name of the facility?  Like

22   if I want to write a letter, who do I write it to?

23        A    You would write it to Champaign

24   Residential Services.

25        Q    Were they affiliated with any particular

1   hospital?

2        A      No.

3        Q      Were they affiliated with anyone?

4        A      No.

5        Q      Who is the clientele?

6        A      They were adults and children with mental

7   retardation.

8        Q      Did you receive any discipline when you

9   worked there?

10       A      No.

11       Q      What agency oversees the facility, like

12  comes in and makes sure that, you know, census is

13  correct and they're being treated --

14       A      Appropriately.  There are two.

15       Q      Okay.

16       A      One is the Ohio Department of

17  Developmental Disabilities.  The other one would be

18  the Ohio Department of Health.

19       Q      How often did they come in and inspect?

20       A      Usually within that same window of nine to

21  15 months.

22       Q      What was -- did you receive any citations

23  during the seven or eight years you were --

24       A      I'm sure.  I know we did.  I don't recall

25  anything specific.

1       Q    As far as the Allen County facility, were

2   you the person highest in authority?

3       A    Yes.

4       Q    Were there STNAs that worked for that

5   facility, the 32-bed facility?

6       A    The 32-bed facility?  They weren't called

7   STNAs.

8       Q    What were they called?

9       A    They were called habilitation specialists.

10      Q    Did they get -- have different testing or

11  they just have a different title or what?

12      A    They don't require the two-week training

13  course and they receive on-the-job training.

14      Q    Is an STNA and a CNA the same thing?

15      A    I don't know about CNA.  I think it's a

16  different description for a similar job title.

17      Q    Okay.  Do you know the difference?

18      A    No.

19      Q    Okay.  Did -- was there certain staffing

20  ratios that had to be met when you had the Allen

21  County job?

22      A    Yes.

23      Q    The Champaign job?

24      A    Yes.

25      Q    Were those met?

1      A      Yes.

2      Q      Were you the person that would do the

3  hiring?

4      A      At times.

5      Q      What positions would you hire for?

6      A      I think mainly department managers.

7      Q      Okay.  Other than Judy Ditto, did you have

8  any other DONs when you worked there?

9      A      No other DONs while I worked there.

10     Q      Okay.  So Judy was the DON the entire

11 time?

12     A      At the 32-bed facility.

13     Q      Okay.  Were there other DONs?

14     A      There was another lady, an RN that worked

15 in the group homes.

16     Q      When you say she worked in the group

17 homes, she would go from home to home and provide

18 medical care?

19     A      She would go from home to home and provide

20 assessments and training.

21     Q      Well, if her assessment indicated that

22 medical treatment was necessary, then what happens?

23 Does she provide the medical treatment or they go to

24 the hospital?

25     A      Something simple, she would provide.

1    Anything advanced, it would be referred to either

2    home health or the hospital.

3         Q    Was the RN the same RN during the entire

4    time you worked there?

5         A    Yes.

6         Q    Who was that?

7         A    Her name is Claudia.  Don't remember her

8    last name.

9         Q    Okay.  Did you provide the evaluation for

10   the DON --

11        A    Yes.

12        Q    -- or was that someone else?  Who did the

13   DON answer to?  Who was the direct supervisor of the

14   DON?

15        A    I was a supervisor and so was the regional

16   corporate nurse.

17        Q    I mean, did you have dotted-line

18   supervision and then the DON answers directly to the

19   regional nurse or was it the other way around?

20        A    I don't think it was that formalized.

21        Q    Okay.  But you didn't have any type of --

22   strike that.

23             You didn't provide any type of evaluation

24   related to the DON's clinical skills, correct?

25        A    Correct.

1       Q     You and the DON got along for the seven or

2    eight years?

3       A     Yes.

4       Q     When was the last time you talked to her?

5       A     Two, three years ago maybe.

6       Q     Why did you leave there?

7       A     I -- I left there to join another company

8    my brother started.

9       Q     What company did your brother start?

10      A     He purchased a Rain Soft distributorship.

11      Q     A Rain Soft?

12      A     Water treatment, yes.

13      Q     What were you going to do there?

14      A     I helped him with telemarketing.  I helped

15   with sales, those types of things.

16      Q     Did you maintain your administrator's

17   license during the seven or eight years you worked

18   for Champaign?

19      A     Yes.

20      Q     And that was by getting the continuing

21   education requirements and paying a fee?

22      A     Yes.

23      Q     Even though you didn't need it?

24      A     The company took care of it.

25      Q     Okay.  And then when you join your

1    brother, do you still maintain your license?

2        A    Yes.

3        Q    How long do you work for your brother or

4    with your brother?

5        A    I don't recall exactly.  Maybe two years.

6        Q    Why would you leave the job, the Champaign

7    job and go work with your brother?

8        A    It was a lot more money.

9        Q    Your brother offered you more money?

10       A    Yes.  And I had an ownership interest.

11       Q    Did the two of you set up the company like

12   a partnership or LLC or --

13       A    I don't think so.

14       Q    What was the name of the company?

15       A    It was -- I'm trying to recall.  It was

16   Rain Soft products.

17       Q    That was the name of the company, Rain

18   Soft products?

19       A    No.  It was Rain Soft product line.  The

20   name of the company was Findlay Water Treatment.

21   It's been a while ago.

22       Q    Was the company incorporated?

23       A    Yes.

24       Q    So it was Findlay Water Treatment, Inc.?

25       A    I don't think they used the Inc.

1       Q     But it was incorporated?

2       A     Yes.

3       Q     With the State of Ohio?

4       A     I don't know where.

5       Q     Were you an officer of the company?

6       A     No.

7       Q     Just an owner?

8       A     I was -- I got a piece of the proceeds,

9  yes.  I got a piece of the commission.

10      Q     Well, if you were an owner, what percent

11 ownership did you have in the company?

12      A     I don't remember that.  I got a commission

13 reimbursement.

14      Q     Okay.  But you think just because you got

15 a commission that you were an owner of the company?

16      A     We were working on that, but I don't -- I

17 don't know if it was ever finalized.

18      Q     Well, did you have stock in the company?

19      A     I don't know if it was ever completed.

20      Q     What does that mean?  You started to have

21 stock and then you don't know if you ever got it?

22      A     They started to do that but I don't know

23 if they ever completed it or not.

24      Q     Who is the "they"?

25      A     It would have been my brother and his

1   significant other.

2        Q    Was she an owner, too, significant other?

3        A    I think so, yes.

4        Q    What's her name?

5        A    Her name is Pam.

6        Q    What's her last name?

7        A    Logan.

8        Q    Okay.  So the three of you owned the

9   company?

10       A    That was the way it was planned to start,

11  yes.

12       Q    And then was it a protected territory?  In

13  other words, you guys were the only individuals

14  selling this product in that particular area?

15       A    Yes.

16       Q    And you worked there for two years?

17       A    I think so.  Somewhere right around there.

18       Q    Did you have benefits?

19       A    I think my husband had benefits during

20  that time.

21       Q    That's not my question.  I'm not going to

22  ask about your husband yet.

23       A    Okay.

24       Q    Did you have benefits when you worked for

25  the Findlay Water Treatment Company other than

```
 1   compensation?

 2        A     I don't recall.  I don't.

 3        Q     Was there a 401(k) set up?

 4        A     No, I don't think so.

 5        Q     Okay.  Was there medical benefits

 6   available?

 7        A     I don't recall.

 8        Q     Did you have a company car?

 9        A     No.

10        Q     Company laptop?

11        A     No.

12        Q     Did you supervise any employees?

13        A     No.

14        Q     Were there any employees of the company

15   other than the three owners?

16        A     There were telemarketers.

17        Q     Okay.  Full time?

18        A     I don't recall.

19        Q     Did they provide you with leads?

20        A     Yes.

21        Q     Were you paid W-2 income?  Was it K-1

22   income?  How were you paid?  1099 income?

23        A     I think it was 1099.

24        Q     Were you an independent contractor of some

25   type?
```

1        A     I believe so.

2        Q     Why did you leave there?

3        A     I don't recall.  Probably a better

4   opportunity came open.

5        Q     Well, why would you leave -- the reason

6   you left Champaign --

7        A     Oh.

8        Q     -- was money?

9        A     I do recall why we left there.  They

10  separated and --

11       Q     Who separated?

12       A     My brother and his friend --

13       Q     Significant other?

14       A     -- separated and wanted to sell the

15  business.  That was it.

16       Q     Okay.  Did you buy the business?

17       A     No.

18       Q     Did you sell your share of the business?

19       A     No.

20       Q     What happened to your share of the

21  business?

22       A     I was paid out money and that was it.

23  There was no shares.

24       Q     Well, somehow you got money from the sale,

25  correct?

1      A     I made commission and I made a final

2   payment from the transaction of the --

3      Q     Sale?

4      A     -- of the end of the business or whatever.

5   Yes.

6      Q     Well, did somebody buy the company?

7      A     I don't know if they did or not.

8      Q     Did the corporation come in and take the

9   company over?

10     A     That might have been it.  I don't know for

11  sure.

12     Q     Is that because you weren't making the

13  numbers that the company required?

14     A     No.  Sales were very good.  No, I think it

15  was more of a personal decision.

16     Q     On your brother and significant other's

17  portion?

18     A     Yes.

19     Q     Okay.  Did you end up making the money you

20  thought you were going to make when you left

21  Champaign?

22     A     Not as much as I had hoped for, but I

23  remember doing very well.

24     Q     Okay.  So what years was that?  Which two

25  year time period now are we talking about?

1      A     Sometime between 2004 to 2000 and -- I

2   don't recall.

3      Q     Was it '4 to '6?

4      A     Let me think here.  No.  It was in the

5   1990s.  It was from 1990 -- 1990 -- excuse me.

6      Q     Was it 1997 to 2005?

7      A     No.  But it was like 1997 to 1999 maybe.

8      Q     So you think it was only two years?

9      A     Somewhere right around there, yes.

10     Q     Where did you work next?

11     A     After that, I went back to nursing home

12  and started in with, I believe -- let me think here.

13  I think HCF.

14     Q     HC what?

15     A     F.  HCF.

16     Q     What does that stand for?

17     A     Health Care Facilities.

18     Q     Where are they located?

19     A     They're in Lima, Ohio.

20     Q     Is this a temporary company or is this

21  like you go in and you work full time?

22     A     This was a full time.

23     Q     Okay.

24     A     Trying to remember the exact --

25     Q     Where were you placed?

1       A       I started at a place called Shawnee Manor.

2       Q       Shawnee Manor?

3       A       Yes.

4       Q       Where at?

5       A       In Lima.

6       Q       What was Shawnee Manor?  Skilled?

7       A       Skilled.  Skilled nursing home, yes.

8       Q       How many beds?

9       A       A hundred and some.  124, I think.

10      Q       Were you replacing an administrator that

11  had left or was this a newly opened facility?

12      A       This was an older facility and I was

13  replacing a gentleman who was promoted to the

14  regional spot.

15      Q       Who was that?

16      A       His name was Scott.  Last name is

17  Unverferth.

18      Q       Unverferth.

19      A       Unverferth -- U-N-V-E-R, ferth, F-E-R-T-H.

20      Q       Was there a DON there?

21      A       Yes, there was.

22      Q       Who was that?

23      A       Her name was Lori.

24      Q       What's her last name?

25      A       I don't remember her last name.

1        Q    How long did you and Lori work together

2   when you were the administrator and she was the DON?

3        A    Not -- maybe six, seven months.

4        Q    How did the two of you get along?

5        A    Okay.

6        Q    Did you give her an evaluation while you

7   worked there?

8        A    I don't remember.

9        Q    Okay.  How long did you hold that

10  position?

11       A    Only a short while.

12       Q    I don't know what that means.

13       A    Maybe six, seven months.

14       Q    Okay.  The whole time you held that

15  position, Lori was the DON?

16       A    I think so.

17       Q    Okay.  If you think of Lori's name in the

18  course of the deposition, will you tell me?

19       A    Yes.

20       Q    Why did you only work there six or seven

21  months?

22       A    The facility that they owned that was

23  closer to my home came open and I transferred to

24  another one of their facilities, Wapak Manor.

25       Q    That's where your mom worked?

1          A    That was years ago that she worked there.

2     She doesn't work there presently, no.

3          Q    She didn't work there when you came in?

4          A    No.

5          Q    So you were able just to transfer if you

6     wanted to transfer or did you have to give them

7     enough time to find a new administrator?  How did it

8     work?

9          A    I got a new start date at the new

10    facility.  I don't know what happened.

11         Q    Well, how long between the time you

12    request the transfer and the time you leave?

13         A    I didn't request it.  They asked me if I'd

14    like to and it might have been a month.

15         Q    Who was the DON when you got there?

16         A    I think it was Amy Kentner.

17         Q    Was she there when you got there or did

18    you hire her?

19         A    I think she was a nurse there.

20         Q    Okay.  Did you promote her?

21         A    I think the company did.

22         Q    Was there a DON in place when you got

23    there?

24         A    Yes.  I'm trying to remember her name.

25    Kat Klosterman, Katherine Klosterman.  She was a DON

1    there as well.

2         Q    Well, was she a DON first?

3         A    I think Amy was first and then Kat.

4         Q    Okay.  So Amy was the DON when you first

5    got there?  Yes?

6         A    I think so.  I can't recall.

7         Q    Well, why did Amy cease being the DON and

8    Katherine become the DON?

9         A    Amy was in her administrator's training

10   and got promoted to an administrator within the

11   company.

12        Q    And then whose decision was it to put

13   Katherine in that position as DON?

14        A    It was a joint decision between myself and

15   the corporate nurse, regional.

16        Q    Joint and between you and the regional

17   nurse?

18        A    Yes.

19        Q    Is that what you're saying?

20        A    Yes.

21        Q    Who was the regional nurse?

22        A    At that time, I think it was Diane.

23        Q    What's Diane's last name?

24        A    Bonifas, B-O-N-I-F-A-S.

25        Q    Okay.  So how long do you hold that

1    position?

2          A     Five-and-a-half years.

3          Q     From when to when?

4          A     From 2002 to 2007 maybe.   2006.

5          Q     Why did you leave?

6          A     I got a call from somebody at Heritage

7    Manor that the administrator's position was opening

8    there.

9          Q     Had you worked there before?

10         A     Yes.

11         Q     Who did you get the call from?

12         A     I think it was maybe Kim somebody that

13   used to work there.

14         Q     Ken?

15         A     Kim.

16         Q     Kim.

17         A     Kim Burger I think was the name.

18         Q     What was her title?

19         A     I think she's a director of nursing.

20         Q     Was she the DON when you worked there?

21         A     No.

22         Q     How did you know her?

23         A     I hired her as a nurse.

24         Q     Where at?

25         A     At Heritage Manor.

1      Q      Why did you leave Heritage Manor the first

2   time?

3      A      The first time I left Heritage Manor, it

4   was to get a better opportunity.

5      Q      I thought you told us it was owner

6   conflict?

7      A      It was.  There was that, too, but it was

8   mainly to get a better opportunity, to make more

9   money.

10     Q      Okay.  So was going back to Heritage a

11  better opportunity than you had at the prior -- the

12  job that you held at the time, the Wapak job?

13     A      I went back to Heritage mainly because the

14  operating company was Tandem that had been the

15  Integrated Health before.  So there -- the ownership

16  issue was still an issue, but there was a better,

17  stronger operating company there.

18     Q      How did you know that?

19     A      I don't recall if Kim told me or if I

20  investigated it on-line but I found that out.

21     Q      Were they a publicly traded company?

22     A      I don't know if they're publicly traded or

23  not.

24     Q      Okay.  So had you been looking for work

25  for a period of time before you got the call?

1      A    No, not really.

2      Q    Okay.  So after you get the call, what do

3   you do?

4      A    After I get the call, I met with the

5   regional person.

6      Q    The regional administrative person?

7      A    She was also the nurse, too, but yes.

8      Q    So she was on both sides, clinical and

9   administrative?

10     A    Yes.  Yes.

11     Q    Who was that?

12     A    That was Nancy Johnson.

13     Q    Okay.

14     A    And I accepted the position.

15     Q    Okay.  Well, you interviewed with Nancy?

16     A    Yes.

17     Q    And then she offered you the position?

18     A    I think I had to -- I had to go to Roanoke

19   and meet with Joe Conte again.

20     Q    Roanoke, Virginia?

21     A    Yes.

22     Q    Is that where the company's based?

23     A    Yes.

24     Q    And you had to meet with Joe Conte again?

25     A    Yes.

1       Q    Did they ask you questions about why you

2   left the first time, why should they rehire you

3   given that you left the company?

4       A    The first time was Integrated Health

5   Services, and they went out of business.  So no, I

6   don't think they asked me that.  I don't recall that

7   anyway.

8       Q    Well, Joe was working at the time when you

9   left?

10      A    He was a regional manager, yes.

11      Q    He didn't ask you any questions about how

12  can I trust you not to leave?

13      A    No.

14      Q    You said you had to meet with him.  Why?

15      A    I don't know.  I think it's just our

16  policy.

17      Q    Okay.  So did he offer you the job?

18      A    I don't recall exactly who it was.

19      Q    Did you contact by a letter?

20      A    I don't remember.

21      Q    So how long is it between the time you get

22  the phone call and the time you start working?

23      A    I don't recall.

24      Q    So you start as an administrator?

25      A    Yes.

1        Q      Who are you answering to?

2        A      Nancy Johnson.

3        Q      How long do you hold that job?

4        A      I was there for maybe a year.

5        Q      Did you get an evaluation when you worked

6    there?

7        A      I don't recall.

8        Q      Was there a DON turnover when you worked

9    there?

10       A      I don't recall.

11       Q      Was there ratio staffing concerns?

12       A      I don't recall that.

13       Q      Did you get any type of state survey

14   during the time you worked there this time?

15       A      I don't recall.

16       Q      Why did you leave?

17       A      The owners sold the home to a gentleman

18   from Columbus.  Vrable Health Care purchased it.

19       Q      Okay.

20       A      And Vrable had their own administrator.

21       Q      Well, did you try to keep your job?

22       A      No.

23       Q      Were you offered some type of severance?

24       A      I don't recall.

25       Q      Did you attempt to keep working at

1    Heritage?

2         A    No.  I don't recall.  I don't recall.  No.

3         Q    Did you attempt to work for Vrable at any

4    facility?

5         A    No.  I tried to call Al a couple times.  I

6    did talk to Al a couple times for --

7         Q    Who's Al?

8         A    Vrable.  I left a message for him and he

9    didn't return my call.

10        Q    So when do you leave?

11        A    I don't remember the exact date.

12        Q    Well, give me the year, if you can

13   remember.

14        A    2007 or '8 --

15        Q    Did you --

16        A    -- I think.

17        Q    -- apply for unemployment?

18        A    No.  I don't think so.

19        Q    How long were you unemployed?

20        A    I wasn't unemployed.  I'm trying to

21   remember where I went next.  I don't remember where.

22   I wasn't unemployed.  I'm trying to recall where I

23   went after that.  I don't remember.  I can't

24   remember.

25        Q    Did you go to HCF?  Go back?

1      A     HCF was between -- HCF was a six-year

2   period.  HCF came after Heritage Manor.  HCF was

3   first Shawnee and then Wapak.

4      Q     Hold on.  Do I have to go back and change

5   your testimony?

6      A     Yes.  Yes, you do.  Sorry.

7            MR. GARRISON:  That's okay.

8      Q     After you leave Findlay Water Treatment,

9   where do you go?

10     A     I believe then I went to Champaign

11  Residential Services.

12     Q     Okay.

13     A     I think.  Yes.

14     Q     Then where did you go from there?

15     A     From there, the second time Heritage --

16  from there, I believe it was Heritage Manor.

17     Q     Okay.  And then from Heritage where?

18     A     To Wapak -- or to Shawnee and then Wapak.

19     Q     Okay.  So at this point you're at HCF?

20     A     Yes.

21     Q     Which facility?

22     A     Wapak.

23     Q     How long are you there?

24     A     Five years maybe.

25     Q     Who is your DON for those five years?

Page 121

1        A    Amy Kentner and Katherine Klosterman.

2        Q    Okay.  Then after you leave there, is

3   that -- do you leave Wapak because it goes out of

4   business or somebody acquires it?

5        A    No.

6        Q    Why do you leave?

7        A    Let's see here.  Figuratively, I think --

8   I think I went from Wapak to St. Marys Living

9   Center.  I'm trying to remember.

10       Q    Did you go there directly?

11       A    I'm trying to remember.  I think so,

12   within 30 days maybe.

13       Q    What position did you hire into?

14       A    Administrator.

15       Q    When was that?

16       A    2011, 2010.  The end of 2010.

17       Q    So how long did you work for HCF Wapak?

18       A    From -- from like 2006 or '7 to 2010.

19       Q    Why do you leave Wapak?

20       A    Actually I was bored.

21       Q    Why were you bored?

22       A    I -- just like I wanted to change and do

23   something a little more challenging.

24       Q    Because you'd worked there five years?

25       A    I think that was -- yes.

Page 122

1        Q    I mean, is that the longest you've ever

2   held a job?

3        A    No.

4        Q    Okay.  So how is it that you become

5   employed with St. Marys?  Do you know someone there?

6        A    I have a friend that works at the

7   hospital.

8        Q    Which hospital?

9        A    St. Marys Hospital.

10       Q    Who is that?

11       A    Sara Buscaca.

12       Q    Spell her last name, please.

13       A    B-U-S-C-A -- I think -- C-A.

14       Q    Okay.  What position does she hold?

15       A    She is an administrator and a nurse.

16       Q    She told you there was an opening?

17       A    I found the opening.  I started looking

18  and I found the opening and I called Sara to talk to

19  her about the facility.

