# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

Jane Fiely.                                      Case No. 3:13CV2005

    Plaintiff

  v.                                              **ORDER**

Essex Healthcare Corp., et al,

    Defendant

This is a suit under the Family Medical Leave Act (FMLA), 29 U.S.C. § 601, *et seq.*, and Ohio's Age Discrimination in Employment Act (ADEA), O.R.C. §§ 4112.02(A), (N), 4112.99.

Plaintiff Jane Fiely is a former Director of Nursing for the defendants, who operate a nursing home in St. Mary's, Ohio. She alleges that defendants fired her in violation of the ADEA and retaliated against her for exercising her FMLA rights.

Pending is defendants' motion for summary judgment. (Doc. 35). For the reasons that follow, I grant the motion.

## Background

Plaintiff Jane Fiely, born in 1950, began working as Director of Nursing at the St. Mary's facility on February 16, 2005.[1] Her immediate supervisor was the administrator of the St. Mary's

---

[1] Plaintiff did not work continuously for defendants. On July 23, 2010, she quit by failing to report to work on successive days. Not having replaced her by September, the defendants asked plaintiff, then sixty years old, to return to work, and she did so on September 20, 2010.

facility. Plaintiff was also under the supervision of Atrium's Regional Director of Clinical Services, Barry DeRossett, who oversaw clinical operations at multiple facilities.[2]

Defendants maintained a disciplinary policy stating, *inter alia*, "unacceptable conduct may result in suspension pending an investigation for discharge." "Unacceptable conduct" included "failure to follow the Company's Professional Standards of Conduct." Those Standards, in turn, prohibited "engaging in violent or threatening behavior of any kind."

In December, 2010, Lorraine Fischio, who was born in 1961, became St. Mary's' Administrator and thus plaintiff's direct supervisor. In February, 2011, DeRossett became Regional Director of Operations, which meant he had overall operational responsibility for several facilities, including St. Mary's, and was Fischio's direct supervisor.

Initially Fischio and plaintiff had a "very good" relationship. Fischio's first two annual evaluations described plaintiff's performance as "commendable."

In 2012, however, Fischio notified DeRossett that she had received complaints from St. Mary's employees that plaintiff yelled at staff in the hallway and disciplined staff in inappropriate places. Fischio counseled plaintiff about such conduct.

In Fischio's 2013 evaluation of plaintiff, she concluded plaintiff was "Meet[ing] Expectations." Fischio also noted plaintiff "has shown marked improvement in resident [and] staff relations."

A Spring, 2013, Ohio Department of Health (ODH) annual compliance inspection and survey at St. Mary's informed DeRossett of issues with plaintiff's performance. In early April, 2013, Fischio reported to DeRossett that plaintiff had yelled at other employees in a hallway. DeRossett

---

[2] DeRossett later became Director of Operations.

2

visited St. Mary's on April 18, 2013, and met with plaintiff to discuss her behavior and performance. He addressed the reports of plaintiff's yelling at staff in the hallways, her performance and behavior during the ODH survey, and his general concern about her performance.

In response, plaintiff said that Fischio did not want her at St. Mary's. DeRossett and plaintiff then discussed how plaintiff and Fischio could better work together.

According to plaintiff, she also told DeRossett that Fischio had spoken to her several times about possible retirement and offered her a retirement package. But plaintiff did not, during that discussion, express concerns that she was encountering age-based discrimination.[3]

On Saturday, April 20, Kelsey Quellhorst, a Nursing Aide, notified Fischio that, during the preceding evening, plaintiff had confronted Quellhorst in the hallway after receiving a complaint from a patient's family. Quellhorst said plaintiff had become angry and pushed her into a wall and held her there. When Quellhorst broke free, plaintiff grabbed her, pushed her again, and restrained her again.

After the incident, and before she left work Friday evening, Quellhorst had placed a statement about the incident under the door to Fischio's office. In the statement, Quellhorst reported:

---

[3] In her opposition to defendants' motion for summary judgment, plaintiff refers to these and other statements she attributes to Fischio as "ageist." For purposes of this opinion, I accept, without deciding, the accuracy of those attributions and that they manifested impermissible age-related bias on Fischio's part.

That does not matter, however, because the record conclusively shows that other managers – DeRossett and Bob Huenefeld, as I discuss below – were the decision-makers. Thus, even if Fischio were antagonistic toward plaintiff on the basis of age, she simply did not play a role, much less a dispositive role, in the decision to fire plaintiff. There is no evidence in the record that Fischio's views had any influence on either Huenefeld or DeRossett. To be sure, plaintiff claims that Fischio "handpicked" those whom she interviewed – but plaintiff does not present *evidence* as to what others might have said that would have supported her version of the incident.

at approximately 5:30 p.m. on 04/19/2013 … [plaintiff] began yelling at me and was invading my personal space. She continued to raise her voice and yell at me while coming even closer to my face and proceeded by grasping my right shoulder very firmly and pushing me back into the wall. [And had] yelled at me for quite a few minutes. When I finally jerked my shoulder to get her hand off of me and starting walking away when [sic] she [plaintiff] grabbed my shoulder again to yell at me more.