20       Q    Where did you find the opening?

21       A    I don't remember exactly.  One of the

22  on-line --

23       Q    Did you fill out an application?

24       A    Yes, I did.

25       Q    Okay.  Where did you fill out the

1    application?  Was it on-line or did you go in?

2         A    I don't remember.

3         Q    Did you fill out the application and then

4    get an interview?

5         A    I don't remember.

6              (Whereupon, Plaintiff's Exhibit 14

7              was marked for identification.)

8         Q    Handing you what's been marked as

9    Plaintiff's Exhibit 14.  Have you seen this document

10   prior to today?

11        A    Yes.

12        Q    For the record, what does this document

13   appear to be a copy of?

14        A    My application.

15        Q    The application that you filled out to

16   work for Essex Health Care, Atrium Living Centers?

17        A    Yes.

18        Q    Did you understand that they were owned by

19   Essex Health Care Corporation?

20        A    Not at the time.

21        Q    Do you have an understanding of that as we

22   sit here today?

23        A    Yes.

24        Q    Okay.  Let's look at your application.  Is

25   everything true and accurate to the best of your

Page 124

1    knowledge?

2        A    Yes.

3        Q    Okay.  I want to look at the second page

4    of Plaintiff's Exhibit 14.  Well, first of all, does

5    your handwriting appear everywhere in this document?

6        A    Yes.

7        Q    Okay.  Let's look at the second page of

8    Plaintiff's Exhibit 14.  Under security data, you're

9    asked have you ever been convicted of a crime or

10   pleaded guilty or no contest to a crime.  Do you see

11   that?

12       A    Yes.

13       Q    And the box yes is checked?

14       A    Uh-huh.

15       Q    Tell me about that.

16       A    That's a mistake.  I must -- I must have

17   misread it.  I've never been convicted of a crime.

18       Q    Well, did anyone at the company who

19   interviewed you ask you about answering that you've

20   been either convicted of a crime or pled guilty or

21   no contest to a crime?

22       A    No.

23       Q    Anybody ask you why you put yes there?

24       A    No.

25       Q    Okay.  The next question says have you

1  ever been excluded, debarred, or otherwise

2  ineligible for participation in federal healthcare

3  programs, and you checked the box yes.  Tell me

4  about that.

5       A    I was in a hurry doing this.  I don't

6  remember.

7       Q    No.  Just tell me, did you put the check

8  in the box?

9       A    Yes.

10       Q    Okay.  Why did you put the check in the

11  box?

12       A    I meant to check no and I checked yes

13  instead.

14       Q    Well, did anyone from Atrium or Essex or

15  anyone ask you why you put yes to the question that

16  says have you ever been excluded, debarred, or

17  otherwise become ineligible for participation in

18  federal healthcare programs?

19       A    No.

20       Q    Okay.  So you're saying for the two

21  questions in a row, you checked the wrong box; is

22  that fair?

23       A    Yes.

24       Q    Well, the first question is have you ever

25  lived in this state continuously for the past five

Page 126

1    years and you checked yes.  Is that a right answer?

2         A    Yes.

3         Q    Okay.  So we have one right answer, two

4    wrongs, right --

5         A    Right.

6         Q    -- for that section?  Okay.  Now, let's

7    look at -- and we'll read from the bottom up.  The

8    first job that you have listed is Aon Corp.?

9         A    Uh-huh.

10        Q    And that you worked there from 199 -- from

11   1988 to 1991, correct?

12        A    Yes.

13        Q    That's what you wrote?

14        A    Yes.

15        Q    And then you said your next job was at

16   Heritage Manor; is that true?

17        A    Yes.

18        Q    And that job was from when to when?

19        A    1992 to 1997.

20        Q    Okay.  Then the next job was what?

21        A    Champaign Residential Services.

22        Q    And you say you worked there from '97 to

23   2005, correct?

24        A    Yes.

25        Q    Is that true?

1      A     Yes.

2      Q     Then you have the next job as Tandem at

3    Heritage Manor from 2005 to 2006, correct?

4      A     Yes.

5      Q     And then you have HCF Wapak from 2007 to

6    the present; is that correct?

7      A     Yes.

8      Q     Where's the job that you had when you

9    worked with your brother and owned the company?

10     A     Well, this is -- well, I think I included

11   it in here at some point but I didn't --

12     Q     Okay.  Where is it?  Just tell me if it's

13   included.

14     A     I'm trying to remember the exact years.

15   It was sometime between -- it was sometime around

16   Heritage Manor and Champaign Residential Services.

17     Q     Is there some reason you failed to put

18   that on here?

19     A     No.

20     Q     You also, I believe, did not include the

21   HCR position when you worked for Heartland; is that

22   correct?

23     A     That's correct.

24     Q     Why didn't you include that position?

25     A     I didn't remember it obviously at the time

Page 128

1   I filled this out.

2        Q    What years did you claim you worked at

3   Heartland?

4        A    Sometime around 1994.  Sometime between

5   1991 to 19 -- 1991, 1992.

6        Q    I'm just trying to figure out where we put

7   that job in your employment experience.  Is it

8   between Aon and Heritage Manor in Minster, Ohio?

9        A    No.  It would be between Heritage Manor

10  and Champaign Residential.

11       Q    Okay.  And for how long did you work for

12  Heritage -- I mean Heartland, I'm sorry.

13       A    Like a year.

14       Q    One year?

15       A    Yes.

16       Q    Are you claiming you just forgot about

17  that job?

18       A    Yes.

19       Q    Okay.  So on the second page, I think the

20  things that aren't true are the two checked boxes in

21  the security page, correct?  Security data section?

22       A    Yes.

23       Q    And then leaving out the Heartland

24  position and you left out the position where you

25  owned and worked for the company?

1       A      Yes.

2       Q      I think you said it was Findlay Water

3   Treatment or something to that effect?

4       A      It was Total Water Solutions.

5       Q      Okay.  You remember the name now?

6       A      Yes.  Total Water Solutions.  Thank you.

7       Q      Did the person that interviewed you have

8   this document in front of them?

9       A      I don't remember.

10      Q      Okay.  Who interviewed you?

11      A      First it was Terry Schollmeier.

12      Q      Okay.  Do you know what position she

13  holds?

14      A      Terry is a man.  He was the administrator

15  at the time.  I don't --

16      Q      So he was the administrator before you?

17      A      I think so.

18      Q      Was he interim?

19      A      Maybe.

20      Q      I mean, do you know the -- do you know the

21  name of the administrator before you that didn't

22  hold the interim title?

23      A      Yes.  Yes.

24      Q      Who is that?

25      A      Matt Russellsburg.

1       Q    I mean, did you know him before you

2   started working at St. Marys?

3       A    I knew who he was.  I didn't know him

4   personally.

5       Q    How did you know who he was?

6       A    We were at a meeting one time and he was

7   introduced.

8       Q    Okay.  Who did you work for at that point?

9       A    I don't remember.

10       Q    Okay.  On the first page of this document,

11   you put that you were referred to Atrium by

12   CareerBuilder; do you see that?

13       A    Yes.

14       Q    Okay.  Well, weren't you really referred

15   by the friend in the hospital?

16       A    No.  I think I had been looking and I

17   found it and I think I talked to her about the

18   facility.

19       Q    Okay.  At the time that you fill out this

20   document that we marked as Plaintiff's Exhibit 14,

21   were you employed by anyone?

22       A    I don't remember.

23       Q    Okay.  It looks like you signed the

24   document on 11/23/10; is that fair?

25       A    Yes.

1      Q      Okay.  When do you recall starting?

2      A      Sometime at the end of that year.

3      Q      After Christmas?

4      A      I don't remember.

5                    (Whereupon, Plaintiff's Exhibit 15

6             was marked for identification.)

7      Q      Handing you what's been marked as

8      Plaintiff's Exhibit 15.  You seen this document

9      prior to today?

10     A      No.

11     Q      Do you know what this document is?

12     A      Yes.

13     Q      What is it?

14     A      It's an Ohio new hire reporting form.

15     Q      Have you filled out this document with

16     other employees before?

17     A      No.

18     Q      All right.  Do you see down at the bottom,

19     it says date of hire, 12/27/10?

20     A      Yes.

21     Q      Okay.  Do you have any reason to disagree

22     that you were hired on December 27, 2010?

23     A      No.

24                   (Whereupon, Plaintiff's Exhibit 16

25            was marked for identification.)

1        Q    Handing you what's been marked as

2   Plaintiff's Exhibit 16.  If you could take a moment

3   to look at that document, please, and let me know

4   when you're finished.

5        A    I'm finished.

6        Q    Have you seen this document prior to

7   today?

8        A    Yes.

9        Q    For the record, what does this document

10  appear to be a copy of?

11       A    A job description.

12       Q    Okay.  It's a job description for what

13  position?

14       A    Administrator.

15       Q    Okay.  And that was the position that you

16  were hired for?

17       A    Yes.

18       Q    Okay.  Then it says the position reports

19  to the director of operations; do you see that?

20       A    Yes.

21       Q    Who was the director of operations at the

22  time that you became employed?

23       A    Paul Gustafson.

24       Q    Okay.  How long was he the director of

25  operations during your employment?

1       A     I don't remember exactly.

2       Q     More than six months?

3       A     Probably right around there.

4       Q     Six months.  And then who became the

5    director of operations?

6       A     Barry DeRossett.

7       Q     If you can look with me to the last page

8    of the document.  It says Page 7 of 6.  Do you see

9    that?  Very last page of the document.

10      A     Yeah.

11      Q     You would agree with me that it says Page

12   7 of 6?

13      A     Yes.

14      Q     Okay.  Is that your signature on the

15   document?

16      A     Yes.

17      Q     Okay.  And it's dated 1/4/2011; do you see

18   that?

19      A     Yes.

20      Q     Is that the date it was given to you?

21      A     I don't remember.

22      Q     Okay.  When you hire into the position,

23   was there a DON in place?

24      A     Yes.

25      Q     Who was the DON?

1       A     Jane Fiely.

2       Q     Had you known Jane from working at any

3   other facility?

4       A     No.

5       Q     Okay.  Did someone provide you any type of

6   on-the-job training when you started working?

7       A     Terry did.

8       Q     Terry?

9       A     Uh-huh.

10      Q     How long did Terry provide you on-the-job

11  training?

12      A     Maybe a week.

13      Q     Why did you want to work at St. Marys?

14      A     I liked the community and I liked the

15  assisted living that the building offered.

16      Q     You liked the community.  Meaning the

17  community, the town it was in, or the community of

18  the buildings?  I mean --

19      A     The people in the community.

20      Q     The people in the community?

21      A     Yes.

22      Q     Is that a community that you've lived in?

23      A     No.

24      Q     Okay.  Well, how did you know you liked

25  the community?

1       A       I know people that work there and live

2    there that are good people.

3       Q       Okay.  So this wasn't that you were

4    unemployed and needed a job and took the first thing

5    that came along?

6       A       I was looking for another job at the time

7    this was offered.

8       Q       What job were you looking for?

9       A       I was looking for a different type of

10    opportunity.

11       Q       Like what?  Tell us.

12       A       Possibly a continuing care community,

13    something with multiple levels of beds -- bed.

14       Q       What's a continuing care facility?

15       A       That's a type of facility that offers

16    multiple levels of care under one roof.

17       Q       I mean, with the idea that someone

18    transitions or just new people are brought in and

19    put in the different levels?

20       A       With the idea that people can transition

21    under one roof without having to leave the home.

22       Q       I mean, had you interviewed for any

23    positions in that type of setting where there was

24    multiple levels?

25       A       Just the DD services.  We had multiple

1    levels of care in that system, but that was it.

2         Q    DD services, I don't know what that means?

3         A    Developmentally disabled, mental

4    retardation.

5         Q    I mean, were you interviewing for that

6    type of position?

7         A    No, actually.  Actually I was interviewing

8    for a banking position when I saw St. Marys Living

9    Center.

10        Q    What type of banking position?

11        A    As a loan officer.

12        Q    For a bank or a mortgage company or --

13        A    For a bank.

14        Q    What bank?

15        A    Chase.

16        Q    Did you put the developmental disabilities

17   job on your application?  Which one is that?

18        A    That was Champaign Residential Services.

19        Q    Okay.  Well, you indicated in the box the

20   reason for leaving that job is you went back to

21   senior health care, what does that mean?

22        A    I left DD services and went back to

23   nursing home.

24        Q    Okay.  Why is it that you wanted to go

25   into banking?

1      A    I don't -- I don't know that I want to.  I

2  have a friend that had a position open and called me

3  to interview for it.

4      Q    At Chase Bank?

5      A    Uh-huh.  Yes.

6      Q    Did you interview for the position?

7      A    Yeah.

8      Q    Were you offered the position?

9      A    No.  At that point, St. Marys Living

10  Center came open and I decided to stay with what I

11  knew.

12      Q    Okay.  Do you regret that decision?

13      A    No.

14      Q    Okay.  So when you hire into St. Marys,

15  are they leveled in any way or is it just one type

16  of facility?

17      A    They're leveled.

18      Q    They are leveled?

19      A    Yes.

20      Q    What are the different levels?

21      A    They have 50 skilled beds and 15

22  intermediate -- or 15 assisted living.

23      Q    Anything else?  Just the --

24      A    No.

25      Q    So 65 altogether?

1       A     Yes.

2       Q     That seems like a lower number than you've

3   worked with in the past; is that true?

4       A     I've had different sizes of buildings over

5   the years.

6       Q     I mean, most of the buildings you told us,

7   except the DD position, I think had a hundred beds

8   or over a hundred beds; is that true?

9       A     That's true.

10      Q     Okay.  Why did you want to go to a

11  facility that had like half of the beds that you

12  were used to?

13      A     It was a nice location.  I liked the

14  location.  It's close to my home.  Good community

15  and I felt like I had the support of people at the

16  hospital that I knew.

17      Q     Why is the support of the hospital

18  important?

19      A     Well, I think it's important when you want

20  to do business in the community that you have a good

21  relationship with the people that are going to be

22  referring you patients.

23      Q     The hospital refers to you patients; is

24  that how it works?

25      A     Yes.

1      Q    Are the patients in the skilled and

2   assisted living, are they Medicare/Medicaid

3   patients, or are they private insurance?  How does

4   that work?

5      A    In the skilled side, they're both.

6      Q    Okay.  I mean, is there a percentage

7   typically or is the majority covered by Medicare and

8   Medicaid?

9      A    I think the majority are covered by

10   Medicare and Medicaid.  There's a few private pay

11   patients here in town.

12      Q    Okay.  What about in the assisted living

13   portion?

14      A    Those were all private pay -- no, there

15   was a couple that were Medicaid.

16      Q    Okay.  Are the skilled and assisted living

17   rooms in the same building?

18      A    They're in the same building, on opposite

19   ends of the building.

20      Q    Okay.  I mean, if I'm in the assisted

21   living portion, can I walk into the skilled

22   facility?

23      A    Yes.

24      Q    And vice versa?

25      A    Yes.

1      Q    Okay.  As the administrator, did you have

2    supervisory authority over the DON?

3      A    To an extent.

4      Q    I don't understand that answer.  What does

5    that mean "to an extent"?

6      A    Well, my -- my authority over Jane or over

7    the DON was limited to day-to-day operations.

8      Q    What does that mean?

9      A    As far as making reminders or coaching

10   tips or work practices, daily work practices.

11     Q    Okay.  These daily reminders or coaching,

12   whatever you want to call them, did they have

13   anything to do with her clinical abilities, skills?

14     A    Somewhat as far as filling out the AM

15   clinical board completely, making sure that resident

16   incident/accidents are followed up on timely.

17     Q    Resident what?

18     A    Incident and accident reports.

19     Q    Are followed up timely?

20     A    Followed up, yes.

21     Q    I mean, do you provide any direct care to

22   any of the skilled residents, any residents on the

23   skilled side?

24     A    Does the facility provide?

25     Q    Do you, yourself, as an administrator?

1      A     Do I?  No.

2      Q     Do you provide any type of services

3  personally to the individuals on the unskilled side,

4  the assisted living?

5      A     Any skilled services to the assisted

6  living people?

7      Q     Yeah.  Do you provide any services to the

8  assisted living?

9      A     Occasionally I would work as a hall

10 attendant once in a while.

11     Q     Okay.  During the time that you're the

12 administrator, are the 50 beds typically filled or

13 unfilled?  Is there a certain number that you try to

14 maintain?

15     A     We try to meet a percentage basis of

16 census.  Usually 85 to 90 percent occupancy.

17     Q     Were you typically able to do that from

18 the time you become the administrator till the time

19 you leave?

20     A     Over a period of time, yes.

21     Q     This -- you talked to me earlier about

22 gathering statements about Jane's work mannerism, I

23 think, in 2011 and 2012.  Is that pursuant to some

24 type of policy or procedure?  Because I read the

25 policy and procedure book and didn't see where

1    administrator goes out and collects statements and

2    then shares them with anyone?  Is that something you

3    made up?

4        A    I was asked to do coaching and mentoring

5    for Jane, and when I sat down to meet with her a

6    couple of different times over the years, she didn't

7    understand what the problems were.

8        Q    Well, who asked you to do the coaching and

9    mentoring?

10       A    My supervisor.

11       Q    Well, who is that?  Barry?

12       A    Barry.

13       Q    Because you had two supervisors, I

14   understand, and just so we're on the same page,

15   Barry asked you to do that; is that fair?

16       A    Yes.

17       Q    Okay.

18       A    There --

19       Q    Okay.

20       A    Yes.

21       Q    Did Barry ask you in writing?  Something

22   we could look at to see his instructions?

23       A    I don't recall.

24       Q    Well, if he had put it in writing, would

25   you have saved it somewhere?  Would it be on your

1    computer?

2         A    It would be on my computer.

3         Q    Okay.  Did you search your computer for

4    any memos from Barry to you or you to Barry about

5    Jane?

6         A    No.

7         Q    Do you and Barry typically communicate by

8    phone or by computer?

9         A    By phone.

10        Q    Okay.  Do you have the ability to tape

11   your phone calls?

12        A    No.

13        Q    You said over the years.  Did he ask you

14   to do this more than twice?

15        A    I can't put an exact number, maybe two,

16   three, four times.

17        Q    Two, three, four?  So somewhere between

18   two and four?

19        A    Yeah.

20        Q    In those two to four times, do you think

21   at least one time he communicated in writing?

22        A    It's possible.

23        Q    Okay.  Did he tell you why he wanted you

24   to do this coaching, mentoring?

25        A    No.

1      Q    He didn't give you any indication it was

2  based on complaints he was receiving or anything to

3  that effect?

4      A    I was getting complaints from the staff

5  and I approached Barry.

6      Q    Okay.  So you approached Barry?

7      A    Yes.

8      Q    Okay.  And you approach him and say what?

9  Let's talk about -- you said it was two to four, so

10 let's start with the first time.  When was that?

11     A    I don't recall.

12     Q    What month?  What year?

13     A    I don't recall.

14     Q    Okay.  Well, who approached you and what

15 did they say?

16     A    As far as what again?

17     Q    Who approached you and what did they say

18 that led you to go to Barry so you could end up

19 giving Jane this coaching or mentoring?

20     A    I think the first I recall was -- the

21 first time I recall anything with Jane was with -- I

22 think it was with Shelby.

23     Q    Okay.  Just so the record's clear, when

24 you say I think it was with Shelby, are you saying

25 you know it was with Shelby --

1      A    I'm not sure.

2      Q    -- or you're guessing?

3      A    I'm not sure.  I'm not sure who it was.

4      Q    Was there ever an incident with Shelby,

5    whether it was the first, second, third, or fourth?

6      A    Yes.

7      Q    Okay.  What does Shelby do?

8      A    She's an RN.

9      Q    Okay.  And what was she complaining about?

10     A    She was complaining that Jane had yelled

11   at her and she had asked her to change a statement.

12     Q    So she was complaining that her boss

13   yelled at her?

14     A    She felt it was inappropriate and she felt

15   like she had been forced to make changes to her

16   statement.

17     Q    Okay.  Was Jane asking her to change the

18   wording of a statement that left the statement still

19   in tact as to what it was trying to convey?

20     A    She was asking her to change the statement

21   to make it seem less behaviorally or clinically

22   complex.

23     Q    Okay.  Did it have to do with a patient

24   yelling?

25     A    I would have to see the document.

1      Q    Okay.  Well, did you review that document

2   in preparation for your deposition today?

3      A    Not in detail, no.

4      Q    What does not in detail mean?  You did

5   review the document, you just didn't read it in its

6   entirety?

7      A    I read through it, but it was a lot of

8   verbiage back and forth and I don't recall the exact

9   details.

10     Q    Okay.  So did you go to Jane and talk to

11  Jane first or did you go to Barry?

12     A    I don't recall.

13     Q    Okay.  Was there anything inappropriate

14  with Jane asking Shelby to modify the words that she

15  was using?

16     A    I don't recall.

17     Q    Well, I'm just saying whatever Shelby

18  wrote, is there some sort of scope of practice that

19  doesn't allow that to be changed?

20     A    Can I see the copy of the document?

21     Q    I'm just asking from your memory.

22     A    It was -- it appeared to me to be

23  inappropriate at the time.

24     Q    Do you still feel that way today?

25     A    Yes.

1      Q    Okay.  So it was inappropriate at the time

2   and it's inappropriate as we sit here today?

3      A    Yes.

4      Q    Why do you think it's inappropriate?  I

5   mean, is it against some rule or regulation?

6      A    No.  I felt it's inappropriate because

7   it's not good nursing practice.

8      Q    Okay.  Well, given all of your years as a

9   nurse?

10     A    I'm not a nurse.

11     Q    Okay.  So what were you basing that it was

12  inappropriate nursing practice?