The statement also identified other employees, including "Jill R., Ciara M. . . . and Darla," as witnesses.

After talking with Quellhorst, Fischio called plaintiff to notify her about Quellhorst's report. Fischio asked plaintiff to write a statement detailing her version of events. Fischio also notified DeRossett about Quellhorst's report and asked St. Mary's employees Jill Roby, Ciara McConn, Darla Micheal, Elizabeth Miller, and Deanna Kirkpatrick to provide written statements about the incident.

Plaintiff called in sick on the following Monday, April 22nd. She went to her doctor, who diagnosed her with sinusitis, prescribed her medication, and instructed her not to work for two more days. Plaintiff told St. Mary's she would be out through April 24th and return to work on April 25th. She provided a doctor's note to St. Mary's.

In the meantime, DeRossett notified Susan Kreuser, Atrium's Vice President of Human Resources, about Quellhorst's report of her confrontation with plaintiff. Kreuser, in turn, contacted Atrium's Regional Director of Human Resources, Bob Huenefeld, who had operational responsibility for St. Mary's. Kreuser asked Huenefeld, born in 1943, to investigate the incident.

Huenefeld had written statements from Quellhorst, Roby, McConn, Micheal, Miller, and Kirkpatrick. In addition, he reviewed Quellhorst's personnel file and went to St. Mary's to interview Quellhorst, Roby, McConn, and plaintiff.

4

Quellhorst told Huenefeld that plaintiff had grabbed her shoulder and pushed her back into the wall, and, as she turned to leave, grabbed her shoulder again. Roby told Huenefeld that she did not see plaintiff grab Quellhorst, but she was not present for the entire incident. McConn told Huenefeld that plaintiff shoved Quellhorst, having put her hand on Quellhorst's shoulder with enough force to push her into the wall.

Because plaintiff was not at work, Huenefeld called her to obtain her side of the story. At the outset, he explained the reason for his call and asked if they could meet in person to discuss the incident. Plaintiff said she was sick and could not meet in person, but could talk on the phone.

According to plaintiff, she read Huenefeld a written statement she had prepared about the incident. Plaintiff asserts she told Huenefeld she did not touch Quellhorst during the incident. Plaintiff did not give that or any other written statement to Huenefeld or anyone else at St. Mary's.

On April 24, Huenefeld sent a memorandum to Kreuser, DeRossett, and Fischio summarizing the information he had gathered and stating his findings and conclusions. Huenefeld found that plaintiff had grabbed Quellhorst twice and, in doing so, had handled that situation in an unprofessional manner. The memo recommended discipline up to and including discharge.[4]

---

[4] Plaintiff contends that the defendants' investigation of the incident was a "cat's paw," designed to conceal their unlawful motive in firing plaintiff. I disagree. Plaintiff asserts, *inter alia*, that the defendants had a duty to obtain an "independent" investigator. They cite nothing in support of that unique contention. They claim Huenefeld's inquiries were incomplete, but point only to the failure to interview residents as being meaningful in that regard. It was not necessary for him to do so. She faults DeRossett (and, by implication, Huenefeld) for relying on information from Fischio, but points to nothing that Fischio provided that was not something that Fischio was simply relaying from others.

At bottom, this was a typical "he said/she said" situation where a non-witness, high-level manager, as to whom plaintiff has attributed no improper motive, conducted the investigation he thought necessary. While with hindsight one may identify imperfections in the investigation (though I do not), plaintiff has not shown that the investigation was a sham, much less that it in any way

DeRossett made the decision to fire plaintiff. In making this decision, DeRossett considered the information from Huenefeld's investigation, the written statements employees submitted, and the discussion he had had with plaintiff the day before the incident. DeRossett did not consider plaintiff's age during his decision-making process. He also took into consideration the fact that Fischio had counseled plaintiff previously about her conduct toward other employees.

DeRossett told Fischio he had decided to fire plaintiff before notifying plaintiff.

Plaintiff returned to work on April 25, 2013, and met with Fischio in person and DeRossett by phone. They told her she was being fired because she "was accused of hitting an aide."

In the interim between plaintiff's firing and the hiring of a replacement Director of Nursing, St. Mary's installed Katherine Klosterman, born in 1979, in the position. In June, 2013, the defendants appointed Erika Niemeyer as plaintiff's replacement.

## Discussion

A party is entitled to summary judgment on motion under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323.

Once the movant meets that initial burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986). Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

---

manifested or sought to cover up age discrimination.