13     A    I believe it's inappropriate to go behind

14  someone and change their verbiage.

15     Q    Well, did she change the verbiage or did

16  she ask Shelby to change the verbiage?

17     A    I don't recall which.  I think she asked

18  Shelby to change the verbiage.

19     Q    So that's not the same as her going behind

20  and changing it, right?

21     A    Right.

22     Q    And you don't recall if you went to Jane

23  first or you went to Barry first?

24     A    No, I don't recall.

25     Q    Okay.  And then you sat down with Jane?

Page 148

1      A      Yes, I did.

2      Q      And you discussed the situation?

3      A      I told her what Shelby had said.

4      Q      No.  Did you tell her that Shelby came to

5   you and you went to Barry and that's why you were

6   having a conversation with her?

7      A      I don't recall that --

8      Q      Okay.

9      A      -- much of the detail.

10      Q      What did she say?  Put us in the

11   conversation as best you can recall.

12      A      I told Jane that Shelby had made this

13   accusation and that I asked her if it was true.  I

14   think she denied doing anything inappropriate and

15   that was it that I recall.  I told Shelby it

16   shouldn't happen again and to continue to monitor

17   it.

18      Q      Continue to monitor what?

19      A      To see if there's changes in incident

20   reports or witness statements.

21      Q      Okay.  Well, was it an incident report or

22   a witness statement?

23      A      I believe it was some type of a behavioral

24   documentation report.

25      Q      Okay.  And was -- you're telling me that

1   Jane didn't change it.  She asked Shelby to change

2   it, right?

3       A    I believe Shelby felt that she had to

4   change it based on Jane's approach.

5       Q    Okay.  You think Shelby felt.  Describe

6   the feelings.

7       A    I think Jane was yelling at Shelby and

8   I believe that Shelby changed it under duress.  My

9   impression is she felt she had to do what Jane

10  asked.

11      Q    Okay.  Did you witness any of this?

12      A    No.

13      Q    Did Shelby say that she changed it under

14  duress?

15      A    I believe that was her -- that's my

16  impression of her conversation.

17              MR. FRANKLIN:  Okay.  Why don't we

18          take like five minutes.

19              MR. GARRISON:  Okay.

20              (Whereupon, a recess was taken at

21          1:42 p.m. and resumed at 1:53 p.m.)

22  BY MR. FRANKLIN:

23      Q    The incident with Shelby, I'm not sure if

24  we put it one, two, three, four.  Do you remember

25  any other incidents?

1       A       I remember the incident with Amanda at the

2    nurses' station.

3       Q       At the nurses' station?

4       A       Yes.

5       Q       Okay.  What was the incident?

6       A       Amanda stated that Jane yelled at her

7    because a med count was off.

8       Q       What's a med count?

9       A       It's a med -- it's the transition between

10   nurses at the end of their shift and they count

11   their -- I think they just count the narcotics.

12      Q       The Schedule II?

13      A       And whatever other schedule it might be.

14      Q       You don't have any Schedule I narcotics

15   there?

16      A       I don't know.  Don't recall.

17      Q       So they do a count of the narcotics?

18      A       Yes.

19      Q       And if the count's off, what does that

20   mean?

21      A       It can mean a variety of things.

22      Q       I mean, is it important?

23      A       Yes.

24      Q       I mean, could the count being off mean

25   someone got maybe too many narcotics?

```
 1       A    That's a possibility.

 2       Q    Could be that an employee took narcotics?

 3       A    It could be.

 4       Q    Could be a resident took narcotics?

 5       A    Could be.

 6       Q    Could be resident's family took narcotics?

 7       A    Could be.

 8       Q    Could be it just wasn't counted right?

 9       A    Could be.

10       Q    Okay.  There are lots of reasons that the

11  med count could be off, right?

12       A    Yes.

13       Q    Did you witness Jane yell at Amanda?

14       A    No.

15       Q    Okay.  Did anyone witness Jane yell at

16  Amanda?

17       A    I don't recall.  I think there was someone

18  there.  I don't recall who it was.

19       Q    Well, did you get a statement from that

20  person?

21       A    I got a statement, I think, from Amanda.

22       Q    Okay.  But did you get a statement from

23  the witness?

24       A    A verbal statement, I believe.  I think it

25  might have been from a lady named -- I don't recall.
```

1      Q    Okay.  From a lady that you don't recall a

2  verbal statement?

3      A    I'd have to see the document.

4      Q    Okay.  Well, if it was a verbal statement,

5  there wouldn't be a document, would there?

6      A    I'm not sure if the time that -- I'm not

7  sure if the two times that were reported were

8  related or not.  If it's the same incident, I can't

9  recall for sure.

10     Q    Okay.  Did you ask the person that gave

11  you the verbal statement to give you a written

12  statement?

13     A    No.

14     Q    Okay.  So Jane yelled at Amanda, like, for

15  how long?

16     A    I'd have to see the report.

17     Q    I mean, did you get a sense it was an

18  hour, half an hour, five minutes, 30 seconds?

19     A    I got an impression it was significant and

20  then it -- and that it was done in front of others.

21     Q    You got that feeling from what, Amanda

22  telling you that?

23     A    Yes.

24     Q    So you sat down with Jane?

25     A    I don't recall.

1      Q    Did you go to Barry?

2      A    I don't recall.

3      Q    Well, the incident when you're coaching

4  and mentoring, wouldn't that imply that you talked

5  to Jane?

6      A    That would imply that I did.

7      Q    Okay.  Do you recall what Jane said, if

8  anything?

9      A    No, I don't.

10     Q    I mean, did she give you a different side?

11  Did she say I didn't yell at her; I might have

12  raised my voice a little bit?

13     A    I don't recall what her --

14     Q    Okay.

15     A    -- response was.

16     Q    Okay.  These incidents happened in '11

17  and '12?

18     A    I have to see the report.

19     Q    Okay.  In all of the other incidents, was

20  there ever an allegation that Jane had touched the

21  person in any way?

22     A    No.

23     Q    Okay.

24     A    Not that I recall.

25     Q    When you say not that I recall, isn't that

 1    something you would remember?

 2         A    There was a lot.

 3              MR. FRANKLIN:  Can you read back my

 4         question, please.

 5              (Whereupon, the court reporter read

 6         back the previous question.)

 7         A    I believe so.

 8         Q    Okay.  In your working environment in the

 9    facility, are you testifying that people never get

10    upset and yell at each other?

11         A    No.

12         Q    No, they don't, or no, it does happen?

13         A    I believe it does happen.

14         Q    And when it happens, are people coached?

15         A    Yes.

16         Q    I mean, do you ever raise your voice when

17    you're upset with any of the -- your employees?

18         A    No.

19         Q    Okay.  So anyone that would testify to

20    that would be lying, correct?

21         A    No, I don't raise my voice to the best of

22    my recall.

23         Q    So you may raise your voice, you just

24    don't remember?

25         A    I don't remember ever raising my voice to

1    anyone.

2         Q    Okay.  Has anyone ever raised their voice

3    to you?

4         A    Yes.

5         Q    Okay.  Whose raised their voice to you?

6         A    Employees over the years have raised their

7    voices.

8         Q    Okay.  Has anyone above your reporting

9    level ever raised their voice to you when they were

10   upset with something you've done?

11        A    Not that I recall.

12        Q    How did you and Jane get along in 2010,

13   2011, 2012?  Good working relationship?  Bad?

14        A    Jane and I really didn't have a

15   relationship.

16        Q    Okay.  What does that mean?

17        A    We didn't work closely together.

18        Q    Well, is it typical in your business that

19   the administrator and the DON would work closely

20   together?

21        A    Not always, no.

22        Q    I mean, aren't you doing the

23   administrative side of the business and the DON does

24   the clinical side of the business?

25        A    Yes.

1      Q     Okay.  Did anyone ever complain about

2   Jane's clinical skills?

3      A     Yes.

4      Q     Okay.  Who would complain about Jane's

5   clinical skills?

6      A     Other nurses.

7      Q     Okay.  Who are these other nurses?  What

8   are their names?

9      A     Gabby.

10     Q     Gabby.  What's Gabby's last name?

11     A     I think Chavarria or Chavarria.

12     Q     Can you just spell it for the record?

13     A     C-H-A-V-A-R-R-I-A, I think.

14     Q     Okay.  How many times did she complain

15   about Jane's clinical skills?

16     A     Constantly.

17     Q     Okay.  Did you then report that to Barry?

18     A     Yes.

19     Q     Okay.  To your knowledge, did he

20   investigate?

21     A     I don't know.

22     Q     Was there a particular clinical skill that

23   Gabby was complaining about or did she just complain

24   overall about Jane's clinical skills?

25     A     I can't recall a lot of specifics.  It was

1    a frequent occurrence.

2         Q    Okay.  It was a frequent and you can't

3    remember a lot of.  Just give us like one or two

4    examples.

5         A    Incident report completion.

6         Q    Incident report completion.

7         A    The --

8         Q    Well, hold on.  What does that mean?  I'm

9    sorry, I don't work in that field.

10        A    It means that when there's an incident

11   that the intervention gets put in place timely and

12   correctly and followed up.

13        Q    Okay.  So when there's an incident, the

14   report is timely?

15        A    The follow-up to the incident, the

16   corrective action is made timely.

17        Q    Okay.  Give me an example of what Gabby

18   complained of.

19        A    If there was a medication change and the

20   medication needed to be ordered or preauthorized or

21   written on the MAR, it wasn't done.

22        Q    Was that something that Gabby could have

23   done or is that something only the DON can do?

24        A    That's something that everybody can do,

25   all the nurses can do.

1       Q     Well, then, instead of complaining, why

2    didn't Gabby just do it?

3       A     She did do it.

4       Q     Okay.  So isn't that part of her job?

5       A     It could be.

6                MR. FRANKLIN:  Browns tonight.

7                MR. GARRISON:  We're in Ohio, I

8            guess.

9                MR. FRANKLIN:  Thank you, Jane.

10               (Whereupon, a discussion was held off

11           the record.)

12   BY MR. FRANKLIN:

13      Q     So Gabby would just do it?

14      A     Yes.

15      Q     That's part of her job, right?

16      A     It could have been considered part of her

17   job as well.

18      Q     So she was complaining that Jane wasn't

19   doing something that was part of her job?

20      A     The -- I think the overall impression is

21   that the things that Jane agreed to do or that were

22   a part of the DON position were not being done

23   timely or accurately.

24      Q     Okay.  What position did Gabby hold?

25      A     Gabby was -- I think was the interim

1  manager.

2      Q     Is she an RN, LPN?

3      A     She's an LPN.

4      Q     Okay.  What position did Jane hold other

5  than DON?  Is she an LPN or RN?

6      A     Jane's an RN.

7      Q     Okay.  Well, I mean, did Gabby complain to

8  your knowledge to the Ohio Board of Nursing, for

9  instance, of any of Jane's alleged clinical

10 deficiencies?

11     A     Not that I'm aware of.

12     Q     I mean, at any point did it dawn on you

13 that you had an LPN complaining about their RN DON?

14     A     Yes.

15     Q     I mean, did it come -- did you -- did the

16 thought process go through your head that maybe

17 Gabby's just complaining to complain?

18     A     The biggest portion of her complaints were

19 personality-based issues.

20     Q     Okay.  But I think we were talking about

21 clinical complaints.

22     A     Clinical, correct.

23     Q     I mean, did a resident ever complain about

24 Jane's clinical abilities?

25     A     I can't recall clinical from a resident.

1      Q    Okay.  Did a resident's family ever

2  complain about Jane's clinical skills?

3      A    They complained about her management

4  skills.

5      Q    Does that have to do anything with the

6  clinical side?  I know you want to tell me about her

7  management side.

8      A    Not that I can recall an actual clinical

9  issue, but Jane wasn't a clinical person.

10     Q    Okay.

11     A    Okay.

12     Q    If Jane was doing something outside of her

13  scope of practice or acting in a negligent manner

14  with regard to providing any type of medical

15  treatment to a resident, that could and should be

16  reported to the Ohio Board of Nursing, correct?

17     A    Correct.

18     Q    I mean, did you ever make any complaint to

19  the Ohio Board of Nursing with respect to Jane's

20  clinical skills?

21     A    No.

22     Q    All right.  Where you work now, do you

23  have a DON?

24     A    Yes.

25     Q    Are you advertising for a DON?

1        A     Yes.

2        Q     Why?  Is your DON leaving?

3        A     Our DON has left.

4        Q     Why did your -- I thought that you told me

5   that you have a DON.  Maybe I asked the question

6   wrong.  Is there currently a DON in a position?

7        A     Yes.  We have an interim DON in the

8   position.

9        Q     What happened to the prior DON?

10       A     She resigned.

11       Q     Okay.  Did she resign when you came on

12   board?

13       A     Three months later, yes.

14       Q     Okay.  Any reason related to you that she

15   resigned?

16       A     No.  She resigned to raise -- she has a

17   six-month-old child.

18       Q     Is that what she told you?

19       A     Yes.

20       Q     So the position's been filled.  Is the

21   position currently being filled by interims?

22       A     Yes.

23       Q     Is it one interim DON or have there been

24   several?

25       A     Just one.

1       Q     Okay.  Who is that?

2       A     Her name is Melissa Mills.

3       Q     Has she applied for the position?

4       A     No.

5       Q     Do you know why not?

6       A     She prefers to stay in her MDS role.

7       Q     Do you know if it has anything to do with

8  you and your personality as to why she doesn't want

9  the position permanently?

10      A     I can't speculate.  That's what she told

11  me.

12      Q     Did you ever give Jane any type of formal

13  discipline?

14      A     I believe I did one write-up once for --

15      Q     For what?

16      A     I think it was for going over labor hours.

17      Q     What does going over labor hours mean?

18      A     Just that the labor hours were very

19  significantly over budget in that two-week cycle.

20      Q     In a two-week cycle?

21      A     Over budget in that two-week period.

22      Q     Was there a reason for that?

23      A     I don't recall anything specific.

24      Q     Did you and Jane work well together in the

25  sense of running the facility?  I mean, didn't you

1   guys get the bronze award?

2        A    Yes.  We did.

3        Q    Okay.  Do you just simply point to

4   yourself as the person that was responsible for

5   that?

6        A    Only from the standpoint that I wrote

7   99 percent of it.

8        Q    Only from the standpoint you wrote

9   99 percent of it.  What does that mean?

10       A    Only that I drafted the document, that's

11  all.

12       Q    What do you mean you drafted the document?

13       A    Jane and I started to create it, and then

14  I finished it.

15       Q    No.  What document are you talking about?

16       A    It's an application.

17       Q    Okay.  So it's an application based on

18  what's going on at the facility?

19       A    Yes.

20       Q    Okay.  So the what's going on at the

21  facility has to do with both the administrative and

22  the clinical side, correct?

23       A    Exactly.

24       Q    I mean, you drafted the application --

25       A    Yes.

1      Q      -- based on what you were witnessing?

2      A      Yes.

3      Q      So you think simply because you drafted

4    the application and did apparently 99 percent of it

5    that you're responsible for the bronze award?

6      A      No.

7      Q      Not the individuals that were actually

8    doing the work?

9      A      No.  I don't feel like I'm solely

10   responsible for that, no.

11                    (Whereupon, Plaintiff's Exhibit 17

12                    was marked for identification.)

13     Q      Handing you what's been marked as

14   Plaintiff's Exhibit 17.  Have you seen this document

15   prior to today?

16     A      Yes.

17     Q      And for the record, what does this

18   document appear to be a copy of?

19     A      It's a picture of Barry, Jane, and myself

20   and the bronze award.

21     Q      In your hands?

22     A      Yes.

23     Q      What is the bronze award?

24     A      It's an entry level quality award from the

25   American Health Care Association.

Page 165

1      Q    And when you say quality, what's that
2   based on?
3      A    That particular award was based on the
4   facility's desire to build a quality system in
5   house.
6      Q    It's based on the facility's desire to
7   what?
8      A    It's based on the company -- or the
9   facility's initiative to work toward inputting a
10  quality system.
11     Q    Okay.  So I think you told me earlier in
12  order to get the gold, you had to get the silver,
13  right?
14     A    Yes.
15     Q    And in order to get the silver, do you
16  have to get the bronze?
17     A    Yes.
18     Q    Did you give Jane any evaluations while
19  she worked there?
20     A    I think so.
21     Q    Okay.
22              MR. FRANKLIN:  Did you bring your
23          set?
24              MR. GARRISON:  No.  We'll share.
25          Appreciate it.

1       Q     Handing you what was previously marked as

2   Defendants' Exhibit N, if you could take a moment to

3   look at that, please.  Have you seen this document

4   prior to today?

5       A     Yes.

6       Q     For the record, what does this document

7   appear to be a copy of?

8       A     This is a performance evaluation for Jane.

9       Q     Okay.  Was it conducted by you?

10      A     Yes.

11      Q     Okay.  Is that your signature on the

12  second page?

13      A     Yes.

14      Q     I mean, do you have some reason to doubt

15  that this is an evaluation that you gave to Jane?

16      A     No.  It's just that I'd only been there

17  for like a month and a half and I think I was -- I

18  don't recall this exact -- it's been too long ago,

19  but I'm sure I did it, so -- I see my signature on

20  here so --

21      Q     I mean if you have some reason to doubt,

22  just let us know on the record.

23      A     Okay.  No, I don't have no doubt.

24      Q     Okay.  I mean, it's your -- does your

25  handwriting appear anywhere on this document?

1        A     That's my signature, yes.

2        Q     Okay.   There was a section that you could

3    have written anything under the supplementary

4    remarks; do you see that?

5        A     Yes.

6        Q     You chose not to?

7        A     Yes.

8        Q     Okay.   Under -- there's a punctuality and

9    attendance, it says the employee was late, dash,

10   tardy and then there's the word salary; did you

11   write that?

12       A     No.

13       Q     Okay.   Do you have any reason to doubt you

14   signed this on February 11th, 2011?

15       A     No.

16       Q     It looks like you sent this -- strike

17   that.   Do you see the words at the bottom of the

18   first page that says sent to Susan and then there's

19   a date?

20       A     Yes.

21       Q     Is that your handwriting?

22       A     No.

23       Q     Whose handwriting is that, if you know?

24       A     It looks like our HR director, Claudette.

25       Q     Claudette?

Page 168

1        A     Yes.

2        Q     Are you saying that Claudette is a

3   full-time HR director?

4        A     She's full time.  She does other things as

5   well besides HR.

6        Q     Okay.  But are you saying she's the

7   full-time HR director?

8        A     Yes.

9        Q     Since when?

10       A     Since I started there.

11       Q     Do you know who Bob Huenefeld is?

12       A     Bob is our regional HR director.

13       Q     Would he know better than you as to what

14  position Claudette held?

15       A     Probably.

16       Q     Handing you what was previously marked as

17  Defendants' Exhibit O.  Have you seen this document

18  prior to today?

19       A     Yes.

20       Q     For the record, what does this document

21  appear to be a copy of?

22       A     Appears to be a performance evaluation for

23  Jane.

24       Q     Okay.  Is that your signature on Page 2,

25  Bates stamped 225?

1          A     Yes.

2          Q     Okay.  Does your handwriting appear

3     anywhere else on the document?

4          A     Just the check marks in the box.

5          Q     And you checked the box commendable; is

6     that fair?

7          A     Yes.

8          Q     Handing you what was previously marked as

9     Defendants' Exhibit P.  Have you seen what we've

10    marked as Defendants' Exhibit P prior to today?

11         A     Yes.

12         Q     And for the record, what does Defendants'

13    Exhibit P appear to be a copy of?

14         A     Performance evaluation for Jane.

15         Q     Okay.  Covering what time period?

16         A     The date of review here was February 7th

17    of 2013.

18         Q     Okay.  So what time period does the review

19    cover?

20         A     Would have covered the time period from

21    the end of the last eval. to February of 2013.

22         Q     Okay.  So this covers a one-year time

23    period approximately?

24         A     Approximately.

25         Q     So that's approximately 2012?

Page 170

1          A     Uh-huh.

2          Q     Up until --

3          A     Yes.

4          Q     -- February 7th, 2013?

5          A     Yes.

6          Q     Okay.  Does your handwriting appear
7     anywhere on the first page?

8          A     Yes.  At the top.

9          Q     Okay.  Which portion -- where's your
10    handwriting appear?

11         A     Right here.  The top of this form.

12         Q     Okay.  All of the writing is yours?

13         A     Yes.

14         Q     Okay.  Let's look at the second page.
15    Where's your handwriting appear, if it does?

16         A     I think it's the whole page except I'm not
17    sure about Number 1, if that's mine or not at the
18    top.

19         Q     Okay.  Well, can you read into the record
20    what you wrote in the second box of Number 1?
21    That's your handwriting?

22         A     Yes.

23         Q     Not the goals and accomplishments, but
24    where it says performance factors?

25         A     Yes.

1      Q     Okay.  What did you write?

2      A     In Number 2?

3      Q     Yeah -- no, Number 1.

4      A     Number 1.  Good knowledge of basic

5  systems.

6      Q     Okay.  Then what did you write in Number

7  3?

8      A     Needs to improve.  Will help by having

9  nursing stations separated.

10     Q     What's the word after separated?

11     A     Separated now.

12     Q     Okay.  What did that mean?

13     A      It was the hope that communication and

14  employee relations would improve once we broke the

15  nursing stations into two separate areas of the

16  building.

17     Q     Okay.  Why was that a thought?  Why was

18  there a thought that breaking the nursing stations

19  up would provide for better employee communication?

20     A     One, it would give an opportunity for Jane

21  to have more privacy in disciplining or talking to

22  people and it would give maybe more focus to the

23  nurses.  They wouldn't have so much noise or

24  interruptions into their --

25     Q     What do you mean more privacy to Jane when

1    she's disciplining?

2        A    Well, the way the facility was structured,

3    there was one nurse at one station, the other nurse

4    at the other, and Jane could go into those areas

5    without another nurse being right there.

6        Q    Okay.  Well, that's -- that was the

7    thought process if the areas were broken up?

8        A    And to make it more efficient for the

9    nursing staff, yes.

10       Q    Did that ever happen?

11       A    As far as did we break them into two?

12       Q    Yeah.

13       A    Yes.

14       Q    Okay.  When did that happen?

15       A    I don't remember.  Sometime maybe --

16       Q    Was it after Jane left?

17       A    No.  Maybe in the middle to early part of

18   2013.

19       Q    Okay.  Well, at the time that this

20   document was written, let's say February 7th, 2013,

21   around that time period, were the nurses' stations

22   separated at that point?  'Cause this seems to say

23   we're going to do it.

24       A    I can't exactly say, but it probably

25   happened sometime close to this date.

1      Q    Okay.

2      A    Either before or after this date.  It was

3  probably close around this time.

4      Q    Okay.  What did you write in Number 4?

5      A    Communication good.  Circulates memos.

6  Documentation good.

7      Q    Okay.  There's like a rating system, what

8  was it, one through four, one through five?  What

9  was it, if you know?

10     A    One through five on the front.

11     Q    Okay.  What did you write under Number 5?

12     A    Jane has shown marked improvement in

13  resident and staff relations.

14     Q    Okay.  And you gave her a 3.5?

15     A    Yes.

16     Q    What did you write in Number 7?

17     A    Has been educated.  Labor hours needs to

18  help, something, nursing staff accountable to leave

19  on time -- hold nursing staff accountable to leave

20  on time.

21     Q    Okay.  Has been -- start over again.

22     A    Has been --

23     Q    Has been educated in labor hours.

24     A    Hours.

25     Q    Needs to help, what's that word?

1        A     Hold.

2        Q     Hold?

3        A     -- nursing staff accountable to leave on

4   time.

5        Q     Was there some type of problem with the

6   nurses staying too long after their shift?

7        A     Yes.

8        Q     And they hadn't clocked out yet, is that

9   the problem?

10       A     That, among other things, yes.

11       Q     Okay.  Well, I'm trying to figure out what

12  this means, has been educated in labor hours, needs

13  to help hold nursing staff accountable to leave on

14  time.  Were they not leaving on time?

15       A     They were working unapproved overtime and

16  taking too long to complete admissions and not

17  getting approval from Jane ahead of time.

18       Q     Taking too long to do admissions, what

19  does that mean?

20       A     Instead of passing the admission process

21  on to the incoming nurse, they were staying and

22  finishing the admission on their own.

23       Q     But isn't that more expedient so they

24  didn't have to explain to the oncoming nurse

25  everything that they had already done by way of

1    admitting the patient?

2        A    You would think so, but not.  Because when

3    you do an admission, you do the complete forms.

4    There's certain assessments that are completed in

5    certain time ranges, and then once the nurse

6    completes those basic assessments, I can pass it off

7    to the next nurse, and she can start on a new

8    assessment process.  So to have unapproved overtime

9    is not acceptable.

10       Q    Looking at the third page, is your

11   handwriting anywhere on this page?

12       A    Yes.

13       Q    Okay.  Where is your handwriting?

14       A    At the top.

15       Q    Where it says please review nurses' notes

16   daily?

17       A    Yes.  Yes.

18       Q    Work to improve labor?

19       A    Yes.

20       Q    Is that a question mark or -- see

21   attached.  Did you attach something to this?

22       A    I don't recall if I did or didn't.  Work

23   to improve labor management.

24       Q    What's that other -- what's the other

25   words?

Page 176

1        A     That's my initial and last name.

2        Q     Why did you initial that box?

3        A     I don't know.

4        Q     Okay.  Then your handwriting is also on

5    new goals?

6        A     These are Jane's goals and I think I added

7    one, Number 4.

8        Q     Okay.  What does Number 4 say?

9        A     Set up behavior tracking sheets.

10       Q     Behavior tracking sheets.  What are

11   behavior tracking sheets?

12       A     Those are flow sheets that the nurses use

13   to document resident behaviors prior to medicating.

14       Q     Prior to what?

15       A     Medicating or prior to treating them or

16   after.  If there's an unusual behavior, it should be

17   put on a behavior flow sheet.

18       Q     And it looks like you signed this on

19   2/8/13; is that correct?

20       A     Yes.

21       Q     What are the initials after your name?

22   What does that stand for?

23       A     Nursing home administrator.

24       Q     Nursing home administrator?

25       A     Yes.

1        Q    Do you give evaluations to any other

2   employees other than Jane?

3        A    Yes.

4        Q    Okay.  Who else do you provide evaluations

5   for?

6        A    I give evaluations to the social service

7   director.

8        Q    Okay.  Who was that?  Is that still --

9        A    Lisa Inskeep.

10        Q    Inskeep?

11        A    Yeah.  Yes.

12        Q    Okay.  Anybody else?

13        A    To the activity director.

14        Q    Who is that?

15        A    Marge Luedeke.

16        Q    Okay.

17        A    To the food service supervisor.

18        Q    Okay.  Who's that?

19        A    That's Liz Miller.

20        Q    Okay.

21        A    To the maintenance person.

22        Q    Who was that?

23        A    Most recently, that position changed.  I'm

24   trying to remember the guy's name.  Pat somebody, I

25   think.  I don't think I gave him any eval.

1        Q     Who was it before Pat?

2        A     Before -- before Pat, I think it was Jerry

3   Piper.

4        Q     What happened to him?

5        A     He passed away.

6        Q     When?

7        A     Sometime last fall maybe.

8        Q     How long had he been the maintenance

9   person?

10       A     Maybe a year.

11       Q     In 2011, did the facility have an annual

12  evaluation?

13       A     I don't recall.

14             (Whereupon, Plaintiff's Exhibit 18

15             was marked for identification.)

16       Q     Handing you what's been marked as

17  Plaintiff's Exhibit 18.  Take a moment to look at

18  that, please.  Have you seen Plaintiff's Exhibit 18

19  prior to today?

20       A     Yes.

21       Q     For the record, what does Plaintiff's

22  Exhibit 18 appear to be a copy of?

23       A     Appears to be my performance evaluation

24  from 2011.

25       Q     Okay.  Would you consider this a positive

1   performance evaluation?

2        A    Yes.

3        Q    Where it says the controllables should be

4   much better for 2012, what's a controllable?

5        A    That's a group of accounts that are

6   managed on per patient, day, rate, and it's a set

7   daily budget based on patients in-house and a group

8   of supply accounts mostly.

9        Q    Did you ask Barry what he meant by the

10  controllables should be much better?

11       A    No.

12       Q    Did you know what he meant?

13       A    Yes.

14       Q    What did he mean?

15       A    He was looking for -- he was looking for

16  the results to be at budget.

17       Q    The results to be what?

18       A    At budget.

19       Q    Okay.  But overall, do you think it was a

20  positive evaluation?

21       A    Yes.

22                 (Whereupon, Plaintiff's Exhibit 19

23            was marked for identification.)

24       Q    Handing you what's been marked as

25  Plaintiff's Exhibit 19.  Have you seen this document

1   prior to today?

2       A    Yes.

3       Q    For the record, what does this document

4   appear to be a copy of?

5       A    My performance eval from 2013 -- 2012, I

6   guess.

7       Q    Covering 2012?

8       A    Yes.

9       Q    Do you consider this to be a positive

10  evaluation?

11      A    Yes.

12              MR. FRANKLIN:  Okay.  Can we take

13          like five minutes?

14              MR. GARRISON:  Sure.

15              (Whereupon, a recess was taken at

16          2:40 p.m. and resumed at 2:50 p.m.)

17              (Whereupon, Plaintiff's Exhibit 20

18          was marked for identification.)

19  BY MR. FRANKLIN:

20      Q    Handing you what's been marked as

21  Plaintiff's Exhibit 20.  If you could look at these

22  documents, please.  Have you had the opportunity to

23  look at Plaintiff's Exhibit 20?

24      A    Yes, I did.

25      Q    What are Silverchair Learning Systems?

Page 181

1    What is this?

2         A     This is an education -- on-line education

3    system that is accredited and it is recognized as a

4    kind of an industry education standard.

5         Q     Do you have a similar system that you use

6    to get your continuing education?

7         A     Yes.  Some of it, yes.

8         Q     Okay.  Is yours called Silverchair?

9         A     Yes.

10        Q     Okay.  But these are Silverchairs for

11   Jane?

12        A     Yes.

13        Q     Okay.  And if you get a certificate of

14   completion, does that evidence that you sat through

15   and completed the requirements for that particular

16   module or class?

17        A     Yes.

18        Q     Okay.  For instance, the first one looks

19   like it's the ins and outs of documentation; is that

20   fair?

21        A     Yes.

22        Q     Do you have similar Silverchairs?  Like

23   would you have the ins and outs of documentation

24   that you would have to look at and fill out?

25        A     Each position has a group that they're

1    responsible for learning.

2         Q    Okay.

3         A    Mine may have included this or may not

4    have, I don't know.

5         Q    And this is something that the employee

6    does outside of work?

7         A    Typically it's completed in the workplace,

8    but yes, you can -- you can go on-line and purchase

9    it if you care to independently.

10        Q    Well, I mean, could the employee do these

11   at home?

12        A    Yes.

13        Q    Okay.  And they wouldn't have to pay for

14   them?  The company pays for them, right?

15        A    I believe so.

16        Q    Okay.  Handing you what's been marked as

17   Defendants' Exhibit U.  If you could take some time

18   to look at that document, please.  Have you seen

19   this document prior to today?

20        A    Yes.

21        Q    For the record, what does this document

22   appear to be a copy of?

23        A    It looks like an employee memorandum on

24   labor hours --

25        Q    Okay.

1      A      -- for Jane.

2      Q      You wrote -- is this your handwriting on

3  the first page?

4      A      Yes.

5      Q      Okay.  And it's to Jane at the top and it

6  says RN DON and then it says St. Marys Number 61; do

7  you see that?

8      A      Yes.  That's not my handwriting.

9      Q      That's not your handwriting?

10     A      The St. Marys 61 isn't.

11     Q      Whose handwriting is it, if you know?

12     A      I'm not sure.

13     Q      Okay.  What is this document?  I see that

14  there's nothing filled out in the second section,

15  description of violation, any previous violations?

16  What is this?

17     A      This is just a progressive -- it's just an

18  employment memorandum for bringing issues into

19  writing.

20     Q      What is an employee memorandum?  Is it

21  discipline?

22     A      Counseling, yes.  Counseling.

23     Q      So it's documented discipline?

24     A      Yes.

25     Q      Is it a documented oral?

Page 184

1       A    Yes.

2       Q    Okay.  Is this the same as we looked at in

3    the evaluation about going over hours?

4       A    Yes.

5       Q    Okay.  On the second page, is that all

6    your handwriting except for where it may be signed

7    by Claudette Minnich -- Minnich?

8       A    Minnich.  It's mine except for the comment

9    under employee section.

10      Q    Okay.  Where it says have not received

11   labor report since June 6th?

12      A    Yes.

13      Q    What's a labor report?

14      A    That's a report that is issued by the

15   company that talks about the budgeted hours versus

16   the actual worked.

17      Q    Okay.  Well, did you have -- strike that.

18   Did Jane explain to you why she needed to see that

19   report in her opinion?

20      A    Yeah, she needs to see the report.

21      Q    Okay.  But do you -- did she explain to

22   you why?

23      A    I don't recall.

24      Q    Okay.  Under corrective action, did you

25   write Jane should have requested a copy of the labor

Page 185

1    report if needed?

2         A    Yes, I did.

3         Q    Is that what you said?

4         A    Yes.

5         Q    Okay.  And then did you write refused to

6    sign?

7         A    Yes.

8         Q    Okay.  Handing you what's been marked as

9    Defendants' Exhibit V.  Have you seen this document

10   prior to today?

11        A    Yes.

12        Q    For the record, what does this document

13   appear to be a copy of?

14        A    Appears to be an employee memorandum.

15        Q    Okay.  Is that your handwriting on the

16   first page?

17        A    Yes.

18        Q    Except for where it says St. Marys Number

19   61?

20        A    Yes.

21        Q    And this appears to be a final written

22   warning; do you see that?

23        A    Yes.

24        Q    And then if we look at the next page, it

25   says -- well, why don't you tell me what it says.

1    Jane was overheard?

2        A    Yes.  Jane was overheard yelling at a

3    nurse on Friday 7/13/12 at approximately 2:30 p.m.

4    in a patient area and in front of others.

5        Q    Okay.  And then corrective action, what

6    does that say?

7        A    Says Jane will be placed on a 30-, 60-,

8    90-, 180-day action plan to work on employee

9    relations, respect, communication, the correct way

10   to educate and train employees, improve

11   follow-through and relationships with other

12   department managers.

13       Q    Okay.  And then it's dated 7/17/12,

14   correct?

15       A    Yes.

16       Q    Where's your signature?

17       A    I didn't sign it and Jane refused to sign

18   it --

19       Q    Okay.

20       A    -- and so --

21       Q    Okay.  The last document we looked at

22   where Jane refused to sign, you wrote in the

23   section --

24       A    Right.

25       Q    -- refused to sign?

1      A     Right.

2      Q     I don't see where you wrote that on this

3   document?

4      A     I didn't.  I'm trying to remember the

5   events of that day or week, but we had a meeting

6   scheduled or the HR director was coming in and one

7   or the other did not appear for the meetings, so I

8   reviewed it with Jane and she looked at the plan and

9   didn't sign it and I didn't sign it either.

10     Q     Well, are you sure that you went over this

11  document with Jane?

12     A     No.  I think I went over the 30-day action

13  plan with her, but I can't recall for sure.

14     Q     Okay.  Looking at Defendants' Exhibit V,

15  did you ever give this document to Jane?

16     A     I don't recall for sure.

17     Q     Did you ever ask Jane to sign this

18  document?

19     A     I don't recall for sure.

20     Q     I mean, you keep testifying under oath

21  that Jane refused to sign this document, and now you

22  don't even know if Jane ever saw the document?

23     A     I think Jane saw the part that went with

24  this document.  I'm not sure if she saw this actual

25  document.

Page 188

1     Q     The part that went with the document?

2     A     The 30-, 60-, 90-day action plan itself.

3     Q     What does that look like?

4     A     It was a plan that --

5     Q     No, tell me what it physically looks like

6   because I want to ask for it.  So what do I say?

7     A     It's a three-part plan.  It's a plan that

8   has certain goals at certain time periods.

9     Q     No.  How many pages is it?  Let's start

10  there.

11    A     Two or three.

12    Q     Okay.  What's across the top?

13    A     I don't recall exact words.  I think it

14  says action plan on it somewhere.

15    Q     Okay.  And she refused to sign that?

16    A     She reviewed it and laid it down on the

17  desk.  That's the best I recall.

18    Q     Did you ask her to sign it?

19    A     I believe I did, yes.

20    Q     Or you believe you did?

21    A     I think I did.

22    Q     Did you --

23    A     I can't remember for sure.

24    Q     -- or did you not?

25    A     We were sitting there looking at the

1  documents and either Claudette had come or gone and

2  the point was not to discipline Jane, the point was

3  to get the behavior changed.

4      Q    What do you mean Claudette had come and

5  gone?

6      A    We had a time -- if I remember correctly,

7  we had a time set up to meet.  I don't know if

8  Claudette came in and then left or if Jane came in

9  and left but we did not meet that day, the three of

10 us together in the room.

11     Q    Okay.  Well, when did you write this

12 document?  Was it before or after you had this

13 alleged meeting with Jane about the performance

14 plan?

15     A    It was before, I think, but I can't recall

16 the exact date.  I can't recall what was done.

17 These were kind of simultaneously, but I don't

18 remember the exact date.

19     Q    Well, could you have drafted this document

20 after the meeting with Jane?

21     A    It's possible, but it doesn't matter since

22 she didn't sign it.

23     Q    Well, you didn't sign it either?

24     A    Right.

25     Q    Are you saying Claudette was in the room?

1   Why didn't she sign it?

2        A    Claudette was in the room with me and then

3   either Jane didn't come or Jane was there and left,

4   one of the two.  The three of us did not connect

5   that day.

6        Q    Why didn't you sign it then?

7        A    I don't want to sign something that I

8   haven't really -- I don't like to sign things that I

9   haven't given to people or that I haven't got

10  witnessed.

11       Q    That you haven't got witnessed, what does

12  that mean?

13       A    It's -- I think it's better to have things

14  signed in the presence of others when you're

15  completing it.

16       Q    So you didn't sign it because Claudette

17  wasn't there?

18       A    Well, if Jane refused to sign, which was

19  typical, then without having a witness present,

20  nothing would have been signed.

21       Q    Okay.  You said Jane didn't sign, which

22  was typical; what do you mean by that?

23       A    I mean that I think there were other

24  issues that were put in writing that Jane refused to

25  sign.

1      Q    Okay.  Well, if Jane refused to sign, I

2   see that you write in the section --

3      A    Yes.

4      Q    -- refused to sign, right?

5      A    Right.

6      Q    Okay.  And we've seen one document so far

7   that says refused to sign?

8      A    Okay.

9      Q    And now we're looking at Defendants'

10  Exhibit V, which you don't know if you gave to Jane,

11  you don't know if it was drafted before you even had

12  the meeting with Jane, and you're saying that you

13  didn't sign it because there wasn't a witness there?

14     A    I normally would sign things in the

15  presence of the people that were getting it.

16     Q    You normally would sign it in the presence

17  of --

18     A    I would normally have signed things in the

19  presence of Jane and a witness or whomever.  And --

20     Q    And what?

21     A    I don't recall.  I don't know where the

22  three-day action plan was, but I believe I handed it

23  to her and that was the part I wanted her to read.

24     Q    Okay.  Handing you what was previously

25  marked as Defendants' Exhibit Z.  Have you seen this

Page 192

1  document prior to today?

2      A    Yes.

3      Q    Is this the 30-day plan you were telling

4  us about?

5      A    Yes, this is it.

6      Q    Okay.  Well, it looks like it's a 90-day

7  plan; do you see that?

8      A    Yes, I do see that.

9      Q    Okay.  So which is correct, your testimony

10  or the document?

11     A    I gave -- I believe I handed this to Jane

12  to review and she looked at it and read it and I --

13  if I recall correctly, she said that she would try

14  to improve in these areas.

15     Q    Okay.  I want to stop you right there --

16     A    I didn't ask her to sign it.

17     Q    -- to answer my question.  Because before

18  we go forward, is the 90 day on the document the

19  truth or is the 30 day that you testified to the

20  truth?

21     A    No.  I said 30, 60, 90, that's what the

22  plan said.  It was 30, 60, 90.

23     Q    Okay.  You said you handed her a document

24  that said 30-day improvement?

25     A    I'm sorry.  It was a 30-, 60-, 90-day

1    plan, and this is it.  Time periods are on it.  And

2    I asked her to read it and to improve.

3         Q    Okay.  Well, I see on the last page that

4    you could have signed?

5         A    Yes.

6         Q    And you didn't sign it?

7         A    No.

8         Q    And where it says employee's signature,

9    you didn't write refused to sign, correct?

10        A    Correct.

11        Q    Okay.  Did you ask her to sign the

12   document?

13        A    I don't recall if I did or not.

14        Q    Did you give her a copy of the document?

15        A    Yes, I did.

16        Q    Okay.  So you had more than one copy?

17        A    I gave her a copy of the document and I

18   believe she took it with her and said she'd review

19   it or something and bring it back.  I think.  I

20   can't recall for sure.

21        Q    Well, if you look at the third page, under

22   comments, says administrator will help -- do you see

23   where I'm at?  Third page, bottom.

24        A    Yeah.

25        Q    Says administrator will help schedule, and

1   facility will pay for the cost of employee training.

2   Administrator agrees to be present at employee's

3   coaching and disciplinary actions if requested by

4   Jane.  Results of the monthly employee interviews

5   will be shared with Jane during follow-up meetings

6   to help her improve in those areas and meet

7   objectives.  Do you see that?

8        A    Yes.

9        Q    Did that ever happen?

10       A    I met with Jane several times over the

11  past couple years regarding her employment.

12       Q    I understand you're going to say -- you're

13  going to tell me something that you did in the last

14  few years, but I'm saying related to the document

15  and what I just read --

16       A    Uh-huh.

17       Q    -- did you do that?  I mean, there's some

18  action that you were --

19       A    Yes.

20       Q    -- to take?

21       A    I believe -- I believe that we sent Jane

22  to an in-service of some type or scheduled her an

23  in-service and some type of employee relations

24  program.  Other than that, I don't recall.

25       Q    So it's your testimony that she went to an

1   employee relations program or that you scheduled it

2   for her and she didn't go?  Which is it?

3        A    I don't remember.  I don't remember.  I

4   think we -- I think I -- I think I asked Barry about

5   an employee performance program and got her enrolled

6   in it.  I don't remember if she went or not.

7        Q    What do you mean you think you asked

8   Barry?  Either you did or you didn't?

9        A    I think I asked Barry for approval to pay

10  for a one-day seminar in employee relations.

11       Q    No.  Either you did or you didn't or

12  you're guessing?

13       A    I -- I think I discussed it with him.

14       Q    Does "I think" mean it happened or it may

15  have happened?

16       A    It may have happened.

17       Q    Okay.  Okay.  Now, there's something on

18  here that says the results of the monthly employee

19  interviews will be shared with Jane.  Were you

20  interviewing employees monthly about Jane?

21       A    No.  I was following up with some of the

22  employees that had posed the complaints previously.

23       Q    Okay.  Well, did you ever ask -- there's a

24  handful of employees that apparently are complaining

25  about their boss being loud, and I presume there are

1    other employees that aren't complaining; is that

2    fair?

3         A    I'm -- I'm sure it is, yes.

4         Q    Well, how many employees does Jane have

5    responsibilities for?

6         A    Approximately 50 to 60 maybe.

7         Q    Okay.  And we've got four or five

8    complaining that Jane's yelling at them?

9         A    There were more than four or five.

10        Q    Okay.  Did you catalog the monthly

11   interviews?

12        A    They were captured on an annual or

13   bi-annual employee satisfaction survey.

14        Q    Well, I think you referenced you were

15   going to do it monthly.  Did you do that?

16        A    Yes.

17        Q    Results of the monthly interviews?

18        A    I did not share the results of the monthly

19   interviews with Jane.

20        Q    Why not?

21        A    I didn't hold them consistently.

22        Q    Why not?

23        A    I think -- I think at the end -- I think

24   Jane started showing some improvement in 2013.

25        Q    In fact, you noted that on her evaluation?

1       A    I did.  Okay.  Yes, I did.  I think she --

2    I think she was making an effort and trying to do a

3    better job.  I wasn't getting the volume of

4    complaints.

5       Q    Of not raising her voice to the employees?

6    That's what she was doing better?

7       A    Yes.

8       Q    Handing you what's been marked as

9    Defendants' Exhibit W.  Have you seen this document

10   prior to today?

11      A    Yes.

12      Q    For the record, what does this document

13   appear to be a copy of?

14      A    Appears to be a copy of an employee

15   memorandum.

16      Q    It looks like it says Step 2, first

17   written warning; is that fair?

18      A    Yes.

19      Q    And you checked that box?

20      A    Yes.

21      Q    Go back to Defendants' Exhibit V.  It's

22   the one that looks like this.  It purports to be the

23   final written warning.

24      A    Yes.

25      Q    What's the date on this document?

Page 198

1          A    It looks like 7/7/12.

2          Q    And what's the date on the document that

3     we gave you marked Defendants' Exhibit W?  It's the

4     first written warning.  It's the one I just handed

5     you.

6          A    7/18/12.

7          Q    How does she get a Step 3 in the

8     progressive discipline and then a few days later get

9     a Step 2 in the discipline?

10         A    I don't think -- I don't think that this

11    discipline was presented to Jane.  I think this was

12    presented to Jane.  If I remember right, I think the

13    goal was to maybe use this 30-day action plan first,

14    and since these aren't signed or acknowledged,

15    they're not relevant in my mind.

16         Q    Well, you can say that they're not

17    relevant, but you don't unfortunately get to decide

18    and really we don't either.

19         A    Uh-huh.

20         Q    So going back to Defendants' Exhibit W, is

21    that your handwriting on the first page?  It's the

22    one that says Step 2, first written warning.  Do you

23    see that?

24         A    Yes.

25         Q    Okay.  Does your handwriting appear

1  everywhere on the document except where it says

2  St. Marys Number 61?

3      A    Yes.

4      Q    Okay.  Now look at the second page.  What

5  does this say where it says supervisor's comments?

6              (Whereupon, Susan Kreuser left the

7           room.)

8      A    This -- this offense is relating to the

9  event on 7/13/12 in patient PP's room.  Jane will

10  use a calmer approach and respectful manner in

11  dealing with employees, not addressing staffing

12  problems in resident areas and in front of therapy

13  staff and/or visitors.

14      Q    Who is PP?

15      A    I don't remember.

16      Q    Okay.  What else did you write on the

17  document under corrective action?

18      A    Jane, please re-read the Atrium Mission

19  Statement and credo.  Follow these guidelines.

20  Complete 100-day action plan.  Objectives attached.

21      Q    Where does it say, Jane, please re-read?

22      A    It doesn't.

23      Q    You just added that?

24      A    I guess I did.

25      Q    Okay.  Did you ever present this document

1  to Jane?

2      A    I don't remember.  I know I presented the

3  action plan.

4      Q    Yeah.  I know you keep saying that.  But

5  did you present this document, the one that we just

6  looked at, Defendants' Exhibit W?

7      A    I don't recall.

8      Q    Okay.  I see that you signed the document

9  allegedly on 7/18/12; do you see that?

10      A    Yes.

11      Q    And you didn't put anywhere on the

12  document refused to sign?

13      A    Right.

14      Q    And according to you, this document is not

15  relevant, correct?

16      A    Well, I think at the time I discussed the

17  situation with Bob Huenefeld, and I think he

18  suggested we do a 90-day action plan instead of a

19  memorandum.  I think.

20      Q    Are you saying there's a 30-day and a

21  90-day --

22      A    No.

23      Q    -- and 180-day action plan somewhere?

24      A    No.  This is all one plan.

25      Q    This.  Just for the record, it's

1  Defendants' Exhibit Z.  Handing you what's been

2  marked as Defendants' Exhibit X.  If you could take

3  a moment to look at that document, please.  Have you

4  seen Defendants' Exhibit X prior to today?

5       A    I've seen this before, but I don't

6  remember where I saw it at.

7       Q    Okay.  Well, it looks like it's dated

8  5/25/10 and 6/8/10, do you see that, signatures?

9       A    Yes.

10       Q    You weren't there at the time, correct?

11       A    No.

12       Q    Handing you what's been marked as

13  Defendants' Exhibit Y.  If you take a moment to look

14  at that, please.  Have you seen this document prior

15  to today?

16       A    I don't remember this, no.

17       Q    Okay.  You weren't at the facility on

18  July 22nd, 2010, correct?

19       A    No.

20       Q    Okay.  Handing you what was previously

21  marked as Defendants' Exhibit AA.  Have you seen

22  this document prior to today?

23       A    Yes.

24       Q    For the record, what does this document

25  appear to be a copy of?

1       A     It appears to be a written copy of notes

2   that I made.

3       Q     Okay.  When did you make these notes?

4       A     Sometime in November of 2011.

5       Q     Okay.  Were you doing it continuously,

6   like typing on a -- in a file or how did you take

7   these notes?

8       A     I don't recall.

9       Q     Okay.  'Cause if you look at the second

10  page, it says on November 10th, and then you have

11  something on November 6th.

12      A     These are -- these are staff issues that

13  were brought to me.  Shelby Reicher Gates is the

14  name of the nurse.  These were issues that I

15  gathered that were employee concerns with Jane.

16      Q     Okay.  I'm asking right now just

17  physically how this was created?

18      A     How this was created?  I created this from

19  notes that people had given me or verbal reports

20  that they had told me about.

21      Q     Okay.  Well, with respect to the verbal

22  reports, did you write it down somewhere other than

23  this document?

24      A     Some of it is written down and some of it

25  isn't.

1      Q    No.  The verbal reports that people would

2    give you, are they written somewhere?

3      A    I have to look at it closer.

4      Q    Okay.  Go ahead.

5      A    Some of it is written and some of it is

6    not.

7      Q    Okay.  Well, with respect to the oral

8    reports, which -- are you saying some of the oral

9    reports you wrote down and some you didn't?

10     A    Some of the oral reports -- some of the

11   oral reports -- the oral reports are written in

12   here.  The written reports, I got written reports

13   and may have summarized them here.

14     Q    Okay.  With respect to the oral reports

15   being in here, were they somewhere else first?  In

16   other words, when people are telling you, are you

17   jotting them down on scrap pieces of paper?  Are you

18   going to your computer and typing them?  What are

19   you doing?  Physically how are you creating this

20   document?

21     A    I don't remember.

22     Q    Okay.

23     A    I don't remember how I physically -- some

24   reports were in writing.  Some people came in and

25   met with me and I maybe typed it on here.  I don't

1    remember.

2           Q    Did you do it on your desktop at work?

3           A    Yes.

4           Q    Did it go through more than one version?

5    Did you go back and make changes?  I mean --

6           A    I don't remember.  I don't remember making

7    any changes, but I don't remember.  I don't

8    remember.

9           Q    Handing you what was previously marked as

10   Defendants' Exhibit BB.  Have you seen this document

11   prior to today?

12          A    Yes.

13          Q    For the record, what does this document

14   appear to be a copy of?

15          A    It's a note to a file and I had a

16   conversation with Jane about these issues.

17          Q    Did Jane ever see the document?

18          A    Yes.

19          Q    When did Jane see this document?

20          A    When I handed it to her to read.

21          Q    Did you ask her to sign it?

22          A    I don't recall.

23          Q    Did you sign it?

24          A    I -- I put my name on it.  I didn't sign

25   it, sign it.

1      Q      Well, it didn't say note to Jane, it says

2    note to file, right?

3      A      Correct.  Yes.

4      Q      And you're claiming she came in your

5    office and you handed it to her or did you find her

6    out on the floor and hand it to her?  How did this

7    happen?

8      A      No.  I asked her to come to the office and

9    I told her there were some issues that needed to be

10   addressed and I handed this to her to read and Jane

11   did improve.

12     Q      Okay.  Well, are you out on the floor

13   dealing with situations related to the patients and

14   their medical care or are you in the office most of

15   the time dealing with budgetary issues?

16     A      I do about a 50/50 blend of both.

17     Q      Uh-huh.  How about Jane, does she get to

18   do a 50/50 blend or is she out on the floor?

19     A      I -- probably 50/50 blend.

20     Q      Really?  Tell me about the 50/50.

21   What's -- let's say 50 percent she's out on the

22   floor.  What's she doing the other 50 percent of the

23   time?

24     A      She would be inputting incident and

25   accident reports or reading nursing notes.  She

1    would maybe be doing her pharmacy recommendations.

2        Q    Okay.  Well, doing nursing notes and

3    pharmacy recommendations, she can be out on the

4    floor doing that, right?  She can be at the nurses'

5    station?

6        A    Yes.

7        Q    Okay.  Do you count that as not being

8    50 percent on the floor if she's in the nurses'

9    station?

10        A    Jane normally did a lot of that from her

11   office, but you can do it wherever.  Part of it is

12   administrative work and part of it is hands on

13   working with employees and inspecting patient care.

14        Q    You don't consider that there may just be

15   a few employees that don't want to answer to their

16   boss and they want to try to get their boss in

17   trouble and they have an administrator apparently

18   that will allow them to do that?

19        A    I believe that that could be very

20   possible, but I feel like during the duration of my

21   time there, the employee comments were excessive and

22   pervasive and they got marginally better for a

23   period of time and -- but there were still comments.

24        Q    Well, by the time you fill out her

25   evaluation in February of '13, you're indicating

1    that there's improvement in those areas, correct?

2         A    Yes.

3                   (Whereupon, Plaintiff's Exhibit 21

4              was marked for identification.)

5         Q    Handing you what's been marked as

6    Plaintiff's Exhibit 21.  If you could take a moment

7    to look at that, please.  Have you seen this

8    document prior to today?

9         A    Yes.

10        Q    For the record, what does this document

11   appear to be a copy of?

12        A    It's a copy of an employee satisfaction

13   survey.

14        Q    Okay.  Is this one of the documents you

15   were using to indicate that employees may be unhappy

16   with Jane?

17        A    Yes.

18        Q    Okay.  And this is something an employee

19   can fill out without anyone knowing who's making the

20   complaint, correct?

21        A    Yes.

22        Q    Okay.  And it looks like if you look under

23   the -- maybe -- it's the third page.  It starts out

24   under the line that's blackened DON has favorites,

25   DON has favorites, DON tends to favor certain staff

1    members.  Do you see that?

2         A    Yes.

3         Q    And on the very next page, it says

4    employees are treated better due to personal

5    relationships with DON and administrator, see that?

6         A    No.  What page is that, please?

7         Q    Bates stamped 853, maybe the third full

8    complaint.

9         A    Yes, I see it.  Yes.

10        Q    And in this thing, people complain that

11   they're not getting paid enough, correct?

12        A    Correct.

13        Q    People complain the air conditioner isn't

14   working, right?

15        A    Correct.

16        Q    I mean it just seems to be a survey where

17   employees can vent without having to produce any

18   evidence or naming any names, correct?

19        A    Correct.

20        Q    Would you agree with me that this survey,

21   it says date close 6/30/12, so this would be for the

22   first half of '12?

23        A    Yes, I think so.

24        Q    First page, it says survey close date.

25        A    Yeah.

 1              (Whereupon, Plaintiff's Exhibit 22

 2         was marked for identification.)

 3    Q    You seen Plaintiff's Exhibit 22 prior to

 4  today?

 5    A    Yes.

 6    Q    For the record, what does Plaintiff's

 7  Exhibit 22 appear to be a copy of?

 8    A    The employee satisfaction survey.

 9    Q    And it looks like this was for the second

10  half of '12?

11    A    Yes.

12    Q    Is that fair?  And is it -- if an employee

13  puts a 1 or a 5, do they get to further explain

14  their answer?  Or I mean how does this work?

15    A    Well, I think, if I remember properly, it

16  was on-line and you answer questions and then you

17  had an opportunity to write comments on the bottom.

18  I can --

19    Q    Okay.  Well, let's look at the overall.

20  If something is a 4 -- the highest it can be is a 5;

21  is that correct?

22    A    Yes.

23    Q    Okay.  So it says I regularly see my

24  administrator, 4.4.  Do you see that?

25    A    Yes.

1        Q    I mean that's a good score, right?

2        A    Yes.

3        Q    I regularly see my DON, 4.2, see that on

4   the next page?

5        A    Yes.

6        Q    The administrator and the DON know my

7   name.  Do you see that?  4.7?

8        A    Yes.

9        Q    And then it goes on.  Okay.  But then some

10  people complain about how much FMLA time another

11  employee takes.  If you look on Bates stamped Page

12  858, and there's a big block that's kind of -- has

13  black on it.  Then if you look one, two, three,

14  four, five, six, seven, it says the restorative

15  nurse was on a longer FMLA than three months and

16  went back into her job.  Do you see that?

17       A    Yes.

18       Q    So people have the ability to just

19  complain about their coworkers, too, right?

20       A    Yes.

21       Q    Okay.  I just find it interesting that you

22  would hold the comments that are made by the people

23  in the survey and use those comments to try to

24  counsel your DON.  I mean, why would you use the

25  comments these people are making to counsel your DON

1   when they're just all over the place?  People

2   complain about everything.

3        A    Well, Jane is the director of nursing and

4   her activity sets the precedent for the rest of the

5   nurses and the staff in the building.

6        Q    Well, there's things in here about you

7   that aren't complimentary.

8        A    Oh, I'm sure there are.

9        Q    Does your boss hold you to task on what

10  people say about you in the survey?

11       A    I was -- I was talked to about a couple of

12  comments, yes.

13       Q    But they're comments, would you agree with

14  me, that are just made anonymously without any

15  supporting documentation or evidence, right?

16       A    I'd have to read the document here a

17  little more thoroughly.

18       Q    Okay.  Go ahead.  What's an Accu-Check?

19       A    That's a piece of equipment that checks

20  your glucose level.

21       Q    Okay.  Ultimately are you responsible for

22  making sure those work?

23       A    Me, personally?

24       Q    Yeah.  Yeah.  You're the administrator.

25       A    I'm ultimately responsible for everything

1   probably.

2        Q    My question, I think, was on this

3   document, people don't provide evidence to support

4   their complaint, correct?

5        A    Correct.

6        Q    Do you ever hold a -- probably don't know

7   the term good and welfare.  It's a union term, but

8   do you ever hold sessions where employees can

9   complain to you face to face and provide evidence?

10       A    Yes.  My door's open.

11       Q    Okay.  And when someone comes in and makes

12   that type of complaint, did you document the

13   complaint?

14       A    I follow up on it if I feel that it's

15   valid.

16       Q    Okay.  But do you document it?  I'm not

17   asking if you follow up on it.

18       A    Sometimes yes; sometimes no.  It depends.

19       Q    If you document it, would it be in the

20   legal pad?

21       A    No.

22       Q    Where would it be?

23       A    If I documented a complaint, I would ask

24   the employee to write a statement.

25       Q    Okay.  Well, where can I find the

1    statements then since you don't write them?  You

2    have the employee write them.  Where are they?

3         A    It's a verbal report.  If I took something

4    on the fly, I would maybe follow up with it verbally

5    or I might ask the employee to write the statement

6    and give it to me later.

7         Q    Okay.  But what happens to the statement?

8    Where's it at?  Where do you put them?

9         A    I don't have -- I don't know.

10        Q    I mean is there a file called employee

11   statements?

12        A    No.

13        Q    Do you put them in the employee's

14   personnel file?

15        A    Sometimes.  Sometimes they would go in a

16   personnel file.

17        Q    Okay.

18        A    Other times the issue is resolved and

19   there's no need for further follow-up.  I don't keep

20   the paper.

21        Q    You just destroy it?

22        A    I didn't keep it.  I don't know if -- what

23   HR does with them.  I don't know.

24        Q    HR has these types of files?

25        A    I don't -- whatever -- if there's a -- if

1   there's a situation where I get a complaint, if I --

2   normally standard practice is to let the person put

3   it in writing.  If they talk to me about something

4   once or twice and I follow up on it and there's

5   still an issue, then I'm going to ask for it to be

6   in writing.  If not, I would verbally correct the

7   situation and that would be it.

8        Q    Okay.  But when the employee puts this in

9   writing, you ask the employee?  Do they take it upon

10  themselves to?  Where are the writings kept?  If the

11  lawyers in the case want to read the writings, where

12  are they?

13       A    I don't know.

14       Q    Well, what's your standard practice even?

15       A    Standard practice is to -- I guess to keep

16  them in a file somewhere.

17       Q    Okay.  But what's the file called?

18       A    I don't know what the file's called.  I

19  have -- I have a file or did have a file of comment

20  cards or notes at my desk.  I don't -- once the

21  issue is resolved, I don't keep them.

22       Q    Well, you said you --

23       A    Every single letter under my door, no, I

24  don't keep them.

25       Q    The ones that you do keep, where do you

1   keep them?  What's this file that you just

2   mentioned?

3        A    They would have been in a file in my desk

4   drawer.

5        Q    Okay.  What's the file called?  I'm going

6   to write him a letter and I'm going to ask for the

7   file.  What's it called?  Do you have a little name

8   on it?

9        A    No, I don't.

10        Q    Just a file that sat in the desk drawer?

11   If there was an issue, you'd drop it in there.  If I

12   have to follow up -- is there a bunch of files in

13   it?

14        A    No.

15        Q    Just one file?

16        A    Just one file.

17        Q    What drawer did you keep it?

18        A    My lower right or left desk drawer.

19        Q    Okay.  Was the file red, green, manila

20   file?  What was it?

21        A    It was a manila file.

22        Q    Was it a hanging file?

23        A    No.  It was in a hanging file.

24        Q    Okay.  Did anyone ever ask you to look

25   through that file to see if there were complaints

1    related to Jane?

2          A     No.

3                    MR. GARRISON:  Let's go off the

4                record for a minute.

5                    MR. FRANKLIN:  Sure.

6                    MR. GARRISON:  Just take a quick

7                break.

8                    (Whereupon, a recess was taken at

9                3:45 p.m. and resumed at 3:50 p.m.)

10   BY MR. FRANKLIN:

11         Q     I'm going to hand you Plaintiff's Exhibit

12   3.

13                    THE WITNESS:  Oh, I should tell him

14                that?

15         A     Your last question, you asked me something

16   about documentation at my desk and you said did

17   anybody ask me for anything.  Is that it?

18         Q     Obviously you want to tell me something.

19   Just go ahead.  Don't worry about my question.

20         A     I'm sorry.  I scanned or gave everything

21   that I had to Matt at your firm some time ago.

22   Those are all the notes that I have is what you

23   have.  That's all.

24         Q     What do you mean you scanned?  What does

25   that mean?

1          A      Somebody asked me a few months ago for

2    copies of the documentation that was in the file,

3    which we gave them, and then they asked me if I had

4    any notes or anything else to add and that's when

5    I -- you have whatever else I had in my file.

6          Q      Did you tell anybody about those legal

7    pads?

8          A      Nobody asked me about any legal pads.

9          Q      Well, I mean did they have to come out and

10   say all notes including notes connected to legal pad

11   or spiral-bound or three-ring folders?  I mean did

12   they actually --

13         A      No.

14         Q      -- have to identify each and every way a

15   note could be kept?

16         A      Any note that I recall I would have had

17   with Jane was in that folder.  I wouldn't -- I

18   didn't have anything significant that would have

19   been added from a legal pad or from any other

20   document.

21         Q      See, with all due respect, the lawyers for

22   good or bad probably don't want to think that you're

23   saying there's nothing significant.  Significant

24   could be favorable to your side or favorable to me.

25   We'd like the document.

1      A    Anything that I did with Jane, you've

2  seen.  I haven't -- there's nothing that I know of

3  that I created or remember that isn't here that I've

4  looked at or on this table.

5      Q    No.  But at the time that they asked you,

6  let's say, to scan those documents, why didn't you

7  say I also have legal pads that may be relevant?

8      A    Because I didn't -- didn't have anything

9  on a legal pad that I remember relating to Jane.

10     Q    I understand that you remember --

11     A    I'm sorry.  I don't -- yes.

12     Q    -- but that's --

13     A    I don't -- would not have associated

14  having a notepad as having a document for her file.

15  Sorry.

16     Q    Well, after the lawyers had you scan that

17  file, at some point did you shred your legal pads?

18     A    I didn't deliberately shred anything.  I

19  threw everything -- when I cleaned my desk out,

20  anything that was there that wasn't relevant to

21  day-to-day operations or was old, I would have

22  disposed of it.  I don't recall anything specific.

23     Q    But see, you're making the assessment of

24  whether it's relevant or not.

25     A    Right.

1      Q    Correct?

2      A    Correct.

3      Q    And the legal counsel wasn't there helping

4   you because they didn't even know about it?

5      A    There was nothing -- I can't recall of

6   anything that was related to Jane at all.

7      Q    Yeah.  Okay.

8      A    Sorry.

9      Q    I've handed you what's been marked as

10   Plaintiff's Exhibit 3 and would ask you to read the

11   document.

12      A    I wrote --

13      Q    Not out loud.  Just read it to yourself.

14   Let me know when you're done.

15      A    Okay.

16      Q    Have you seen this document prior to

17   today?

18      A    Yes.

19      Q    For the record, what does this document

20   appear to be a copy of?

21      A    It appears to be a copy of a statement

22   that was taken from or written by Shelby Gates.

23      Q    Okay.  How do you know this was written by

24   Shelby?  I don't see a name on the document, do you?

25      A    No.

Page 220

1       Q     Okay.  Is this the document that you were

2   talking about where Jane yelled at Shelby and tried

3   to get her to change what was on some type of note?

4       A     Yes.

5       Q     Okay.  This is the document we were

6   talking about?

7       A     Yes.

8       Q     Okay.  Why didn't you have Shelby sign it?

9       A     I think Shelby refused or didn't want her

10  name involved.  I think she was intimidated.

11      Q     Do you think that's fair to other

12  employees that employees can make an accusation and

13  say I don't want my name used, I don't want to sign

14  the document and then you use the document as some

15  type of discipline for an employee?

16      A     Well, I didn't discipline her.  I used

17  this as a coaching tool.

18      Q     Okay.  Did Jane ever see this document?

19      A     Jane -- I believe Jane saw it, yes.  I

20  think she did see it.

21      Q     Okay.  Tell me where it's documented that

22  Jane ever saw this statement that's not signed by

23  any employee?

24      A     No, it's not.

25      Q     And not only is it not signed, it just

1   doesn't have anyone's name?

2        A     Correct.

3        Q     Doesn't even have your name as a witness?

4        A     Correct.

5        Q     Why not?  Why wouldn't you put your name

6   on there as a witness so at least we know that

7   you're the one that took the statement?

8        A     I didn't witness the event happening.

9        Q     Okay.  But you could have witnessed the

10  employee writing what happened?

11       A     I could have.  I didn't.

12       Q     Why didn't you write refused to sign on

13  this document?

14       A     I don't recall.  Let me see here.  Okay.

15  This was the 14th.  I believe that I used this as a

16  part of my employee coaching notes to Jane on

17  November 14th regarding this incident with --

18       Q     The notes that Jane never signed, right?

19       A     Correct.

20       Q     And the notes that you may or may not have

21  shown Jane?

22       A     I'm certain I handed them to Jane to

23  review.

24       Q     To keep?

25       A     She was welcome to have a copy if she

1   wished.

2       Q    Well, did you give her -- I mean, the

3   document's almost two pages long, did you expect her

4   to memorize?

5       A    No.  I can't remember if she had a copy or

6   not.  I remember her reviewing them.

7       Q    Why wouldn't you have her sign for a copy

8   so we know that she got it and she looked it over?

9       A    My -- my goal was not to penalize or

10  humiliate Jane.  My goal was to educate her that

11  this was an issue.

12      Q    Do you think you could humiliate Jane?

13      A    No.

14      Q    Okay.  Tell me what -- your version of the

15  incident that happened with Kelsey in 2013.  If

16  you're going to rely on any notes, just tell us.

17      A    Okay.  Well, is this the one we're talking

18  about with Kelsey -- Kelsey -- this is the final

19  event, I think.  Kelsey called me and --

20      Q    Called you where?

21      A    On my telephone.  On my cell phone.

22      Q    Cell phone.  Okay.

23      A    I wasn't at work.  She called me.  She was

24  upset and crying.  I asked her what was wrong.  It

25  took her a little while to get it out.  She said

1   that Jane had shoved her into a wall and she was

2   really upset.

3          Q    What's the relative age of Kelsey?

4          A    21, 22.

5          Q    What do you think the relative age of Jane

6   is?

7          A    Sixty something.

8          Q    Okay.  So Kelsey's upset and crying?

9          A    Yes.

10         Q    And it took a while for her to get it out?

11         A    Yes.

12         Q    What did she say when she finally got it

13  out?

14         A    She gave me this long story that led up to

15  the event about meatloaf and who ate in the dining

16  room and family members that were upset, and she

17  said -- she said she walked to the end of the hall

18  and met Jane coming down.  And she said, I told Jane

19  about my conversation with the family member and she

20  got angry with me, and I tried to tell her no, it

21  was her -- she told me to do what I -- was going to

22  take her to the dining room or not, and then the

23  part that was troubling to her is she said Jane put

24  her hand and pushed her into the wall and held her

25  there, which she said I broke free and she grabbed

1   me and pushed me and held me again.  That's --

2       Q    Okay.  Let's try to clarify a little bit

3   of what you just said.

4       A    Okay.

5       Q    What's management -- what's patient's

6   rights?  Is that a written document?

7       A    Yes.

8       Q    Okay.  And a patient has a right to eat

9   wherever they want?

10      A    Yes.

11      Q    And wasn't this particular patient

12  complaining that they were being forced to eat in

13  the dining room when they really wanted to eat in

14  their own room?

15      A    I don't recall if it was the patient or

16  her daughter.

17      Q    Okay.

18      A    One of them.

19      Q    Well, did you ever interview the patient?

20      A    No.

21      Q    Did you ever interview the daughter?

22      A    I called the daughter and talked with her

23  about what she overheard.  She didn't want to get

24  involved.  I think she said that she didn't see

25  anything but she heard raised voices in the hallway.

1        Q     Okay.  Did you write all that down?

2        A     I don't recall if I did or not.

3        Q     Why wouldn't you?

4        A     I don't know.  I don't recall if I wrote

5     it down or not.  I don't think so.

6        Q     Okay.  So we only have your word for it,

7     correct?

8        A     Yes.

9        Q     How did you get the daughter's phone

10    number?

11       A     I think I got it off the face sheet of the

12    chart.

13       Q     Hmmm.

14       A     You're welcome to call her, I'm sure.

15       Q     What's her name?

16       A     I don't recall, but it can be located.

17       Q     More importantly, though, did you talk to

18    the patient?

19       A     I don't recall.

20       Q     I mean, is the patient suffering from some

21    type of mental illness?  Dementia?  Alzheimer's?

22       A     I don't recall.

23       Q     Okay.  Because it was the patient -- it's

24    called the patient's rights, right?

25       A     Correct.

1  Q  It's not the patient's family's rights?

2  A  Right.

3  Q  And that's something, I presume, that you

4 as an administrator hold very seriously?

5  A  Yes, I do.

6  Q  I mean, if a patient's in your care, they

7 have certain rights, don't they?

8  A  Yes, they do.

9  Q  Okay.  And I presume that you do trainings

10 to make sure employees understand patient's rights,

11 correct?

12  A  We do via Silverchair.

13  Q  Okay.  And I would think that if an

14 employee was violating a patient's rights, you would

15 take that really seriously?

16  A  I would.

17  Q  Okay.  So does Kelsey explain to you in

18 her whatever state she was in, aggravated or crying,

19 whatever, does she explain to you that Jane was

20 discussing with her patient's rights?

21  A  I don't recall patient rights being

22 mentioned.

23  Q  Okay.  Well, you have the conversation

24 with Chelsea -- Kelsey, what's the next thing that

25 you do?

1        A     I think the -- I think the next thing I

2    did was to call Jane.

3        Q     Okay.  Did you get a hold of her?

4        A     Yes, I did.

5        Q     Okay.  What did Jane say?

6        A     I asked Jane, I said what happened between

7    you and Kelsey Friday night.

8        Q     Was this Friday that you were talking to

9    her?

10       A     No.  This was Saturday morning.

11       Q     Okay.  So what day does Kelsey call you?

12   Friday?

13       A     I think Kelsey called me at Saturday

14   morning.  I'm not sure.

15       Q     So the event takes place Saturday, and

16   Kelsey calls you -- or it takes place on Friday and

17   Kelsey calls you Saturday morning and she's still

18   crying and upset?

19       A     I think she may have tried to call me like

20   at three something in the morning.  I'm not sure.

21   But I know we finally touched base like at 10:00 in

22   the morning, something like that.

23       Q     Why are you saying that you think she

24   called you at 3:00 in the morning?

25       A     Because there was a call on my phone, on

1   my cell phone.  I got a call, and I think she may

2   have tried to call me in the early morning hours.

3        Q    Why do you say that?  Was her phone

4   number --

5        A    Oh, I don't know.

6        Q    Did she leave a message?

7        A    No, I don't know.  I don't recall.

8        Q    It could have been anyone in the world

9   that tried to call you on your cell phone?

10       A    It could have been.  You're right.

11       Q    You're just guessing?

12       A    I don't know who called me that early in

13  the morning.

14       Q    Well, did the number come up?

15       A    I don't recall for sure.

16       Q    I mean, if someone calls me in on my cell

17  phone, I look at it and I can see the number.

18       A    Yeah.

19       Q    Unless it says blocked or whatever.

20       A    Right.  I don't recall for sure.

21       Q    Okay.  So somebody tried to call you at

22  3:00, what, did you answer too late?  Did you just

23  see you missed a call?

24       A    I think it was a missed call.

25       Q    Okay.  And you're presuming that it was

1   Kelsey?

2        A    I'm not sure.

3        Q    But it could have been anyone in the

4   world?

5        A    It could have been.

6        Q    Okay.  So you have a talk with Kelsey at

7   10:00 something a.m. on Saturday, correct?

8        A    Yes.

9        Q    Okay.  And that's the first time you've

10  heard of this alleged incident?

11       A    Yes.

12       Q    Okay.  Even though ultimately there are

13  witnesses allegedly to the incident, no one informed

14  you of this incident until Saturday when Kelsey

15  calls, correct?

16       A    Yes.

17       Q    Okay.  So Kelsey goes through her --

18  you've already explained, this crying and she's

19  still upset.  Did she threaten to -- did Kelsey

20  threaten in any way to involve the authorities?

21       A    Yes.

22       Q    Okay.  Well, you left that part out.  So

23  tell us that part.

24       A    She threatened to take it to her father,

25  who I think is a policeman or detective or something

Page 230

1    on the St. Marys Police force.

2         Q    Okay.  Did that scare you in some way?

3         A    She wanted to press assault charges, and I

4    wasn't scared.  It was more, one, I didn't want to

5    involve the facility.  Two, I didn't want to do

6    anything to jeopardize Jane's nursing license, and I

7    asked her for some time to investigate and look at

8    the situation.

9         Q    Well, Kelsey's dad being a policeman, what

10   did that have to do with it?  I mean, first of all,

11   you claim that she told you that she got pushed,

12   which is battery, so did she say I'm going to press

13   charges for assault and battery?

14        A    I don't remember the battery part.  I

15   remember that she wanted to file charges --

16        Q    All right.  Let her.  Right?

17        A    -- sometime so --

18        Q    You can't keep her from filing charges,

19   right?

20        A    No, I can't.

21        Q    Okay.  And you can't keep her from going

22   to the Ohio Board of Nursing and making a complaint,

23   correct?

24        A    Correct.

25        Q    So you asked her for time to do what?

1    Investigate?

2         A    Yes.  And I asked her to come in on

3    Monday, I believe.

4         Q    Okay.  Had you ever met her father?

5         A    No.

6         Q    I mean, what makes you think he was a

7    policeman or a detective or something?

8         A    She told me he was.

9         Q    During that conversation or some other

10   time?

11        A    I think it was during that conversation.

12        Q    Okay.  So the first time you find out her

13   father may be a policeman or detective is during

14   that conversation?

15        A    I think so.

16        Q    So how does she say it to you?  She

17   doesn't just say I'm going to press charges, she

18   says I'm going to get my dad involved?

19        A    I think she said she told her father about

20   the incident and he was recommending that she press

21   charges, something along those lines.

22        Q    Okay.  Well, so she could have gone to the

23   prosecutor and pressed charges?

24        A    She could have.

25        Q    Okay.  But you asked her not to get time

1   to investigate?

2       A    Yes.

3       Q    And then you called Jane?

4       A    And then I called -- I called Jane and

5   asked her what had happened.

6       Q    Okay.  And what did she say?

7       A    Jane remembered raising her voice.

8       Q    Okay.

9       A    She said she didn't remember anything

10  about touching her.

11      Q    Okay.

12      A    And then I reported it to Barry.

13      Q    Okay.  How did you report it to Barry?  By

14  phone?  By --

15      A    By phone.

16      Q    -- computer?  When you told Barry the

17  story, did you say she threatened to get her dad

18  involved who's a policeman or detective in

19  St. Marys?

20      A    I don't know if I told him during that

21  initial conversation.  I think he found out probably

22  that following Monday.

23      Q    Well, did you tell Jane that Kelsey was

24  threatening to press charges and that her dad was a

25  policeman or a detective at St. Marys?

1      A    I don't remember.

2      Q    Well, if you were concerned about Jane,

3  which you said hold off and I'll investigate, why

4  wouldn't you tell Jane that?

5      A    I may have.  I don't remember.

6      Q    Okay.  So you have the conversation with

7  Jane.  Do you take notes?

8      A    No.

9      Q    Okay.  Then you contact Barry on that same

10 Saturday?

11     A    Yes.

12     Q    Okay.  By phone?

13     A    Yes.

14     Q    Okay.  You call his cell phone?

15     A    Yes.

16     Q    What do you say to him?

17     A    I told him that I received a report from

18 an employee that was very upset, that she claimed

19 that Jane had pinned her against a wall and held her

20 there and that she had done it in front of

21 witnesses, and that -- I think something along those

22 lines there.

23     Q    Let me stop you there.  Where did the

24 witnesses come in?  You haven't told us any part of

25 the story where anybody said there were witnesses?

1    A    When I was talking with Kelsey, I asked

2    Kelsey was there anybody else around and she said

3    yes.

4    Q    Did she name names?

5    A    Yes, she named a nurse, Jill.

6    Q    Okay.

7    A    She named Ciara.  I don't remember her

8    last name.  I think she gave the name of Darla

9    Michaels, I believe.  I don't remember.  I can't

10   remember of anything else.

11   Q    Okay.  Jill is a nurse?

12   A    Yes.

13   Q    Ciara is an STNA?

14   A    Yes.

15   Q    And what's Darla?

16   A    An STNA.

17   Q    Okay.  How old is Ciara?

18   A    20, maybe, 21.

19   Q    Same age as Kelsey?

20   A    Probably close.

21   Q    What about Darla, how old is she?

22   A    50, 55 maybe.

23   Q    What about Jill?

24   A    35, maybe, 30.

25   Q    Okay.  So in the story now when you talk

1    to Kelsey and she's upset and saying she's going to

2    go file charges or whatever, you asked her if there

3    are any witnesses and she names Jill, Ciara, and

4    Darla; is that fair?

5         A    Yes.  I think.  Yes.

6         Q    Okay.  Did you tell Barry that?

7         A    I don't know if I told him specifically

8    who they were, but I said it was in front of

9    witnesses or people who were around.

10        Q    Well, allegedly.  You hadn't talked to any

11   of the witnesses, right?

12        A    No, I hadn't.

13        Q    So we only have Kelsey's word for it?

14        A    Correct.

15        Q    Did you ask Jane if there was anyone

16   around?

17        A    I don't recall if I did or not.

18        Q    Because maybe her witnesses might have

19   differed from Kelsey naming someone like Ciara?

20        A    I asked Jane to complete a statement and

21   to write down her recollection of the event and I

22   never saw one, so I don't know.

23        Q    So what do you mean you asked Jane to

24   write a statement and you never saw it?

25        A    I asked Jane to give us a written

1   statement regarding her -- what she felt took place

2   and I don't know if there's a statement that exists,

3   but I never received one.

4        Q    Well, let's be fair, you asked Kelsey to

5   name the witnesses, right?

6        A    I asked her to put it in a statement, to

7   write a statement.

8        Q    No, I thought you told me she told you

9   Darla, Jill, and Ciara?

10       A    I think she did, but I asked her to put it

11  in writing.

12       Q    Okay.  Well, did you do that with Jane?

13  Did you ask her, name the witnesses while you're on

14  phone?

15       A    I don't recall.  I don't recall if I did

16  or not.

17       Q    Did Jane tell you when she was on the

18  phone with you that she was sick?

19       A    No.  I don't recall it.

20       Q    Well, see, there you go.  If you don't

21  recall, are you saying it didn't happen or you don't

22  have present day recollection?

23       A    I don't have present day recollection.  I

24  can't remember.

25       Q    So when was Jane scheduled to be back at

1    work next?

2         A    Probably Monday.

3         Q    Okay.  When was Kelsey supposed to be back

4    at work?

5         A    I don't know what her schedule was.

6         Q    Okay.  So what happens after you tell

7    Barry?

8         A    I think he said something about coming in

9    that next week.

10        Q    He was going to come in?

11        A    I think so, yes.

12        Q    Okay.  Anything else?  Did he say anything

13   else?  Give you any instruction?

14        A    I think he said something about calling

15   Kelsey back and let her know that we were going to

16   investigate it, something along those lines.

17        Q    Hadn't you already told Kelsey that?

18        A    Yes, I did.

19        Q    So did you say I don't need to call her

20   back, I've already told her that?

21        A    I did it.  I believe I did it anyway.  I

22   talked to Kelsey --

23        Q    So you --

24        A    -- several times.

25        Q    -- talked to her a second time?

1       A     Yes.

2       Q     Did you say you talked to Kelsey several

3    times?

4       A     Over that three- or four-day period, yes.

5       Q     Okay.  Well, tell me about the second time

6    after Barry tells you to call her back and say we're

7    investigating?

8       A     That's what I said.  I said we're

9    investigating and something -- please bring your

10   statement in Monday or as soon as you can, something

11   along those lines.

12      Q     Did you call Jane back and say I talked to

13   Barry and we're investigating?

14      A     I tried to call Jane at some point, but I

15   could not get through on her cell phone.

16      Q     No.  Did you try her as soon as you got

17   off the phone with Kelsey?

18      A     I don't remember when it was exactly, what

19   time.

20      Q     Well, was it on the Sunday?  Was it still

21   on Saturday?

22      A     I don't recall for sure.

23      Q     Well, did you talk to Kelsey the second

24   time on Saturday after you talked to Barry?

25      A     I think it was either Saturday or Sunday

1    and I don't remember which day.

2         Q    I mean, were you concerned that you didn't

3    want to get the facility involved in any type of

4    criminal action if there was?

5         A    Yes.

6         Q    Did you care about Jane?

7         A    Yes.

8         Q    So how many times over the weekend,

9    meaning Saturday and Sunday, did you talk to Kelsey?

10   We know you talked to her twice now.  Did you talk

11   to her again?

12        A    I don't think I talked to her again until

13   maybe Monday when she brought her statements in.

14        Q    Did you get the sense that here's a

15   22-year-old girl who's trying to manipulate the

16   entire facility because daddy happens to be a

17   policeman or a detective?

18             MR. FRANKLIN:  No offense, Teri.

19        A    No, I didn't get that impression.

20        Q    You didn't get that sense?

21        A    No.

22        Q    So on Monday, did you have another talk

23   with Kelsey?

24        A    On Monday, Kelsey brought in her

25   statement.

1       Q    You've told us that.

2       A    Yes.

3       Q    I asked if you talked to Kelsey.

4       A    I'm trying to remember if I talked to

5    Kelsey.  Probably briefly.  I think I let her know

6    that there would be corporate people coming in to

7    interview her.  I don't think it was for long that I

8    spoke with her, no.

9       Q    Well, you said you talked with her several

10   times in that --

11      A    To calm her down.

12      Q    -- that three- or four-day period.  To

13   calm her down?

14      A    Yes.

15      Q    Why, was she still upset on Monday?

16      A    Yes.

17      Q    Well, describe for us how she was acting

18   where you had to calm her down?

19      A    Well, she was tearful.  She was very

20   angry.  She was in shock.

21      Q    No.  No.  No.  She was in shock?

22      A    She appeared to be in shock.  She appeared

23   to be in shock.

24      Q    Uh-huh.  What -- describe for me how she's

25   angry and tearful and appears to be in shock?

1       A      She was incredulous.  She was very

2    surprised that the event happened, and she was very

3    embarrassed that it happened in front of others.

4       Q      Is that what she said to you in this

5    shocked state?  I'm going to be incredulous and I'm

6    very embarrassed that it happened in front of

7    people?

8       A      She was very embarrassed.

9       Q      No, did she say that?

10       A      She appeared -- yes, she said she was

11    embarrassed, and she appeared to be very surprised.

12       Q      Appeared to be very surprised.  Okay.

13    Describe what someone looks like when they appear to

14    be surprised, they're angry, they're in shock,

15    they're incredulous --

16       A      She said --

17       Q      -- they're embarrassed.

18       A      She said something about -- Kelsey said

19    something about she can't believe that this whole --

20    that it happened.  That was her -- I can't believe

21    that it happened.

22       Q      Well, since she was in shock, did you tell

23    her that she should get medical treatment?

24               MR. GARRISON:  Objection.

25               Argumentative.

1       Q    Since you came to the conclusion she was

2    in shock, did you recommend medical treatment?

3       A    No.

4       Q    Where did you have this conversation with

5    Kelsey where you've said she was incredulous,

6    embarrassed, shocked?  Where did that take place?

7       A    I believe it was in my office that morning

8    when she dropped off the statement.

9       Q    Okay.  Did her statement say she was

10   incredulous, embarrassed, and in shock?

11      A    I'd have to see it again.

12      Q    Did you write it anywhere?  Because I'm

13   hearing from you -- I'm hearing for the first time

14   all of these words.

15      A    Those were my impressions --

16      Q    Uh-huh.

17      A    -- of her.

18      Q    Well, did you write them down?

19      A    No.

20      Q    So they're your impressions as you

21   recall --

22      A    Yes.

23      Q    -- over a year ago?

24      A    Yes.

25      Q    Why didn't you write all of this down?

1        A     There wasn't any need to.  She had

2   written -- supplied her statement and her list of

3   who she felt overheard, and I didn't feel a need to

4   document her emotional response.

5        Q     Okay.  Or what she was saying?

6        A     I -- I was not following up on the

7   investigation.

8        Q     Okay.  Well, I mean, is that why you

9   didn't take notes because you weren't following up

10  on the investigation?

11       A     Yes.

12       Q     Okay.  Well, given that she was, in your

13  words, in shock, did she work that day?

14       A     I don't recall.

15       Q     I mean did you give her time off of work

16  given that she was in this alleged emotional state?

17       A     No.  No, I didn't.

18       Q     I mean, would you want somebody who is

19  angry and in shock and incredulous handling or

20  dealing with the patients of your facility?

21       A     No.

22       Q     So what happens next?  She gives you the

23  note around 10:00.  I forget, what time did you say

24  it was?

25       A     Sometime, I think, that morning.

1      Q    Okay.  Did you call Jane?

2      A    No, I don't believe I did.  I think I

3  called Clara -- Ciara, the STNA that may have

4  overheard it.

5      Q    You called her?

6      A    Or called for her, one of the two.  She

7  was at a JVS school that day, and I think she

8  returned the call from school.

9      Q    What's a JVS school?

10      A    It's like a joint vocational training

11  center.

12      Q    So is she a minor?

13      A    I don't know if she was 18, 19.  I don't

14  know what her age was.

15      Q    I mean, was she 17, 16, 15?

16      A    I don't recall her exact age.

17      Q    How old -- I mean, how old are people, if

18  you know, that are in JVS?  That's still like a high

19  school, right?

20      A    I don't know what her program was.

21      Q    Okay.  So you call her and she calls you

22  back?

23      A    Yes.

24      Q    Okay.  Did you document that conversation?

25      A    No.  I asked her to supply a statement of

1    what she saw or heard on that Friday afternoon.

2        Q     Did you say anything like write this

3    before you talk to Kelsey, I want to know exactly

4    what you saw?

5        A     No.

6        Q     I mean, did you give her any admonition

7    about talking to anyone else that might have

8    influenced what she wrote?

9        A     No.

10       Q     Did you ever read her statement?

11       A     Yes.

12       Q     Okay.  In her statement, did she say Jane

13   was yelling?

14       A     I don't recall.  I have to see the

15   document.

16       Q     Okay.  Did you believe everything that

17   Ciara wrote in her document?

18       A     I didn't have -- I don't remember anything

19   specific.

20       Q     Handing you what's been marked as

21   Plaintiff's Exhibit 6.  Have you seen this document

22   prior to today?

23       A     Yes.

24       Q     Do you see in the document where Ciara

25   says Jane was not yelling at Kelsey?

1      A     Yes.

2      Q     Okay.  Did Kelsey say Jane was yelling at

3  her?

4      A     Yes.

5      Q     Okay.  Did you read Jill's statement?

6      A     At one time, yes, I did.

7      Q     Did Jill say that she never saw Kelsey --

8  or Jane put her hands on Kelsey?

9      A     I don't recall the specifics.  I'd have to

10  see the document.

11     Q     Did you review these documents in

12  preparation for your deposition?

13     A     Yes.

14     Q     Okay.  So you read them this morning,

15  right?

16     A     No.

17     Q     No?

18     A     I read them a couple days ago, I think.

19     Q     What did you look at 25 minutes before we

20  started the deposition?  Different documents?

21     A     Probably more of the same.  I didn't read

22  anything that closely 25 minutes.

23     Q     Handing you what's been marked as

24  Plaintiff's Exhibit 4.

25     A     Okay.

Page 247

1      Q    Have you seen this document prior to

2  today?

3      A    Yes.

4      Q    For the record, what does this document

5  appear to be a copy of?

6      A    Appears to be a copy of Jill Roby

7  statement.

8      Q    Did you read on Page 3 where Jill says

9  then Kelsey got an attitude and said I hate this

10  place, no one tells us anything?

11      A    Yes.

12      Q    No one communicates with each other?

13      A    Yes.

14      Q    I don't know if I'll be back on Monday.

15  I'm tired of being a slave.  Did you read that?

16      A    Yes, I did.

17      Q    Do you think Jill was making that up?

18      A    I don't know if Jill was making it up.

19      Q    Well, have you known Jill to lie in the

20  past?

21      A    No.  I don't think Jill's lied in the

22  past.

23      Q    Well, Jill's an LPN, correct?

24      A    Correct.

25      Q    Did you see that Jill said on the last

1    page, she didn't hear any profanity or see any acts

2    of violence?

3         A    Yes.

4         Q    Did you ask Jill if she witnessed Jane

5    touching Kelsey?

6         A    I don't recall that, no.

7         Q    So we have Ciara saying that Jane wasn't

8    yelling, and we have Jill witnessing apparently

9    Kelsey being upset, saying she may not come to work

10   on Monday and she's tired of being a slave, but

11   nobody says in these statements that -- even Ciara,

12   that Kelsey said get your hands off of me or words

13   to those effect?

14        A    I don't know about anything other than

15   these statements.

16        Q    I mean is -- let's just say everything

17   that happened was true, and as you keep saying, Jane

18   pushed Kelsey against the wall and pinned her there,

19   is that in and of itself grounds for termination?

20        A    Well, I don't know, but with the violence

21   in the workplace rule, I think that that crosses a

22   boundary, yes.

23        Q    I mean, had Jane ever pinned you against

24   the wall?

25        A    No.

1      Q    Ever touched you?

2      A    Not in a harmful way, no.

3      Q    Okay.  Well, would she shake your hand?

4  What do you mean not in a harmful way?  What are you

5  alluding to?

6      A    I'm not alluding to anything.  I'm just

7  saying Jane's never touched me inappropriately, no.

8      Q    I mean, have you witnessed Jane pinning

9  people against the wall?

10     A    No.

11     Q    I mean, did you question in your own mind

12 just the age difference of the people involved in

13 this alleged confrontation?

14     A    No.

15     Q    Okay.  So what did you do next?  Did you

16 talk to Jane on Monday?

17     A    I don't think so.  I think I tried to call

18 her and I couldn't get through for some reason.  I

19 think at that point -- I think at that point Bob and

20 Barry came in and took over.

21     Q    Okay.  Did you talk to Jane on Monday?  I

22 know that you said you tried, but did you ever

23 get --

24     A    I don't think --

25     Q    -- through to her?

1        A     No, I don't think so.

2        Q     Were you ever made aware that Jane had

3   called off sick?

4        A     Claudette brought in a slip at some point

5   that day, but I don't remember exactly what time.

6        Q     Well, is Claudette a person that Jane

7   could call off and say that she's too sick to come

8   in?

9        A     I'd prefer it would be me directly, but

10  Claudette took the message and wrote it on a slip

11  and brought it to me.

12       Q     What do you mean you prefer it to be you?

13  You tell us that Claudette is HR?

14       A     Yeah.

15       Q     Are you saying that Jane couldn't call off

16  to HR if she's sick?

17       A     Jane can call off to HR if she were sick,

18  absolutely.  I just prefer that employees call off

19  to me directly if at all possible.

20       Q     Okay.  But I'm asking you is it grounds

21  for some type of disciplinary action if she -- Jane

22  calls off and talks to Claudette?

23       A     No.  No.

24       Q     What happens next?  Who gets there first,

25  Barry or Bob?

1          A     I don't remember.

2          Q     Does Barry or Bob conduct an

3     investigation?

4          A     I assume so.

5          Q     Were you asked to leave your office?

6          A     Yes.

7          Q     Did they use your office?

8          A     Yes.

9          Q     Well, who was in your -- was Barry and Bob

10    in your office talking to witnesses?

11         A     I assume so.  I don't know for sure.

12         Q     So you think they were both in there?

13         A     I don't know.

14         Q     I mean, what did they tell you to do?

15    Clear out?  We'll tell you when you can come back

16    and use your office?

17         A     I think that I asked if they wanted me to

18    sit in, and they said no, they preferred I didn't.

19    So I set up an office somewhere in the conference

20    room or something.  I don't remember.  I wasn't

21    really in that area much.

22         Q     Well, did they give you a list of

23    employees they wanted to talk to?

24         A     I think I did.  Yes, I think Bob asked me

25    for a list of people to talk with.

1      Q    And did you give them that list?

2      A    I think so.

3      Q    And then did you go and get that employee

4  and bring them into your office and then leave?

5      A    No.  No.

6      Q    Who got the employee?

7      A    I think they contacted them directly from

8  the names list.

9      Q    Okay, but I'm saying employees of the

10  facility working --

11      A    Yes.

12      Q    -- how would Bob or Barry contact the

13  employee?

14      A    I don't know if they called them.  I'm not

15  sure how they tried to reach them.  I don't know.

16      Q    Okay.  But you're confident they were both

17  in that room?

18      A    I know at some point they were there

19  together for a period of time, but I don't know how

20  long.

21      Q    Okay.  What days?  You told me you talked

22  to Kelsey on Monday and you described her demeanor.

23      A    I don't -- I don't remember if it was

24  Tuesday or Wednesday.  I don't remember, or both

25  days, I can't recall.

1      Q    To your knowledge, did they interview

2   employees?

3      A    I think they did, yes.

4      Q    What do you mean you think they did?  What

5   leads you to believe they did?

6      A    I saw Kelsey who came in the facility and

7   was in the office for a period of time.  I think I

8   saw Jill in the office for a while.  I think those

9   are the only two I actually saw.

10     Q    Well, did Kelsey come in with her dad or

11   did she come in by herself?

12     A    I didn't see her father in the -- I don't

13   know who he is, but I didn't see any gentleman with

14   her.

15     Q    With a uniform on?

16     A    No, I didn't see anyone like that.

17     Q    All right.  So then what happens after

18   this period of time where you think Bob and Barry

19   are talking to employees?

20     A    Then -- let's see, that was Tuesday and

21   Wednesday, I think.  I think Jane called off for

22   like three days, and then --

23     Q    No.  No.  Where are you inserting that in

24   the story?  Happened on Tuesday or Wednesday?

25     A    I'm trying to remember the next time we

1  met and I think it was on Thursday morning, I

2  believe.

3      Q    So you think on Thursday Jane called off

4  or had she called off earlier for the three days?

5      A    No.  I think on Monday she called in and

6  like she was gone for a few days.  And then the

7  next -- after Bob and Barry left, the next employee

8  meeting with Jane, I think, was on that following

9  morning after she left.

10     Q    The next employee meeting, I don't

11 understand.

12     A    Or the next time I met with Jane, I think,

13 was on that Thursday morning.

14     Q    Okay.  So is Jane in your office?

15     A    Yes.

16     Q    Anybody else in the office?

17     A    No.  I think Barry was on the speaker

18 phone.

19     Q    Now, was he on the speaker phone from the

20 minute Jane walked into the office or was there a

21 time that you and Jane had a conversation and then

22 you said I need to get Barry on the phone?

23     A    I think Jane and I talked for a few

24 minutes before we got Barry on the phone.

25     Q    Put me in the conversation where you and

1    Jane talked for a few minutes before you got Barry

2    on the phone.

3         A    I don't remember even what we talked

4    about.

5         Q    Well, did you say, did you recall touching

6    Kelsey?

7         A    No.

8         Q    Did you tell her she was going to be

9    terminated?

10        A    I don't remember if I did or not.  I don't

11   remember.

12        Q    Well, you weren't afraid to be in the room

13   with her when you told her that you were going to

14   terminate her?

15        A    I don't remember saying that she was being

16   terminated.

17        Q    Okay.  You don't remember saying it?

18        A    No.

19        Q    You just -- you don't have present day

20   recollection, but it may have happened?

21        A    I don't have present day recollection.

22        Q    But it may have happened?

23        A    I don't think so.

24        Q    But when was the decision made to

25   terminate?

Page 256

```
 1        A    I think the nearest I think is when we --
 2   I think I remember something about Jane asking Barry
 3   if I don't resign, am I going to be terminated.  I
 4   think that's it.
 5        Q    No.  When was the decision made to
 6   terminate?  Did the three of you, you and Barry and
 7   Bob have a conversation?
 8        A    I don't recall.
 9        Q    Well, so you're not going to be able to
10   tell me if you took notes of the conversation since
11   you don't remember?
12        A    I can't remember specifically.  I can't
13   remember specifically discussing it with them.
14        Q    Well, did you know that at the time that
15   Jane walked into your office that she was going to
16   be terminated?
17        A    I think I knew that that was a conclusion,
18   yes.
19        Q    Okay.  So you don't remember what you and
20   Jane talked about before you got Barry on the phone,
21   right?
22        A    No.
23        Q    Then Barry gets on the phone and what
24   happens?
25        A    I don't really remember much except I
```

1    remember there was a little bit of chitchat and then

2    I remember -- I remember Jane asking something about

3    if I'm going to resign or should I be fired.  I'm

4    not sure.  I think -- I think Jane said if I don't

5    resign, am I going to be asked to leave or be fired

6    and I think he said yes.

7         Q    Well, was Jane terminated or did she

8    resign?

9         A    I don't know.  I think she resigned.

10        Q    Well, you were in that room.

11        A    I don't --

12        Q    You're the administrator of the building,

13   right?

14        A    Right.  I don't know exactly what her

15   agreement was or if she -- I think she said that she

16   would prefer to resign.  I believe.

17        Q    When you say I don't know what her

18   agreement was, you never left your office and she

19   talked to Barry by herself, correct?

20        A    Yes.  But I think Jane -- I think Jane had

21   an employee meeting with Bob or Barry sometime

22   during that process.  I'm not sure.  I never saw any

23   information regarding that.

24        Q    No.  All I want to know is, because I

25   wasn't in the room, it was you and Jane and

Page 258

1    apparently Barry by phone, and was Jane fired or did

2    Jane resign?

3         A    I think she said I'll resign.

4         Q    Okay.  So it's your testimony she

5    resigned?

6         A    To the best of my recall, she resigned.

7         Q    Did you contest her unemployment?

8         A    I didn't, no.

9              (Whereupon, Plaintiff's Exhibit 23

10             was marked for identification.)

11        Q    Handing you what's been marked as

12   Plaintiff's Exhibit 23.  Have you seen this document

13   prior to today?

14        A    Yes, I do remember this.

15        Q    For the record, what does this document

16   appear to be a copy of?

17        A    It's an e-mail from me to Susan Kreuser.

18        Q    Okay.  It looks like -- will you start on

19   the last page.  You say, Susan, enclosed are the

20   statements I took, which may or may not have been

21   included in Jane's employee file.  Thanks.

22             Did you canvass all the employees who

23   witnessed or may have witnessed Jane's alleged

24   confrontation with Kelsey or did you only go off of

25   what Kelsey told you?

1        A    I didn't canvass really any of the

2   employees.

3        Q    Well, you got statements from employees?

4        A    Correct.  But aside from taking the

5   statements from the employees, I didn't do any

6   follow-ups.

7        Q    But you only took the statements of the

8   employees that Kelsey told you to take, that

9   witnessed the incident, correct?

10       A    Yes.  Correct.

11       Q    Did you ask those witnesses if there was

12  anyone else around?  In other words, try to find all

13  of the witnesses, not just the ones Kelsey points

14  out?

15       A    I didn't ask them anything other than to

16  produce their statements.

17       Q    Uh-huh.  Susan then sends to you what day

18  did we suspend Jane.  Why did she ask that?  I mean,

19  did you contact her and say why did you ask me

20  something like that?

21       A    Well, I pretty much say here Jane was

22  never suspended.

23       Q    Yeah.  But why did Susan, if you know,

24  presume Jane had been suspended?  Had she called you

25  and said anything?

1      A     No.  But normally whenever there's any

2  type of physical or a verbal abuse, the standard

3  practice in these facilities is to suspend the

4  person that might be involved while you're

5  investigating.

6              I didn't suspend Jane.  I did ask her to

7  come in and tell us what happened.  And I think Bob

8  tried to reach her.  Whether he was successful or

9  not, I don't know.

10      Q     You write when she did finally come in, I

11  met with her in person --

12      A     Yes.

13      Q     -- and Barry was on speaker phone?

14      A     Yes.

15      Q     She willingly resigned and said she didn't

16  feel well enough to empty out her office that day

17  but would return over the weekend; do you see that?

18      A     Yes, I do.

19      Q     All right.  So you wrote she willingly

20  resigned?  You wrote that, right?

21      A     Yes, I did.  And I feel like she resigned.

22      Q     Okay.  See you're hedging.  You feel like

23  she resigned or she did resign?  Here you write she

24  willingly resigned.

25      A     Well, when Barry asked for her

1    resignation, she said I resign.

2        Q    Okay.  Did you report this alleged

3    incident to the Ohio Board of Nursing?

4        A    No.  I don't think so.

5        Q    Okay.  Did you report this alleged

6    incident to the prosecutor?

7        A    No.

8        Q    Did Jane ever tell you that she put her

9    hands on Kelsey?

10       A    Jane couldn't tell me anything.  She

11   couldn't recall anything that happened much.  She

12   said that they had been -- they had raised their

13   voices, something along that, but when I asked her

14   if she had ever done anything to Kelsey, she

15   couldn't recall.

16       Q    Well, she said that -- she never said to

17   you that she put her hands on Kelsey?

18       A    No, she did not.

19       Q    She never said she pinned Kelsey against

20   the wall?

21       A    No.

22       Q    Who -- did anybody other than Kelsey tell

23   you she got pinned against the wall?

24       A    I believe Ciara did, the STNA that was in

25   the hallway.

Page 262

1        Q    I think that Ciara writes in the

2   second-to-last paragraph, Kelsey kept trying to

3   explain to Jane that she was just doing what she was

4   told.  Jane kept getting more and more mad.  She

5   grabbed Kelsey's shoulder and shoved her back

6   against the wall and was about five or six inches

7   away from Kelsey's face.  Was telling Kelsey that

8   she needed to get it through her head and to listen

9   to Jane.  Right after, Darla asked me to help her

10  with residents, so I left.  So according to this, it

11  looks like Ciara says that Jane shoved Kelsey once

12  into the wall, right?

13       A    Right.

14       Q    Okay.  You somehow conclude that she

15  pinned Kelsey twice into the wall, correct?

16       A    Correct.

17       Q    What's that based on?  You didn't see it,

18  so whose statement are you relying on?

19       A    That, I was relying on Kelsey's statement

20  and the fact that Jane put her hand on the employee.

21  Whether it was once or twice, once was significant.

22       Q    Did you ever get the feeling that Kelsey

23  was just setting up the agency?  In other words,

24  Jane may have touched her and she acted like Jane

25  pushed her back into the wall?

Page  263

1      A     No.

2                 MR. GARRISON:  John, just curious how

3            much on time?

4                 MR. FRANKLIN:  I don't have much

5            more.

6                 MR. GARRISON:  Okay.

7                 MR. FRANKLIN:  In fact, let's take

8            five minutes right now.

9                 MR. GARRISON:  Okay.

10                 (Whereupon, a recess was taken at

11            4:51 p.m. and resumed at 4:55 p.m.)

12   BY MR. FRANKLIN:

13      Q    Did you ever talk to Jane about retiring?

14      A    I didn't.  We talked about retirement,

15   what it would be like.  I didn't -- Jane doesn't

16   have any specific retirement plans that I know of.

17      Q    I'm sorry.  I think I asked you one

18   question.

19      A    Oh.

20      Q    Did you ever talk to Jane about

21   retirement?

22      A    Yes.

23      Q    How often?

24      A    I don't know, maybe once a year, twice a

25   year.

1    Q    Did you tell Jane that you could get her a

2  good retirement package if she left the company?

3    A    No.

4    Q    Did you have any conversations with Jane

5  related to a retirement package?

6    A    Not -- not really specifically with Jane.

7  Jane, I think, had a friend that was a nurse that

8  had some -- I don't know if she retired or quit or

9  what, but she got some kind of a settlement and I

10  think that was the conversation, something about

11  Linda Piper.

12    Q    When did that take place?

13    A    I don't remember the specifics.

14    Q    Well, was it in 2013?

15    A    Probably.

16    Q    Was it shortly before she left employment?

17    A    I don't recall the exact date.

18    Q    Were you encouraging Jane to retire?

19    A    No.  I wasn't encouraging Jane to retire.

20  I think Jane was frustrated about retirement.

21    Q    Were you frustrated about retirement?

22    A    No.  I'm too young yet.

23    Q    Did you tell Jane that you wanted to get

24  out of St. Marys because it was too stressful?

25    A    I don't recall saying that, no.

Page 265

1        Q    Did you want to replace Jane with someone

2   else as DON?

3        A    No.

4        Q    Did you ever tell her that?

5        A    Did I ever tell her I didn't want --

6        Q    That you wanted to replace her as DON?

7        A    No, I don't recall that.

8        Q    Did you tell her that you wanted a younger

9   DON?

10       A    No.

11       Q    Did you tell her that you wanted a DON

12  that was your age?

13       A    No.

14       Q    Was there anyone that you called to be a

15  DON after she lost her job?  Did you have an interim

16  DON?

17       A    I'm trying to remember who worked as an

18  interim DON.  I think it might have been Katherine

19  Klosterman.

20       Q    Was that someone you had worked with

21  before?

22       A    Yes.

23       Q    How did you get her to come and be an

24  interim DON?

25       A    She was -- she actually works in the

1   building as the MDS nurse and I think Kat agreed to

2   fill in for a while until a permanent replacement

3   could be found.  She did both jobs.

4        Q    How old is Katherine?

5        A    Katherine is probably 55, 56 maybe.

6        Q    How old are you?

7        A    52.

8        Q    So you and Katherine are about three years

9   apart?

10       A    Maybe she's 59, but probably no more than

11  59 at the most.

12       Q    Okay.  How long did she hold the position?

13       A    Probably two or three months maybe.

14       Q    Did you offer her the position full time?

15       A    No.

16       Q    Why not?

17       A    Kat loves her MDS work and she's a good

18  MDS nurse.

19       Q    Well, did you ever ask her if she wanted

20  the position or are you just making all these

21  assumptions on her behalf?

22       A    I don't recall if I ever specifically came

23  out and asked her.  I think when we asked her to be

24  the interim, at that point she probably said, okay,

25  but nothing more, would be my guess.

1      Q    Then who took over after Katherine?

2      A    Katherine knew of a person.  Her name is

3   Erika Ritenour.

4      Q    How old is she?

5      A    35 maybe.

6      Q    When you say Katherine knew of a person,

7   what do you mean by that?  She recommended her for

8   the job?

9      A    Yes, I think she did.  Oh, she thought she

10  would be a good fit with her skills that she had.

11     Q    Was she a DON somewhere else?

12     A    She was an ADON, assistant director of

13  nursing.

14     Q    Where at?

15     A    A facility in Lima.  It's a big one.  I

16  think it's -- I don't remember the name of it.

17     Q    Handing you what's been marked as

18  Plaintiff's Exhibit 7.  Have you seen this document

19  in whole or part prior to today?

20     A    Yes.

21     Q    Okay.  Which parts have you seen?

22     A    I remember this part about the list of the

23  employees involved.

24     Q    Okay.  Where did you get that list from?

25     A    I think I got the list from Kelsey.

1    Q    Okay.  You wrote over the weekend I asked

2  Jane to complete a statement, but I have not seen

3  anything yet and she called off sick today.  Do you

4  see that?

5    A    Yes.

6    Q    At any point when you see Jane, do you ask

7  her for the statement?

8    A    Well, I tried calling Jane a couple times,

9  I believe.  I could not get through on her cell

10  phone.  And I -- Bob had said that he was going to

11  call her and talk with her and get her statement, so

12  at that point I didn't pursue it any further.

13                MR. FRANKLIN:  Teri, can you read

14          back my question.

15                (Whereupon, the court reporter read

16          back the previous question.)

17    A    No.

18    Q    Handing you what's been marked as

19  Plaintiff's Exhibit 8.  Have you seen this document

20  prior to today?

21    A    Yes, but I didn't remember it until today.

22    Q    What does that mean?

23    A    I just remembered this happened.  I didn't

24  remember it the first time.  Jane is not sure if

25  she'll be well enough to be here in the a.m.  What

1   day was this?  Monday.  She said she has a doctor's

2   appointment today at 4:00 p.m.  Her home number if

3   you want to talk to her directly.  Okay.  I -- maybe

4   I did make contact at her home number.

5        Q    Why have you been telling me that you

6   weren't able to get hold of her?

7        A    Because I didn't remember talking to her.

8        Q    Okay.  But you didn't tell me you didn't

9   remember.  You said you didn't.

10       A    I don't remember talking to her and I

11  didn't remember actually getting a hold of her at

12  any number.  I tried a couple of times on different

13  phone numbers.  I don't remember us making contact.

14       Q    Okay.  So even seeing this, are you trying

15  to tell me you didn't talk to her?

16       A    I don't remember talking with her.

17       Q    Okay.  Well, I don't remember is a lot

18  different than --

19       A    Okay.

20       Q    -- I didn't talk to her.

21       A    Okay.  Well, I don't remember talking to

22  her.

23       Q    And the number that you're giving Bob is

24  her home phone number?

25       A    Yes.

1       Q     And then you said I'm giving you this

2    because her cell phone appears to be out of service.

3    What did you mean by that?

4       A     I tried calling it and I couldn't get it

5    to go through.  I don't remember.

6       Q     What do you mean you couldn't get it to go

7    through?  With the voice mail?  Didn't ring?  What

8    happened?

9       A     I don't remember.  I just know I couldn't

10   get it to go through for a period of time.

11      Q     Okay.  But how do you know the problem

12   wasn't on your end, like your cell phone was --

13      A     It could have been.  It could have been.

14   It could have been my phone.

15      Q     Handing you what was previously marked as

16   Plaintiff's Exhibit 9.  Have you seen this document

17   prior to today?

18      A     Yes.

19      Q     For the record, what does this document

20   appear to be a copy of?

21      A     It's a copy of an e-mail from myself to

22   Susan Kreuser.

23      Q     Okay.  Well, it starts out Kelsey

24   Quellhorst, STNA, called me early in the morning

25   4/20/13.  I returned her call around 10:00 a.m. the

1   next morning.  Now, when you're writing that to

2   Susan, you're telling her that Kelsey called, but

3   when you testified -- early in the morning, but when

4   you testified here earlier, you told me it could

5   have been anyone in the world?

6        A    I remember -- I thought I remembered a

7   call coming in from Kelsey in the early morning

8   hours, but I wasn't sure.

9        Q    Well, you didn't write that on this

10  document.  You didn't write I wasn't sure.  You said

11  STNA called me early in the morning.  I returned her

12  call around 10:30 a.m.

13       A    This took place on June 10th of 2013.  I

14  may have been fresher in memory on June 10th of 2013

15  than I am today.

16       Q    So we're to disregard what you said here

17  today and just go on what may be written in a

18  document from a year and a half ago?

19       A    I would say that Kelsey probably called me

20  early in the morning on 4/20.

21       Q    Okay.  In spite of what you testified here

22  today that it could have been anyone in the world?

23       A    I think I said initially it probably was

24  Kelsey, but you couldn't -- I couldn't verify her

25  phone number.

1      Q    Okay.

2      A    So I'm assuming, looking at this, it

3  probably was Kelsey.

4      Q    Looking at this document refreshes your

5  recollection that it could have been Kelsey, even

6  though you don't know whose number called you?

7      A    I don't recall.  I couldn't recall when

8  you asked me earlier if it was her that called me in

9  the early morning.  I told you I thought it was from

10  Kelsey.  I couldn't remember for sure.  And then I

11  returned her call at 10:30 the next morning and

12  that's what she told me.

13      Q    She told me Jane had grabbed her

14  physically, shoved her into the wall and held her

15  there.  When she tried to escape, Jane went after

16  her again.  She was tearful, humiliated, and angry.

17      A    Yes.

18      Q    Those are all things she said to you?

19      A    That was my impression of her demeanor

20  over the phone.

21      Q    So over the phone, you were able to

22  discern that she was humiliated?

23      A    She told me she was humiliated.

24      Q    She also told you she was angry?

25      A    No, but I could tell from the tone of her

1   voice she was very angry, and she was crying.

2       Q     Yet she was tearful?

3       A     And she was crying, yes.

4       Q     You write in the third paragraph, I then

5   immediately text Jane and asked her to call me.  She

6   did return my call that morning, and I questioned

7   her about what took place between her and Kelsey

8   late Friday afternoon.  She said that Kelsey was

9   argumentative, but Jane did not recall anything else

10  unusual about their meeting in the hallway.

11      A     Right.

12      Q     Did you expect Jane to recall a negative,

13  something that didn't happen?

14      A     No.  I just asked her what happened.

15      Q     Okay.  And she said she didn't -- nothing

16  unusual happened, correct?

17      A     She didn't recall anything specific, no.

18      Q     You write this was the last time I talked

19  with Jane prior to our final meeting.  She called

20  off to Gabby Chavarria, LPN, on Monday morning and

21  was off work due to illness Monday, Tuesday,

22  Wednesday.  Is that your recollection that she

23  called off to Gabby?

24      A     It is now.  I thought she called off to

25  Claudette, but seeing this, she probably did call

1  off to Gabby.  I don't remember exactly who she

2  called off to.

3      Q    Well, you didn't tell me that earlier.

4  You said earlier she called off to Claudette.  You

5  didn't say I think she called off to Claudette or

6  maybe she called off to Claudette.  You said she

7  called off to Claudette?

8      A    I assumed she called off to Claudette

9  because Claudette brought me the note, the call-in

10  slip.

11     Q    I mean you realize you're under oath,

12  right?

13     A    I do.

14     Q    Okay.

15     A    But I'm doing it to the best of my memory.

16     Q    Handing you what's been marked as

17  Plaintiff's Exhibit 1.  Let me know when you're

18  done.

19     A    Okay.

20     Q    Did you review this document in

21  preparation for your deposition?

22     A    I reviewed it.  I remember reading it,

23  yes.

24     Q    Okay.  Did you -- were you able to look at

25  this document during the time of the incident or are

1   you just looking at it now to refresh your

2   recollection?

3       A    I'm looking at it now to refresh my

4   recall.

5       Q    You hadn't seen it before today?

6       A    I don't -- I'm sure I must have, but I

7   don't recall it.

8       Q    Why do you think you must have?  It

9   doesn't say to you anywhere in here.

10      A    Well, I'm thinking maybe Bob reviewed this

11  at some point with me sometime.

12      Q    Are you guessing?

13      A    I'm guessing.  I don't know.  I don't

14  remember seeing this exactly.

15      Q    My only question is had you -- do you have

16  any recollection of seeing it before the lawyers may

17  have given it to you to review for today's

18  deposition?

19      A    I believe at some point I did see this

20  before today.

21      Q    Okay.  When?

22      A    I don't recall.  Sometime during those

23  three days, probably more towards the end, but I

24  don't recall for sure.

25      Q    Well, how did you get a copy of the

Page 276

1   document?  I mean, I don't see your name on it

2   anywhere.  I don't see that it was sent to you or to

3   the facility.

4        A    I don't know.  I just -- I think I read

5   this before, but I don't remember how I would have

6   gotten a copy.

7        Q    I want to go back to the previous

8   document, Plaintiff's Exhibit 9.  You have it in

9   your hand.  Why were you writing this document on

10  June 10th?

11       A    I don't know.  I don't know what I was

12  responding to.

13       Q    Well, the parts that are blacked out, did

14  those have words in them?

15       A    I don't know.

16       Q    I mean, is it --

17       A    I don't know.  It looks --

18       Q    -- like a symbol or do you recall it

19  having words up above?

20       A    I don't recall it.  I can't recall what

21  was above, if anything.  I don't know.

22       Q    Okay.  I'm just wondering why you would be

23  creating this document about a month and a half

24  after the incident?

25       A    It probably would have -- I don't know.  I

1  don't know.  I can't remember why, what this

2  specific document was for.

3      Q    Well, when you're writing the document and

4  you're saying she was tearful and humiliated and

5  angry, are you looking at another document or are

6  you just remembering the phone call or what?

7      A    I -- I -- I'm probably remembering the

8  phone call.  This is from Susan Kreuser.  I don't

9  remember what -- why she was asking me to do this.

10      Q    No, it's not from Susan.  It's to Susan.

11      A    Oh, to Susan.

12      Q    From you.

13      A    Okay.  I don't recall what initiated me to

14  send this information.

15      Q    And I'm not asking that.  I'm asking --

16  you're writing things like she was tearful,

17  humiliated, and angry.  I'm asking if you were doing

18  that from memory --

19      A    From memory.

20      Q    -- or were you looking at another

21  document?

22      A    No, that would have been from memory of

23  the phone call, I believe.

24      Q    So this entire e-mail that you're writing,

25  you're doing from memory?

1     A    Yes.

2     Q    Okay.  Even the part where you now change

3  and say this was the last time I talked with Jane

4  prior to our final meeting?  She called off to

5  Gabby, and you have Gabby's last name, on Monday

6  morning, and was off due to illness Monday, Tuesday,

7  Wednesday.  You were doing all that from memory?

8     A   I don't recall in what context this was

9  being asked of me.  I don't know if I had the file

10  in front of me, what it was for.  I don't recall

11  that time, why I put this memo together or this

12  note.

13     Q    Well, you put it together because

14  apparently Susan told you to put it together?

15     A    Apparently, but I don't know what the

16  purpose of it was for.

17     Q    Well, maybe she didn't want you to know

18  the purpose.  She just asked you to put together the

19  document?

20     A    That could be.

21     Q    Okay.  Do you recall asking her why?

22     A    No, I don't.

23           (Whereupon, Plaintiff's Exhibit 24

24           was marked for identification.)

25     Q    Handing you what's been marked as

1    Plaintiff's Exhibit 24.  Have you seen this document

2    prior to today?

3         A    When I created it.

4         Q    Okay.  Well, help me read the document.

5    It says to Claudette from

6    atrium@atriumlivingcenters.  Who is that?  Is that

7    your e-mail?

8         A    I don't know who that is from Atrium to

9    Claudette, I don't know who she's --

10        Q    Well, who's atrium@atriumlivingcenters?

11        A    I don't know who that is.

12        Q    Okay.  Well, explain to me the bottom

13   portion of the document, if you can.  Maybe you have

14   to explain it all to me at once.  Who's asking who

15   for what?

16        A    I'm sending -- I don't know.  I don't

17   know.  Maybe I asked her for a note or something.  I

18   don't know if it matters, but she called and asked

19   me --

20        Q    Well, who writes, Lorraine, I don't know

21   if it matters, but she had called and asked me to --

22   asked for me to put PTO because of the doctor taking

23   her off work for three days, bronchitis and being

24   really sick is what she said.  Who writes that?

25        A    I'm assuming it's Claudette, I guess.

1          Q     Okay.  Well, that's where I'm confused.  I

2     mean, you tell -- you tell us initially she called

3     to Claudette.  Then you say she talked to Gabby.

4     Then it looks like Claudette is telling you that she

5     actually talked to her, meaning Claudette.  So which

6     is the real testimony?

7          A     I don't know.  I don't know who Jane

8     called into for sure.  I know Claudette presented me

9     the note.  At some point, I must have heard that it

10    was Gabby she called off to.  I don't know for sure.

11         Q     Well, it doesn't say anything about Gabby

12    in this e-mail.  It says, Lorraine, I don't know if

13    it matters, but she had called and asked for me to

14    put on PTO because of the doctor taking her off work

15    for three days.  Bronchitis and being really sick is

16    what she said.  So isn't Claudette saying that Jane

17    talked to her?

18         A     That's what it appears to be.

19         Q     Then where are you getting this that she

20    talked to Gabby?

21         A     I don't know, but at some point Gabby must

22    have told me that she talked with Jane or called

23    into Jane.  Maybe she called both people.  I don't

24    know.

25         Q     Okay.  Now, on June 6th, Claudette is

1    telling you that Jane called off to her, talked

2    about the three days, talked about bronchitis and

3    talked about being really sick.  On June 10, you

4    send Susan an e-mail saying it's Gabby.

5        A    I assumed she called off to Gabby

6    evidently at the time.

7        Q    No.  You knew on the 6th she said she

8    talked to me?

9        A    I don't -- maybe she talked to both

10   people.  I don't know.

11       Q    You write to Susan, Jane called in first

12   thing Monday morning, 4/22, and she sent in or

13   dropped off a slip taking her off work the 22nd to

14   the 25th.  I tried to talk to her on the phone on

15   the weekend and again on Monday a.m., and she did

16   not return my phone message.  So you're telling

17   Susan that you weren't able to talk to Jane on

18   Monday.  Is that what you're telling her?

19       A    I don't recall talking with Jane on

20   Monday.  I don't recall.  I tried getting a hold of

21   Jane a couple times and was not successful.  Maybe

22   we touched base on Monday, but I don't remember.

23       Q    Okay.  The record's going to show that you

24   talked to her on Monday and the record's going to

25   show that Jane talked to Claudette.  Why are you

1    telling Susan -- why does it make sense in your mind

2    that she talked to Gabby and you didn't talk to her?

3                    MR. GARRISON:  Objection.  Asked and

4              answered.  Go ahead and answer if you can.

5        A    I don't -- I talked to Gabby and Claudette

6    both during that day at some point.  A note appeared

7    on my desk that Jane had called into work.  I don't

8    know who she called off to and I don't know what

9    type of illness.  It said ill.  I don't know if she

10   talked to Gabby and Claudette both that day.  I

11   don't know.

12       Q    Well, you know she talked to Claudette

13   because Claudette told you she talked to her?

14       A    This was on June 6th.

15       Q    Right.  And on June 10th you're telling

16   Susan that it was Gabby?

17       A    Well, for some reason on June 10th, I had

18   the impression it was Gabby.

19       Q    Okay.  Well, what happened between

20   June 6th and June 10th that caused you to have the

21   impression it was Gabby?

22       A    I don't know.  I don't recall anything

23   specific.

24                    MR. FRANKLIN:  Okay.  Okay.  Let's

25              take five.

1          MR. GARRISON:  Sounds good.

2          (Whereupon, a recess was taken at

3      5:29 p.m. and resumed at 5:34 p.m.)

4          (Whereupon, Plaintiff's Exhibit 25

5      was marked for identification.)

6  BY MR. FRANKLIN:

7      Q    Handing you what's been marked as

8  Plaintiff's Exhibit 25.  Have you seen this document

9  prior to today?

10     A    Yes.

11     Q    For the record, what does this document

12 appear to be a copy of?

13     A    It's an employment application.

14     Q    For who?

15     A    Erika Neimeyer.

16     Q    For what position?

17     A    Director of nursing.

18     Q    Okay.  And it looks like she was referred

19 by Katherine Klosterman?

20     A    Yes.

21     Q    Is that true?

22     A    Yes.

23     Q    Okay.  It says that she worked at

24 Cridersville Healthcare PRN, what does PRN stand

25 for?

1       A     It's kind of working just on casual pool.

2       Q     Okay.  But what does the initials PRN

3  stand for?

4       A     As needed.

5       Q     Okay.  Does she still work there, if you

6  know?

7       A     I don't know.

8       Q     Does she still have employment with Baton

9  Rouge Senior Healthcare Service, if you know?

10      A     I don't know.

11      Q     Okay.  It looks like she signed this

12 application on 4/27/13; is that fair?

13      A     (Witness nodded.)

14      Q     Do you recall when she started?

15      A     No, I don't.

16            (Whereupon, Plaintiff's Exhibit 26

17            was marked for identification.)

18      Q     Handing you what's been marked as

19 Plaintiff's Exhibit 26.  Have you seen this document

20 prior to today?

21      A     Yes.

22      Q     For the record, what does this document

23 appear to be a copy of?

24      A     A copy of Erika's resume.

25      Q     Okay.  It shows her education as James A.

285 of 287.  PageID #: 1417

1    Rhodes State College December 2010, associate's

2    degree, dash, nursing, RN, correct?

3          A    Yes.

4          Q    Where it says BL -- BLS, slash, CPR

5    certified, what does that mean?

6          A    I believe it stands for basic life

7    support, cardiopulmonary resuscitation.

8          Q    Okay.  Who checks out the employee's

9    background before they're interviewed for the job?

10         A    It would probably be me and/or Claudette,

11   the HR person.

12         Q    Did you check out Erika's background?

13         A    I don't remember if I did her references

14   or not.

15         Q    Okay.  But who checks with the State of

16   Ohio to make sure that she doesn't have any type of

17   criminal history that would preclude her from

18   working in a skilled nursing facility?

19         A    That would be HR.

20         Q    So it's somebody outside of your location

21   or are you saying it's HR meaning Claudette?

22         A    I don't know if it's Claudette or if it's

23   at a corporate level for a DON.

24         Q    You said corporate for a DON?

25         A    I'm not sure who does it.

1       Q    Was there ever any discussion about Jane

2    needing FMLA leave to cover the days that she was

3    off sick?

4       A    I don't remember hearing anything about

5    that.

6       Q    What do you remember -- what do you mean

7    you don't remember hearing?

8       A    I don't remember hearing or talking to

9    Jane about FMLA.

10      Q    Not Jane.  Was there any discussion with

11   management about Jane potentially needing FMLA leave

12   to cover the times that she was off?

13      A    No.

14      Q    No?  There was no discussion?

15      A    I don't -- not that I recall.

16      Q    Okay.  So you're saying there may have

17   been, you just don't have present day recollection?

18      A    Correct.

19           MR. FRANKLIN:  I have no further

20           questions of this witness.

21           MR. GARRISON:  Nothing here.

22           Reserved.

23           (Whereupon, the deposition was
             concluded at 5:39 p.m.)

24                      - - -

25                  _____

                    LORRAINE R. FISCHIO
                    LORRAINE R. FISCHIO

Page 287

1              C-E-R-T-I-F-I-C-A-T-E

2        I, Teri Genovese Mauro, a Notary Public in and

3   for the State of Ohio, duly commissioned and

4   qualified, do hereby certify that the within-named

5   Witness, LORRAINE R. FISCHIO was by me first duly

6   sworn to tell the truth, the whole truth and nothing

7   but the truth in the cause aforesaid; that the

8   testimony then given by her was by me reduced to

9   stenotype in the presence of said Witness,

10  afterwards transcribed upon a computer; that the

11  foregoing is a true and correct transcription of the

12  testimony so given by her as aforesaid.

13       I do further certify that this deposition was

14  taken at the time and place in the foregoing caption

15  specified and was completed without adjournment.

16       I do further certify that I am not a relative,

17  employee or attorney of any of the parties hereto,

18  or otherwise interested in the event of this action.

19       IN WITNESS WHEREOF, I have hereunto set my hand

20  and affixed my seal of office at Toledo, Ohio, on

21  this 23rd day of September, 2014.

22

23                        TERI GENOVESE MAURO
    My Commission expires        Notary Public
24  June 8, 2018.          in and for the State of Ohio

25