In deciding a motion for summary judgment, I accept the non-movant's evidence as true and construe all evidence in the non-movant's favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

### A. ADEA Claim

For purposes of this opinion, I accept plaintiff's contention that she has made out a *prima facie* case of age discrimination: she was well within the protected class, able to perform her assigned duties, lost her job, and a person outside the protected class replaced her.

The issue is, therefore, whether plaintiff could persuade a rational trier of fact that the reason defendants gave for their decision – its finding plaintiff treated Quellhorst in an unprofessional (and unacceptable) manner – was pretext for concealing age discrimination.

Given the investigation – and despite plaintiff's arguments about its insufficiencies, which I have found unpersuasive – that underlay the decision, plaintiff could not meet that burden. There simply is no evidence that Fischio's age-based animus (which I accept as existing for purposes of this decision) influenced either Huenefeld or DeRossett. To be sure, it was Fischio's job to let plaintiff know about the decision; but, in doing so, and in doing so in DeRossett's telephonic company, she was simply conveying a decision that others had made.

There is one aspect of this case that bears additional note: plaintiff was the Director of Nursing – an important position in any healthcare facility. While a company might forgive an altercation between two lower-level employees of equal status, a company may well view a supervisor's mistreatment of a subordinate with less tolerance.

I conclude, therefore, that plaintiff has not shown the existence of a genuine issue of material fact respecting her ADEA claim.

7

### B. FMLA Retaliation Claim

The key issue on the retaliation claim is whether defendants knew that plaintiff's absence for five days manifested an exercise of plaintiff's FMLA rights. If they did not know that such was the case, plaintiff cannot attribute a retaliatory motive to their decision to fire her when she returned.

To retaliate is to act intentionally. *See, e.g.*, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 187, 173-74 (2005) ("Retaliation is, by definition, an intentional act."). And intent requires knowledge or reason to know. *See, e.g.*, Restatement (Second) of Torts § 8A, Comment b (1965) ("If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.").

Plaintiff's opposition papers miss the mark on this score. She cites cases establishing a low threshold for triggering a *request* for FMLA leave, so that practically anything indicative of a desire or need for time off due to illness puts an employer on notice that the employee is exercising her rights under the FMLA. *See, e.g.*, *Wolf v. Antonio Sofo & Son Importing Co.*, 919 F. Supp. 2d 916, 922, 927 (N.D. Ohio 2012).

Once an employer knows or should have known that an employee is asking in advance for FMLA leave and denies the request, interferes with the right to exercise such leave, or retaliates in response to such request, the employee has made out a *prima facie* case. *Id.* at 926-27.

But those cases are immaterial and irrelevant under the facts of this case. Plaintiff did not refer to the FMLA at any time during the time she was home sick. That fact, alone, is not enough to require the employer to inquire about, much less authorize FMLA leave. *Brown v. The Pension Bds.*, 488 F. Supp. 2d 395, 409 (S.D.N.Y. 2007) (mere absence from work insufficient to put employer on notice that plaintiff was exercising FMLA rights).

In other words, an employee who wants FMLA leave before taking time off is in a different situation than plaintiff here.

In circumstances like this, where an employee is absent due to illness – especially for such a brief period – the employee, on return to work or even while absent, must do something to put the employer on notice that she wants, or is taking, FMLA credit. *See Brohm v. JH Props., Inc.*, 149 F.3d 517, 523 (6th Cir. 1998) ("While the employee need not actually mention the FMLA by name, the critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition."); *cf. Avila-Blum v. Casa de Cambio Delgado, Inc.*, 519 F. Supp. 2d 423, 427-28 (S.D.N.Y. 2007) (denying summary judgment on FMLA retaliation claim where employee was not merely out sick, but had "communicat[ed] with Defendants over the several months prior to her absence").

Plaintiff did not do so. She simply said nothing about the FMLA until after she lost her job. She gave the defendants no reason for understanding that she wanted such credit. Being off sick, without more, was insufficient to put defendants on notice she was requesting FMLA leave. *See Collins v. NTN-Bower Corp.*, 272 F.3d 1006, 1008 (7th Cir. 2001); *Brown*, *supra*, 488 F. Supp. 2d at 409.

Thus, plaintiff cannot make out a *prima facie* case of FMLA retaliation.

Moreover, even if plaintiff had made out a *prima facie* case, she has, as already noted, introduced no evidence from which a reasonable jury could find that defendants' stated reason for firing her was a pretextual. For that reason, too, defendants are entitled to summary judgment.

**Conclusion**

Plaintiff has not shown that a genuine factual dispute exists with respect to either of her claims.  She has failed to show that a reasonable jury could find the reason defendants gave for firing her was a pretext for either age discrimination or their retaliation for exercising her FMLA rights, or that she has made out a prima facie case under the FMLA.

It is, accordingly,

ORDERED THAT defendants' motion for summary judgment (Doc. 53) be, and the same hereby is granted.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge